**Lesson 1**
**Introduction**

**Lesson 2**
**Good Faith Handling**

**Lesson 3**
**Medical**

**Lesson 4**
**Control File Handling**

**Lesson 5**
**Suit Handling Motions**

**Lesson 6**
**ClaimIQ Litigation Tab**

**Lesson 7**
**Defense Counsel Billing Procedures**

**Lesson 8**
**Fatality Claim Handling**

**Appendix**

CONFIDENTIAL!

# Lesson One
# Introduction to GEICO Claims
# Continuing Unit Manual

CONFIDENTIAL

## Objectives:

1. Understand and adhere to the classroom rules of conduct and Continuing Unit (CU) guidelines.
2. Identify and comprehend key elements of the job functions and tasks of the CU Claims Examiner.
3. Discuss career development and personal growth within GEICO.
4. Review and understand the GEICO Claims Department Mission Statement.

# Welcome!

Congratulations on successfully passing Preparatory School within your region and welcome to the second phase of your CU training, Central Liability School. Before we begin the training process, we will take some time to meet your trainers, talk about the Claims Home Office Training and Education Department, and learn something new about each other.

Your training class will be a combination of classroom discussion, practice exercises, tests, live practice (role plays), and live application which will last one week. You are here to learn and since we work as a team, we will allow each other the same courtesy that we would expect for ourselves.

In order to move on to post-school, you must successfully pass the Central School phase here in Virginia Beach.

CONFIDENTIAL

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

# CU Central School Training Rules

- **The instructor will present the material but learning and training will not take place unless you take an active role in learning it.** You can do this by participating in practice sessions including role-plays and by actively participating in classroom discussions.

- **Once the classroom portion of Central School training is complete, you will travel back to your respective profit center for post-school to fine-tune your on-the-job application of the skills you have been taught.** The post-school phase will include coaching, monitoring, instruction on handling new/transfer files, multi-tasking, and overall preparation for the CU desk. Regional specific items will be discussed in this phase.

- **Upon your successful completion of post- school, your application of lessons learned are continuously monitored and measured. This is your orientation period and will last approximately 6 months.** Your post-school trainer, supervisor, or manager will provide you with your goals for your orientation period.

CONFIDENTIAL!

Confidential Information of GEICO Companies
© Government Employees Insurance Company

# Training Guidelines and Scoring Requirements

<u>Scoring Requirements</u>

**<u>In order to progress to the next phase</u>, you must score a minimum of 85% on the Final Exam and have an Overall Class Average of 85%.** The Overall Class Average is a composite of your scores from quizzes and the Final Examination. The quizzes account for 50% of your Overall Class Average, while the Final Exam contributes the remaining 50% to your Overall Class Average.

**You must achieve an 85% overall average <u>and</u> a minimum score of 85% on the final exam to successfully complete the Central School phase of training and continue on to the next phase. The final exam consists of 2 parts; a 50 question GU test which makes up 50% of the final exam and the remaining 50 % of your final exam is the written practical application.**

<u>Example</u>:

| Example | Quiz Average | Final Exam | Overall Class Average | Result |
|---|---|---|---|---|
| **Student 1** | 95 | **84*** | 89.5 | Student **<u>does not</u>** pass. |
| **Student 2** | 80 | 85 | **82.5*** | Student **<u>does not</u>** pass. |
| **Student 3** | 83 | 90 | 86.5 | Student may progress to the next phase. |

*Does not satisfy the 85% passing requirement.

<u>Dependability (100%)</u>

You are expected to be on time and present everyday. We understand that emergencies do occur and these will be evaluated on an individual basis.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

CONFIDENTIAL

Absenteeism and tardiness are unacceptable. Tardiness to class from lunch, breaks, etc. will not be tolerated, and will be considered "late to work."

Classroom Conduct

To make sure everyone receives the full benefit from our training programs; there are certain rules of professionalism that are strictly enforced.

- 100% of your attention is required at all times
- We are all professionals and are expected to conduct ourselves as professionals at all times. Profane, racial and sexual comments are prohibited.
- Cheating will not be tolerated. Cheating will result in disciplinary action up to and including termination of your employment
- Refrain from making negative comments in the classroom—there are no dumb questions.
- DO NOT conduct personal business during class time.
- DO NOT discuss your salary; this is confidential information.
- Side bar conversations are discouraged while in class. You should direct all questions to your trainers. Mutual respect must be maintained at all times.

Transmitting and Receiving Devices

Use of cellular phones and beepers are prohibited in class. If there is an emergency situation which requires you to keep a device on vibrate, please discuss with your trainer.

Electronic Communication Policy

As you know, GEICO's computer network is for business purposes only. Do not e-mail anyone for personal reasons. This includes GEICO associates and external e-mail addresses.

Dress Code

GEICO maintains a business casual environment. Please refer to the following list when determining acceptable business casual attire.

- Slacks (Khakis/Chinos)
- Culottes or Skorts (must have the fullness of a skirt)
- Blouses or shirts with collars or turtlenecks (must be tucked in)
- Women may wear dress T-tops
- Casual shoes with socks
- Traditional business attire (shirt, tie, suit, sports jacket)
- Skirts of reasonable length
- No denim of any color
- No tennis shoes (except on jean casual days)

Remember: IF IN DOUBT, DO NOT WEAR IT!

CONFIDENTIAL!

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

# Travel Safety and Conduct

Associates travel on company business for a variety of reasons. We want all travel to be safe and productive. When we travel we represent the company, not only in the course of business, but after business hours. Our personal behavior and practices reflect not only on ourselves, but on the company.

The following "Travel Safety" guidelines are intended to enhance the safety of your personal and business travel and conduct. They are not intended as a substitute for good judgment and common sense.

1. Anytime you travel be aware of your surroundings. If you are traveling with others, it is best to travel in a group.
2. Do not answer the door to your hotel/motel room without verifying who is at the door. If the door has a "peep hole", use it. If a person claims to be a hotel employee and you have not previously been informed of their visit, call the front desk and ask if someone from the hotel's staff has been given permission to access your room and the purpose of that visit.
3. Use a well traveled public entrance to the hotel/motel.
4. Be particularly observant in parking lots. Do not leave valuables in your vehicle.
5. Close and lock your hotel door securely whenever you are in your room. Use all of the locking devices provided.
6. Do not give your room number to anyone. Do not display your guest room key in public or leave them on restaurant tables, at the swimming pool, or other places where they may be stolen or observed.
7. Do not draw attention to yourself by displaying large amounts of cash or expensive jewelry.
8. Do not invite strangers to your room.
9. Place all valuables in the hotel/motel's safe deposit box.
10. Check to see that any sliding glass doors, windows and any connecting room doors are locked.
11. If you observe any suspicious activity, report your observations to the hotel/motel management or call 911.

CONFIDENTIAL!

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

12. Upon arrival, please notify the hotel's front desk or security department if you will require special assistance in the event of an emergency evacuation.

13. If you leave your hotel/motel room in the evening, leave a light, radio or TV on and hang the "Do Not Disturb" sign on the door.

14. Do not use the stairs to get to your room; even if it is good exercise, take the elevator.

15. Ask the hotel staff about the safety of walking from your hotel to nearby restaurants, movie theaters, or the parking lot. Don't hesitate to ask about transportation shuttle services and escorts to your car or room. If you inquire about safe jogging or walking areas verify that the hotel/motel's employee giving the advice has experience walking in the area.

The following "Conduct" guidelines are intended to enhance the safety of your personal and business travel and conduct. They are not intended as a substitute for good judgment and common sense.

1. Keep a reasonable schedule so that you will have time for dinner, sufficient time to study and complete assignments if you are participating in a training class, and time to get enough sleep so that you are well rested and ready and alert for the next day's work.
2. Maintain a professional demeanor with hotel staff, the public, and other associates. You represent GEICO and your Planning Center so be prudent in what you say and do.
3. If you drink alcohol, limit your consumption so that you are not "considered under the influence" by any standard set for operating a motor vehicle whether or not you are operating a vehicle. If you are assigned a company car, or are renting a motor vehicle while on travel for the company you may not consume any alcoholic beverages and drive any motor vehicle.
4. You may not charge any alcoholic beverages to your hotel/motel account. The company travel reimbursement policy does not provide for reimbursement of alcoholic beverages.
5. Any associate who observes another associate under the influence of alcohol/drugs or who observes another associate demonstrating inappropriate or unprofessional conduct is **required** to report the conduct to their manger and human resources as soon as possible and in no event no later than the next business day.
6. Any associate whose behavior is found to be in violation of any company policy, or whose conduct is deemed to reflect adversely on the company in any way is subject to disciplinary action up to and including termination of employment.

**There is no texting or cell phone use permitted while driving a company car/van.**

CONFIDENTIAL!



This page was intentionally left blank

Confidential Information of GEICO Companies
© Government Employees Insurance Company

I have read and understand the above company guidelines for Travel Safety & Conduct.

PRINT & SIGN NAME: ________________________________________

DATE: ________________________

CONFIDENTIAL!

Confidential Information of GEICO Companies
© Government Employees Insurance Company



Intentionally left blank

Confidential Information of GEICO Companies
© Government Employees Insurance Company



# Training Expectations

- **Building injury knowledge**. We will develop and enhance your knowledge of injuries and apply that knowledge to common CU scenarios.

- **Control Files.** You will learn to identify factors in a claim file that warrants the file to be "controlled". You will also learn how to complete a Control File Alert

- **Suit Handling.** You will learn the basics in suit file handling including; how to refer a suit to defense counsel; common defenses; suit direction; fee bill review & proper closure methods

- **Develop and maintain positive and proactive file handling habits and procedures.**

CONFIDENTIAL

Confidential Information of GEICO Companies
© Government Employees Insurance Company

## Mission of the Claims Department

The Claims Mission statement is as follows:

**"Affect a prompt, courteous, and equitable disposition of claims through direct customer contact."**

In order to be effective in completing this mission, we have to **be willing to go above and beyond for the customer.** We must be willing to put ourselves in our customer's shoes and provide them with the service that we would expect ourselves. It is not always an easy task, but it is vital to our mission.

***Good Service depends on:***

- ***the knowledge you have,***
- ***the judgment you develop,***
- ***how well you organize your work,***
- ***and how you deal with customers***

## Notes:

CONFIDENTIAL

## What is the job function of a CU Examiner?

As a CU Examiner, you are responsible for the following high-impact service areas:

- **INVESTIGATE AND DETERMINE LIABILITY:** Queries (by telephone and in writing) insureds, claimants, police, witnesses, physicians, attorneys and so forth to accumulate facts and information about the claim. Evaluates the facts and determines policyholder's negligence. Consults with supervisor as required. Recognizes necessary Control File Alerts to Claims Home Office Legal.

- **PROVIDE INFORMATION:** Gives information to insureds, defense counsel and claimants or their representatives about the claim investigation process to assure customer understanding and cooperation in settling the claim. Provide information to other departments.

- **NEGOTIATE AND MAKE CLAIM PAYMENTS:** Uses facts and information about the loss to confer with claimants and their representatives (attorneys, doctors, beneficiaries, etc.) to arrive at monetary settlements of losses. Makes or obtains authorization to make claim payments.

- **FILE HANDLING:** Verifies policy and coverages; Establishes proper features; determines what investigation is needed. Identifies files that warrant control file handling.

- **SUIT HANDLING:** Opens suit counts; coordinates our investigation with defense counsel and/or CHOL; gives proper direction to defense counsel; attends mediations, settlement conferences and trials.

- **DOCUMENT AND CLOSE FILES:** Writes record of correspondence, conversations and payments made on the claim file; keeps file up to date. Reviews files to determine that all paperwork is complete and losses are satisfied. Summarizes file for closing and forwards to appropriate department. Includes documentation of activity.

- **MONITOR OPEN FILES:** Deals continuously with adjusters, attorneys, claimants, insureds and so forth to maintain a flow of activities surrounding a file to move the claim toward rapid settlement. Includes dealing directly with Defense counsel, plaintiff's attorney, etc. Also involves prioritizing daily activities to keep files moving toward closure.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

CONFIDENTIAL!

## Personal Development

- **Undergraduate** completion with tuition reimbursement from GEICO

- **Claims Investigation** Pictorial

- **Introduction to Property and Liability Insurance**
  Focuses on how property-liability insurance works

- **General Insurance Program** leads to the Certificate in General Insurance (Completion of the program satisfies the requirement to complete CPCU 553-Survey of Personal Risk Management and Insurance)
  - INS 21 Property and Liability Insurance Principles
  - INS 22 Personal Insurance
  - INS 23 Commercial Insurance

- **Claims Law** (see regional management for approval)
  - Legal Principles
  - Law of Automobiles – Claims and Coverages
  - Liability
  - Law of Claims Fraud Investigation and Defense

- **Associate in Claims** (Completion of AIC 33, 34 and 36 plus CPCU 553, 555 or INS 22 earn the Associates in Personal Lines Auto and Liability)
  - AIC 33 The Claims Environment
  - AIC 34 Worker's Compensation and Managing Bodily Injury Claims
  - AIC 35 Property Loss Adjusting
  - AIC 36 Liability Claim Practices

## Notes:

CONFIDENTIAL!

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

- **CPCU** (Chartered Property and Casualty Underwriter Program)

  Foundation Courses:
  - 510 Foundation of Risk Management, Insurance and Professionalism
  - 520 Insurance Operations and Regulation
  - 530 The Legal Environment of Risk Management and Insurance
  - 540 Business and Financial Analysis for Risk Management and Insurance Professionals
  - 560 Financial Services Institutions

  Personal Concentration Courses:
  - 555 Personal Risk Management and Insurance: Property and Liability
  - 556 Personal Financial Planning
  - 557 Survey of Commercial Risk Management and Insurance

  Commercial Concentration Courses:
  - 551 Commercial Property Risk Management and Insurance
  - 552 Commercial Liability Risk Management and Insurance
  - 553 Survey of Personal Risk Management

- **Continuing Education** courses offered by regional trainers
- **Licensing Continuing Education** if required by your region
- **Claims Leadership** Development Programs

**Notes:**

CONFIDENTIAL!

Confidential Information of GEICO Companies
© Government Employees Insurance Company

## Overview of a CU Claim

After viewing the suit paperwork and/or file documents, the next step is to make immediate contact with all interested parties. Our standard is to make all contact attempts within one hour of receiving a new file assignment and to actually secure contact within 24 hours on file transfers. **The urgency of making contact with all parties cannot be overstated.**

First impressions are always remembered. Most of the files you receive will have been worked by either a TCR1 or TCR2 prior to arriving on your desk. It is vital that you establish a professional relationship with each claimant or their representative early in your handling of the file; one that is founded on empathy, concern, professionalism and trust.

Recognize that this is likely the Insured's first experience in a serious crash or litigation. Your initial contact demonstrates our willingness to shoulder the insured's problems. In order to develop mutual trust, keep in mind that information must be relayed to the insured frequently. The Insured must know and understand how the claims and civil litigation process works and how problems will be handled.

The CU Examiner will also initiate and direct others to help us in our investigation of unresolved issues by requesting medical/employment authorizations, investigating prior injuries, AD assignments, ordering police reports, sending underwriting requests for confirmation of coverage and securing recorded interviews of all involved parties.

In matters that are in suit, the CU Examiner is also responsible for directing the defense attorney and reevaluating each bit of evidence for its value and credibility. Each time you review the claim, the CU Examiner will want to analyze what needs to be done to bring the claim to conclusion and share this with the Defense attorney.

As the claim evolves, maintain frequent contacts with the parties and demonstrate what is being done to bring the claim to conclusion. This will reinforce your professional relationship with the parties involved and the insured. At the same time, this will give us better information to set reserves and resolve the claim quickly.

CONFIDENTIAL!

**The CU Examiner is a problem solver, a decision maker and a negotiator with a capacity to visualize the essence of each individual claim. The CU Examiner uses facts and information about the loss to confer with claimants and their representatives and, when necessary, defense counsel in order to arrive at monetary settlements of losses.**

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

Intentionally left blank

Confidential Information of GEICO Companies
© Government Employees Insurance Company



# Lesson Two
# Good Faith Claim Handling
# Continuing Unit Manual

## Objectives

1. Understand the importance of good faith claim handling.
2. Correctly identify two types of bad faith claim handling.
3. Identify unfair settlement acts.

CONFIDENTIAL!

## What is "Bad Faith"?

Generally, it is the failure to act fairly, promptly, and reasonably. Fair, prompt, and reasonable are three keys to good faith claims handling. In addition, there are two types of bad faith:

–common law bad faith
–statutory bad faith

Bad faith claims generally spring from a failure in one or more of these areas – fairness, promptness and reasonableness. Every decision made on a file and every aspect of the file should reflect that the decisions made and actions taken were fair, prompt and/or reasonable under the circumstances of the claim.

**Extra-contractual Damages** – are monetary damages awarded at trial against an insurance company as a consequence of an insurer's bad faith. Typically, extra-contractual damages include punitive damages to punish and deter the conduct, interest, attorneys' fees, costs and litigation expenses as well as consequential damages incurred by the insured and/or claimant as a result of the bad faith. Consequential damages can include things like inconvenience, emotional distress and mental anguish. Damages awarded against an insurer as a result of bad faith in the handling of claims are paid outside of the insurance contract and are thus referred to as extra-contractual damages.

A suit for bad faith, depending on the jurisdiction, can arise either from a first party claim filed by the insured or from a third party claim brought against the insured.

### First-Party Bad Faith

About one-half of the states recognize a common law tort for bad faith in first-party insurance claims. Of these, most requires the plaintiff to show the insurer was unreasonable in denying the claim and the insurer's "knowledge or reckless disregard of the lack of a reasonable basis for denying the claim." The other states follow the approach which only requires the plaintiff to show unreasonableness in denying the claim. Claims for first-party bad faith are commonly based on inadequate claim processing, improper investigation of a claim, delay in payment and unreasonable denial of a claim.

CONFIDENTIAL!

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## Third-Party Bad Faith

Liability insurance policies apply to claims against the insured by third parties. Liability insurance is also known as third-party coverage. Liability policies set forth the insurer's duties, which typically include paying covered claims, investigating claims and defending the insured in claims by third parties that fall within the scope of the policy. Third-party bad faith claims usually relate to an insurer's failure to settle an underlying suit (for example, by an injured party) against the insured; the insurer's wrongful failure to defend a suit against the insured; or the insurer's bad faith or negligence in defending the insured.

## Unfair Claims Practices:

•Origin – codification of the common law

•Similar from state-to-state because many jurisdictions adopted the NAIC's Model Unfair Claims Practices Act.

•Some state specific differences

Almost all Unfair Claims Settlement Practices Acts are derived from the Model Act promulgated by the National Association of Insurance Commissioners (NAIC) who drafted the Model Act as a distillation of cases analyzing insurance company conduct. Since most states have adopted the Model Act in whole, or in part, as their unfair claims settlement practices act, the acts look generally the same from state to state. Some states have added to the Model Act with additional descriptions of unfair claims practices – i.e. it is an unfair practice in some jurisdictions for an insurer to direct claimants or insureds to particular body shops for repairs. However, by and large, the acts are the same from one state to the next.

(1) Misrepresenting pertinent facts of insurance policy provisions relating to coverage's at issue.

*… if it's covered, it's covered

Example - Applying a Section III exclusion to a Section I claim.

Be careful when drafting disclaimer letters – make sure to quote from the policy of the correct state, check that you are quoting from the correct company (i.e. GEICO, GEICO General, GEICO Indemnity, GEICO Casualty), quote the correct version, by date, of the policy in effect for that insured, and if unsure which version applies, contact underwriting for confirmation, and lastly check to see if any amendments apply that change the basic policy. Of course, if an amendment is in effect, the language of the amendment controls.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

CONFIDENTIAL!

(2) Failing to acknowledge, act reasonably and promptly upon communications with respect to claims arising under insurance policies.

*Be responsive to insureds, claimants, and attorneys

Nothing sends a claim down the wrong path faster than a failure to communicate. Communication needs to be prompt and responsive.
Example – an attorney sends you a letter stating that he represents the claimant and requests acknowledgment of his Letter of Representation (LOR) and requests a copy of his client's recorded interview (RI). The response, albeit prompt, should not state "I acknowledge your LOR. Please send in the medicals." Why? It does not address the request for the RI. Communication needs to address the points that are raised.

(3) Refusing to pay claims without conducting a reasonable investigation based upon all available information.

An insurer must readily be able to answer questions like "Why is this claim being denied?" "Why is coverage being disclaimed?" "Why is a compromise offer in this amount being made?" If an insurer cannot answer these types of question, it cannot answer them to claimants or insureds. An insurer is not at the stage where its investigation is complete until it can readily answer these types of questions.

*Conduct a solid investigation and have a reasonable factual & legal basis for denying a claim

(4) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been submitted.

*Promptly secure all facts needed to make a coverage decision

When a claim is made, the clock starts running for the completion of the coverage investigation. Failure to complete the investigation in a timely fashion can result in an insurer being precluded from disclaiming coverage. An insurer can be precluded from disclaiming coverage under these circumstances by reason of estoppel and waiver. Promptly secure the necessary facts to make the coverage decision.

Essentially, waiver and estoppel are doctrines that can preclude an insurer from enforcing policy provisions such as exclusions or conditions unless they are asserted or raised in a timely fashion.

CONFIDENTIAL

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**Estoppel** is a legal doctrine recognized both at common law and in equity in various forms. It is meant to complement the requirement of consideration in contract law. In general it protects one who would suffer detriment if: The defendant has done or said something to induce an expectation. The plaintiff reasonably relied on the expectation and would suffer detriment if that expectation were false.

Estoppel is generally only a defense that prevents a representor from enforcing legal rights, or from relying on a set of facts that would give rise to enforceable rights (e.g. words said or actions performed) if that enforcement or reliance would be unfair to the representee. Because its effect is to defeat generally enforceable legal rights, the scope of the remedy is often limited.

**Waiver** is the voluntary relinquishment or surrender of some known right or privilege. While a waiver is often in writing, sometimes a person's actions can act as a waiver. In civil procedure, certain arguments must be raised in the first objection that a party submits to the court, or else they will be deemed waived.

(5) Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims when liability has become reasonably clear

*When liability is reasonably clear, attempt a fair, prompt, and reasonable settlement

1st Party claims – If liability is clear, and the amount owed is clear, unreasonable delay in the resolution of the insured's claim can be taken as an unfair claims practice.

Furthermore, when making settlement offers in first party and third party claims, the settlement offer must be within the evaluated range of the claim.

Example. A UM claim is evaluated for settlement at between $5000.00 and $10,000.00. The first offer to the insured must at least be $5000.00. It cannot be below $5000.00 as that offer does not fall within the evaluated range. The same applies to a third party claim brought against the insured. The settlement offer must be within the evaluated range.

If the file can be evaluated for settlement purposes, do not wait for a demand. Evaluate the file and make an offer within the evaluated range. A demand is not a precondition to a settlement offer.

CONFIDENTIAL!

(6) Compelling insureds to file suit to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds.

*Make fair and reasonable offers; do not "low-ball".

Example - in an Uninsured or Underinsured motorist claim, do not make a "low ball" offer. The offer must be within the evaluated settlement range on the claim. Note: A "low ball" offer would be an offer that is below or under the evaluated settlement range.

(7) Making claims payments without specifying the coverage under which the payment is being made.

*Specify the involved coverage and the amount being paid under that coverage.

The purpose here is to avoid confusion. A check that does not specify what it is for does not advise an insured or claimant about what the payment is for and whether they are receiving that to which they are entitled.

Example – An insured has an accident implicating medical payments, UM, collision, rental, etc. A check sent to the insured for $1,000, without any indication of what it is for, does not advise an insured about what he is receiving, what he is receiving under each coverage, or whether he is receiving that to which he is entitled under the policy.

(8) Advising an insured or claimant of a policy of appealing decisions that favor an insured or claimant in order to compel them to accept settlements or compromises less than the amount awarded in arbitration

*Never threaten!

Suggesting lengthy litigation or delay as an inducement for someone to accept a settlement offer is improper because it advances reasons why the offer should be accepted that are other than the offer being fair and reasonable. The only reason to advance for acceptance of an offer is that the offer is fair and reasonable under the circumstances of the claim. Resolve claims early when able.

CONFIDENTIAL!

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

(9) Delaying the investigation or claim payment by requiring an insured, claimant, or his/her physician to submit a preliminary claim report and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information.

*Do not request unnecessary information that delays resolving the claim

Rarely does an insurer have each and every document needed to evaluate a claim. With some claims, the insurer has the information needed to evaluate the claim but the information is in a different form than what the insurer is typically used to. If an insurer has what is needed to make a decision, in whatever form, as long as reliable, an insurer needs to act and make the decisions that need to be made and not wait for unnecessary or duplicative information.

Example – The insured negligently hits a motorcyclist. The insured has BI coverage of $25, 000.00. The insurer learns from interviewing the insured, the officer, and a witness that the motorcyclist lost a leg. The motorcyclist's attorney sends in a demand for the insured's policy limits to settle the claim. The insurer's response letter should not say "We can neither accept nor deny the demand as we have insufficient information. Please submit the medical reports and bills." Why? Because the insurer has reliable information that the motorcyclist lost his leg. The BI limits of $25, 000.00 should be offered to settle the claim. Medical reports, bills, permanency ratings and the like are unnecessary for making the decision to offer the BI limits of $25, 000.00 because reliable information exists to make the decision to offer the policy limits to settle the claim.

(10) When liability is reasonably clear, failing to promptly settle claims under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage.

*Do not delay settling a PD claim to influence settlement of a rental or other claim An insurer should never use settlement of a claim under one coverage to influence settlement under another coverage.

Example – The claimant makes a BI claim and a PD claim against the insured. An insurer should not negotiate the claims by stating that if the claimant accepts X amount on his BI claim, then the PD will be paid at Y. The inducement to accept the offers is other than the offers being fair and reasonable. Rather, an insurer must evaluate each claim separately and make fair and reasonable offers on each. The negotiations for the two claims, BI and PD, are not tied to or conditional on each other.

CONFIDENTIAL

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

(11) Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denying a claim or for offering a compromise settlement.

*Explain the facts and/or law supporting the denial or compromise

An insurer needs to be able to answer questions about why certain action was taken regarding a claim. When a claim is denied or when a compromise offer is made, an insurer must have the facts and/or law readily available to be able to answer questions like "Why was the claim denied?" or "Why was a compromise offer made?"

(12) Negotiating liability insurance claims and ascribing a percentage of fault to a person seeking to recover from an insured party, in spite of an obvious absence of fault on the part of that person.

*Make fair and reasonable evaluations of Fault

The facts and/or law must support an assignment of any percentage of fault to another party. Arbitrary assignments of fault as a negotiating tool is an unfair settlement practice.

## Worst Practices:

We are proud of GEICO's claim practices. We have a claim philosophy that says we treat all those that we encounter fairly and honorably.

Mistakes happen when obligations are not understood and when guidelines are not followed. Mistakes fall into two categories. Mistakes can be an act of Omission – which is the failure to do something that should have done, or mistakes can be an act of Commission – which is doing something that should not have been done.

•Failing to responsively answer phone calls and correspondence from a claimant or their attorney.

Point 1 – The Claims Manual, and state specific guidelines, set forth the time limits within which responses to phone calls and correspondence must be made. These guidelines must be followed.

CONFIDENTIAL!

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

•Rejecting a claimant's contentions without fully investigating the contentions.

Point 2 – Assume the following file note:

"Secure claimants RI. Then deny this claim. This is fraud."

This is not correct file handling. The investigation comes first and once the investigation is complete a decision is made on the claim, not vice versa.

•Failing to initiate settlement discussions because no demand has been made.

Point 3 – Pursue prompt, fair, and equitable disposition of claims. If an insurer has the information needed to make a fair and reasonable evaluation, it should do so and initiate settlement discussions. Remember, a demand is not a precondition to a settlement offer.

•Using delay tactics to holdup a settlement.

Point 4: An insurer should never delay initiating settlement discussions in order to obtain unnecessary information. An insurer should never wait on the receipt of an official record when copies of such record have been received and are reliable.

•Not properly defending the insured or noting negative remarks in the file.

Point 5: Assume this file note:

"An accident reconstruction would probably be beneficial for the insured, but the costs outweigh the benefits".

Here, an insurer would be placing its interests in saving costs ahead of the insured's interests in being defended. Remember, the policy provides coverage for the costs of litigation. In this example, if an accident reconstruction expert is deemed necessary and relevant to the insured's defense, an accident reconstruction should be obtained. (Accident reconstructionists are independent forensic engineers and physicists that through forensics determine how and why an accident happened - accomplished first by correctly interpreting the clues left by the remaining physical evidence of the accident, then by reconstructing and studying the events preceding, during, and following the accident).

***Or assume this note:*** "The claimant is lying!" This reflects a personal opinion. The file should reflect facts, not personal opinions. Rather, the file should simply state the facts – "Claimant testified she had no prior history of back complaints. Dr. Smith's records however show an extensive Past Medical History (PMH) of back complaints." All file notes should be clear, concise, accurate and factual.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM00077

CONFIDENTIAL!

•Failing to tell the insured of the potential for personal exposure.

Point 6: Insurers have a duty to advise an insured of the following:

- the nature of the claim or suit against them,
- the potential, where applicable, that the claim could exceed their coverage limits,
- their right to retain personal counsel of their own choice, at their own expense, to protect their interests in excess of the policy limits, (of course, the Company will provide them with counsel to defend them per the terms of the policy),
- and their right to personally contribute to any settlement above the policy limits.

An insurer should not lose sight of the fact that a third party claim or suit is against the insured, not the insurer. An insurer should keep an insured advised and updated of the status of the claim or suit.

When appropriate, an insured should update its insured with phone calls and/or letters about significant new developments in the claim and matters of which they need to be aware. The letter below is an example of an update letter (of course, all letters must be tailored to the circumstances applicable to the particular case):

"This is an update on the current status of this matter. Please be advised that our investigation into the accident and the claimed damages is continuing. As you know, you have bodily injury liability limits of $100,000/$300,000 under your Family Automobile Policy.

Our investigation shows that claimant Sally Smith's injuries from the accident include:…We will attempt to resolve this claim within your bodily injury liability limits.

We are writing to advise that if a jury were to believe claimant's version of the accident as well as the claimed damages and ongoing complaints, a jury verdict could exceed your policy limits. We do want to advise you that you have the right to obtain your own personal attorney, at your own expense, to protect your interest above the policy limits and to discuss the implications if the damages exceed the policy limits. You need not hire your own attorney, but you have the right to do so. Of course, the Company will provide defense counsel to defend you should suit be filed and defense counsel will work with any personal counsel you may wish to retain.

CONFIDENTIAL!

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

You also have the right to personally contribute from your own personal assets towards any settlement above the policy limits, although you are not required to do so. If you wish to consider making a personal contribution to a settlement above the policy limits, please let us know.

We will continue to try and resolve the claim against you and will advise you of further developments. Should you have any questions, please feel free to call. Thank you for your attention to this matter."

•Failing to treat First-Party claims differently than Third-Party claims.

Acceptable for 3rd Party claim:
"IME needed to rebut permanency claim"

*versus*

Not Acceptable for 1st Party claim:
"IME needed to rebut permanency claim"

Words and terms are important. Suppose the claim involves a third party claim against an insured and the file says "IME needed to rebut permanency claim". This suggests a strong defense for the insured.

But suppose now that it is not a third party claim, but a first party claim where the insured is making a claim under his or her own policy.

The same file note could be misinterpreted to suggest that it was an insurer against their insured. In a first party case, it is not the insured vs. their insurer. Rather, an insurer should simply be fairly, reasonably and promptly evaluating an insured's claim. The file handler should simply seek an IME to evaluate the permanency claim.

IME= Independent Medical Examination
PMH= Past Medical History

•Substantially increasing settlement offers with no new information about the claim.

Point 7: Substantial increases in settlement offers with no new information suggests that the first offer was not fair and reasonable.

Example – The first offer in a first party claim is $10, 000. Six months later, despite no new information having been received, the offer is raised to $30, 000. What does that say about the fairness and reasonableness of the first offer?

CONFIDENTIAL!

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

Remember, make a fair and reasonable evaluation and offer. If new information is received that changes the evaluation, document the file with the receipt and evaluation of the new information, the new evaluated range on the file, and make a new offer within the evaluated range.

•Treating ALOG like "Dear Diary".

Point 8: File documentation should be a chronological account of the handling of the file. Assume a file note like this:

> "This case clearly exceeds the policy limits. I will try to settle it for less".

This would be treating file documentation as "Dear Diary" and is not correct. It does not reflect a fair and reasonable offer.

•Documenting the file with an "off the cuff" value before the file is actually ready for evaluation.

Point 9: A file should be evaluated when it is ready to be evaluated and not before. Suppose an examiner receives a new file very early on in the investigation and writes

> "Probably a limits case."

The file is not yet ready to be evaluated. This would be an example of an "off the cuff" speculation about value made before the matter was ready to be evaluated. Evaluate the file only when the information necessary to do so has been received.

## Best Practices:

• Point 1: Avoid all of the "Worst Practices"!

•Complete prompt liability and damage investigations. "Resolve early when able."

Point 2: Adhere to all company policies and procedures for claim handling. If a first call settlement is warranted, make an effort to resolve the claim in a fair and equitable manner.

•Bifurcate claim files when conflicts exist.

Point 3: When an insurer bifurcates a file, i.e. a Personal Injury Protection (PIP) claim and an Uninsured Motorist Bodily Injury (UBI) claim to different examiners, the files must be treated by all as bifurcated. The communications between the examiners and supervisors should be no different and no more than if they worked for different insurers.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

CONFIDENTIAL!

•ALOG is for documenting file handling only.
Point 4: As we previously stated, ALOG is only for the documentation of claim handling. Documentation should be clear, concise, accurate and contain only factual representations.

•Being careful when writing and speaking because we can bind the company.
Point 5: All employees handling claims are agents of an insurer and speak and write with the apparent authority of the insurer. Make sure to have the authority to make representations before they are made.

•Make only representations and assurances that can be met.

Point 6: It is better to tell people what can be accomplished, and by when it can be accomplished, than it is to tell them what they want to hear at that moment but which cannot be accomplished. I.e., if it is represented that a check is in the mail, the check must be in the mail.

•Keep the insured aware of significant developments and of settlement negotiations.

Especially in excess cases, take care to:

- –protect the insured
- –inform the insured of developments
- –advise the insured of their right to personal counsel of their own choice and at their own expense to protect their interests above the policy limits
- –advise the insured that they can personally contribute to any settlement over the limits

•Advise insureds of the coverages available under the policy pertinent to their claim.

Examples: Med Pay, Rental
Reimbursement, UM/UIM, etc.

•Document in ALOGI discussions held with the insured about coverage and benefits under their policy. Document all discussions about coverage with an insured. Make sure to inform an insured of all the coverages implicated – i.e. collision, med pay, rental, Under Insured/ Uninsured Motorist protection (UM/UIM). For example, document file discussions about coverage with: "Explained collision, med pay, rental, UM to insured." You must also document significant developments and settlement negotiations.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

CONFIDENTIAL!

Documentation of discussions about coverage should ordinarily be made in ALOGI. However, if the coverage discussions are deemed to be important and critical, documentation of the coverage discussions should also be made in the form of a confirmatory letter to the insured.

•Document! Document! Document! because . . ."If it isn't in the file, it never happened"

•The insured's interests receive equal weight as the interests of the insurer.

•Be fair, prompt and reasonable.

Point 1: The file is how an insurer defends its handling of the claim. If a file is silent, an insurer cannot prove what it did or did not do and cannot establish that its handling was fair, prompt and reasonable.

•Use ALOG to highlight fair file handling. The ALOG entry you write now is your opportunity to support decisions that may be questioned in the future.

•Write Email messages in the same manner as ALOG entries.
Each file entry is an opportunity to document how fairly, reasonably, and promptly a matter has been handled. Use file entries to document fair file handling at every stage of the claim. Emails should be written with the same attention as any other file note and should reflect the same fairness of file handling.

## Third-Party Bad Faith verses First-Party Bad Faith:

•Common themes in Third-Party bad faith suits:

- The interests of the insurer were placed before the interests of the insured.

Point 1 – Remember the example: "An accident reconstruction would probably be beneficial to the insured but the costs outweigh the benefits".
If a loss involves questionable liability and a reconstructionist is necessary for an insured's liability defense, obtain the accident reconstruction.

- The basis for the offer and the offer itself were not reasonable.

Point 2 – Remember the example "This claim clearly exceeds the limits. I will try to settle it for less." If the fair evaluation is that the claim clearly exceeds the limits, than the offer should be the limits.

CONFIDENTIAL!

- The insurer did not notify or update the insured on the status of settlement negotiations and the likelihood of an excess verdict.

Point 3 – Consider the following example: The insured was negligently involved in an accident in which the claimant was killed. The insured has a policy with BI limits of 20k. A settlement conference occurs and the settlement demand is $20,500. The insured is not notified of the demand above his policy limits and no settlement occurs. Remember, if the limits have been offered and a demand is made for an amount above the insured's limits:

- Notify the insured of the demand and memorialize the notification in writing,
- Advise the insured of their right to make a personal contribution to the settlement of the matter,
- And then memorialize in a letter to the insured his or her decision as to how he or she wishes to proceed.

## How to avoid a Third-Party bad faith suit:

- Fully investigate; fairly evaluate.
- Inform the insured that a judgment could exceed their limits. Advise of the right to counsel at their own expense to protect their interests above the policy limits.
- Keep the insured advised of significant developments and settlement demands.

## Common themes in First-Party bad faith suits:

- Failure to communicate with the insured.
- Failure to act promptly.
- Failure to make a reasonable offer. These three points describe the primary grounds asserted in first party bad faith claims.

## How to avoid a First-Party bad faith suit:

- Promptly communicate with the insured and quickly gather necessary information to resolve the claim.
- Make only fair and reasonable offers.
- Show fair-mindedness.
- "Murphy's Law" – If it can go wrong, it will.

CONFIDENTIAL!

Confidential Information of GEICO Companies
© Government Employees Insurance Company

## First-Party (UM):

- Claim range = $16-17,000
- Fee counsel's opinion of the value = "$20,000 or so."
- File says "need to see manager for UM limits of $40,000k"
- Demand $40,000; Offer $7,000
- Insured sues for Bad Faith

What happened . . . ??? This example shows how the file evaluation at every stage was no less than $16,000 and that the first offer of $7,000 was not within the evaluated range and was not fair and reasonable.

## Third-Party: BI policy limits = $25,000:

- Plaintiff's attorney says the case can be settled for $25,000; insurer offers $25,000
- Plaintiff's attorney then says settlement is contingent on reimbursement of $348 for copying the client's medical records that the insurer requested
- Insurer refuses to pay the $348; the PH is not advised of the negotiations. Settlement falls apart.

What happened . . . ??? This example illustrates why insureds must be notified of demands above their policy limits and why they must be advised of demands above their policy limits and advised of their right to personally contribute to any settlement above their limits.

## Demands Outside of the Insured's Coverage:

- BI limits – $25,000; PD limits – $10,000.
- Pat demands the BI and PD limits and also demands $500 in miscellaneous expenses unrelated to the loss and not covered by the insured's policy.
- Insurer offers the BI and PD limits and advises Pat of no coverage available for the claimed miscellaneous expenses of $500.
- No settlement occurs and Pat files suit.

What should have occurred . . . ? This example illustrates what is in effect a demand above/outside of the insured's policy limits. The demand included a demand for $500 for expenses not covered under the insured's policy. Consequently, the $500 claim was a demand above/outside of the insured's policy limits and was also a demand for damages not covered by the insured's policy.

Since Pat was conditioning the settlement of the BI and PD claims against the insured on the payment of the $500 in miscellaneous expenses not covered by the insured's policy, the insurer here should have immediately contacted the insured to advise of the demand for the $500 in expenses not covered by the policy and should have advised the insured of their right to personally contribute $500 to effectuate settlement of the claims.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

CONFIDENTIAL!

The insurer should follow that conversation with the insured with a confirmatory letter memorializing that the insured was advised of the demand for the $500 in miscellaneous expenses and also memorializing the insured's decision to either make a personal contribution or to decline to make a personal contribution.

## Responding to settlement demands

Responding to settlement demands is a core function of the claims department. In order to respond properly you must first be able to identify two important types of settlement demands.

**"Time Limit Demand"** – This is a demand for settlement within a specific period of time mandated by either the injured party(s) or his/her attorney. This time starts when GEICO receives the demand in the office, not the time it is delivered to your desk.

The second type of settlement demand is a **"Policy Limits Demand."** This is a demand that requests payment of our insured's policy limits or an amount in excess of our insured's applicable policy limits. **You must review and log these claims with your supervisor immediately.** You will further review your specific states requirements for the proper handling and response in post school. A key step in the demand-response process is the evaluation of the claim.

It is important that adjusters not make offers on claims when we do not have the required documentation to support a casual relationship between the loss and alleged injuries. As a claims examiner, it is equally important that we follow all applicable Technical Claims Memorandums, specifically "Response to Settlement Demands", regarding the requirement to not only evaluate a claim for bodily injury, but also to make offers, even if more information has been requested by the examiner to prove the alleged injury is related the loss.

There has been an increase in the number of responses to settlement demands where the adjuster simply requests additional information without an evaluation of the claim being completed. The above mentioned TCM serves as a reminder that a claim should first be evaluated before sending correspondence to the injured party(s) attorney requesting additional information. Furthermore, additional information should be requested only when we believe the information is absolutely necessary to evaluate the claim(s).

Often a demand package fails to provide complete documentation of the claimed injuries and damages, but this fact alone does not relieve us of our obligation to evaluate the information we do possess.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

CONFIDENTIAL!

When possible, we must make a reasonable attempt to settle claims based upon what has been documented. We should also alert the attorney or injured party(s) that if other documentation is forthcoming we would re-evaluate the claim's value.

In some cases missing documentation may be so significant that a reasonable evaluation of the claim cannot be made. However, this determination can only be reached after first attempting to evaluate the claim. There should be only a limited number of circumstances when an offer of settlement cannot be made and the company's sole response is a request for additional information.

A letter asking for additional information or documentation should **never be sent simply to avoid evaluating a file or as a delay tactic**. We should not request additional information if that information will not significantly change the case value or evaluation nor should we be requesting information we already have within our claim file.

When evaluating a claim where the injured party(s) (either represented or unrepresented) is in active therapy prior to our loss we must review the medical records supplied in the original demand for an exacerbation of a pre-existing condition or additional treatment because of our loss.

**For example:** the injured party(s) was treating every other week with a chiropractor for cervical pain before the date of loss. Immediately after the accident, she began to treat three times per week for a total of six weeks and underwent diagnostic testing for complaints of cervical and neck pain. Six weeks later, the injured party(s) was treating two times per month. Finally, after three additional months, she was released from treatment. Her medical bills total $6,430. $1,125 is for the diagnostic tests. In this case, you would *consider* the entire treatment period, but *accept* only six weeks of care with the diagnostic testing as related to the loss due to the exacerbation of a pre-existing condition.

CONFIDENTIAL!

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## Time Limit Demand & Policy Limit Demand Tenders

**All claims associates are reminded to review TCM 275B, 3rd Revision (dated June 2, 1997) titled: TCM-Claims-Response to Policy Limit Time Limit Demand-ALL / TCM-Limits-Demand-Response-ALL / TCM-Claims-Response to Demand in Excess of Authority-ALL. Particular attention should be paid to Florida claims in the light of the decision in Berges v. Infinity, No. SC01-2846, Supreme Court of Florida, November 18, 2004. (See Florida TCM's 1000931 and 1000944.)**

When appropriate, tendering policy limits is only one of the many duties consistent with our obligations to act in good faith. This is true whether our tender is in response to a time demand, or when we have an affirmative obligation to tender in jurisdictions such as Florida. We must be constantly vigilant to watch for time limits with which we must comply. Time limits and duties may be imposed by state law. There may also be time limit demands made by the injured party(s) attorneys, to perform some act or take a series of actions in addition to the payment of the limits.

**For example**, even after a decision is made to pay our policy limits, we still must comply in a timely manner with legally sanctioned requests to provide information regarding the available limits, including proper certification of those limits. Failure to do so may be considered inconsistent with our obligation to act in good faith. In some jurisdictions, particularly Florida, this failure to act in and of itself has been construed as evidence of bad faith.

In jurisdictions that have legally sanctioned "recipe demands," all claims personnel must be fully cognizant that a failure to comply timely with a single reasonable request can have the same effect as not tendering our limits. Therefore, it is imperative that examiners respond **in writing** to each item in a recipe demand. (an example format of a response is provided at the end of this lesson).

Furthermore, if our ability to comply with a demand is outside of our control, yet falls within the control of the insured (the most common example is a request for the insured to execute a notarized affidavit of assets), we must ensure that we have communicated the request to the insured as soon as possible. We also have the duty to emphasize the time constraints, and follow-up with the insured. The insured must have ample opportunity to comply timely and/or have a reasonable opportunity to consider the request and consult with personal counsel, at their won expense, if necessary. A single attempt to communicate such information is usually not sufficient.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

CONFIDENTIAL!

Finally, we cannot overemphasize the importance of documenting and confirming telephone conversations **in writing** where substantive issues pertinent to the payment of limits and/or compliance with a time limit demand are discussed. Those examiners handling Florida claims must be aware of the impact of the decision in the civil case known as "Berges." In this situation, the insurance company received an extension to a deadline over the telephone. The extension was later disputed by the injured party(s) attorney. The court specifically observed that since neither the insurer nor the insurer's retained counsel "…memorialized in writing their understanding…" of the extension, the deadlines had **not** been extended.

An entry in ALOG or notation to the file regarding discussions of substantive issues is not by itself considered documenting the file. **Memorialize it in a letter!** Make certain to follow up and confirm that your correspondence was received. Keep any fax confirmation reports or overnight mail receipts in your file.

All claims associates should be familiar with standards and practices of good faith claims handling, especially in those jurisdictions where they have specific responsibilities.

While some states have set the legal standard for bad faith high (i.e. negligence alone is not bad faith but is one of the factors to consider), other jurisdictions such as Florida have set the bar much lower. Florida statutes state that using "the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business" is the standard.

However, all standards take into consideration and scrutinize the totality of the claim handling. Potential extra-contractual exposure does not end because we have decided to pay our limits in the case. When exercising your duties, your actions and/or failure to act in accordance with this information can have significant consequences.

CONFIDENTIAL!

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

# Example of a Time Limit Demand

Winfield & Associates, LLC
Attorneys and Counselors

University Tower
3500 Tower Boulevard, Suite 1500
Dunn, NC 22270

Alexis Winfield
Arnold Palmer
Willie Etheridge

Telephone (919) 441-1212
Facsimile (919) 440-4454

January 2, 200X

Geico Insurance Company
1 GEICO BLVD
Chevy Chase, MD 20815

Re: Our client: Laura Shaffer
Your insured: Chad Hill
Date of Loss February 15, 200X
Claim/policy: 4000073520

Dear Ms. Adjuster;

The purpose of this letter is to determine whether you are interested in settling this claim. Therefore, for settlement purposes only, we would recommend that our client accept the sum of $25, 000.00 in full compromise and settlement of this claim via overnight mail. We will leave this offer open for twenty days. If we have not heard form you within twenty days, we will discuss the possibility of litigation with our client. Please return all photographs and estimates upon receipt of this letter.

In addition, my client's signature on any release is contingent upon this specific additional language:
"By executing this release, my client does not waive his right to pursue his underinsured/uninsured motorist coverage carrier for any additional/supplemental monies which would be deemed recoverable." Furthermore you will not pursue my client with respect to any property damage claim and I am requesting signed insurance affidavits from your insured.

We look forward to hearing from you shortly and are confident that we can reach an amicable settlement of this claim.

Sincerely yours,
Alexis Winfield, Esq.
CC: Client

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

CONFIDENTIAL!

The time limit an attorney/injured party(s) can impose varies from state to state. If the insured's policy limits were $25,000 or less, this would have been an example of a Time Limit & Policy Limits Demand.

Let's look at some of the conditions mentioned in the above demand letter.

Condition 1 - $25, 000.00 in full compromise and settlement of this claim.
Condition 2 - within twenty days
Condition 3 - via overnight mail
Condition 4 - contingent upon this specific additional language;
Condition 5- return all photographs and estimates upon receipt of this letter.
Condition 6 - not pursue your client with respect to any property damage claim
Condition 7 - signed insurance affidavits from your insured.

As you can see, a demand letter may not address specific conditions in a bullet form. It is our job as claims examiners to identify the necessary exposure to our insured and GEICO upon receipt of the mail and handle the matter both efficiently and effectively.

**REMEMBER**

**All policy limit and time limit demands must be logged with your supervisor!**

CONFIDENTIAL!

Confidential Information of GEICO Companies
© Government Employees Insurance Company

**EXAMPLE of a response to a Time Limit/Policy Limit Demand**

January 12, 200X

Law Offices of Winfield & Associates, LLC
University Tower
3500 Tower Boulevard, Suite 1500
Dunn, NC 22270

Sent via Overnight Delivery and Fax to (919) 440-4454

| | |
|---|---|
| Insured: | Chad Hill |
| Claim Number: | 500400007-0101-520 |
| Date of Loss: | 2-15-0X |
| Your Client: | Laura Shaffer |

Dear Ms. Winfield:

Enclosed is our proposed Release of All Claims and check in the amount of $25,000.00 made payable in the manner you prescribed {Condition 1}. The check and release are being sent together via overnight mail and will be delivered to your office during business hours prior to the expiration of your time deadline {Conditions 2 & 3}.

This letter will confirm my telephone conversation with (ATTORNEY) in your office, on (DATE), wherein he advised that your office will handle the pending lien. It is our understanding that you will protect and pay any and all liens against this settlement out of the proceeds of the settlement.

The enclosed Release of All Claims, with the additional language you requested {Condition 4} is a proposed release, appropriate to your client's claim, to be signed by your client after your review and approval. Not all release forms precisely fit the facts and circumstances of every claim. Should you have any questions about any aspect of the release terms, please call me immediately. You may also send me any suggested changes, additions or deletions with a short explanation of the basis for any changes you suggest; or if you have a revised proposed release that you desire to use, please forward it to me. We consider the enclosed proposed Release a document that represents our settlement of this case on behalf of the insured party. We do not consider this release a document which creates any new terms or conditions governing our resolution of this claim.

I have enclosed an estimate and color photos of (INSUREDS) vehicle {Condition 5}. I do not have any photos of your client's vehicle, but I have enclosed a copy of the estimate received in this office from Crawford and Company.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

CONFIDENTIAL!

Finally, I am enclosing a notarized statement signed by me as an authorized GEICO representative and the (INSUREDS) indicating that we will not pursue your client with respect to any property damage claim {Condition 6}. I am also enclosing insurance affidavits signed by the (INSUREDS) as requested {Condition 7}.

If you feel that there is any aspect of the enclosed documents which does not reflect our settlement of your client's claim, please contact me immediately so that we can revise the document to reflect the exact terms of our agreement.

Sincerely,

CU Examiner
1-800-000-0000 Ext 1111
Enclosures
cc: Mr. and Mrs. Insured

CONFIDENTIAL!

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

TCM- Claims-Response to Policy Limit Time Limit Demand-All
TCM-Limits-Demand-Response-All
TCM-Claims-Response to Demand in Excess of Authority-All

TCM-275B
3rd Revision

**MEMORANDUM**

TO: ALL CLAIMS TECHNICAL PERSONNEL

FROM: A. S. Kalinsky, Claims Legal - Ext. 2645

SUBJECT: Claims Response to Time Limit-Policy Limit Demands

DATE: June 2, 1997

CONFIDENTIAL!

Even though policy limit, time limit demands have become almost routine, a timely and appropriate response from claims must be made to such demands.

Therefore, the following guidelines should be implemented immediately:[1*]

1. All new mail should be promptly reviewed by the claims examiner to determine if it contains any time limited material. This would also include a supervisor review of any new mail on the desk of an associate who might be out of the office due to vacation, illness or other reasons.

2. All policy limit demands in all cases must be discussed with the Claims Supervisor as soon as possible after receipt of the demand. If the supervisor is unavailable, discuss with the claims manager, RLA or AVP of Claims.

3. Prepare the appropriate response to the demand and discuss it with the RLA in all cases not on control. If the RLA is unavailable, call the appropriate Claims Attorney. If the case is already on control, then the letter should be discussed with the Claims Attorney before mailing.

4. Once aware of the demand, the Supervisor must be certain the reply is prepared and sent timely.

---

*[1] The purpose of this revision is to clarify that these guidelines apply to any demand above your authority that you are seeking to reject if the value of the case also exceeds your authority. The applicability of the guidelines is not limited to time limit - policy limit demands. See VII herein.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

5. Any policy limit demand on a case involving catastrophic injury should be discussed with the Supervisor, Manager or RLA regardless of the amount of the policy limit or the apparent lack of liability.

6. Policy limit demands which involve extremely serious injuries and extremely tenuous liability even if the policy limit is within your authority should be discussed with Claims Legal prior to absolute rejection of the demand.

7. Any questions about any case involving a policy limit demand or policy limit-time limit demand must be resolved promptly with the appropriate Supervisor, RLA or Claims Attorney.

8. The Supervisor must maintain a combination desk diary and log of all policy limit-time limit demands to be certain that all receive an appropriate and timely response.

9. All such demands must be initialed and dated by the Supervisors when received and entered into the log.

10. If it is decided that the demand is to be met or the case settled for some lesser amount, in all cases there must be a cover letter accompanying the settlement draft. Furthermore, the supervisor must initial the file that the claim has been settled or the demand met and be certain that the cover letter accompanies the draft. The cover letter need only recite the agreed upon settlement amount and indicate the settlement draft is enclosed.

We must be sure to accomplish a timely response in all cases and improve the quality of our responses. A two or three paragraph statement of our conclusions in response to a detailed analysis from the-plaintiffs attorney is not adequate.

In that regard, the following outline should be useful in preparing a response to a detailed demand letter.

I. Liability

A. Where liability is a strong issue, clearly set out the defense theory of the case. Don't utilize percentages but indicate our position (i.e. little, no, some liability) and give your reasons.

B. Where liability is against our insured, point to any arguing points we do have, such as seat belt defenses, any grounds for comparative or contributory negligence upon which we intend to rely.

C. Where investigation is incomplete, explain why and give some idea of how long it should take to complete your investigation.

CONFIDENTIAL!

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

II. Damages

A. Where information is still needed to evaluate the claim:

1. Advise the attorney that you can neither accept nor reject the demand based upon the information in the file.

2. Then identify the information you need; and

3. Indicate when and how often you have requested the information.

4. Request it again and provide authorizations, and

5. If you need an IME, tell them so and again ask that it be arranged.

B. Where you have all the information you need and liability investigation is also complete and you are not going to meet the demand:

I. Advise as to your theory of the case on liability.

2. Discuss damages and indicate whether or not they are related or not related to the loss, and why we believe this to be the case.

3. Discuss permanency and whether or not it is pre-existing. Where applicable, discuss thresholds, collateral sources, etc. as well as matters in mitigation such as seat belt defenses, comparative negligence, etc.

4. Don't use words like "unreasonable" and "exorbitant". If you don't agree or strongly disagree with plaintiffs evaluation, tell them and tell them why in clear understandable language.

III. In Suit - Discovery

If the case is in suit, review the items set out above and:

a. Discuss the case with our attorney.

b. Review discovery done and advise the plaintiff of any further discovery necessary before responding to his demand.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

CONFIDENTIAL!

IV. Extensions

When you want an extension of time, request it in writing. Give your reasons and request a response in writing . If you have an extension by phone, confirm it in writing.

V. Review

Review every response to a policy limit-time limit demand with your supervisor and/or your RLA. If the case is on control, review it with the Claims Attorney.

VI. Supervisory Authority

POLICY LIMITS LIMIT DEMANDS- policy limit demands with or without a time limit that are within your authority to settle would also be within your authority to reject. Policy limit demands that are not within your authority to settle are therefore, not within your authority to reject. Policies limit demands which involve extremely tenuous liability even if the policy limit is within your authority should be discussed with Home Office Claims Legal prior to absolute rejection of the demand.

We are not going to discuss every policy limit or policy limit-time limit demand that we receive. We must discuss those policy limit-time limit demands which might result in a verdict in excess of your authority and which rejection appears to be a termination of further settlement efforts.

Remember, any policy limit-time limit demands received and the time to respond has already expired should be brought to the attention of Home Office Claims Legal for discussion as soon as possible.

Lastly, the insured must be kept advised in writing of these critical negotiations.

"VII. Demand Exceeds Authority, But Is Not Time Limit - Policy Limit

A demand which exceeds your authority, but is not a time limit - policy limit demand, may not require all of the steps delineated above. It does, however, always require discussion with your supervisor and a written response.

A.S. Kalinsky

ASK: jkt

CC: John J, Geer, Jr.

CONFIDENTIAL!

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

# EXCESS AD DAMNUM LETTER

Date

Name
Address
Address

Claim Number:
Insured:
Date of Loss:
Claimant:

Dear [Insured]:

We have received a copy of the lawsuit filed against you by [plaintiff] in the [court] Court of [venue] because of the accident referenced above. As provided by your policy, we have referred the defense of this lawsuit to the law firm of [defense firm name, address, phone number]. Please notify them immediately if you intend to pursue a claim against [plaintiff] or another party.

This defense is provided subject to all the terms, conditions and provisions of the policy contract. Please do not discuss this suit or the facts of this accident with anyone other than our authorized representative or your own counsel.

Since the amount you are being sued for is more than the insurance policy limits, you may want to exercise your right to obtain your own attorney, at your expense, to cooperate with the defense attorney we have retained on your behalf to protect your interests for any amount that may be in excess of your policy limits. You need not hire your own attorney, but you have the right to do so under the policy. The defense attorney provided by GEICO will do his or her best to protect your interests.

If the case goes to trial, most likely we will require your participation in court. You will be given ample notice of the date, time and place of trial or other court appearances. Your policy may provide additional coverage for costs incurred should we request you attend hearings or trials. Please refer to your policy contract.

If you have any other insurance which may cover this loss, you should notify that insurance company of this lawsuit and advise us of the name of the company.

CONFIDENTIAL!

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

Please inform the defense attorney and GEICO if you change your address or intend to be absent. The defense attorney will expect your full cooperation and will be glad to assist you if you have any questions or need information.

**Please sign and date the enclosed copy of this letter and return it to us in the envelope provided as confirmation that you received and read this letter.**

If you have any questions, please contact me at the number below. Please refer to our claim number when call or writing about this claim.

Sincerely,
/S/
Claims Examiner
X2341

Send the letter regular mail in duplicate with a request that one copy be signed and returned to the Company. If the signed copy is not returned, the letter must be sent again by Certified Mail, Return Receipt, cc: Attorney Addressee Only.

In many states, if we are operating under a reservation of rights or if the complaint contains a punitive damages count, the insured may retain an attorney at our expense. Check with your RLA or Clams Legal.

CONFIDENTIAL!

# Lesson Three
## Medical Review for Continuing Unit Examiners
## Central Liability School

### Objectives:

**At the completion of this phase of training, the student will be able to demonstrate the following:**

1. List the benefits of medical knowledge in handling auto claims.
2. Demonstrate an understanding of the anatomy and physiology of the spinal column.
3. Identify types of severe disc disease and the common subjective and objective data used in the diagnosis of severe disc problems. In addition, the student will be able to distinguish treatment options for claimants with severe disc disease and recognize some side effects from these types of injuries.
4. Indicate a clear understanding of spinal cord injuries. This includes the information on long term care as well as additional medical conditions that arise from a spinal cord injury.
5. Compare and contrast different types of fractures and list the various diagnostic tools and treatment options available to the claimant who sustains a fracture. This will also cover information on limb amputation.
6. Identify the symptoms (subjective and objective), treatments and complications that can arise from head injuries.
7. Identify diagnosis and treatment criteria for Neurological/Psychological conditions.
8. Identify other injuries to organ structures and the musculoskeletal system and describe the diagnostic criteria and other treatment options available to our customers affected by these conditions.
9. Classify lacerations and burns.

CONFIDENTIAL!

**The Benefits of Understanding Medicals**

In this lesson we will explore medical conditions commonly seen at the CU level of claims handling. Proper understanding of these injuries will have several benefits:

- Superior customer service through increased ____________________
- Improved consistency in ____________________________________.
- Greater details when securing _________________________________.
- Accuracy in recommending ___________________________________.
- Proper ____________________ and discretion on suit and non-suit control file handling.

Let's take a closer look at each of these benefits.

**Superior Customer Service through Increased Empathy**

Simply stated, having "empathy" is having the ability to put yourself in someone's shoes. Since the beginning of your claims career, you have been providing empathetic statements to our customers when taking and receiving any new loss. As a CU examiner, having a detailed knowledge of the medical condition plaguing the claimants will allow you to gain a different perspective on the empathy you can provide your claimants, their survivors, or their designated representatives.

**Improved Consistency in Medical Investigations**

Your responsibility as a CU examiner is performing the proper medical investigation for injuries claimed by claimants. Understanding the physiological component of an injury will guide you in your investigation and, ultimately, will assist you in placing a consistent value on similar losses.

**Greater Details when Securing Recorded Interviews**

Recorded interviews at this level of claims handling will be very similar to the recorded interviews you conducted at previous levels. However, the recorded interview as a CU Examiner requires us to ask the right "medical" questions with precision. This ensures we have a complete understanding of the nature of the injury so that we are better able to evaluate the injury claim properly. Detailed knowledge of a condition will allow you to ask more precise questions.

**Accuracy in Recommending Case Reserves and Settlement Authority**

When analyzing our reserves, being aware of the treatment processes and protocols are beneficial in completing your review and recommending case reserves. Based on your knowledge of the Claims Manual, you know how important it is to give a clear and concise summary of the claim when recommending or changing the case reserve or requesting settlement authority. The knowledge you have about the injury itself will allow you to accomplish this task more accurately.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

CONFIDENTIAL!

**Proper evaluation and discretion on suit and non-suit control file handling**

Increased productivity is a positive result of gaining advanced knowledge of medical review. Since a major portion of your job will focus on handling cases in which a file is on control, having a detailed knowledge of the injury or injuries will assist you in recognizing those files that need to be placed on control with CHOL. It will also allow you to be more timely and accurate in your overall suit and non-suit file evaluations.

**Having the proper knowledge of any specific injury will have exponential effects on how fast we work and the customer service we provide. In turn, this will have an impact on our average loss expenses.**

**Remember**

**You can never make recommendations on medical treatment for your customers. They seek the treatment that is right for them and we evaluate that treatment.**

CONFIDENTIAL!

Confidential Information of GEICO Companies
© Government Employees Insurance Company

## The Spinal Column

Before we delve into specific scenarios and spinal injuries commonly seen at the CU level of claims handling, we need to exam the anatomy and physiology of the spinal column and its related structures. Based on your TCR2 experience, you have probably learned that a majority of the bodily injury claims handled involve injuries related to the spinal column. This is still true at the CU level of claims handling.

When reviewing your claimant's medical documentation, especially in your review of diagnostic data, recalling the anatomy and physiology of the spine will benefit your ability to understand the extent of the injury. This will give you a better picture of the impact the injury had on the lifestyle of the claimant. This will assist you in placing a value on the loss.

As you continue to review medical documentation, the need for you to identify and question degenerative findings in medical reports will intensify. This is especially true when questioning whether a treatment regimen, procedure, or surgery is causally related to the accident. Ask yourself this - did we cause it, or did we just aggravate a pre-existing condition?

## Description

The spinal column is made up of vertebrae joined together and permitted forward and backward bending, side bending, and rotation of the spine. Five distinct regions comprise the spinal column, including the cervical (neck) region, thoracic (chest) region, lumbar (low back) region, sacral and coccygeal (tailbone) region. The cervical region consists of seven vertebrae, the thoracic region includes twelve vertebrae, and the lumbar region contains five vertebrae. The sacrum is composed of five fused vertebrae, which are connected to four fused vertebrae forming the coccyx. Intervertebral discs lie between each adjacent vertebra. Each disc is composed of a gelatinous material in the center, called the nucleus pulposus, surrounded by rings of a fibrocartilagenous tissue (annulus fibrous).

At this time, we will identify the anatomy of an intervertebral disc.

CONFIDENTIAL!

Confidential Information of GEICO Companies
© Government Employees Insurance Company



CONFIDENTIAL!

Confidential Information of GEICO Companies
© Government Employees Insurance Company



1. Spinal cord, Thecal sac and Nerve Root
2 End Plate
3 Vertebral Body
8. Neural Foramina
7. Facet Joint
4. Intra Vertebral Disc (IVD)
5. Vertebral Body
6. Nerve Root
CONFIDENTIAL!

Confidential Information of GEICO Companies
© Government Employees Insurance Company

**Nerve Roots serve Three Functions**
**Sensory – Motor - Reflex**

CONFIDENTIAL!

Confidential Information of GEICO Companies
© Government Employees Insurance Company

**Miscellaneous Injuries of the Spine**

So far, we have reviewed the anatomy and physiology of the spine. This included the basic structure of the spinal column as well as the structure of an intervertebral disc. Since the majority of the BI/UM features we handle involve these types of injuries, having a clear and concise understanding is advantageous to your productivity.

As a prelude to our discussion on more severe injuries of the spine, we will now focus our attention on disorders of the spine that are somewhat unclassified.

Sprain/Strain____________________________________________

____________________________________________

____________________________________________

____________________________________________

Fractures____________________________________________

____________________________________________

____________________________________________

____________________________________________

Disc____________________________________________

____________________________________________

____________________________________________

____________________________________________

Alignment____________________________________________

____________________________________________

____________________________________________

____________________________________________

The spine is a very strong structure that is designed to take on a lot of pressure and movement as an individual navigates through his/her daily lives. But when something traumatic occurs and this structure is compromised, it can really have a negative impact on the lifestyle of the individual.

Please keep in mind that not all of these severe injuries require surgery. Many cause no real upset to the daily lives of our claimants and some improve dramatically with physical therapy. There will be cases in which surgery is imminent. Let's take a look at some of these conditions.

CONFIDENTIAL!

Confidential Information of GEICO Companies
© Government Employees Insurance Company

## Severe injuries of the Back

As you may have learned from your experience as a TCR2, a majority of the injuries experienced in an auto accident usually will have a primary diagnosis of sprain/strain. The course of treatment following this acute phase depends greatly on the individual. Some claimants might seek care at the ER and then will cease treatment. Some might follow-up with an orthopedist, chiropractor, osteopath or their general practitioner. Regardless of what happens, many of the subjective symptoms that indicate severe disc injury do not manifest themselves until after the acute phase of the condition.

Many claimants are typically treated initially for your basic soft tissue injury once radiographic evidence rules out a fracture. After weeks of treatment with minimal improvements, the claimant can be referred for additional diagnostic imaging (i.e. CT, MRI, etc.), especially with the presence of other subjective symptoms such as numbness and tingling in the extremities. Consequently, many claimants will be diagnosed with an Intervertebral Herniated Disc (IHD).

Disc herniation is a rupture of fibrocartilagenous material (**annulus fibrosis**) that surrounds the intervertebral disc. This rupture involves the release of the disc's center portion containing a gelatinous substance called the **nucleus pulposus**. Pressure from the vertebrae above and below may cause the nucleus pulposus to be forced outward, potentially placing pressure on a spinal nerve and causing considerable pain and damage to the nerve. This condition most frequently occurs in the lumbar region between L5 and S1. It is also commonly called herniated nucleus pulposus, prolapsed disc, ruptured intervertebral disc, or slipped disc.

However, disc herniation can also occur in the cervical spine. The incidence of cervical disc herniation is most common between the C5 and C6. The second most common area for cervical disc herniation occurs between the C6 and C7 vertebrae. Disc herniation is less common in the thoracic region.

Predisposing factors associated with pathologic disc herniations include age, gender, and work environment. Other medical conditions that could contribute to the cause of herniations are osteophytes, spondylolisthesis, (remember ***spondyl*** refers to the ***vertebra***) and degenerative disc disease.

Typically, a degenerative disc will loose its height due to desiccation (drying out). These are diagnosed due to the loss of signal by MRI because of the disc does not have as much water as a healthy disc. As the disc weakens over time, it is more likely to become herniated as lateral forces are placed upon it.

CONFIDENTIAL!

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

The peak age for the occurrence of disc herniation is between 20–45 years of age. Studies have shown that males are more commonly affected than females in lumbar disc herniation by a 3:2 ratio. Prolonged exposure to a bent-forward work posture is correlated with an increased incidence of disc herniation.

Make certain that you look at the description of the abnormality as well as other structures being affected by this abnormality. **Disc injuries that do not touch the spinal cord and do not displace the nerve roots should not cause subjective complaints of radiating numbness or motor weakness in the area innervated by the nerve root.**

An example of a negative impact is anything that can be argued as acute. These include bulges and/or herniations that are causing some sort of disruption of the spinal cord, the nerve root or the neural foramen. Let's define some of these acute pathologies…

- A protrusion/disc bulge is an extension of the disc wall (annulus fibrosis) beyond the boundary of the adjacent vertebral end plates

- The disc herniation or "prolapsed disc" is where a greater extension of the disc wall with a possible tear in the annulus and movement of the nucleus. When the nucleus migrates through this tear in any way, some radiologists define this as a Herniated Nucleus Pulposus (HNP). This injury can be minor in nature or it can be severe enough to displace the spinal cord or a spinal nerve root.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

CONFIDENTIAL!

- Extruded Herniated Disc, in this example, there is an extension of the nucleus pulposus through a complete tear in the annulus. Although the nucleus remains attached to the center of the disc, the majority of the contents has migrated through the tear and is now in the spinal canal.

- Sequestered Herniated Disc – This is very similar to the extruded disc in that there is a complete tear in the annulus and the nucleus is migrating through this defect. But with the annulus, the nucleus remained attached to the center of the disc. With a sequestered disc, part of the nucleus remains attached to the center but the outer portion physically breaks off. This fragment of nucleic material is now interrupting normal processes within the spinal canal.

When presented with either the MRI report or allegations of these types of findings, it is strongly suggested that you keep these types of files on a short diary. The exposure is already going to be affected somewhat by just knowing this information. It might be necessary to consult your supervisor about a reserve change if a case reserve has already been set.

CONFIDENTIAL!

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

Analyzing the MRI also allows you to identify degenerative terms that can allow you to be more effective in negotiations. The existence of these conditions indicates that this person already has a degenerative spine and that we possibly aggravated the condition.

- **Osteophyte** - a pathological bony outgrowth
- **Spondylosis** - any of various degenerative diseases of the spine
- **Spondylitis** - inflammation of the vertebrae
- **Schuermann's** disease - This is an abnormality of the growth plates that are on the upper and lower surfaces of the vertebral body before skeletal maturation. It can result in a marked increase in the normal rounding (kyphosis) of the thoracic spine in adolescents. It is seldom a cause of back pain.
- **Scoliosis** - This is sideways curvature of the spine. It can be congenital, secondary to paralysis (such as poliomyelitis) or idiopathic (i.e. no known cause). As the curve increases, the ribs on the concave side are jammed together forcing the vertebrae to rotate. In turn this makes the ribs on the convex side more prominent causing a "hump back". Any type of scoliosis is often associated with premature aging changes in the discs at the apex of the curve.
- **Degenerative Disc Disease** - With gradual aging, there is loss of water from the nucleus pulposus with resulting thinning of the disc space between the adjacent vertebrae and this can be seen on plain x- rays. The narrowing of the disc space causes the annulus fibrosis to "bulge" and this can be seen on CT or MR scans. It does not usually cause symptoms.
- **Facet Arthritis** – Osteo or Rheumatoid arthritis with the facet joints of the spine.
- **Spinal Stenosis** - the gradual formation of bony outgrowths narrows the spinal canal and the openings through which the spinal nerves emerge. This condition is not caused by trauma.
- **Spondylolisthesis** – Due to gradual deterioration of the tissues supporting the spine, this can cause a "lipping forward" of one vertebra on top of the other.
- **Spondylolysis** - disintegration or dissolution of a vertebra

CONFIDENTIAL!

Confidential Information of GEICO Companies
© Government Employees Insurance Company

**Schmorl's nodes** are most common in the middle and lower spine. Schmorl's nodes are common, especially with minor degeneration of the aging spine. Schmorl's nodes usually cause no symptoms, but reflect that "wear and tear" of the spine has occurred over time. Schmorl's nodes are a helpful x-ray finding as an indicator of degenerative process that may be affecting a patient's spine.

Remember that individuals with these types of conditions are already predisposed to injury. We must recognize and understand these conditions in order to affectively argue these pre-existing circumstances with the claimant or their representative.

## Central Disc Herniations

The last thing we will discuss in regards to disc pathologies are central disc herniations. These herniations or bulges are usually asymptomatic and are quite common among the general population. Why are we prone to have such an injury? The answer can be found in reviewing the natural curvatures of our spine. We learned earlier that we have a natural lordotic (forward) curvature in our cervical and lumbar spines and we have a natural kyphotic (backward) curvature in our thoracic spine.

These normal curvatures predispose us to these types of injuries. With that said, an argument can be made that any slight bulge in this area not causing an impingement of the spinal cord could have pre-dated the accident. This fact, coupled with other facts about the claimant (age, weight, occupation, etc.) should provide you a sufficient mitigator(s).

Lastly, severe central disc herniations causing flattening of the spinal cord can be considered a serious injury and can cause other symptoms. This includes urinary or bowel incontinence, breathing issues and sexual dysfunction.
Causes & symptoms
Any direct, forceful, and vertical pressure on the discs can cause the disc to push its fluid contents into the vertebral body. Herniated nucleus pulposus may occur suddenly from lifting, twisting, or direct injury, or it can occur gradually from degenerative changes with episodes of intensifying symptoms.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

CONFIDENTIAL!

The annulus may also become weakened over time, allowing stretching or tearing and leading to a disc herniation. Depending on the location of the herniation, the herniated material can also press directly on nerve roots or on the spinal cord, causing a shock-like pain (sciatica) down the legs, weakness, numbness, or problems with bowels, bladder, or sexual function.

## Diagnosis

Several radiographic tests are useful for confirming a diagnosis of disc herniation and locating the source of pain. These tests also help the surgeon indicate the extent of the surgery needed to fully decompress the nerve. X rays show structural changes of the lumbar spine. Earlier we discussed Myelography and the fact that it is a special x-ray of the spine in which a dye or air is injected into the patient's spinal canal. The patient lies strapped to a table as the table tilts in various directions and spot x rays are taken. X-rays showing a narrowed dye column in the intervertebral disc area indicate possible disc herniation.

Computed tomography scan (CT or CAT scans) exhibit the details of pathology necessary to obtain consistently good surgical results. Magnetic resonance imaging (MRI) analysis of the discs can accurately detect the early stages of disc aging and degeneration. Electomyograms (EMGs) measure the electrical activity of the muscle contractions and possibly show evidence of nerve damage. An EMG is a powerful tool for assessing muscle fatigue associated with muscle impairment with low back pain.

## Treatment/Drugs

Unless serious neurological symptoms occur, herniated discs can initially be treated with pain medication and up to 48 hours of bed rest. There is no proven benefit from resting more than 48 hours. Patients are then encouraged to gradually increase their activity. Pain medications, including anti-inflammatories, muscle relaxers, or in severe cases, narcotics, may be continued if needed.

Epidural steroid injections have been used to decrease pain by injecting an anti-inflammatory drug, usually a corticosteroid, around the nerve root to reduce inflammation and edema (swelling). This partly relieves the pressure on the nerve root as well as resolves the inflammation. (See Example #18)

CONFIDENTIAL!

Confidential Information of GEICO Companies
© Government Employees Insurance Company

## Physical Therapy

After the initial consultation, the neuro or ortho will meet again with the injured party after securing the results of the MRI (and electrodiagnostics if ordered). Assuming that our patient does present with some type of disc pathology, the physician will usually recommend the following:

- Continued physical therapy
- Medications
- Referral to the specialty of Pain Medicine

Unless serious neurological symptoms occur, herniated discs can normally be treated with pain medication and up to 48 hours of bed rest. There is no proven benefit from resting more than 48 hours. Patients are then encouraged to gradually increase their activity. Pain medications, including anti-inflammatories, muscle relaxers, or in severe cases, narcotics, may be continued if needed.

Physical therapists are skilled in treating acute back pain caused by the disc herniation. The physical therapist can provide noninvasive therapies, such as ultrasound or diathermy to project heat deep into the tissues of the back or administer manual therapy, if mobility of the spine is impaired. They may help improve posture and develop an exercise program for recovery and long-term protection. Appropriate exercise can help take pressure off inflamed nerve structures, while improving overall posture and flexibility. Traction can be used to try to decrease pressure on the disc.

Often times an extruded and sequestered HNPs are commonly handled (without a conservative approach) with surgery. Proper reserving should be taken into account as well as notice of the potential exposure to our insured.

Regardless, treatment options can differ based on the age of the customer, his/her health status minus the disc pathology, the size of the customer, etc. You must also remember that there are many doctors who recommend surgery for many ailments when a conservative approach might be applicable. Regardless, most orthopedics or neurologists usually recommend a conservative approach when a customer presents with these objective findings.

CONFIDENTIAL!

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## Pain Management Through Injections

In many cases, spinal injections may be used both to find out what is causing your pain and to treat your pain. Doctors refer to these two separate uses of spinal injections as diagnostic and therapeutic. If an injection provides pain relief in the area that is injected, it is likely that this particular area is the source of the problem. Injections are also therapeutic in that they can provide temporary relief from pain.

With most spinal injections, a local anesthetic (numbing medication) called lidocaine (also known as Xylocaine) is injected into a specific area of the spine. Lidocaine is a fast-acting drug, but the effects wear off within about two hours. That is why lidocaine is used more often as a diagnostic tool rather than a long-lasting pain reliever. Bupivacaine (also known as Marcaine) is another type of anesthetic that can be used. It is slower to take effect, but it lasts longer, giving the patient more relief from pain. Cortisone is a strong anti-inflammatory steroid medication. It is commonly injected along with a local anesthetic in order to reduce inflammation in the affected areas. Cortisone is long lasting and can be slow-releasing in order to give the best possible benefits of pain relief. Cortisone may not begin working for several days following the injection, but the effects can last for months. Sometimes a narcotic medication such as morphine or fentanyl is mixed with cortisone and the anesthetic to get increased pain relief.

**Trigger Point Injection** – used to treat extremely painful and tender areas of muscle. A trigger point is a discreet knot or tight, ropy band of muscle that forms when muscle fails to relax. It may be felt under the skin and may twitch involuntarily when touched.

The purpose if these injections are to reduce inflammation and relax the muscle tissue; therefore decreasing pain and allowing the pt. to participate more effectively in their rehab program. The procedure is very simple – a small needle is inserted into the trigger point and medication is injected. The common frequency and duration is about 5-10 trigger point injections given in one session and sessions are typically repeated at regular intervals in series and coordinated with physical therapy.

**Epidural Steroid Injections** - An ESI is a common type of injection that is given to provide relief from certain types of low back and neck pain. The "epidural space" is the space between the covering of the spinal cord (dura mater) and the inside of the bony spinal canal. It runs the entire length of your spine. When injected into this area the medication moves freely up and down the spine to coat the nerve roots and the outside lining of the facet joints near the area of injection. For example, if the injection is given in the lumbar spine, the medication will usually affect the entire lower portion of the spine.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

CONFIDENTIAL!

The epidural needle is inserted into the back until the doctor feels sure it is in the epidural space. The doctor will then place a small amount of lidocaine into the epidural space and wait to see if you feel warmth and numbness in your legs. If so, the needle is most likely in the correct position. The remainder of the medication is injected and the needle is withdrawn.

Frequency and Duration is typically no more than three injections should be given in a 6-8 month period. The frequency of the injections depends on the actual injury and the benefits received per the pt. If three injections have not helped the patient, it is very unlikely the patient will receive any further gains from additional injections. There are three different ways to perform an epidural injection:

- Caudal block
- Translumbar
- Transforaminal

**Caudal Block** - A caudal block is placed through the sacral gap (a space below the lumbar spine near the sacrum). The injection is placed into the epidural space. This type of block usually affects the spinal nerves at the end of the spinal canal near the sacrum. This collection of nerves is called the cauda equina. One of the benefits of this type of injection is less chance of puncturing the dura.

**Translumbar** - The Translumbar approach is the most common way of performing an epidural injection. This type of injection is performed by placing a needle between two vertebrae from the back. The needle is inserted between the spinous processes of two vertebrae. You can actually feel the bumps that make up the spinous process by feeling along the back of your spine.

**Transforaminal** - The Transforaminal approach is a very selective injection around a specific nerve root. As we indicated earlier, the foramina are small openings between your vertebrae through which the nerve roots exit the spinal canal and enter the body. By injecting medication around a specific nerve root, the doctor can determine if this nerve root is causing the problem. This type of epidural injection is used most often for diagnostic purposes, and it is commonly used in the neck.

CONFIDENTIAL!

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## Indications for an ESI

Epidural injections are used to treat radicular pain caused by nerve irritation. This type of pain is usually caused by herniated discs or spinal stenosis. A herniated disc occurs when pressure or degeneration produces a tear in the disc's outer ring (the annulus), and the nucleus ruptures out of its normal space. If it rips near the spinal canal, the bulging disc can push out of its space and into the spinal canal, placing inappropriate pressure on the spinal cord and nerve roots. Spinal stenosis is a narrowing of the spinal canal that can cause pressure on the spinal cord and spinal nerves.

Epidural injections are also helpful when the main problem is arthritis of the facet joints in multiple areas of the spine. The medication coats the outside of the problem joints and absorbs into the joints. This type of injection reduces the inflammation in the joint. The injection is sometimes aimed at the small nerves that supply the joints.

It may be necessary to have several epidural injections in a series over a period of a few weeks. This is because the relief from the epidural injection usually decreases with time. It is not uncommon to have three lumbar epidural injections, each about ten days apart.

Your doctor may suggest that an epidural injection not be considered if you have abnormalities of the epidural space. Either it has been altered from a congenital (present at birth) abnormality, or from a previous surgery that has left scarring.

**Infection** - Injecting steroids, such as cortisone, anywhere in the body allows for absorption of the medication into the bloodstream and can lower the body's ability to fight infections. Cortisone should not be used if there is any type of serious infection in the body.

**Steroid Related** - Absorption of the medication may also cause a systemic (whole body) corticosteroid effect such as fluid retention or interference with glucose control. An epidural might not be appropriate for patients with diabetes or congestive heart failure.

CONFIDENTIAL!

Confidential Information of GEICO Companies
© Government Employees Insurance Company

**Risks**

There are risks associated with epidural injections. This is not intended to be a complete list, but these are some of the most common.

- Dural puncture
- Intravascular injection
- Infection
- Bleeding
- Bladder dysfunction
- Neurologic complications

**Dural Puncture**

A dural puncture, or "wet tap," is perhaps the most common complication from an ESI. This complication only occurs in 0.1 to 5 percent of all injections. The result of a dural puncture is usually a spinal headache and nausea. A spinal headache occurs when the puncture in the spinal sac fails to seal itself off. This allows the spinal fluid to continue to leak out and lowers the spinal fluid pressure in the brain. When sitting or standing, the headache and nausea are much worse because the spinal fluid pressure is lower at the top (near your head) than at the bottom of the spine. The headache usually goes away when you lie down with your feet higher than your head.

To treat a spinal headache, a "blood patch" is usually recommended. If the doctor realizes immediately during the procedure that there is a wet tap, he may perform a blood patch before he removes the epidural needle. A blood patch is a simple procedure. About three ounces of blood are drawn from an arm vein and immediately injected into the epidural space with the epidural needle. The blood clots around the spinal sac and stops the leak by forming a "patch."

**Intravascular Injection**

There is a slight chance that the medication may be injected into one of the tiny blood vessels that runs through the epidural space instead of the epidural space itself. This can cause seizures, cardiac arrest, and even death if too much of the medication goes directly into the blood steam. The chance of this happening is very small.

**Infection**

Epidural injections are done under sterile conditions very similar to surgery. Still, anytime a needle is inserted into the body there is a small chance of infection. Since the needle must be placed near the spine during an epidural, an infection is much more serious if it occurs. The chance that an infection will occur is extremely small.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

CONFIDENTIAL!

**Bleeding**
An epidural injection can result in a hematoma. A hematoma is simply a collection of blood caused by an injury to a blood vessel. An epidural hematoma can be serious if it is big enough to put sufficient pressure on the spinal nerves so that they quit working. This can cause problems with the bowels and bladder.

**Bladder Dysfunction**
The epidural injection actually paralyzes the nerves to the bowel and bladder for a short period. You may not have control over your bladder for one to two hours following the procedure.

**Neurological Complications**
There is always a small risk of damage to the spinal nerves. The spinal cord is a bundle of millions of nerves connecting the brain with the rest of the body. If the epidural needle directly injures the spinal nerves, it may result in injury to the nerves.

**Facet Joint Injections**
Facet joint injections are used to localize and treat low back pain caused by problems of the facet joints. These joints are located on each side of the vertebrae. They join the vertebrae together and allow the spine to move with flexibility. The facet joint injections form a pain block that allows the doctor to confirm that a facet joint is causing the pain. The medication used also decreases inflammation that occurs in the joint from arthritis and joint degeneration.

It is important to make sure that the injection goes directly into the facet joint. Fluoroscopy can be used to confirm that the needle is in the right position before any medication is injected. A fluoroscope uses X-rays to show a TV image. You doctor can watch on the screen as the needle is placed into the joint and magnify the image to increase accuracy.
There are two types of facet joint injections.

- Interarticular are injected directly into the joint to block the pain and reduce inflammation.
- Nerve blocks help determine whether the joint is indeed a source of pain by blocking the small nerves that connect with the joint.

CONFIDENTIAL!

Confidential Information of GEICO Companies
© Government Employees Insurance Company

**Specific Indications**
A facet joint injection is perhaps the best way to diagnose facet joint syndrome. Joints that look abnormal on an X-ray may in fact be painless, while joints that look fine may actually be a source of pain. This is a rather simple procedure with little risk.

**SI Joint Injections**
Sacroiliac (SI) joint pain is easily confused with back pain from the spine. The SI joint is located between the sacrum and pelvic bones. Sometimes injecting the SI joint with lidocaine may help your doctor determine whether the SI joint is the source of your pain. If the joint is injected and your pain does not go away, it is probably coming from somewhere else. If the pain goes away immediately, your doctor may also inject cortisone into the joint before removing the needle. Cortisone is added to treat inflammation from SI joint arthritis. The injection usually gives temporary relief for several weeks or months.

**<u>If the conservative approach is unsuccessful, doctors may have no choice but to recommend surgical intervention.</u>**

CONFIDENTIAL!

Confidential Information of GEICO Companies
© Government Employees Insurance Company

## Surgical Procedures

Based on your knowledge and experience, you are all aware of the types of surgeries that can follow a diagnosis of disc pathology. Most begin conservatively (as stated before) but more invasive methods can be implemented if symptoms do not wane.

Most disc protrusions produce no symptoms and many patients with symptomatic disc herniations experience symptom resolution without surgical intervention. For those claimants that continue to have subjective and objective symptoms that do not resolve themselves, surgery is required. The types of surgery performed on these claimants will depend on the type and location of the injury. Let's take a look at the types of surgical procedures used for these types of injuries:

**Laminectomy** (lam·i·nec·to·my) - The term Laminectomy is derived from lumber (lower spine), lamina (part of the spinal canal's bony structure) and -ectomy (removal). The operation is performed to relieve pressure on one or more spinal nerve roots. This pressure, often called nerve root compression or a "pinched nerve", is what often causes back and leg pain.

Lumbar laminectomy surgery is performed with the patient lying on the abdomen or side after being put "to sleep" with general anesthesia. The surgeon reaches the lumbar spine through an incision in the lower back. After the muscles of the back are spread apart using a retractor to expose the lamina, a portion of one or more vertebra are removed in order to reach the compressed nerve root(s). Once the point where the nerve is being compressed is located, the source of the pressure is removed. That may involve removing either:

Comment [G1]: CU Stuff

- The ruptured portion of the disc;
- The bony spurs and bony overgrowth; or,
- Any scar tissue

The operation normally takes approximately 2 hours. It is normal to have pain after the operation. It will be most severe in the lower back where the surgery was done. Residual leg pain is not uncommon. This is caused by swelling of the previously compressed nerve as well as from surgery itself. There may be muscle spasms across the back and down the legs. Medication will be prescribed to help relieve the pain and/or spasms.

CONFIDENTIAL!

Confidential Information of GEICO Companies
© Government Employees Insurance Company

**Hemilaminectomy** (hemi·lam·i·nec·to·my) - The term Hemilaminectomy is where only part of the Lamina and only a portion of the Facet Joint are removed to allow more room for the Lumbar Nerve. This nerve is usually compressed due to a progressive degeneration in the spine.

The most common reason to have this procedure is due to severe Sciatica (numbness or weakness in the leg). Most likely, if symptoms are not too severe other things will be tried first, such as physical therapy, rest, and anti-inflammatory medications. The cause of the symptoms, in the majority of cases, is a degenerative process in the Lumbar region of the spine whereby the Facet Joints enlarge, the ligament becomes thicker, and the disk bulges. When this happens, it reduces the space and compresses the nerves that supply sensation to the legs.

Individuals who undergo this type of procedure cannot drive 3-6 weeks post accident and usually cannot return to work for 4-6 weeks. Most people do have ongoing back discomfort and this will vary from case to case, but may improve with anti-inflammatory medication.

**Foraminotomy** (fora·min·oto·my) – Cervical foraminotomy is an operation to enlarge the space where a spinal nerve root exits the cervical spinal canal to relieve the symptoms of a "pinched nerve."

Compression of the cervical nerve roots can cause neck pain, stiffness, and pain radiating into the shoulder, arm, and hand, as well as numbness, tingling and/or weakness in the arm and hand. Protruding or ruptured discs, bone spurs, and thickened ligaments or joints can all cause narrowing of the space where the nerve exits the spinal canal and cause the above symptoms. Claimants who do not improve with conservative treatment may be candidates for the operation.

Bone from the posterior arch of the spine and joint over the nerve are removed using special cutting instruments and/or a drill. Thickened ligament, bone spurs and/or bulging discs are removed to decompress the exiting nerve, which is checked with a probe to insure adequate space around the nerve root.

Like we saw with previous surgeries, driving is not recommended 6 weeks post surgery and the claimant probably will not be able to return to work until 2-4 weeks post surgery.

CONFIDENTIAL!

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## Discectomy

For the purpose of this course, we will discuss "discectomy" as a general term and then will expand on the different methods used when completely a discectomy.

The term discectomy is normally used to describe the surgical removal of part or all of a intervertebral disc. This herniated disc material may or may not be pressing on a nerve root or the spinal cord. A discectomy can be performed via anterior or posterior approach and/or both and either by open or closed methods. There are (3) classifications of discectomies: Open, Micro and percutaneous.

### Open Discectomy

The open method is the most common treatment for ruptured or herniated disc (especially in the lumbar spine). This method requires a larger incision and muscle dissection in order to gain access to the area of upset. Quite naturally, these types of procedures take longer to complete, increases the need for additional anesthesia, and will require a lengthier hospital stay. The patient will also usually need more time to recuperate.

As we saw earlier, when the annulus becomes weakened, it may tear allowing the nucleus pulposus to push its way out. Once the inner disc material extends out past the regular margin of the outer disc wall, it can press against and possibly damage the very sensitive nerve tissue in the spine.

The surgery involves a small incision (approximately 1 inch) in the skin over the spine, removal of some ligament and bone material to access the disc and the removal of some or all of the disc material.

## Microdiscectomy

A microdiscectomy is a minimally invasive procedure that utilizes a surgical technique in which small portals or tiny incisions are made into the skin through which small, specialized instruments are inserted. The surgeon will utilize microscopic fiber optics that transmits anatomical images of the disc and nerves to a monitor similar to a television. The equipment is made with built-in magnification that enables the surgeon to view structures through this very small portal.

When performing a microdiscectomy, the surgeon will also use a special type of muscle-spreading instrument that reduces muscle damage. This allows for easier removal of disc material that may be herniating or protruding into the spinal canal. This will also allow the surgeon to remove herniated fragments safely while protecting the nerve roots and spinal cord. This procedure normally causes much less pain after the surgery, and allows the patient to recover and return to rehabilitation and normal activity much sooner.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

CONFIDENTIAL!

## Percutaneous Discectomy

Percutaneous Discectomy is a procedure that uses a special tool inserted through a small incision in the back to cut out or drain the herniated disc, thereby reducing its size. It is different from conventional open discectomy or microdiscectomy.

There are different types of percutaneous procedures. All of them involve inserting small instruments between the vertebrae and into the middle of the disc. X-ray monitoring is used during surgery to guide the movement of the surgical instruments. The surgeon can remove disc tissue by cutting it out, sucking out the center of the disc, or by using lasers to burn or evaporate the disc. The disc material that has herniated is not directly removed in these operations.

Percutaneous discectomy may be done if the history, physical examination, and imaging (such as CT scan or MRI) indicate that the disc is bulging and that the nucleus has not ruptured into the spinal canal. Like with other types of discectomies, surgery can be indicated if symptoms are severe and debilitating and after conservative treatment has been attempted.

Contraindications do exist for this procedure and include the following:

- Fragments of disc material (nucleus) in the spinal canal (as seen on CT scan or MRI).
- Narrowing of the spinal canal (spinal stenosis).

These contraindications exist for two very important reasons:

- During a percutaneous discectomy, the surgeon has no way of seeing the herniated disc or the compressed nerve root.
- The surgery does not directly remove the disc herniation.

The most alarming fact is that there is no guarantee that pressure being exerted on the nerve will be reduced or eliminated using percutaneous discectomy. Due to this fact, percutaneous discectomy is less effective than the other traditional methods and is considered to be a poor alternative to standard discectomy or microdiscectomy procedures.

Earlier we commented that there are (3) primary types of percutaneous procedures that are often used, each having some slight differences differing them from the next.

Lets discuss each of these…

CONFIDENTIAL!

Confidential Information of GEICO Companies
© Government Employees Insurance Company

## Disc Nucleoplasty

Disc nucleoplasty, officially called percutaneous disc nucleoplasty, sends pulses of radio waves into the nucleus of a herniated disc. The surgical tool necessary to perform this procedure is the PERC-D Wand ©. This surgical tool allows the physician to use a unique plasma technology called Coblation® to remove tissue from the center of the disc. This is done by using radio waves that vaporize small amounts of disc material, creating an empty space within the disc. Theoretically, the material that has bulged out of the disc wall will then move to fill in this empty space, restoring the disc wall to its original shape. With the disc wall no longer herniated, the pressure on nerve roots or the spinal cord will disappear, providing immediate pain relief.

Recovery from this outpatient procedure is usually very quick because, like most minimally invasive surgery, it does not require the cutting of muscles or bone. With limited bed rest and a program of physical therapy, patients should resume normal activity within one to six weeks.

### IDET (Introdiscal Electro Thermal Therapy)

IDET stands for intradiscal electrothermal therapy. IDET is a minimally invasive procedure used to relieve chronic or severe low-back pain caused by diseased, damaged, herniated or degenerated discs. IDET involves the application of an electrothermal catheter (SpineCATH©), a thin heating wire, which delivers precise amounts of heat to a disc. This allows the physician to shrink or seal any tears or cracks in the outer wall of the disc, reduce the bulge of inner disc material known as a herniated disc, and cauterize (burn) and thereby disable painful nerve endings affected by the deformed disc. It is usually performed on an outpatient basis.

During the procedure, the heating of the catheter may cause the patient some discomfort, which is an indication that the physician has located the correct source of the pain. The procedure is ultimately designed to eliminate chronic low back pain and provide greater range of motion and general mobility.

## DeKompressor Decompression

With this procedure, a part of a herniated disc is removed because it is irritating a nerve and causing pain. In this minimally invasive procedure, a small needle is advanced to the herniated disc guided by a fluroscope. A probe with a rotating tip is then inserted through the needle to reach the herniated disc. When the probe is turned on, its tip drills away part of the disc nucleus. This procedure is theoretically used to create space for the herniated disc wall thus relieving pressure on the affected nerve.

CONFIDENTIAL!

Confidential Information of GEICO Companies
© Government Employees Insurance Company

Like we see with disc nucleoplasty, the Stryker DeKompressor © is also used percutaneously. The Stryker Wand is contraindicated in patients with severely degenerative or disrupted discs. Stryker apparently also has an adapter available for coagulation of disc material similar to that of the PERC-D Wand ©.

## Percutaneous Decompression - The Bottom Line

Now that we have discussed the typical procedures that fall under the umbrella of percutaneous discectomy, it is important to know some of the implications this types of procedures can have on your negotiation strategies and (possibly) the value of your case.

In a typical fender-bender where injuries appear to be soft tissue in nature, we review the demand and usually attempt to argue against the likelihood of permanent injury. This is predicated on the notion that the customer followed the typical tract for these types of injuries. Our thorough review of the medical documents, coupled with our knowledge and experience, guide us in our negotiations. Keeping this in mind, how does our opinion change regarding permanency if the customer undergoes a "spine surgery"?

In some jurisdictions, it seems that customers involved in a typical fender-bender are now being treated en-masse to a "minimally invasive" outpatient surgical procedure that seems to be largely ineffective – but creates a more difficult situation for the insurance adjuster. The procedure carries low risk to the surgeon in terms of time, complications, and compensation. But it is coded and billed as spine surgery nonetheless.

To make the situation more difficult, costs for the surgical supplies (PERC-D Wand, SpineCATH or Stryker DeKompressor) used to perform the surgery is approximately $7,500. The physician's bill (without any sort of bill review mechanism in place) can be around $25,000. In some cases, a discography will be completed at the same time under the premise that the physician must first have objective evidence of the ruptured disc through provocative scoring. Once confirmed, the percutaneous discectomy will be accomplished immediately following the discography.

Charges for the pain anesthesiologist to perform the discography added together with the facility charges can be around $25,000 in some jurisdictions. After the procedure, four to six weeks of PT will be recommended costing approximately $10,000. Pain medication, DME, muscle relaxants, etc. can cost around $1,000. When it is all said and done, charges for the procedure could total <u>$68,500</u>.

CONFIDENTIAL!

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

When billing for physician fees, providers should use CPT Code 62287. This holds true regardless of whether the procedure involves Disc Nucleoplasty (PERC-D Spine Wand©) or DeKompressor Decompression (Stryker DeKompressor Wand©). When analyzing your records, pay close attention to whether the bill includes charges for one of these wands. If it does, provider coding should be 62287. Some providers may attempt to show a bill using other codes. For example, you note the charge for the Stryker DeKompressor Wand when reviewing the record. You then note the "provider charges" being coded as 63056, which is open surgery via Transpedicular approach. This is an error and this point should be used when negotiating the loss.

## Tips for Handling Minimally Invasive Discectomies

- Although this might be stating the painfully obvious, pay attention to key components of your medical investigation that would normally guide you in an evaluation (impact, age of person, past medical history, notes of degeneration in diagnostics, gaps in treatment, position in vehicle, seatbelt, etc.)
- Be cognizant of the diagnostic results. If a MRI result shows a supposed disc pathology but the pathology is not disrupting the nerve root or the spinal cord - but a percutaneous discectomy was performed - question this when negotiating the loss.
- In the absence of nerve root or spinal cord disruption in a person who has allegedly completed conservative therapy + ESI but still has a severe pain; a discography is commonly completed verifying that the disc is the source of the pain. If the percutaneous discectomy was completed in the absence of this, we will need to utilize this information when negotiating the loss.
- Pay close attention to the relationship between the alleged disc pathology, the subjective complaints of the customer, the findings on MRI and the objective testing performed by the physician. This information should correlate. For example – Customer A is complaining of pain, numbness, tingling and weakness about his right wrist and forearm area. When completing his exam, the physician notes decreased pinprick sensation in this same area. An MRI is ordered and shows a C5-6 herniation impinging the exiting right nerve root. All of these symptoms correlate. What happens if this same fact pattern does not correlate? This is something we would normally want to question when evaluating the loss in any case but especially when a "minimally invasive discectomy" occurs.
- When analyzing your records, pay close attention to whether the bill includes charges for one of these wands. If it does, provider coding should be 62287. Some providers may attempt to show a bill using other costly codes. It is important to be cognizant of this and discuss same in negotiations.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

CONFIDENTIAL!

## Spinal Fusion

Fusion is a surgical technique in which one or more of the vertebrae of the spine are united together ("fused") so that motion no longer occurs between them. The concept of fusion is similar to that of welding. Spinal fusion surgery, however, does not weld the vertebrae during surgery. Rather, bone grafts are placed around the spine during surgery. The body then heals the grafts over several months - similar to healing a fracture - which joins, or "welds," the vertebrae together.

The ultimate goal of fusion is to obtain a solid union between two or more vertebrae. Fusion may or may not involve use of supplemental hardware (instrumentation) such as plates, rods, screws, and cages. Instrumentation is sometimes used to correct a deformity, but usually is just used as an internal splint to hold the vertebrae together to while the bone grafts heal.

Recovery following fusion surgery is generally longer than for other types of spinal surgery. Patients generally stay in the hospital for three or four days, but a longer stay after more extensive surgery is not uncommon. A short stay in a rehabilitation unit after release from the hospital is often recommended for patients who had extensive surgery, or for elderly or debilitated patients.

It also takes longer to return to a normal active lifestyle after spinal fusion than many other types of surgery. This is because you must wait until your surgeon sees evidence of bone healing. The fusion process varies in each patient as the body heals and incorporates the bone graft to solidly fuse the vertebrae together. The healing process after fusion surgery is very similar to that after a bone fracture. In general, the earliest evidence of bone healing is not apparent on X-ray until at least six weeks following surgery. During this time, the patient's activity is generally restricted. Substantial bone healing does not usually take place until three or four months after surgery. At that time, activities may be increased, although continued evidence of bone healing and remodeling may continue for up to a year after surgery.

The length of disability time will depend upon both the type of surgery and the kind of job the claimant performs. It can vary anywhere from approximately 4-6 weeks for a single level fusion in a young, healthy patient with a sedentary job to as much as 4-6 months for more extensive surgery in an older patient with a more physically demanding occupation.

In addition to some restrictions in activity, a brace is sometimes used for the early post-operative period. There are many types of braces that can be used. Some are very restrictive and are designed to severely limit motion, while others are intended mainly for comfort and to provide some support. The decision to use a brace or not, and the optimal type of brace, depends upon your surgeon's preference and other factors related to the type of surgery.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

CONFIDENTIAL!

Although fusion can be a very good treatment for some spinal conditions, it does not return your spine to "normal." The normal spine has some degree of motion between vertebrae. Fusion surgery eliminates the ability to move between the fused vertebrae, which can put added strain on the vertebrae above and below the fusion. Fortunately, once a fusion has healed, it rarely, if ever, breaks down. However, it does place more stress on the vertebrae next to the fusion. This has some potential to accelerate degeneration of those segments, but this risk varies between individuals.

## Spinal Cord Injuries

The spinal cord is the major bundle of nerves that carries nerve impulses to and from the brain to the rest of the body. It is about 18 inches long and extends from the base of the brain (medulla oblongata), down the middle of the back, to about the waist (L1/L2 vertebra). The brain and the spinal cord constitute the Central Nervous System. Motor and sensory nerves outside the central nervous system constitute the Peripheral Nervous System, and another diffuse system of nerves that control involuntary functions such as blood pressure and temperature regulation are the Sympathetic and Parasympathetic Nervous Systems.

The nerves that lie within the spinal cord are upper motor neurons (UMNs) and their function is to carry the messages back and forth from the brain to the spinal nerves along the spinal tract. The spinal nerves that branch out from the spinal cord to the other parts of the body are called lower motor neurons (LMNs). These spinal nerves exit and enter at each vertebral level and communicate with specific areas of the body. The sensory portions of the LMN carry messages about sensation from the skin and other body parts and organs to the brain. The motor portions of the LMN send messages from the brain to the various body parts to initiate actions such as muscle movement.

A person can "break their back or neck" yet not sustain a spinal cord injury if only the bones around the spinal cord (the vertebrae) are damaged, as long as the spinal cord is not affected. In these situations, the individual may not experience paralysis after the bones are stabilized.

Spinal Cord Injury (SCI) is damage to the spinal cord that results in a loss of function such as mobility or feeling. Frequent causes of damage are trauma (car accident, gunshot, falls, etc.) or disease (polio, spina bifida, Friedreich's Ataxia, etc.). **The spinal cord does not have to be severed in order for a loss of functioning to occur**. In fact, in most people with SCI, the spinal cord is intact, but the damage to it results in loss of functioning. SCI is very different from back injuries such as ruptured disks, spinal stenosis or pinched nerves.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

CONFIDENTIAL!

The effects of SCI depend on the type of injury and the level of the injury. SCI can be divided into two types of injury - complete and incomplete. A complete injury means that there is no function below the level of the injury; no sensation and no voluntary movement. Both sides of the body are equally affected. An incomplete injury means that there is some functioning below the primary level of the injury. A person with an incomplete injury may be able to move one limb more than another, may be able to feel parts of the body that cannot be moved, or may have more functioning on one side of the body than the other. With the advances in acute treatment of SCI, incomplete injuries are becoming more common.

The level of injury is very helpful in predicting what parts of the body might be affected by paralysis and loss of function. Remember that in incomplete injuries there will be some variation in these prognoses.

In general, the higher in the spinal column the injury occurs, the more dysfunction a person will experience. The vertebrae are named according to their location. The eight vertebrae in the neck are called the Cervical Vertebra. The top vertebra is called C-1; the next is C-2, etc. Cervical SCI's most often cause loss of function in the arms and legs and result in quadriplegia. Injuries above the C-4 level may require a ventilator for the person to breathe. C-5 injuries often result in shoulder and biceps control, but no control at the wrist or hand. C-6 injuries generally yield wrist control, but no hand function.

The twelve vertebrae in the chest are called the Thoracic Vertebra. The first thoracic vertebra, T-1, is the vertebra where the top rib attaches. Injuries in the thoracic region usually affect the chest and the legs and result in paraplegia. Individuals with C-7 and T-1 injuries can straighten their arms but still may have dexterity problems with the hand and fingers. At T-1 to T-8 there is most often control of the hands, but poor trunk control as the result of lack of abdominal muscle control. Lower T-injuries (T-9 to T-12) allow good truck control and good abdominal muscle control. Sitting balance is very good.

The vertebra in the lower back between the thoracic vertebra, where the ribs attach, and the pelvis (hipbone), are the Lumbar Vertebra. The sacral vertebrae run from the Pelvis to the end of the spinal column. Injuries to the five Lumbar vertebra (L-1 thru L-5) and similarly to the five Sacral Vertebra (S-1 thru S-5) generally result in some loss of functioning in the hips and legs.

Besides a loss of sensation or motor functioning, individuals with SCI also experience other changes. For example, they may experience dysfunction of the bowel and bladder. Sexual functioning for men can sometimes be affected as well as fertility. Women's fertility is generally not affected. Very high injuries (C-1, C-2) can result in a loss of many involuntary functions including the ability to breathe, necessitating breathing aids such as mechanical ventilators or diaphragmatic pacemakers.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

CONFIDENTIAL!

Other effects of SCI may include low blood pressure, inability to regulate blood pressure effectively, reduced control of body temperature, inability to sweat below the level of injury, and chronic pain.

Approximately 450,000 people live with SCI in the US. There are about 10,000 new SCI's every year; the majority of them (82%) involve males between the ages of 16-30. These injuries result from motor vehicle accidents (36%), violence (28.9%), or falls (21.2%). Quadriplegia is slightly more common than paraplegia.

When a SCI occurs, there is usually swelling of the spinal cord. This may cause changes in virtually every system in the body. After days or weeks, the swelling begins to go down and people may regain some functioning. With many injuries, especially incomplete injuries, the individual may recover some functioning as late as 18 months after the injury. In very rare cases, people with SCI will regain some functioning years after the injury. However, only a very small fraction of individuals sustaining SCI's recovers all functioning.

High C-level injuries usually require that the individual use a power wheelchair. Low C-level injuries and below usually allow the person to use a manual chair. Advantages of manual chairs are that they cost less, weigh less, disassemble into smaller pieces, and are more agile. However, for the person who needs a powerchair, the independence afforded by them is worth the limitations.

Some people are able to use braces and crutches for ambulation. These methods of mobility do not mean that the person will never use a wheelchair. Many people who use braces still find wheelchairs more useful for longer distances. However, the therapeutic and activity levels allowed by standing or walking briefly may make braces a reasonable alternative for some people.

Of course, people who use wheelchairs are not always in them. They drive, swim, fly planes, ski, and do many activities out of their chair. If you hang around people who use wheelchairs long enough, you may see them sitting in the grass pulling weeds, sitting on your couch, or playing on the floor with children or pets. No one is "wheelchair bound."

Interestingly, other than level of injury, the type of rehab facility used is the greatest indicator of long-term survival. This illustrates the importance of and the difference made by going to a facility that specializes in SCI. People who use ventilators are at some increased danger of dying from pneumonia or respiratory infection, but modern technology is improving in that area as well. Pressure sores (Also called bed sores) are another common cause of hospitalization, and if not treated - death.

CONFIDENTIAL!

Confidential Information of GEICO Companies
© Government Employees Insurance Company

A pressure sore is any redness or break in the skin caused by too much pressure on your skin for too long a period of time. The pressure prevents blood from getting to your skin so the skin dies. Normally the nerves send messages of pain or feelings of discomfort to your brain to let you know that you need to change position, but damage to your spinal cord keeps these messages from reaching your brain. If not properly turned on a regular basis, these pressure sores can continue to grow in depth and diameter. In many cases, claimants with SCI have to go through plastic surgery to graft skin over the sites of these sores. If not properly noted and treated, these sores can be deep enough to reach the bone.

If the open sore becomes infected (as they commonly do) it is extremely difficult to treat this and a systemic infection usually develops pretty quickly. Depending on the health status of the claimant, this can result quickly in death. This can occur more rapidly with people on a lower socioeconomic level.

Overall, 85% of SCI patients who survive the first 24 hours are still alive 10 years later. The most common cause of death is due to diseases of the respiratory system, with most of these being due to pneumonia. In fact, pneumonia is the single leading cause of death throughout the entire 15-year period immediately following SCI for all age groups, both males and females, whites and non-whites, and persons with quadriplegia.

The second leading cause of death is non-ischemic heart disease. These are usually unexplained heart attacks often occurring among young persons who have no previous history of underlying heart disease.

Deaths due to external causes are the third leading cause of death for SCI patients. These include subsequent unintentional injuries, suicides and homicides, but do not include persons dying from multiple injuries sustained during the original accident. The majority of these deaths are the result of suicide.

CONFIDENTIAL!

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## Review

1. A laminectomy is ______________________________________________
2. A foraminotomy is ____________________________________________
3. A discectomy is _______________________________________________
4. The spinal cord extends from the _________________ to about the __________ vertebrae.
5. The spinal cord __________________________________________ for a loss of functioning to occur.
6. A "complete" SCI means__________________________________________
7. Paraplegia can occur when the SCI involves the __________ area.
8. Quadriplegia normally strikes individuals when the SCI occurs in the ____________ region.
9. The leading cause of death for quadriplegics is ________________________.

CONFIDENTIAL!

Confidential Information of GEICO Companies
© Government Employees Insurance Company

## Fracture Basics

There are 206 bones in the human body. Bones act as factories for the production of blood and essential blood cells through bone marrow. Bones are integral to the body's strength.

According to orthopedic anatomy, the skeleton consists of long bones, short bones, flat bones, and irregular bones. Long bones act as levers to facilitate motion, while short bones function to dissipate concussive forces. Short bones include those composing the carpus and tarsus. Flat bones, such as the scapula or pelvis provide a broad surface area for attachment of muscles.

When a bone is broken, or fractured, it affects not only blood production and function, but there are also complications associated with the muscles, tendons, nerves, and blood vessels which are attached, or are close, to the bone.

Despite what you may have heard, a broken bone is not worse than a fracture; they both mean the same thing. In fact, the word fracture, according to the Oxford English Dictionary is defined as "the act of being broken." There are different types of fractures and broken bones, **but these words mean the same thing!**

Fractures happen because an area of bone is not able to support the energy placed on it (quite obvious, but it becomes more complicated). Therefore, there are two critical factors in determining why a fracture occurs:

- the energy of the event
- the strength of the bone

The energy can either be acute, high-energy (e.g. car crash), or chronic, low-energy (e.g. stress fracture). The bone strength can either be normal or decreased (e.g. osteoporosis).

### General Treatment Options for all Fractures

Bone is constantly in a state of turnover, even when not damaged or injured. We continually absorb and replace the cells that make up our bones. Because of this natural turnover, the process of healing bone also comes about quite naturally.

However, in order for a fracture to heal as well as possible, a good reduction, or placement, of the bones must be attained.

When doctors talk about **reduction** of a fracture, or **reducing** the broken bone, they are talking about improving the alignment of the broken ends of the bone.

CONFIDENTIAL!

Confidential Information of GEICO Companies
© Government Employees Insurance Company

In most cases, reducing a fracture involves placing the broken bone in a cast, often after a little pulling and tugging to achieve improved alignment. If the reduction cannot be satisfactorily achieved (meaning the alignment is either not adequate or not sufficiently stable), then a further procedure may be necessary. This usually means surgery with fixation of the bone with pins, plates, screws or rods.

One potential complication of fracture treatment is either a mal-union or non-union of bone. This problem is more common in elderly individuals and in people who sustain more severe fractures. In the case of some fractures (e.g. hip fracture in elderly) the rate of non-union is high enough that instead of trying to heal the bone, the damaged segment of bone is replaced (e.g. hip replacement).We'll talk about non-union soon.

The treatment of a specific fracture is too complicated to be discussed in a general overview of broken bones, but depends on factors such as:

- Location of the fracture
- Severity of angulation or deformity
- Potential for healing
- Other injuries
- Age and activity level of the patient
- And many more factors....

***Because treatments are individualized based on the patient, the x-ray appearance of the fracture, and the other factors mentioned, each case must be treated individually.***

Almost all claimants who sustain a bone fracture will go through a physical therapy regimen of some kind to promote complete healing and to regain proper function of the injured area. This is after bone union is visualized via diagnostic imaging and the doctor feels comfortable prescribing the PT. Physical therapists are knowledgeable about surgical procedures, treatment goals, musculoskeletal anatomy, and can tailor their efforts to improve the well-being of the patient.

For individuals who have sustained a fracture, both passive and active physical therapy modalities will be used and will include the following:

- Stretching
- Strengthening
- Ice and Heat Therapy
- Ultrasound
- E-Stimulation
- Aquatic Therapy

Confidential Information of GEICO Companies
© Government Employees Insurance Company

CONFIDENTIAL!

The most common cause of fractures is due to trauma. However, especially in the elderly, broken bones often occur where the bone has been weakened by an underlying process. This is called a "pathologic fracture," which means that there is some pathology, or disease process, that caused the bone to be weak and highly susceptible to fracture. Common diseases that lead to pathologic fracture include osteoporosis and tumors.

When reviewing the medical notes for elderly claimant's, understand that in many cases that their bones are more susceptible to injury than someone who was younger. Therefore, fractures occur at a higher rate for these claimants when involved in a traumatic incident. The normal healing time will also be extended.

These individuals are also more susceptible to other problems that can arise due to their inability to properly rehabilitate the affected area. This includes things such as respiratory problems and pressure sores.

Generally speaking, any fracture for any person carries certain "other" complications that you will need to keep in mind. Remember that these are general complications and that we will expand on these complications as we discuss each type of fracture:

- Cardio-respiratory Complications
- Neurovascular
- Infection
- Deep venous thrombosis
- Delayed union and non-union
- Osteoarthritis

CONFIDENTIAL!

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**Types of Fractures**
There are numerous ways of classifying fractures. All fractures are either complete or incomplete, simple (closed) or compound (open). First, let's take a look at these two latter terms:

**Open (compound) fracture Open or Compound** – An open fracture is a broken bone that penetrates the skin. This is an important distinction because when a broken bone penetrates the skin there is a need for immediate treatment, and an operation is often required to clean the area of the fracture. Furthermore, because of the risk of infection, there are more often problems associated with healing when a fracture is open to the skin. Let's take a look at an illustration showing an open or compound fracture:

**Closed Fractures** - A closed fracture is a broken bone that does not penetrate the skin. This is an important distinction because when a broken bone penetrates the skin there is a need for more immediate treatment, and an operation is often required to clean the area of the fracture. Furthermore, because of the risk of infection, there are more often problems associated with healing when a fracture is open to the skin. Let's take a look at an illustration showing a closed fracture:

CONFIDENTIAL!

Confidential Information of GEICO Companies
© Government Employees Insurance Company

The surgeon may use metal rods, pins and plates to strengthen weakened areas and stabilize the bone. Depending on the severity of the break, the surgeon primarily uses an **external fixator**, to create the union necessary for positive healing. External fixation is accomplished by placing pins or screws into the bone on both sides of the fracture. The pins are then secured together outside the skin with clamps and rods. The clamps and rods are known as the "external frame."

Some of the advantages of external fixation are that it is quickly and easily applied. The risk of infection at the site of the fracture is minimal, but there is a risk of infection where the pins are inserted from the skin into the bone. How quickly the fracture heals and the severity of it depends on the person's age, their health, and the type of impact causing the fracture.

In **compound fractures**, an internal fixator can be used to facilitate the boney union. When reviewing your medical records, the acronym **ORIF** will signify that an internal fixator was applied to the injured site to create bone union. ORIF means Open Reduction with Internal Fixation.

Although both fixation methods require fracture reduction via a surgical procedure, the internal fixator is applied to the injured area and is not exposed to the environment. This fixator cannot be seen once it is in place. Generally, this involves either the use of plates and screws or an intramedullary (IM) rod to stabilize the bone. The risk for infection is lower with ORIF since the rods are not actually protruding from the skin. The incision area can remain cleaned and covered, whereas the external fixator is more exposed to the environment.

Due to the seriousness of this type of injury, the disability period can be more problematic for a compound fracture than a closed fracture. Complications can also occur if the fracture occurred to a weight-bearing bone. This includes weight gain, respiratory problems, shoulder problems, blood clots, etc. Individuals who suffer a fracture to a weight-bearing bone usually have to restrict weight bearing until there is evidence of boney union.

It normally takes **12-16 weeks** for such a fracture to heal properly. This time may be shorter for a young, healthy person and could be extended for an older person. Since these fractures are normally repaired with surgical fixation, ***additional surgical procedures to remove hardware can occur once proper union is achieved if the physician feels it is warranted.*** If the hardware does not cause complications for the injured party, a decision may be made to leave it in place.

CONFIDENTIAL!

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**Closed fractures** can be treated using either an external or internal fixator. The surgeon will make the decision based on the area of injury and the seriousness of the fracture.

The complications that can arise for a closed fracture are the same as you would see with other types of fractures. The risk for infection is decreased because there is no traumatic wound.

On some occasions, boney union can be obtained by the physician reducing the fracture manually without the need for surgical intervention. This is commonly called "setting" or "manipulating" the fracture. Once the fracture is "set", the physician will cast the area in order to gain the desired immobilization.

Another way physicians reduce fractures is through traction. Traction is used to manage fractures in an effort to realign broken bones; it is most often used as a temporary measure when operative fixation is not available for a period of time.

Traction can either be applied through the skin (skin traction) or through pins inserted into bones (skeletal traction).

Skin traction is generally less desirable due to the fact that skin can be injured when pressure is applied for extend periods of time. Skin traction, also called Buck's traction, is commonly used in patients who have a hip fracture.

Skeletal traction does have the disadvantage of complications associated with pin insertion, and infections can come from the sites of pin insertion.

### Complete Fracture

Simply stated, a complete fracture is one in which the broken bone is completely separated at the break. Let's look at a complete fracture with an **external fixator**:

Confidential Information of GEICO Companies
© Government Employees Insurance Company

CONFIDENTIAL!

## Review

In order for a fracture to heal, proper ________________________ must occur.

O.R.I.F. stands for______________________________________________________

_____________________________________________________________________

"Open" fracture_________________________________________________________

_____________________________________________________________________

"Closed" fracture_______________________________________________________

_____________________________________________________________________

### Incomplete Fracture

In an incomplete fracture, the bone cracks but does not break all the way through. Let's take a brief look at an incomplete fracture:

CONFIDENTIAL!

Confidential Information of GEICO Companies
© Government Employees Insurance Company

## Types of Closed Fractures

Now that we have a good general understanding of closed fractures, let's take a look at some specific types of closed fractures you will see when handling CU files:

**Greenstick Fracture** - An incomplete fracture in which the bone is bent. This occurs most often with children. Here is an example:

The name for a greenstick fracture comes from the analogy of breaking a young, fresh tree branch. The broken branch snaps on one side (the outer side of the bend), while the inner side is bent, and still in continuity. Most often the greenstick fracture must be bent back (reduced) into the proper position and then cast for about six weeks. **Greenstick fractures can take a long time to heal because they tend to occur in the middle, slower growing parts of bone.**

**Transverse Fracture** - A fracture at a right angle to the bone's axis. In other words, it is a straight break across the bone.

Transverse fractures are usually the result of a direct blow or pure angular force being applied to the bones. The resultant shape of the bone ends helps transverse fractures stay in alignment more easily than those of other fractures where the resultant ends do not locate so readily.

CONFIDENTIAL!

Confidential Information of GEICO Companies
© Government Employees Insurance Company

**Spiral Fracture** – The break spirals around the bone. This is very common in twisting type injuries. Spiral (or oblique) fractures are usually the result of a twisting moment being applied about the long axis of the bone. For example the foot being held trapped while the leg twists about it. This is as opposed to a sideways movement or bends which results in a transverse fracture.

The x-ray of a fracture caused by a twisting motion may result in an x-ray indicating an oblique fracture. In practice this type of fracture is very rare and is more often a misinterpretation of the x-ray information of a spiral fracture. Damage to the bone ends makes it more difficult to align and balance the bones making for an unstable union. Bone spikes may cause damage to soft tissue, nerves and blood supply. The spikes may break free to form 'Butterfly' fragments.

CONFIDENTIAL!

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**Comminuted Fracture** - Comminuted fracture implies at least three fracture fragments, the fracture lines of which interconnect. The individual fracture lines that form the comminuted fracture may be transverse, oblique, or spiral. Comminuted fractures are generally caused by high-energy trauma, as seen in automobile accidents. Comminuted fractures are difficult to reduce and fix because they have no inherent stability. Constant external traction and alignment or internal fixation is required.

Comminuted

Since the overall therapeutic goal of any fracture is to realign the bone fragments, maintain that realignment, and to restore function to affected area, this because extremely difficult with a fracture such as this. Comminuted fractures can be especially challenging due to the complexity of the fracture fragments and the existence of a soft tissue injury. See below for an illustration of this type of fracture.

**A comminuted fracture quite often results in a situation where exact reconstitution or reconstruction is difficult or impossible.**

CONFIDENTIAL!

Confidential Information of GEICO Companies
© Government Employees Insurance Company

**Compression Fracture –** With a compression fracture, the break occurs due to extreme pressure on the bone. Compression fractures of the spine, also known as vertebral compression fractures, are a specific kind of bone break involving the vertebrae of the spine. With spinal injuries, the location of the damage is generally described in terms of the nearest affected vertebrae. Compression fractures most often occur in what is known as the 'thoracolumbar' range of bones in the back: specifically, they happen at the point where the thoracic (thoracolumbar) vertebrae of the midback meet those of the lumbar region of the lower back. There are 12 thoracic vertebrae, numbered T1 – T12, and 5 lumbar vertebrae, numbered L1 – L5. Fractures can occur in one or more bones from a single injury. Compression fractures almost always affect the T12 and L1 vertebrae together, as in an injury that occurs after jumping or falling from a height. In a compression fracture of the spine, the bone tissue of the vertebral body collapses into itself and has a smaller volume. **In the illustration to the left, the top picture is a normal vertebrate and the bottom picture shows a compression fracture.**

The compression fracture will be classified as stable or unstable. Because a seemingly stable fracture can settle out of the correct position over time, care must be taken to insure that the spine is in fact stable. The claimant's physician will be able to somewhat assess the condition of the spine by feeling along the spinal column for unusual bone position. Location of pain will be taken into account, as well as any swelling that is present. X-rays more precisely identify the nature of the fracture. **Compression fractions result in a loss of height of the vertebral body on x-ray.**

CT (computed tomography) scans may also be ordered in order to better view some of the particular points of the vertebrae. MRI (magnetic resonance imaging) scans can indicate spinal cord damage and other soft-tissue trauma.

Because most compression fractures heal **within 6 to 8 weeks** with rest and pain relief, nonoperative treatment has remained the standard for many years. As with all fractures, treatment depends on the type, location, and exact nature of the injury.

CONFIDENTIAL!

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

Some options include:

- the use of a body cast, when the fracture is somewhat stable in relation to the spinal cord, but must be immobilized in order to promote successful healing
- the use of a custom orthosis (brace), to stabilize spine during healing
- non-steroidal anti-inflammatory medication (such as Motrin, Advil or Nuprin), often in time-released form
- your physician may prescribe stronger medication, though the use of narcotics is generally avoided
- a course of rehabilitation based on successful modes of treatment, such as traction, ultrasound, electrical muscle stimulation, whirlpool, and so on, proven beneficial to patients with spinal injuries

Where surgery is indicated, as in the case of compression on the nerve roots or spinal cord, the surgeon has the opportunity to correct any changes in position of the vertebrae due to the injury or other deformity. Various types of instruments, such as pedicle screws or steel rods, are used to hold the bones in place. Successful recovery will depend greatly on the claimant's commitment to the recovery process.

**Review**

Transverse fracture______________________________________________

__________________________________________________________________

Comminuted fracture_____________________________________________

__________________________________________________________________

CONFIDENTIAL!

Confidential Information of GEICO Companies
© Government Employees Insurance Company

**Impaction Fracture –** With an impaction fracture, the broken ends of each bone are driven into each other. This is quite often seen with hip fractures. Usually an incomplete fracture occurs where the fragments are driven into one another. The area of over-lapping bone is seen radiographically.

Impaction fractures typically occur at the end of long bones. Reduction of such fractures requires traction to disengage the fragments and fixation to hold the fragments apart. If, after fracture, misalignment is untreated, bone shortening will occur because one end has impacted into the other.

Disability time will depend greatly on the severity of the fracture and the general health of the claimant.

**Avulsion Fracture -** A fragment of bone, which is the site of insertion of a tendon, is detached as the result of excessive tension. In other words, the breaking force has been applied in such a way that the muscle pulls a portion of the bone away from the site where it is normally attached.

Avulsion fractures require rest. In general, they will heal within **4 to 6 weeks**. The claimant may need to use crutches for most of this time. If the bony fragment is large, or if it is torn away from its original site by a significant distance, surgery may be required.

CONFIDENTIAL!

Confidential Information of GEICO Companies
© Government Employees Insurance Company