48



**Growth Plate Fractures** - A growth plate is an area of developing tissue between the shaft and the end of long bones in children. It regulates and helps determine the length of the mature bone. It is the last portion of the bone to harden, which leaves it vulnerable to fracture. Those at risk in include the following:

o Children who are still growing (girls aged 11-12 yrs. and boys aged 14 yrs.)
o Boys are twice as likely to incur these fractures
o Those involved in competitive sports or recreational activities

Most growth plate fractures occur in the long bones of the fingers, the outer bone of the forearm, and in the lower bones of the leg. These are diagnosed most accurately by MRI or CT scan. Ultrasound may also be used.

**Growth Plate Fracture classifications – prognosis & treatment:**

**Type I** – fracture above growth plate extending into growth plate – heals well cast/immobilization

**Type II** – fracture at the growth plate and crack through the bone shaft – heals well – cast/immobilization, surgery may be required (most common type)

**Type III** – fractures break through the growth plate separating the bone end from the bone shaft – may result in arrested growth – requires surgery (often internal fixation)

**Type IV** – fracture crosses through a portion of the growth plate and breaks off a piece of the bone end – surgery required with internal fixation (most common in older children)

**Type V** – fracture breaks through the bone shaft, the growth plate and the end of the bone – results in arrested bone growth – surgery required with internal fixation

**Type VI** – similar to Type V but the broken pieces of bone are missing – these are open fractures that require initial surgery for repair and fixation with additional reconstructive or corrective surgery may be needed.
The child should be watched carefully until he/she reaches skeletal maturity to ensure that there is no shortening of the limb. As a CU Examiner, it is extremely important early in the claims process to find out the type of growth plate injury.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

49

**Review**

Compression Fracture_____

_____

An external fixator is used when_____

_____

Avulsion fracture_____

_____


**Healing times of fractures**

During this segment of the lesson, we have consistently stated that treatment options and healing will differ in each case. Notwithstanding, one thing will always remain true for each claimant - for a fracture to heal, stabilization and preservation of blood supply are needed. Below lists the general process the body follows to heal a broken bone.

**Stage 1: Inflammation**

Bleeding from the fractured bone and surrounding tissue causes the fractured area to swell. This stage begins the day you fracture the bone and lasts about **2 to 3 weeks.**

**Stage 2: Soft callus**

Between 2 and 3 weeks after the injury, the pain and swelling will decrease. At this point, the site of the fracture stiffens and new bone begins to form (see figure). The new bone cannot be seen on x-rays. This stage usually **lasts until 4 to 8 weeks after the injury.**

**Stage 3: Hard callus**

Between 4 and 8 weeks, the new bone begins to bridge the fracture. This bony bridge can be seen on xrays. **By 8 to 12 weeks after the injury**, new bone has filled the fracture.

**Stage 4: Bone remodeling**

Beginning about 8 to 1 2 weeks after the injury, the fracture site remodels itself, correcting any deformities that may remain as a result of the injury. This final stage of fracture healing can **last up to several years**.

**Confidential Information of GEICO Companies**
© **Government Employees Insurance Company**

50

Generally speaking, the rate of healing and the ability to remodel a fractured bone vary tremendously for each person. It is not possible to precisely estimate the time that it will take for a fracture to heal. Nevertheless, here is a rough estimate:

- most upper limb fracture repair completely in 6-8 weeks
- lower limb fractures take twice as long
- children take half as long
- add 25% if the fracture involves the femur or is spiral

Healing is considered complete when: there is no motion at the fracture site and x-rays reveal complete bone union. In approximately 10% of all fracture non-union (also called mal-union) takes place.

### Complications

Smoking, old age, arthritis/osteoporosis, diabetes, delays in treatment, and poor nutrition are just a few of the factors that may delay healing of fractures. The extended use of anti-inflammatory drugs and pain medications are also thought to possibly delay healing.

The term mal-union refers to a union of a bone which is often mechanically sound but in the wrong position. This may not be as bad as it sounds depending on the degree of displacement within the union. If, however the fracture ends/fragments are pulled apart by the action of opposing muscle groups, a functional result from a mal-union is unlikely.

If mal-union occurs, another surgical procedure will probably be preformed to correct the mal-union (if correction is possible). Let's take a look at an individual who had a left tibial mal-union:



Confidential Information of GEICO Companies
© Government Employees Insurance Company

51

This percentage of mal-union could be more or less depending on the location of the fracture within the bone and /or whether it is a weight-bearing bone such as the femur, tibia, or fibula.

Another complication that can occur when a claimant experiences a severe fracture is lack of bone regeneration (AKA delayed union). If the bone fails to grow while healing, this will also cause a mal-union. As we have stated on numerous occasions, fractures (especially to long bones such at the Femur, Tibia or Fibula) must be properly reduced for them to heal in a normal manner. In the case of a severe fracture where surgical reduction occurred, the physician will watch this patient closely to verify that bone growth is occurring. Diagnostic studies will be preformed on a periodic basis to verify bone alignment and bone regeneration. If bone regeneration does not occur, this is serious complication that must be addressed.

Approximately 10% of all fractures do not regenerate and non-union takes place. This percentage could be more or less depending on the location of the fracture within the bone and /or whether it is a weight-bearing bone such as the femur, tibia or fibula. Although physicians attempt to generate bone growth through bone stimulation or other methods, this condition will often require surgery. Depending on the area of the break and/or the bone involved, this additional complication will cause a sizable extension in disability time.

Be aware that if a **bone growth stimulator** is ordered for your claimant, *this is a very expensive appliance*. There are two types of bone growth stimulators. Both involve the use of electrical impulses to assist in bone regeneration:

- Internal Stimulator – This device is implanted surgically at the site of the fracture and is commonly used in the treatment of transverse, segmented and comminuted fractures when non-union of a long bone (femur, tibia, fibula, humerus, ulna, radius or clavicle) has occurred.

- External Stimulator – This is a non-evasive alternative when attempting to regenerate bone growth after non-union has taken place. The appliance is placed on the fracture site and sends electrical impulses to the area of non-union. External stimulators are light, safe and easy to use. Treatments are usually performed for about 20-30 minutes per day and may be administered at home. This may vary based on the model.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

52

Although physicians have their preferred methods and timeframes for treating delayed union fractures, this following criterion is standard in the medical community when determining the need for an external stimulator:

- Location in the appendicular skeleton (the appendicular skeleton includes the bones of the shoulder girdle, upper extremities, pelvis, and lower extremities)
- At least 3 months have passed since the date of fracture;
- Serial radiographs have confirmed that no progressive signs of healing have occurred;
- The fracture gap is one cm or less; and
- The patient can be adequately immobilized and is of an age where he/she is likely to comply with non-weight bearing.

**Compartment syndrome:** Severe swelling after a fracture can put so much pressure on the blood vessels that not enough blood can get to the muscles around the fracture. The decreased blood supply can cause the muscles around the fracture to die, which can lead to long-term disability. Compartment syndrome usually occurs only after a severe injury.

**Neurovascular injury:** Some fractures are so severe that the arteries and nerves around the injury site are damaged.

**Infection:** Open fractures can become infected when the jagged bone ends are exposed to the air where they have torn through the skin.

**Post-traumatic arthritis:** Fractures that extend into the joints (intra-articular fractures) or fractures that cause the bones to meet at an abnormal angle in the joint can cause premature arthritis of a joint.

**Growth abnormalities:** A fracture in the growth plate, in a child, can cause many problems. Two of these problems are premature partial or complete closure of the physis (growth plate). This means that one side of a bone or the whole bone stops growing before it naturally would. If one side of a bone stops growing before the other side, the bone will grow at an abnormal angle. If the whole bone, such as a thigh bone, stops growing prematurely, it will be shorter than the other thigh bone, making one leg shorter than the other.

These problems and complications do not often occur. When they do occur, orthopaedists have methods for managing them.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

53

## Amputations

An amputation is defined as the severing of a body part. Every year thousands of people in the United States lose either all of or part of a limb. Some amputations, such as losing a fingertip in a work-related accident in a poultry plant, can cause minor bleeding, discomfort and inconvenience. Other amputations, such as an arm or a leg lost in a car or motorcycle accident, can lead to significant trauma, blood loss, shock, infection, and death.

Amputees usually face additional hospital time, physical and occupational rehabilitation, prosthetic fittings and devices, counseling, skin care treatments and so forth. In addition, amputees face emotional and physical adjustments as well. Amputations may affect upper extremities and/or lower extremities. Upper extremities include an arm, hand or finger. Lower extremities refer mainly to a leg, foot, toes.

Most amputations of the upper extremities are due to trauma. Most of these amputations are loss of fingers. 22% of amputations of lower extremities are due to trauma. Car accidents and work place injuries account for almost 25% of all amputations in the United States.

Issues that affect amputees may differ depending on the extent and location of the amputation. Some common factors experienced by most amputees may include:

- Body Image - involves a time of adjustment for the amputee to accept their amputation and begin to adapt to it.
- Phantom limb pain - occurs when an amputee has any type of sensation or feeling from the missing limb area.
- Stump pain may be caused by damaged nerves in the area closest to the amputated area.
- Other issues including weight gain and maintaining body temperature, balance, flexibility and strength.

There are two types of amputations:
- Traumatic
- Surgical

Traumatic amputation occurs when the limb is actually severed at the time of the accident. When this occurs, EMS will often locate and transport the detached limb along with the patient to the ER. Based on the extent of the injury, replantation may be attempted. Replantation refers to the attachment of amputated anatomical parts to their site of origin. It requires the micro-suturing of blood vessels and nerves for the part to survive, and a clear understanding on the surgeon's behalf of the indications for surgery.

**Confidential Information of GEICO Companies**
© **Government Employees Insurance Company**

54

While this type of surgery used to be performed in only a few hospitals, the development and integration of microsurgery into the training of all modern Plastic Surgeons has meant that most locations with a Plastic Surgery Department are equipped to perform replantations.

Surgical amputation of body parts is often required when a body part has been severely injured in an accident to a point in which the claimant would be better off with a prosthetic limb. In these cases, reconstruction of the injured part is not possible. Surgeons must make rapid decisions while performing surgery on whether parts of a particular limb can be saved. They also must think about the functionality of the stump once healing has progressed to a point in which the customer can be fitted for their prosthesis.

Proper wound care is critical for the amputee. After surgery, attention focuses on care of the wound and maintenance of the residual limb. Any wound from amputation or other surgery is at risk of becoming infected because the skin opening can allow germs or dirt to enter the bloodstream. Infections can cause soreness or pain, fever, redness, swelling or discharge. These infections can also lead to further complications, surgery or even death if not treated properly.

Amputees must undergo extensive physical therapy due to the various problems that we spoke of earlier. Physical therapy will be focused on several different factors:

- General conditioning
- Strengthening of all extremities
- Exercises that assist with balance control (i.e. aquatic therapy)
- Stretching of the area at the joint above the amputation (i.e. knee and hip for leg amputee)

Rehabilitation should be started as soon as the patient is medically stable to help prevent secondary disabilities. Conditioning of the area of injury is also very important since conditioning assists the natural process of shrinking that must occur before prosthesis can be properly fitted.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

## Head Injuries

Each year in the United States, about 1.5 million people sustain a brain injury. Brain injury is a major cause of death and disability for children and adults. Shocking as it sounds; more US children die of brain injury than any other cause.

A blow or jolt to the head can cause traumatic brain injury. The blow causes damage to the brain. Some injuries are focal, or in one area of the brain. Others are diffuse, or in more than one area of the brain. Injuries can range from a mild concussion to severe injury, coma, and death. If you have a mild concussion, you may have no long-term side effects. If you have a moderate to severe brain injury, side effects can range from headache and confusion to personality changes and seizures.

Fortunately, brain injury is one of the most preventable brain disorders. Improved use of car safety belts and child car seats has helped reduce the number of brain injuries. So has greater use of helmets in biking and other sports. Efforts to reduce drinking and driving have also helped. Severe brain injuries affect both the injured people and their families. It is a period of great trauma and change. Over time, often with the help of counseling, you begin to develop a new sense of self. Then you make decisions based on that new reality.

### Types of traumatic brain injury

There are several types of brain injuries, depending on the type of force and amount of force that impacts the head:

- **Open head injury -** The skull is fractured or displaced.
- **Closed head injury -** There is no skull fracture.
- **Concussion** - This is the mildest and the most common type of brain injury. Trauma from an impact or a sudden momentum or movement change can cause a concussion.
- **Contusion –** This is a bruise on the brain caused by a skull fracture.
- **Coup-Contrecoup injury** - Bruises are both at the site of impact and on the opposite side of the brain. This occurs when the impact forces the brain to hit the opposite side of the skull. This can happen in car accidents after high-speed stops. It also happens in **Shaken Baby Syndrome**.
- **Second Impact Syndrome –** This can occur when a person sustains a second brain injury before the symptoms of the first injury have healed. The second injury can happen from days to weeks after the first one. It is also called recurrent traumatic brain injury.

Symptoms of a brain injury can be mild to severe, depending on the amount of damage. Some symptoms show up right away. Others may not appear until several days or weeks after the injury.

**Confidential Information of GEICO Companies**
© **Government Employees Insurance Company**

56

## Immediate Signs of Concussion

(Seen within seconds/minutes):

- Any loss of consciousness
- Impaired attention: vacant stare, delayed responses, inability to focus
- Slurred or incoherent speech
- Lack of coordination
- Disorientation
- Emotional reactions out of proportion
- Memory problems
- Ringing of the ears

## Later Signs of Concussion

The following symptoms can occur hours, days or weeks later:

- Persistent headache
- Dizziness / vertigo
- Poor attention and concentration
- Memory problems
- Nausea or vomiting
- Fatigue easily
- Irritability
- Intolerant of bright lights and / or loud noises
- Anxiety and / or depression
- Disturbed sleep

People with moderate to severe brain injury may have these same symptoms, as well as:

- Seizures
- Physical, cognitive or behavioral impairments that last for months or are permanent
- Prolonged unconscious state
- Coma

People with head injuries must get emergency medical treatment in the first few hours. This can make the difference between recovery and disability or death. It is helpful to have a neurologist involved early in the diagnosis and treatment. It is even more vital if symptoms continue for more than a few days or weeks.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

After an injury, the patient is stabilized. Then doctors can assess the severity of the brain injury. They check the person's level of consciousness and neurological functioning by using the Glasgow Coma Scale.

The Glasgow Coma Scale is the most widely used scoring system used in quantifying level of consciousness following traumatic brain injury. It is used primarily because it is simple, has a relatively high degree of reliability and because it correlates well with outcome following severe brain injury. Let's take a look at the scoring system:

| Glasgow Coma Score | | |
|---|---|---|
| **Eye Opening (E)** | **Verbal Response (V)** | **Motor Response (M)** |
| 4=Spontaneous | 5=Normal conversation | 6=Normal |
| 3=To voice | 4=Disoriented conversation | 5=Localizes to pain |
| 2=To pain | 3=Words, but not coherent | 4=Withdraws to pain |
| 1=None | 2=No words......only sounds | 3=Decorticate posture |
| | 1=None | 2=Decerebrate |
| | | 1=None |
| | | **Total = E+V+M** |

As you can see, a claimant can only have a maximum score of 15 points. A score of zero is consistent with brain death. A total score of 3 to 8 is a severe brain injury and the patient may be comatose or unable to be aroused. From 9 to 12 is a moderate injury. 13 or 14 is a mild injury, with 15 being normal.

Imaging tests may also be used to help in the diagnosis. These may include X-rays and CT (computerized tomography) scans.

It's important to remember that the treatment and recovery process is different for everyone. No two brain injuries are alike.

Treatment immediately begins at the time of the accident. Medical personnel work feverishly to stabilize the claimant as well as to prevent further injury. In the field, this is mainly accomplished by making sure there is a constant flow of oxygen to the brain.

About half of all severely injured people will need surgery. In many cases following a car accident, the claimant will have surgery to remove a subdural hematoma. A subdural hematoma is a form of traumatic brain injury in which blood collects between the outer protective covering of the brain and the arachnoid. Many claimants who experience a traumatic brain injury may need a surgical procedure known as a Ventriculostomy. This procedure drains excess fluid from the brain. In short, the surgery will depend greatly on the amount and area of damage.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

58

After the emergency treatment, people may receive care in an intensive care unit. The ICU is a special unit for patients who, because of the nature of their injury, illness, or surgical procedure, require almost continuous monitoring by specially trained staff.

At this point, people follow many paths toward recovery. There are many options for rehabilitation. These can include:

- Day treatment
- Outpatient therapy
- Home health services
- Independent living programs

The goal of rehabilitation is to help people regain the most independent level of functioning possible and it will be tailored to each person's specific needs as well as their specific strengths and weaknesses.

The rehabilitation team may include:

- Neurologist
- Physiatrist (physical medicine specialist)
- Physical therapist
- Occupational therapist
- Rehabilitation nurse
- Speech/language pathologist
- Neuropsychologist
- Social worker/case manager

Medication is needed for some people for reasons too numerous to count. But since claimants with brain injuries can be at more risk for side effects, doctors are careful in choosing and monitoring their patients' drugs.

There is much that is still unknown about the brain and how it heals and relearns tasks. As modern medicine continues to evolve, new treatment methods are being developed.

The effects of a brain injury can last for months or even years. They can include:

- Problems with cognition, such as memory problems and difficulty concentrating
- Communication problems, such as difficulty expressing yourself and understanding others
- Behavior or mental health problems, such as depression and personality changes

Confidential Information of GEICO Companies
© Government Employees Insurance Company

Treatments and help are available for many of these problems. For others, the goal may be to minimize the impact they have on the life of their family.

Many people find that support groups for people with brain injuries are a source of help, comfort, and information. They learn about coping skills and resources that can help.

## Psychological Conditions

When a claimant experiences something as traumatic as a severe car accident, the psychological effects can be devastating. This is complicated by the fact that psychological conditions can be completely subjective.

Injuries can cause depression, stress, and tension among family members. The relationship between psychological damage and physical injuries is now becoming more accepted. However, in order to claim psychological damage, a psychologist, psychiatrist or other therapist must be involved in the diagnosis and treatment of the condition.

Since psychological injuries quite often gain proportionally higher awards for general damages than other injuries, it is very important that we review all documentation for claims in which psychological damages are being made.

The main thing we have to remember when a psychological claim is made is that the diagnosis must be made by a qualified. On many occasions, other types of providers will attempt to make this diagnosis. In those cases, this must be addressed with the claimant or his/her designated representative.

We also learned in the earlier tutorial that certain criteria must be met prior to a valid diagnosis being made. Proof of the diagnosis will need to be made and we need to request this if it is not included in the specials.

Psychological disorders arising from car accidents are very real conditions. It is our job to validate these claims. But please understand that being involved in serious car accidents can have a profound effect on a person's life, especially when death and dismemberment occurred in the MVA.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

## Miscellaneous Injuries

In this lesson, we have mentioned and spoken about several specific injuries you will address everyday. Now it is time to look at other injuries that can be common in auto accidents.

### Injuries of the Eye

The sense of sight is something that most people take for granted. But when that "sense" is taken away in one or both eyes, they soon learn just how precious it is. Injuries to the eye are becoming more and more prevalent due to the fact that most automobiles on the road now have dual-side airbags. Although these airbags are designed to save lives, those airbags can cause irreversible damage to someone's eyes.

Activated air bags can inflict severe eye injuries, including blindness, even in minor car accidents, a small-scale study shows. The research report, published in the Journal of Ophthalmic Surgery and Lasers, describes the spectrum of air-bag-related eye injuries seen during a two-year period by an ophthalmology trauma team at UCLA. The damage ranged in severity from bruises in the eye socket to a critically ruptured eyeball, resulting in blindness.

All patients suffered significant trauma to the soft tissues and bones of the eye socket and/or serious injury to the eyeball itself, the researchers found. The predominant injuries were bruising of the socket (orbital contusion) and bleeding in the eyeball (hyphema). All five patients suffered hyphema (a hemorrhage in the anterior chamber of the eye), and three later developed angle-recession glaucoma, or pressure in the eye due to rips in the eye's drainage system. Glaucoma, which can slowly destroy vision, needs ongoing treatment. In general, the number of eye injuries from air bags may be rising as more cars become equipped with air bags.

In addition to injuries that can arise from airbag deployment, injuries also occur when claimants are not properly buckled. Many claimants sustain eye injuries due to striking their heads either on the dashboard or the windshield.

If any object hits the eye on center, they transmit all of their energy to it and none to the surrounding bones. This type of impact frequently causes an explosive eye rupture, which has an extremely poor visual prognosis. Most eye injuries are caused by blunt objects larger than the orbital opening. This is the most common type of eye injury in airbag impacts. While these injuries are often mild and do not usually involve rupture of the eye, they sometimes have serious consequences such as retinal detachment, cataract, blow-out fracture (fracture of the thin bone beneath the eye), or retinal scarring leading to loss of central vision.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

61

Based on the severity of the injury, an ophthalmologist (MD) will sometime perform emergency surgery in the attempts to save the eye. In other cases, conservative therapy might be the right course of action. As a CU examiner, read your medical reports carefully and question eye conditions that are degenerative in nature.

**Here are some of the most common degenerative eye conditions you will see in medical notes that simply require the use of spectacles:**

**Myopia - (nearsightedness)**

People with Myopic vision usually have eyeballs that are too large for their lens and cornea to focus light properly on their retina. Eyeglasses and contact lenses can usually correct this problem.

**Hyperopia - (farsightedness)**

Hyperopia vision is caused by the eyeball being too small for the lens and cornea to focus light properly on the retina. Eyeglasses and contact lenses can usually correct this problem.

**Presbyopia - (aging eyes)**

As people age, they often begin to have difficulty focusing their eyes for reading or close work. It is usually corrected with reading glasses. Some people may need bifocal of trifocal lenses.

**Astigmatism - (distorted vision)**

People with Astigmatism have irregularly shaped corneas. It is usually corrected with eyeglasses or contact lenses.


**Most Common Causes of Vision Loss (Degenerative Conditions)**
**Cataracts**

There are over 1 million Cataract operations performed annually in the USA. Cataract surgery is an outpatient procedure with a very high success rate. Due to the lack of modem medical technology in the developing world, it is also the world's leading cause of blindness. Over 16 million people are blind from cataracts.


**Age-Related Macular Degeneration - (AMD)**

This is a degenerative disease of the macula; the macula is the part of the retina responsible for central vision. There is no way yet of repairing the vision that has been lost, but if detected early laser surgery can help slow the progression of the disease. (AMD) is the leading cause of vision loss in people over age 65. Eight million people are legally blind from macular degeneration worldwide and as the population ages this number is expected to grow.


Confidential Information of GEICO Companies
© Government Employees Insurance Company

**Glaucoma**

This disease increases the fluid pressure inside the eye, leading to loss of side vision and eventually total blindness. The increased pressure destroys the optic nerve. With early detection, it can be kept under control with pressure reducing eye drops and surgery. Chances of developing it increase with age. There are over five million people blind from glaucoma worldwide.

**Diabetic Retinopathy**

This complication of diabetes is a leading cause of blindness among middle-aged Americans. The longer a person has had diabetes the more apt they are to develop diabetic retinopathy. Laser surgery can slow the progression of this disease along with management of blood glucose levels. There are 2.4 million people blind from retinopathy worldwide.

**Retinitis Pigmentosa - (RP)**

This rare inherited degenerative disease slowly destroys the retina. Signs of (RP) first show up in early childhood. The side vision is lost first. The Disease progresses over many years leaving the person with only a small portion of their central vision. There is on cure for (RP) yet. There are 1.6 million people blind from (RP) worldwide.

NOTES:

_____
_____
_____
_____
_____
_____

Confidential Information of GEICO Companies
© Government Employees Insurance Company

63

### Injuries to Organs in the Abdominal Cavity

Depending on the severity of the impact, many organs can be affected within the abdominal cavity. This includes organs such as the spleen and liver. Before examine specific conditions, let's look at a diagram that shows the organs located in the abdominal cavity:



### Spleen Injuries

The spleen is the organ most frequently affected in abdominal trauma. The spleen is an organ involved in the production and maintenance of red blood cells, the production of certain circulating white blood cells, as a part of the lymph system, and as a part of the immune system. Because the spleen stores and maintains storages of blood, large amounts of blood can spill into the abdominal cavity after an injury to the spleen.

A large volume of blood may be lost and the situation can become life threatening. Accident victims with an injury to the spleen may complain of left upper abdominal pain. Occasionally, this pain will radiate to the left shoulder. Due to blood loss, a person may also exhibit low blood pressures, weak pulse and possible bruising to the left upper abdominal area.

Why are spleen injuries common in accidents? It is because they occur quite often in driver-side impacts. Since the spleen is located in the upper left quadrant of the abdomen, the blunt trauma from the driver side door striking that area can cause a significant injury.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

64

Traumatic injury to the spleen is no longer an immediate or mandatory indication for operation or splenectomy. Computed tomography (CT) scanning or ultrasound can accurately characterize splenic injury in patients with blunt trauma. Non-operative support with in-hospital observation for up to 5 days is indicated in children and adults with splenic injury where blood loss is under control. This is provided that there is no evidence of other intra-abdominal injuries that might require surgery. Accepted indications for operation in adults include blood loss that cannot be controlled (bleeding >1,000 ML), transfusion of more than 2 units of blood, or other evidence of ongoing blood loss. In children under 14 years old, more aggressive non-operative support is justified.

When operative intervention is necessary, preservation of the spleen should be considered if bleeding can be controlled quickly and when there are no other life-threatening intra-abdominal injuries. Again, in children under 14 years of age, more aggressive attempts at intraoperative splenic salvage are justified.

Due to the vital role the spleen plays, physicians do everything possible to salvage the spleen. But when a splenectomy is necessary, the adjuster has to closely monitor the file due to common complications that can arise from the surgery. These complications include the following:

- Systemic infections
- Splenoportal Thrombosis (blood clots)

Due to the immunological function of the spleen, systemic infection is always a possibility. This can be a serious complication if the claimant is already compromised in some other way (Diabetes, elderly, poor health, etc.). Blood clots are a complication from any surgery and the claimant will be closely monitored following the procedure. "Blood thinners" will be prescribed in most cases.

## Liver Injuries
The functions of the liver are as follows:

- Blood storage and filtration
- Secretion of bile
- Breakdown of fats
- Regulation of blood volumes and clotting factors

Liver injuries are also common in car accidents, especially with passengers. It is commonly seen with right side impacts. An accident victim with an injury to the liver may experience pain in the right upper abdominal region or upper abdomen area. Because the liver receives approximately one fifth of the blood pumped out of the heart, any bleeding injury to the liver can cause a significant blood loss from the liver.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

If this were to happen, the person's blood pressure might fall and their abdomen may distend as it is filling with blood. The persons pulse can become weak and thready. Occasionally, if the liver injury is very small, the person may be admitted to the hospital for observation only. A major liver injury may require immediate surgical intervention.

Surgical intervention for a traumatic injury to the liver is becoming less prevalent. Nonsurgical treatment has become the standard of care in "hemodynamically" stable patients with blunt liver trauma. The use of computed tomography (CT) in the diagnosis and management of blunt liver trauma is mainly responsible for the notable shift during the past decade from routine surgical to nonsurgical management of blunt liver injuries. CT is the diagnostic modality of choice for the evaluation of blunt liver trauma in hemodynamically stable patients and can accurately help identify hepatic injuries.

CT is also useful in the assessment of delayed complications in blunt liver trauma, including delayed hemorrhage, hepatic or perihepatic abscess, posttraumatic pseudoaneurysm, and biliary complications such as bile peritonitis. Follow-up CT is needed in patients with high-grade liver injuries to identify potential complications that require early intervention.

### Kidney Injuries

The body has two kidneys. They are bean-shaped organs about five inches long, two to three inches wide, and one inch thick. They are located in the middle of the back. Kidneys regulate water content of the blood and tissue and help maintain the balance of some key electrolytes, such as sodium, chloride and potassium. Take a look at the following illustration:



The renal artery imports material to the kidney and the renal vein exports purified blood from the kidney. A third tube, the ureter, carries the waste material to the urinary bladder. The purpose of the kidney is to take the impurities from the blood and send them for export from the body. At the same time, they send the cleansed blood back again into the body.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

66

The human body can live off of the capacity of one kidney, but that is the bare necessity. The functioning of the kidney is crucial in sustaining life. Otherwise, waste products would build up and soon poison us.

Renal trauma is present in approximately 10% of all abdominal injuries and 90% of that is due to blunt injury. Major renal trauma is more often associated with penetrating trauma than with blunt trauma (40% vs. 15%). Within the US, the motor vehicle accidents are the most common cause of blunt abdominal trauma leading to renal trauma. As we saw with the spleen and liver, physicians attempt to do whatever possible to treat the patient without performing surgery.

Renal trauma is graded on a scale of 1-5 based on severity. This grading system is quite complicated and too vast for this discussion. When reviewing your medical paperwork, remember that Grade 1 renal injuries are less severe and usually require minimal treatment. Grade 5 renal injuries indicate that the organ has basically shattered. This is a severe injury that requires immediate surgical intervention. Loss of the injured kidney is probable.

## Miscellaneous Injuries of the Abdomen

Now that we have looked at the more prevalent injuries associated with trauma to the abdomen, let's take a look at some other injuries that you will possibly see when handling CU files…

Injuries to the stomach are frequently caused by penetrating wounds or blunt force trauma. Frequently, injuries to the stomach occur with additional injuries to the pancreas or intestines. If there is injury to the stomach, the enzymes and acids that are secreted to assist with digestion leak into the abdominal cavity. This leakage of fluid can result in an infection. Injury to the stomach also interferes with the digestion of food. People with an injury to their stomach may complain of pain in the upper, mid abdominal area. Stomach injuries may also cause the person to have muscle guarding of the abdominal area, tenderness to touch, fast pulse and a low blood pressure. Treatment for the condition will depend largely on the severity of the injury.

Injuries to the pancreas often occur in conjunction with other abdominal injuries. Injury to the pancreas can have a high mortality rate that may be associated with a late diagnosis of the problem. Injuries to the pancreas alter its ability to perform its main functions of enzyme and insulin secretion. Accident victims with pancreatic trauma can complain of pain in the mid abdominal area or back. Abdominal guarding and low blood pressures may be present. Accident victims may have delayed symptoms of up to 12 hours after the initial injury, making diagnosis difficult.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

67

Injuries to the colon and bowels are most frequently because of blunt trauma, such striking the steering wheel in a motor vehicle accident. However, penetrating trauma also accounts for some injury to the colon. Injury to the colon disrupts the ability for the colon to assist with food breakdown, nutrient absorption and waste excretion. It is also possible for wastes and enzymes to leak from a damaged colon resulting in an infection of the abdominal area. Accident victims with injury to the colon may experience pain in the abdomen, nausea, vomiting, muscle guarding or tenderness, absence of bowel sounds or shock.

Blunt trauma is a major cause for damage to the large blood vessels internally. This includes motor vehicle accidents and falls. The acceleration/deceleration injury involved causes a shearing action and results in tears of the large blood vessels. Injury to these vessels (aorta, femoral and iliac vessels) results in a very large amount of blood loss. Accident victims with injury to the large vessels may complain of abdominal pain, nausea, and vomiting.

On examination, an accident victim may have an increase in the size of their abdomen as it is filling with blood, abdominal tenderness, bruising in the abdomen, and/or falling blood pressure with shock. Accident victims may require immediate surgical intervention.

*As a rule, remember that accident victims with internal injury are at greater risk for bleeding and death. Sometimes these injuries may go undetected due to their vague symptoms and the fact that one cannot visualize the injuries as they could a normal cut to the skin. Any treatment for these conditions will be based on the severity of the injury and the subsequent problems that can occur due to the injury (infection, blood loss, etc.).*

NOTES:

_____
_____
_____
_____
_____

Confidential Information of GEICO Companies
© Government Employees Insurance Company

68

## Burns

Burns often happen unexpectedly and have the potential to cause death, lifelong disfigurement and dysfunction. When beginning your medical investigation, remember first that the skin is the largest organ of the human body. Based on this, an injury involving a burn can be devastating for the claimant and the claimant's family.

Although most new automobiles are built in a fashion to minimize the possibility of fire, vehicles can still catch fire depending on the velocity and the point of impact. When handling a loss for claimants who have suffered burns, remember that the critical part of burn management is assessing the depth and extent of injury. Burns are now commonly classified as superficial, superficial partial thickness, deep partial thickness and full thickness.

**When someone has been burned there are three important factors that must be looked at, depth (superficial, superficial partial thickness, deep partial thickness and full thickness), area (total body space covered), and location (where the burn is on the body).**

Depth is a measurement of how deep the damage to the skin goes. The total body area is also important, since the skin is a barrier to protect the body, and when it's damaged, the victim is subject to fluid loss and infections. If more then 15% of the body surface is damaged the victim can go into **shock**, and may require hospitalization for IV fluid resuscitation and skin care.

One of the most important factors is the location of the burn. If a burn occurs on the neck or near the nose and mouth, the persons breathing passages may be affected. Burns often swell and this could become a life-threatening problem if the airways become constricted. Another facial burn that needs special attention is the eyes. These should be looked at as soon as possible and handled very seriously as burns to the eyes may lead to clouded or lost vision. Because burned tissues shrink, burns that extend circumferentially around body structures often require the surgical removal of the dead and damages tissue, this procedure is called an escharotomy. Burns are often difficult to heal and may leave scars.

The American Burn Association has established criteria for determining which patients can be managed as outpatients and which require hospital admission or referral to a burn center. Follow-up care is important to assess patients for infection, healing and ability to provide proper wound care. Complications of burns include slow healing, scar formation and contracture. Contracture is a term that indicates a permanent shortening (as of muscle, tendon, or scar tissue) producing deformity or distortion.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

69

Early surgical referral can often help prevent or lessen scarring and contractures. Family physicians should be alert for psychological problems related to long-term disability or disfigurement from burn injuries.

Burns can be devastating injuries that result in death or lifelong scarring, disfigurement and dysfunction. Burn injuries are the third leading cause of accidental death in the United States. Each year, more than 1 million persons in this country seek medical care for burns. More than 95 percent of these patients can be managed on an ambulatory basis.

Ambulatory management of burns is divided into acute treatment and follow-up care. Acute management includes measures to minimize further damage to patients presenting with recently sustained burns, identifying patients requiring hospitalization and implementing measures to promote healing, prevent infection and relieve pain. During follow-up care, the focus shifts to limiting disfigurement from scarring and dysfunction from contractures. Although most patients with burns can be managed by family physicians, some require surgical referral for skin grafting and scar rehabilitation.

**Acute Management of Burns**

Classification of burns as minor, moderate or major facilitates hospitalization decisions. Proper burn classification requires accurate determination of the depth and extent of the wound(s), as well as consideration of critical issues such as skin thickness, burn location and comorbid conditions. Comorbid conditions refer to the claimant who may already be suffering from other medical conditions separate from the Burn injury.

**Depth of Burns**

The traditional classification of burns as first, second or third degree is being replaced by the designations of **superficial, superficial partial thickness, deep partial thickness and full thickness.** Burn depth has an impact on healing time, the need for hospitalization and surgical intervention, and the potential for scar development. Although accurate classification is not always possible initially, the causes and physical characteristics of burns are helpful in categorizing their depth.

Differentiating a deep partial-thickness burn from a full-thickness burn can be quite difficult initially. Revisions of burn-depth estimations are often necessary in the first 24 to 72 hours and may be required through the first two or three weeks. For instance, although a full-thickness burn typically has a white or charred appearance; it can be red after a scald injury. It is also possible to have a full-thickness burn underneath a blister, which is usually a characteristic feature of a partial-thickness burn. Furthermore, thin skin sustains deeper burn injuries than may be suggested by the initial appearance of the wound. Thin skin is common on the palmer surface of the arms and on the medial thigh, perineum and ears.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

70

All skin can be presumed to be thin in children younger than five years and in adults older than 55 years. It is best to assume that there are no shallow burns in these age groups.

## Extent of a Burn

The extent of a burn is expressed as the **total percentage of body surface** area (TBSA) affected by the injury. Accurate estimation of the TBSA of a burn is essential to guide management.

Multiple methods have been developed to estimate the TBSA of burns. These methods are not used for superficial burns. The best known method, the "rule of nines," is appropriate for use in all adults and when a quick assessment is needed for a child. The results of this quick assessment may be located in the ER records for your claimants. Lets' look at the "Rule of Nines" illustration:



Methods that are more accurate are required for definitive estimation of the extent of burns in children.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

71

The surface area of a patient's palm can also be used to estimate the extent of small or patchy burns. Classically, the palm has been considered to represent 1 percent of the TBSA. However, a recent study demonstrated that the palm more accurately represents 0.4 percent of the TBSA, and the entire hand represents 0.8 percent of the TBSA.

## Inpatient Treatment and Burn Unit Referral

Patients considered to have moderate burns based on the grading system developed by the American Burn Association (ABA) will be admitted for intravenous hydration and surgical care of their wounds. Because of the initial difficulties in differentiating deep partial-thickness burns from full-thickness burns, family physicians should strongly consider obtaining a surgical consultation for what appears to be a deep partial-thickness burn affecting more than 3 percent TBSA.

Pulmonary insufficiency is responsible for more than 75 percent of fire-related deaths. Because of the possibility of progressive edema, patients with suspected inhalation injury should be observed for at least 12 to 24 hours. Historical or physical findings that raise concern about inhalation injury include coughing, wheezing, dyspnea (difficulty breathing), facial burns, sooty mucus (ashy mucus) and laryngeal edema (swelling of the larynx).

Hospital admission is necessary for patients who have circumferential partial-thickness or full-thickness burns and patients who have burn injuries and are considered to be predisposed to infection (e.g., those with diabetes).

### Follow-Up Care for Burns

Follow-up care involves surveying patients with burns for signs of infection, scarring and contracture. To minimize further damage, infection is best managed in a hospital. Scarring and contractures connote long-term disfigurement and disability, both of which are indications for specialized care.

### Follow-Up Intervals

Patients with burns who are being managed as outpatients should be seen again on the day after injury. At this visit, the level of pain can be assessed, pain medication can be adjusted if necessary, and competence in managing dressing changes can be assessed. Subsequent follow-up can then be performed on a weekly basis until wound epithelialization occurs. Epitheliazation is the process of wound repair in which new skin grows and replaces wounded skin. For minor burns, this will be a natural process. However, if pain control is insufficient or there are concerns about the ability of a patient or family members to provide proper wound care, the patient should be seen on a daily basis until complete epithelialization occurs.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

72

If wound epithelialization has not begun after two weeks or if subsequent evaluations reveal the presence of a full-thickness burn more than 2 cm in diameter, the patient should be referred to a surgeon with expertise in burn care. Minor burns (commonly seen with airbag deployment) should typically heal in seven to 10 days.

After epithelialization has occurred, patients are seen every four to six weeks to assess for evidence of abnormal scar formation and to monitor coping mechanisms.

## Abnormal Scarring and Contractures

It has been said that "time heals all wounds." This is not necessarily the case with burns. Although the threat of infection and the magnitude of pain diminish with time, the prospects for long-term scarring and disability often become more apparent. Abnormal scarring is thought to be inevitable when epithelialization takes longer than two weeks in African Americans and in young children, or longer than three weeks in all other patients.

Application of pressure to burn wounds is generally recommended to minimize abnormal scarring, although optimal pressure and duration have not yet been determined in controlled trials. A variety of techniques are used, but all are complex and costly. Therefore, family physicians often refer patients at risk for scarring to a burn specialist. Because pressure prevents scars but does not treat them once they develop, referral should be initiated promptly at the first sign of abnormal scarring or if a wound misses certain epithelialization milestones.

Scar contractures result in disfigurement and disability. If detected early, a contracture can be treated with silicone inserts and pressure. If the contracture is more developed, a continuously worn static splint is added to maintain sustained stretch. Once full range of motion is achieved, splinting can be reduced to nighttime use until the scar fully matures. Surgical intervention should be considered if the contracture is not completely reduced.

### Role of Surgery

Surgical excision and skin grafting beginning less than 72 hours after injury is beneficial and is indicated for full-thickness burns in children and in adults younger than 30 years of age. All other patients with suspected full-thickness burns should be observed for eight to 10 days, as nothing is lost by delaying surgical excision. It is also best to wait two weeks before assessing the need for surgery in children with hot-water scald burns because overly aggressive excision and skin grafting in this group has resulted in worse outcomes. Full-thickness burns less than 2 cm wide can be allowed to heal by contracture as long as they are in nonfunctional, non-cosmetic areas and the skin is not thin.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

73

**Coping with the Injury**

When looking at the affect of burns on claimants, in is understandable that he physical effects of the injury will take its toll.  But we must also be aware of the psychological issues as well. Patients who have sustained burns are at increased risk for anxiety, depression and post-traumatic stress disorder. Family dynamics can also change dramatically. Family members may be stricken with guilt, and patients are susceptible to dependency issues because of the additional help required for daily activities while healing is occurring. If a psychological issue is noticed, appropriate treatment should be implemented.

*When handling burn losses, remember this very important fact:*

The danger from burns depends more on the extent of the burns than on the degree. Superficial burns over a large area are more dangerous than complete charring of a part of a limb.  This is due to the subsequent problems that can manifest when any burn occurs.  These problems include the following:

- Severe pain
- Greater risk for dehydration
- Greater risk of infection
- More surface area for contracture
- More surface area for scarring
- More surface area for disability

There is more pain with large superficial burns than with full-thickness burns occurring to a smaller area.  This has to do with nerve ending destruction.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

74

### Lacerations

A laceration is a wound produced by a relatively sharp object causing a jagged tearing of the skin tissue. Because the skin is cut through its full thickness, stitches are often required.

When handling claims involving lacerations, there are several extremely important factors that need to be investigated:

- Location of the laceration
- Length of the laceration
- Was the wound linear or irregular?
- Did the laceration cause any secondary injuries, such as damage to a tendon?
- Does the claimant have a history of abnormal scarring?
- Occupation of the claimant
- Age of the claimant
- Is scar revision needed?

Before we begin discussing each of these topics, understand that sutures are used for three very important reasons:

1. To prevent infection
2. To minimize scarring
3. To promote healing

Left unstitched, a laceration in more susceptible to infection and the scar is usually more severe. Proper sutures allow the wound to heal more evenly with better margins.



### Location of the Laceration

After emergency care is rendered, the next major thing we look at is the impact the scar will have on the appearance of the individual. Scars that are easily covered by clothing are less of a burden on the individual since they are not seen by the general public. Scars that are located on the face have a much greater impact on the individual. This impact can cause psychological problems, especially for females under the age of 55.

Confidential Information of GEICO Companies
© Government Employees Insurance Company



75



### Length of the Laceration

The length of the laceration also plays a key role in determining the value of the loss. Scar lengths are usually measured in centimeters and will commonly appear this way in medical documentation. When reviewing the claimant's medical records, understand this simple conversion:

### 1 inch = 2.5 Centimeters

If your medical documentation states that a claimant has a 7.5cm laceration above her right brow, you will automatically understand that this claimant has a 3 inch laceration on her lower forehead. Obviously, the size of the scar plays a role in the psychological implications of the scar.



### Was the Wound Linear of Irregular?

Visually, a linear scar is much more appealing than an irregular scar. A linear scar is exactly what it implies. The scar is basically a straight line. Linear scars blend in better with body structures (such as the hairline, etc.) and usually have less of a psychological impact on the claimant. Irregular scars usually have poor wound margins and can be more of an "eyesore". Therefore, the impact to the mental health of the individual could be greatly increased and the need for future scar revision is substantially elevated.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

76



**Did the laceration cause any secondary injuries, such as damage to a tendon?**
As you might recall from earlier in the lesson, tendons connect bone to muscle. When a laceration severs a tendon, there can be serious complications for your claimant. This most commonly occurs with injuries to the hand.

Tendons that move the fingers can sometimes rupture with a sudden force but more often are cut by sharp lacerations. Lacerations may be partial or complete. If complete, the function of that tendon will be lost forever unless the tendon is repaired.

There is a limited period of time after injury during which repair is possible. Examination right away by an expert in hand trauma is needed to prevent serious long-term problems with hand function.

For patients who receive these types of injuries, surgery will almost always be performed. There are two common types of surgeries:

The tendon can be surgically repaired - Sewing together the original tendons

The tendon can be surgically reconstructed - Grafts or transfer with other tendons.

Surgical repair has to be done immediately in order for the claimant not to lose functionality forever. If surgical repair is not possible or if the injury wasn't diagnosed until it was too late for repair, surgical reconstruction will need to occur.

The type of surgery will depend heavily on the severity and location of the injury. After surgery, the claimant will usually have to dedicate themselves to 3 months of rehabilitation if the tendon was surgically repaired. The rehabilitation time for a reconstruction can be up to 6 months.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

### Does the claimant have a history of abnormal scarring?

Abnormal scarring is a problem that commonly affects many people injured in car accidents. This abnormal scarring usually presents itself in the form of Keloid scars.

Keloid scars are defined as an abnormal scar that grows beyond the boundary of the original site of a skin injury. It is a raised and ill defined growth of skin in the area of damaged skin. Although anyone can form a keloid scar some ethnic groups are at more risk of developing them. You are 16% more susceptible if you are African-American or Hispanic. Keloid scars are seen 15 times more in highly pigmented ethnic groups rather than Caucasians.

Some areas of the body do seem more susceptible, the deltoid region of the upper arm, the upper back, and the sternum. The earlobes and the back of the neck are common sites. Skin and/or muscle tension seem to contribute to keloid formation and this is demonstrated by the most common sites of their formation (the upper arm and back). Infection at a wound site, repeated trauma to the same area, skin tension or a foreign body in a wound can also be factors.

There also appears to be a genetic component to keloid scarring. It is known that if someone in the claimant's family has keloids then they are at increased risk. When conducting a recorded statement with a claimant who has sustained a laceration, it is perfectly acceptable to ask the customer if they have a family history of keloid scarring. Since keloid scars take time to form, this could assist you with placing a proper value on the loss. Although we will discuss scar revisions later in this segment, there are three accepted treatments for keloid scars:

- **Surgical treatment -** This is the most effective and the least complex of the available forms of treatment, the recurrence rate however is thought to be about 50%, so a bit disappointing to say the least. Lasers have been tried as an alternative to knife surgery but so far the outcomes are no better.
- **Non surgical treatments -** Interferon therapy (drugs acting on the immune system), has been reported as effective in reducing keloid scarring however it does have significant side effects. Examples are toxicity, flu like symptoms, depression, nausea and vomiting. Prolonged compression of scar tissue can theoretically soften and break up keloid scars; however the practicality of this option depends on the location of the keloid.
- **Combined treatments -** One option involves surgical removal of scar tissue in combination with a couple of steroid injections -one at the time of the surgery and the second injection about 3 to 4 weeks later.

**Confidential Information of GEICO Companies**
© Government Employees Insurance Company

78









### What is the occupation of the claimant?

If the claimant works with the public on a daily basis, the effects from a laceration can be staggering, especially if the laceration occurs in a visible place such as the face. The value for a visible scar can be much higher than for a non-visible scar. Visible and Non-visible scars can also be detrimental for children and teenagers, since they are beginning to form their self-image. Any of these individuals may elect to have scar revision surgery.

### Age of the claimant

As we discussed earlier, the age of the claimant will also play a key role with determining value on a loss. Children and young adults with visible scars will have more trouble with the impact the injury has on their vanity and their self-image. Older adults are usually less worried about this kind of impact on body image.

### Is scar revision needed?

Skin covers the entire body, and acts as a protective barrier. Scar tissue forms as skin heals after an injury (such as an accident) or surgery. The amount of scarring may be determined by the size, depth, and location of the wound; the age of the person; heredity; and skin characteristics including color (pigmentation). No scar can be removed completely. The degree of improvement will depend on variables such as the direction and size of the scar, the age of the person, skin type and color, and hereditary factors that may precondition the extent of the healing process.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

79

Let's look at some "before and after" pictures of scar revisions:

**Indicatio**



Before Scar Revision

After Scar Revision

Keloid

✻ADAM.

Scar removal and revision is best performed after months or years of healing. Medications (topical corticosteroids, anesthetic ointments, and antihistamine creams) can reduce the symptoms of itching and tenderness during this time. Scars shrink and becomes less noticeable as they age, therefore, immediate surgical revision is delayed until the scar lightens in color, which is usually several months or even a year after a wound has healed. A keloid is an abnormal scar that is thicker, different color and texture, extends beyond the edge of the wound, and has a tendency to recur. It often creates a thick, puckered effect simulating a tumor. Keloids are removed at the point where it meets normal tissue. The skin is then sutured closed. Keloids often recur at the site of scar revision.

**Procedure**

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**GTM00177**

80



Scar formation
leads to contracture
of skin under arm

Z-plasty
incision

Z-plasty of
tissue releases
contracture

ADAM.

Surgery to revise scars is done while the patient is awake, sleeping (sedated), or deep asleep and pain-free (local anesthesia or general anesthesia). Massive injuries (such as burns) can cause loss of a large area of skin and may form hypertrophic scars. A hypertrophic scar can cause restricted movement of muscles, joints, and tendons (contracture). Surgical repair includes removing excessive scar tissue and a series of small incisions on both sides of the scar site, which create V-shaped skin flaps (Z-plasty) may be used. The result is a thin, less noticeable scar because the wound closure following a Z-plasty more closely follows the natural skin folds.

### Procedure



Full thickness
skin graft with
artery and vein

ADAM.

Skin grafting involves the taking a thin (split thickness) layer of skin from another part of the body and placing it over the injured area. Skin flap surgery involves moving an entire thickness (full thickness) of skin, fat, nerves, blood vessels, and muscle from a healthy part of the body to the injured site. These techniques are planned when a considerable amount of skin has been lost in the original injury, when a thin scar will not

Confidential Information of GEICO Companies
© Government Employees Insurance Company

81

heal, and when improved function (rather than aesthetic reasons) are the primary concern. Secondary procedures may later be necessary to achieve appropriate aesthetic results.



We will need to continue to monitor any file in which scar revision may be necessary. We will often hire an independent company to take pictures of the scar over different stages of healing. We make a business decision to do this because we want to have an objective person take these photographs.

## Summary

This will complete your lesson on medical review for the CU Examiner. As we stated at the beginning of the lesson, having an understanding of the medical conditions commonly seen at the CU Level will enhance your customer service skills, improve the consistency of your medical investigations and improve your negotiating skills.

When determining the fair value of a loss, it is our main responsibility to take something as subjective as pain and suffering and create a value for that customer. Since we cannot gauge something as subjective as an individual's pain threshold, we have to use objective data to properly evaluate the claim. The medical reports are that data.

Of course there are other things that affect the value of a loss. These things are almost too numerous to count. But the one thing you have control over is how we interpret and evaluate the medical data.

If you ever have any questions or concerns about things you encounter in your reviews, do not hesitate to see your manager, bill review nurses (if applicable) or experienced examiners within your department. Using their experience will benefit you immensely.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

**Lesson Four**
**Control File Handling**
**Continuing Unit Manual**

## Objectives

1. Identify the criteria for placing a file on Control

2. List and explain the three types of Control Files

3. Demonstrate application of the material by completing a Control File Alert

GTM00180

Control files are those claim files that, because of their seriousness, or because of questions of policy, procedure or coverage, are controlled or supervised by CHOL. There are three different types of Control Files; they are **Mandatory, Elective** and **Miscellaneous**. Let's take a look at each of these categories:

## Mandatory Control File Criteria

A claim file that meets any of the following seven Control File Criteria is considered a "mandatory control file". The Control File should be established promptly when it is first apparent that the claim file involves one or more of the following:

1.  A loss potential in a combined amount exceeding the Regional authority. It is expected that Associates handling cases with control file potential will be aware of Regional authority. (See **TCM-Regional-Settlement-Authority-Levels,** formerly TCM-50).

Also, **authority and control file status is on an _occurrence_ basis**. It is possible that an accident involving several policyholders has control file potential, even though each policyholder has minimal limits or shared exposure which might otherwise limit liability. This type of case should be brought to the attention of CHOL as early as possible.

2.  **Law suits** against the Company or an associate involving:

    a)  Allegations of improper handling by a Company associate or agent;
    b)  A claim for punitive damages;
    c)  A claim of bad faith or seeking extra-contractual (breach of contract) damages;
    d)  A Company car, a car leased to the Company, or a car owned by an associate when used for Company business.

3.  Claims involving BI/UM/UIM/PIP coverage with complex coverage issues such as material misrepresentation, failure to cooperate or late notice where a disclaimer must be seriously considered.

4.  Any case arising out of a claim file or the claims handling of a claim file, where it is contemplated that GEICO will be a plaintiff (or a party seeking affirmative relief) in a lawsuit.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

5.  Confirmed catastrophic injury cases ordinarily should not be placed on control unless it is alleged our offer of the policy limits was late and is the reason for the failure of the case to settle.  Exposure to "bad faith" or extra-contractual liability may arise in cases with relatively low policy limits and catastrophic losses.  Notification (telephonic or by Outlook message) to Claims Legal is imperative whenever there is a catastrophic loss alleged and: a demand for policy limits is not accepted or is deferred for any reason (See TCM-275),

**or**

A tender of the policy limits is not accepted because the claimant seeks to recover from an excess carrier **or** from the personal assets of the insured**.  (These files ordinarily should not be placed on control unless it is alleged our offer of the policy limits was late and is the reason for the failure of the case to settle).**

## Common catastrophic injuries include:

1.  Fatality
2.  Spinal cord Injury with paraplegia or quadriplegia
3.  Fracture of multiple members or non-union
4.  Brain damage with mental deficit
5.  Massive internal injuries affecting body organs (especially removal)
6.  Limb amputation
7.  Blindness
8.  Severe 2nd/3rd degree burns
9.  Back injury resulting in incontinence
10. Brachial plexus nerve damage
11. Fractured bilateral oscalcis (Heel Fracture)
12. Ortho injuries requiring two or more surgeries (other than arthroscopic)

In general, not all catastrophic injury claims in Florida are required to go on control in an **urgent status** **as soon as the injury is recognized**, without regard to policy limits, liability issues, or coverage concerns.  If the region elects to tender limits promptly, the file need not go on control unless there are more injured claimants than limits available or the offer has been declined.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

This procedure is not intended to prevent the Region from immediately settling cases within Regional authority if circumstances warrant a prompt settlement or tender of the policy limits. If a tender of the policy limits does not result in a case being resolved, the file should then be put on control as soon as possible and, upon receipt by Claims Legal, the assigned attorney shall exercise line authority. However, if there are split limits **(50/100 or less) and no more than two injuries**, it need not go on control. If there is a single limit and more than one injury claim, then the file should go on control.

6. Medical specials exceed $30,000. Not every claim file where an injured party has $30,000 in medical bills warrants control file status. For example, the file need not be placed on control if the injured party has $30,000 in medical specials, the insured's liability limits are $25,000 and those limits have not yet been offered or refused. Using this same fact pattern, if court approval is required for the settlement, the case need not be placed on control *unless* the court rejects the proposed settlement.

The following examples will serve to identify common situations encountered and the appropriate control file activity, if any:

**Example #1**
When a claimant has incurred medical specials of $30,000 or more on a liability or UM/UIM claim and the policy limits have been offered and refused (irrespective of the policy limits), *this is a mandatory control file*.

**Example #2**
When a claimant has incurred medical specials of $30,000 or more on a liability or UM/UIM claim and the policy limits exceed regional authority, *this is a mandatory control file*.

**Example #3**
Considering the same fact pattern in Example #2, except that the applicable policy limits are within regional authority, CHOL should be consulted to discuss whether the file should be put on control. If CHOL decides that the case does not warrant control file status, the CHOL associate will document ALOG accordingly. Even if the claim file is not placed on control, the claim department must discuss the claim with CHOL 30 days prior to any scheduled trial date.

7. Accidents involving pollution of surface streams or groundwater.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

Except for Florida catastrophic injury cases, mandatory control files must be forwarded to Claims Legal within **seven days** of recognition of control file criteria. In cases where there are liability features in one file and UM or UIM features in another file, both files must go on control.  The entire loss is considered one occurrence.

When one liability or UM/UIM feature meets one of the mandatory control criteria, all liability and UM/UIM injury features are on control and authority to settle any of the control features rests with Claims Legal.  The Region retains its authority to make expense payments.  The region also retains authority over PD, PIP, Med Pay or other coverages unless those coverages meet control file criteria.  The claims attorney exercises line responsibility over control files.

## Elective Control Files

In the following situations, a control file is not mandatory, but may go on control after certain steps, later identified, have been carried out.

1. Questions of Company policy;
2. New or unusual questions of law or procedure;
3. All claims involving bodily injury where the Federal Tort Claims Act (FTCA) applies to the insured and provides a potential defense (see FTCA, Ch VI of the Claims manual).
4. Disputes between this Company and another insurer in which it is indicated that litigation may be instituted by either company concerning questions as to the existence of coverage under policies written by either company, or the extent to which the policies written by either company would apply.
5. Rehabilitation potential on any liability or no-fault PIP claim when such potential is reviewed within the Region and agreed to by the Regional Rehabilitation Coordinator.
6. Appeals, whether initiated by GEICO or any other party to the litigation. Claim Legal must be involved in any decision to initiate or respond to an appeal.  A telephone call between the region and CHOL will usually suffice.

Line management in each regional or branch office is responsible for identifying the situations and then ensuring that appropriate action is taken.  Once the file is on control, the claims attorney assumes line responsibility for the file.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

Ordinarily, seven or 30-day trial summaries, discussions on whether or not to take an appeal and telephone inquiries will be handled by CHO as miscellaneous control files (we will discuss these in further detail during the suit handling lesson).  In the extraordinary circumstance that a control file is warranted, the Sr. Liability Attorney, Sr. Claim Attorney, or AVP of CHOL should make the request for a control file.

## Miscellaneous Correspondence Files

These are less formal referrals of file to CHOL when the approval of a Claims Attorney is required because of a specific problem.  Examples include requests to disclaim coverage when the region has documented the lack of coverage, permission to pay an attorney's bill, which is in excess of regional authority, or requests for trial authority in cases not otherwise meeting control file criteria.

***These limited referrals should be confined to cases that can be resolved in <u>one or two contacts with the claims attorney</u>.***  After discussing and with the approval of the AVP of CHO, or his designees, a request mat be made that a file, which has been referred through Miscellaneous Correspondence, be put on full Control File status and that a Control File be forwarded to CHOL.

NOTES:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## ClaimIQ Control File Alert Document

This is the preferred medium for Home Office notification.  The objective is to provide early, cost-effective notification when control file criteria are met.  If documents are available, they should accompany the form.  **The Alert document should not be delayed in order to obtain other file documents/material.**

The Control File Alert Document is flexible and similar to other ClaimIQ documents. It is automatically generated and accessed similar to other ClaimIQ documents.  Many items on the document are updated as information on liability, injury and/or negotiation is updated in ClaimIQ. ClaimIQ provides dropdown questions and text areas to be used in completing specific items needed for the electronic Control File Alert. There is space for narrative description, analysis, and comments.  Continuation sheets may be used.  It is not necessary to duplicate a narrative that is already contained in ALOG or other file materials like a suit referral document.  The examiner may print specific ALOG screens and attach them to the CFA, if necessary, but refrain from printing the entire ALOG for the file.  The examiner must refer to specific ALOG entries by date.

An Alert Document without adequate narrative attached will be returned to the supervisor.  Where other documents are used to convey basic information, they should be specifically cited on the Alert Document and tabbed for ease of reference. Notwithstanding the forgoing, the examiner will provide a minimal description of the accident.  Do not use such terms as "vehicle 1", **use names** of drivers, passengers, or pedestrians.  The Alert Document may accompany any file except miscellaneous correspondence.

> Do not send an Alert Document on an update.  Use the routing slip, a CFS, or other memo which we will be discussing later in this lesson.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

7

The Examiner is required to complete only one ClaimIQ Control File Alert Document for a single claim. All exposed interested parties will be listed on the initial document. Should a second interested party meet one of the control file mandatory criteria, there is no need to complete a second document. The updated information will be provided to CHOL on the initial documents status update. The examiner is **not** required to complete any of the fields under this sub-tab **unless** a CFA is being drafted. The steps to completing the CFA are as follows:

1. Access the CFA fields on the Header Page of ClaimIQ applicable IP's injury feature by expanding the 'Required for Control File Alert' bar located at the bottom of the page:



**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM00187

2. After expanding the "Required for Control File Alert" sub-tab, complete all applicable fields.



Confidential Information of GEICO Companies
© Government Employees Insurance Company

a.  Only the initial CFA is sent via this document so always select Initial
    report



b.  Select the applicable <u>Company Code</u> from the drop down:



c.  The CHOL approved responses for '<u>Alert Status</u>' are: Routine, Urgent
    or Call Manager at: (Phone number)

> **Remember, all cases are important.  The "urgent" designation is for those cases where time is a critical issue.  Examples include time limit demands, coverage decisions which must be made after an insured has been served with suit papers or a "tender" situation in Florida.**

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**GTM00189**

d.  The "Coverage Verified" question provides a drop down list.  If you choose "At Issue" you **must** address the issue(s) in the "Discussion" section of the CFA.



e.  The "Coverage Involved" text box is to be used to outline only the exposed coverage (s) for the CFA (example:. BI 100/300 or UIM 100/300. This field also serves as the location to note various brief coverage facts.  Examples of these coverage facts would include the contract type if the loss and risk states are different, applicable amendments/endorsements. Any details which cannot be summarized briefly need to be further documented in "Discussion" section of the CFA.

Example:
100/300..MD-A30
contract. With no
applicable end/amend



f.  GPUP Details (limits and policy number, if known) should be listed. Be sure to list all GPUP information. If there is no GPUP, indicate that you have "verified no GPUP".  If you are still investigating to determine if there is a GPUP or it is unknown, then that should also be noted.



**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

g. The 'Reason for notification' question does not fully display the reason in the drop down list.  The reason will fully display in the final CFA document. The control file may meet several referral criteria; but the selection only allows for one. You should select the most significant of those that are applicable in the dropdown; and later in the narrative, you can completely outline all reasons as part of the Issues Requiring HO Action (h).



h. There is a free form textbox for "Issues requiring HO Action". This field should be used to outline the items that need to be addressed by CHO.  Specific examples include Coverage, Reserves, Settlement Authority, Appeal Issues, Policy Limits, Demand, and Other



Example: Reserves



i. Select from the drop down list for 'Documents attached'.  When selecting "selected documents" an additional text box will appear for you to complete.



**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

j. The "Liability assessment" field provides a drop down box of the selections. . If you select "partial" you must indicate the various degrees of negligence in the "Discussions" section of the CFA.



k.   The 'Liability investigation' field provides a drop down box for selection to be made.



l.   The "Reserve adjustment" question has a drop down box with selections of "choose one", "not needed" and "call manager". When you select "call manager" an additional text box appears for you to complete as noted below.



m.   The 'Recommended reserve adjustment' is a text field that allows you to place the dollar reserve which you are recommending for adjustment. **To include injury information for second or more injured parties,** you simply complete a CFA for the first injured party on the claim (the person for whom you are placing the file on control). In the "Plan for Future

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

Action" and "Discussion" fields, a note should apply to the entire claim and outline suggested actions for each and every injured party/claimant for whom you are seeking involvement by CHOL. The reserve adjustment (s) should be documented for the additional parties in "Plan for future action" section.



n.    In the "<u>Direct reserve instruction to</u>" text field you should put the name of the person to whom the CHOL representative will send the reserve authority or response and their "Complete Sysm/Outlook name".  Often, this will be your immediate supervisor.



o.   The "Litigation" question has a drop down box with selections of "In Suit" and "UM/UIM Arbitration". If suit or arbitration has not been filed, it is permissible to leave this as "choose one".



If UM/UIM arbitration is selected, there are no secondary screens and you move to the Status question.

If "In Suit" is selected, the question will expand and the below listed additional text boxes will appear for completion. Note:  If suit has been opened on the Litigation Tab in ClaimIQ, many of these responses will be prefilled.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**



p.  Status—Enter a brief description of the current status of the file. Likely responses might be "Awaiting medical information", "Just started negotiations" or "Suit just filed—discovery pending.

q.  Trial date—the date should be entered if known.

3. Plan for Future Action and Discussion/Documents Attached-these fields should apply to all coverages and features that are being placed on control.

   **_Plan for Future Action_** -The CFA must list a "plan for future action". **There should always be a plan!** Putting a file on control is **not** an abdication of responsibility for the handling of the file.  This is the opportunity to advise the Home Office attorney, in narrative form, exactly what activity is pending and what the plan is to accomplish that needed activity. Some examples are:

   • Planned or suggested investigation activity into coverage, liability or damages.
   • Issues which affect the future ability to investigate the matter such as the insured being diagnosed with a significant disease or one or more parties moving out of the country.
   • In claims where there is a significant issue of the time limit demand that was received but to which there was not a timely response merits specific comment. As an example "we would like to discuss the case in more detail" in response to the missed correspondence is acceptable.
   • Planned discovery process or information on defense counsel recommendations on Litigation cases

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**_Discussion/Documents Attached:_**  You must also list the documents that you will be attaching to the CFA and discuss points that you feel are important or warrant specific mention as a claim handling strategy.



4.  It is necessary to confirm that the _Coverage Facts_ and _Loss Description_ text boxes on the **_Header Page_** are thoroughly completed.  These text boxes display on the CFA document and that document should ideally follow the "Coverage, Liability and Damages" analytical framework.

    In the _Coverage Facts_ text area, there should be a factual discussion of the driver, the owner, the car alleged to be insured, and any other applicable coverage, etc. so that the control file attorney has the facts necessary to determine if the GEICO policy covers the loss.

     The more detailed the Coverage Facts field is prior to drafting a CFA, the less editing will be involved.  It is a good work flow to be thorough when documenting this field as the text feeds to the Timed Reserve Review, Claim Evaluation Summary, Litigation documents and now the CFA.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

The information contained in the *Loss Description* text box should provide **Facts** relevant to liability should be stated succinctly and should include identifying any material facts which are disputed or routine events which did not occur (e.g. the absence of a police report when the sheriff was at the accident scene).  Special mention should be made if any party has made potentially adverse statements, if statements have changed over time or if a party's counsel relays a different version of the facts than relayed in the party's statement or other evidence.  If liability is shared, the % of liability and the thought process behind the decision should be noted in this text box.



5.   Confirm the *Injury/Treatment* Information text box found on the Injury Evaluation page is thoroughly complete.  This is the location for documenting the 'Injuries' portion of a CFA and must start off with **the injured party's name, age, date of birth, occupation and wage loss information**.  If the parties tab is updated with the age, date of birth, occupation and if wage loss information was entered into ClaimIQ, this information will automatically pre-fill the CFA document.



**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

You must enter a description of the injury and a synopsis of the treatment claimed from the medical reports or demand letter should be documented on the "Diagnosis page" and discussed in the Injury/Treatment Information text box. **Use the actual medical diagnosis** ("cervical strain" or "fractured C-2 vertebra") as opposed to a general description of the injured area ("neck").

> **If there is an <u>IME</u>, the specialty (Orthopedic, neurologic, etc.), the date and conclusions should be identified.**

As with the Loss Description text box, the more detailed and up to date the documentation is the less editing will be required when drafting the CFA. The information contained in this text box feeds to the Negotiation Conduct Page when "Add to Strategy" is selected and thus in turn feeds to the Claim Evaluation Summary and the Litigation documents.

6. Confirm the Injury Specials page is updated with the specials claimed (medical bills, lost wages and/or other).



7. To include injury *information for second or more injured parties* you simply complete a CFA for the first injured party on the claim (the person for

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

18

whom you are placing the file on control for). In the **"Plan for future action and Discussion sections,** a note should apply to the entire claim and outline suggested actions for each and every injured party/claimant which we are seeking involvement by CHOL.  A reserve adjustment(s) should be documented for the additional parties in "Plan for future action" section.

8.  You must also update the injury information for each injured party and print a separate Control File Alert addendum for each.   The final CFA document will contain: CFA for the first injured party which includes Coverage, Liability and Injury information for that party along with this Plan/Discussion for **_all_** parties and printed CFA addendums documents for second, third etc. injured parties.

9.  When you have completed drafting the CFA, select "Documents" tab in ClaimIQ and then select "Control File Alert Document."  Once the document is generated, you have the options of "Export" and "Send to Printer." Print a copy of the document to route to CHOL and then "Export" the document. "Export" will save a copy of the document into ECF. The document will appear in the Inbox as a 'Litigation' document. Rename the document as "CFA-claimant name" and move the document to the correspondence folder of the interested party.



10. If there are multiple claimants, repeat the procedure for the "Control File Alert Addendum/s Documents". Print a copy (s) and then "Export" to ECF.
11. Follow your office's current procedures regarding management review of a CFA and forwarding the file to CHOL.

> To complete a CFA on non-ClaimIQ feature(s) such as PIP, Q feature or Collision, you must complete the appropriate paper CFA forms as the claim is not in ClaimIQ.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## Control File Alert

**Initial/Follow Up Report:**  Initial Report

| | | |
|---|---|---|
| Claim: | 6104275310101018 Insured: PARKS, SIDNEY Company: | |
| Date/This Notice: 11.30.2010 | DOL: | 09.19.2008 |
| Region/Branch: FCC0A - Woodbury / | | Risk State: CT |
| | | Loss State: CT |
| Loss Location: / | | Adjuster: Cls, Student (04H150) |

**Alert Status**

Routine

**Coverage Verified: Yes**

Our named insured Mary Johnson was driving her listed 1998 Chevrolet Astro Van during the policy period. This was a Pennsylvania accident with no applicable restrictions or exclusions on coverage. UBI stacks 2x due to stacking...c360 confirmed 1/2/09

**Coverages Involved:**

100/300 UBI..A20MD contract...no applicable end/amend

**GPUP?**
**GPUP Details:**

none available

**Reason for Notification:**

1 - Exceeds Regional Authority

**Issues Requiring HO Action**

Reserves should be adjusted

**Documents Attached**

Complete File

**Facts**

Liability

Our named insured Mary Johnson was involved in a 4-vehicle loss with no dispute of liability. The accident occurred on September 19,2008 at approximately 7pm on State Route-80 Eastbound in Tunkhannock Township, Pennsylvania. The police report indicated that all the vehicles were drivable and no injuries were reported at the scene. There were no witnesses present nor were there any noted on the police report. Our insured's vehicle was stopped Eastbound on State Route 80 along with two other vehicles on the right shoulder due to the hazardous icy road conditions. A tractor trailer was also traveling eastbound on State Route-80. The driver of the tractor trailer lost control on the icy roadway, sideswiped all 3 vehicles that were stopped on the shoulder and continued his travel without making his identity known.

Liability Assessment: Full
Liability Investigation: Complete

| Name | Role | Entity Description | CSP | Liability |
|---|---|---|---|---|
| PARKS, SIDNEY | Insured | GD | Yes | 100 |
| RYAN, BETTY | Claimant (102-AB1:02-APD) | GD | No | 0 |

**Damages**

CLAIMANT: CHEVY/IMPALA/2000.$ 2500.00
INSURED: L ROVER/RANGEROVER/2006,0.00

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## Payment and Reserves

| | |
|---|---|
| Number of BI/UIM Features: | 1 |
| Paid to Date (All Features): | $0.00 |
| Total Current Reserves: | $2,501.00 |
| Adjustment: | Call Manager at 520-555-1212 |
| Recommend Reserve Adjustment: | 75000/loss + 500 exp X 1.11= 75,500 |
| Direct Reserve Instruction to: | My Supervisor |
| Complete Sysm/Outlook Name: | MySupv@geico.com |

## Litigation

| | |
|---|---|
| Litigation: | In Suit |
| Venue: | . |
| Defense Attorney: | Russell  Simmons / Simmons and George |
| | 2425 Jessup Blvd |
| | Columbia ,  MD |
| Status: | In suit |
| Trial Date: | |
| Plaintiff Attorney: | donald  saiontz |
| | 3 south frederick ave, ste 900 |
| | baltimore ,  MD   21201 |
| | (410) 536-8300 |

## Injuries

| | | | |
|---|---|---|---|
| Plaintiff: BETTY  RYAN | | DOB: | 04.15.1967 |
| Role:    OD | | Position in Vehicle: | |
| Feature: 02-ABI | | Reserve: | $0.00 |
| Injuries/Treatment Information: | Lft Strained Shoulder | | |
| | Sprained/Strained Neck/Back | | |

Ms Mary Johnson, 43 yo (April 15, 1967). She is married to Joseph Johnson. She was a foster care mother and now works as a desk clerk for a physicians practice. No wage claim to date.

Her injuries are left shoulder strain, cervical, thoracic and lumbar strain. The cervical strain will not resolve. The plaintiff is alleging permanent injuries to her left arm and neck and back. Surgery was recommended by orthopedic surgeon within 3 years from March 1, 2009.

Mrs. Johnson did not present to the emergency room. She saw her primary care physician who referred her to an Orthopedic Surgeon, Dr. Cyrus McCormic.  She presented to Dr. McCormic with complaints of pain to her left shoulder. X-ray revealed no significant findings. She was referred to physical therapy.

After a considerable gap, Mrs. Johnson commenced her physical therapy on 01/01/2009 for her shoulder sprain. She had 12 visits in 2 months with her last visit on 3/05/2009.

A c-spine MRI performed in February showed per Dr. McCormic, multilevel spondylosis with some disc protrusion at C3-4 and C4-5. She continued to follow up with the Orthopedist due to ongoing shoulder pain. An MRI of the left shoulder was negative. An EMG did not show cervical radiculopathy.

She was referred to a Neurologist. Mrs.Johnson elected conservative treatment (physical therapy) vs. surgery. She also saw orthopedic surgeon, Dr. Povich, who diagnosed her with post traumatic C3-4 and C5-6 cervical facet osteoarthritis, post traumatic thoracic spine HNP at T7-8, T9-10 and T 11-12, posttraumatic L4-5 facet arthritis. Mrs. Johnson continues to treat with Dr Morton.

Medicals

CONFIDENTIAL!

GTM00200

| Provider | First DOT | Last DOT | Visits | Therap. | Non-Therap. | Total Submitted | Total Evaluated |
|---|---|---|---|---|---|---|---|
| Show hidden lines | | | | | | | |
| Hide Albany MRI | 02.12.2009 | 02.12.2009 | 1 | | $5,000.00 | $5,000.00 | |
| Hide Albany Physical Ther... | 01.01.2009 | 03.05.2009 | 12 | $1,600.00 | | $1,600.00 | |
| Hide Baltimore General Ph... | 09.26.2008 | 06.15.2009 | 3 | $400.00 | | $400.00 | |
| Hide Dr Cyrus McCormic | 10.01.2008 | 06.01.2010 | 10 | $1,250.00 | $2,500.00 | $3,750.00 | |
| Hide Dr. Morton | 06.03.2009 | 10.15.2010 | 7 | | $5,000.00 | $5,000.00 | |
| Hide Dr. Pavich | 06.01.2009 | 07.02.2009 | 3 | | $3,000.00 | $3,000.00 | |
| Total | | | 36 | $3,450.00 | $15,500.00 | $18,950.00 | $18,950.00 |

| | Submitted | Evaluated |
|---|---|---|
| Medicals: | $18,950.00 | $18,950.00 |
| Wages: | $4,000.00 | $4,000.00 |
| Other: | $1,000.00 | $1,000.00 |
| Total: | $23,950.00 | $23,950.00 |
| Non-Therapeutic: | | $15,500.00 |
| Employer/Occupation/ Days Out: | Allen and Allen Physicians / / 20.0 | |
| Expert Opinions: | | |
| Last Demand: | | Last Offer: |

**Plan for Future Action (Discuss Any Investigative Problems):**

This case is in litigation in Baltimore County at this time. Staff counsel John Atlas is handling the defense. Answers were filed 1-5-09.The discovery process is ongoing.Staff counsel had to file a motion to compel written discovery. The written discovery package is incomplete and is missing a lot of medical bills and reports. Mrs.Johnson's medical expense are boardable.

**Discussion / Documents Attached:**

Complete suit file including police report, suit papers, and written discovery responses are attached. We will secure all the missing bills and records from Mrs. Johnson's attorney

**Supervisor Comment:**

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM00201

# Control File Alert Addendum

[ Export ]   [ Send To Printer ]

## Injuries

| | |
|---|---|
| Plaintiff: BETTY RYAN | DOB: 04.15.1987 |
| Role:   OB | Position in Vehicle: |
| Feature: 02-ABI | Reserve: $0.00 |
| Injuries/Treatment Information: Other: right Knee pain | |

## Medicals

| Provider | First DOT | Last DOT | Visits | Therap. | Non-Therap. | Total Submitted | Total Evaluated |
|---|---|---|---|---|---|---|---|
| Show hidden lines | | | | | | | |
| Hide Albany Medical Cente... | 06.15.2009 | 12.15.2009 | 6 | $750.00 | | $750.00 | |
| Hide Albany MRI | 06.21.2009 | 06.21.2009 | 1 | $1,250.00 | $1,250.00 | $2,500.00 | |
| Hide Albany Physical Ther... | 06.15.2009 | 03.15.2010 | 32 | $4,500.00 | $750.00 | $5,250.00 | |
| | | | Total | 39 | $6,500.00 | $2,000.00 | $8,500.00 | $7,750.00 |

| | Submitted | Evaluated |
|---|---|---|
| Medicals: | $8,500.00 | $7,750.00 |
| Wages: | $2,500.00 | $2,000.00 |
| Other: | $1,000.00 | $0.00 |
| Total: | $12,000.00 | $9,750.00 |
| Non-Therapeutic: | $2,000.00 | |
| Employer/Occupation/ Days Out: | Wal-Mart / / 20.0 | |
| Expert Opinions: | | |
| Last Demand: | $45,000.00, 10.07.2010 | Last Offer: $13,500.00, 10.07.2010 |

## Damages

CLAIMANT: CHEV/IMPALA/2000,5.2500.00
INSURED: L ROVER/RANGEROVER/2006,0.00

Copyright 2000-2010 Mitchell International All Rights Reserved.

CONFIDENTIAL!

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## Exception Handling

It should be noted that prior to October 2009, the ClaimIQ Header page did not contain the electronic text boxes for "Plan for future action" and "Discussion/Documents Attached" which are currently located on the Header Page—Required for Control File Alert sub-section.  If you view the CFA Document they display; but since the textboxes are not available on the header, you are unable to enter the information needed.

To incorporate this information for losses taken prior to 2009, please follow the steps noted below:

    a.  Select 'Add Note'
    b.  Select 'Injury' as the Type and title the note "CFA-claimant name."
    c.  Document 'Plan for future action' and "Discussion/Documents" as outlined in the example below.
    d.  Press Save and Close.
    e.  The CFA to CHO must refer to this note either in CIQ or in ECF



**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## Use of the Control File Summary (CFS)

Ordinarily, a Control File Summary (CFS) will not be required.  There are circumstances where a claims attorney may require the CFS in order to ensure that the examiner and the attorney have a complete and mutual understanding of the file. An examiner may opt to submit a CFS on any file.  If a CFS is submitted on a file previously placed on control, the CFS should clearly state in its face that a control file already exists for that claim.

The purpose of the CFS is to produce a fact-based, reasoned recommendation in a complex or difficult case.  Notification should not be delayed pending preparation of a CFS; in this situation, use the CFA and the CFS may follow as an update.

We may choose to use a CFS with the following types of files:

1.  Cases involving reinsurance or a GEICO Personal Umbrella Policy (GPUP).
2.  Extremely complex cases.
3.  Cases where there are multiple plaintiffs or claimants.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

# Control File Summary

TO:        A. S. Kalinsky, Claims Legal

FROM:      Examiner – Region

SUBJECT:   Claim Number, Named Insured, Company and Reserves,
           By Claimant, by Feature

DATE:

A.  COVERAGE
    1.   Auto matches the coverage information and has been identified.  If not, explain.
    2.   Policy limits: Explain any Coverage question.
    3.   List any endorsements that may affect coverage for this loss.
    4.   Is there a GEICO Pacesetter policy?   Any other applicable excess or umbrella coverage?
    5.   Has the claim been entered in the control file field of the CRIS system?
    6.   Reason for submission (see Control File Criteria; page XIII-1, Claims Manual).

B.  FACTS OF THE ACCIDENT
    1.   Where, when and how did loss occur?  (In all most unusual fact situations, two or three sentences will be sufficient).
    2.   If the insured, any witness or any person involved in the loss has a version different from the above, give his or her name and briefly explain their version.
    3.   Any policy investigation?   Any charges against any party?  Pleas made and disposition.
    4.   Amount of PD, Coll., or damage to other property.

C.  DIAGRAMS
    Include an informative and neatly drawn diagram showing direction, position of all parties, witnesses and pertinent landmarks.

D.  WITNESS
    List names of witnesses and indicate which have given statements and which have not been contacted or refused to give statements.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

E.   CLAIMANTS – INJURIES AND SPECIAL DAMAGES
In separate paragraphs, list all possible BI, PIP and UM claimants.  Give a
concise statement of the injury, disability, (whether partial, total of
permanent), and in column order, the special damages of each claimant
including property damage items.  Identify the claimant(s) as "pedestrian",
"passenger in the insured car", or "passenger in the claimant car".   Describe
each claimant by name, age occupation, income and marital status.

F.   SUITS PENDING – If none – indicate non-pending.
1.   Title and location of each suit.
2.   Indicate ad damnum and whether or not an excess or acknowledgment
letter has been sent.
3.   Identify plaintiff and defense attorney and set forth any relevant
information about each.  (These should be professional and not
something we would not want discovered).  Discuss any pertinent
information about the place of trial.
4.   Best estimates of trial date.

G.   APPLICABLE LAW
1.   Mention any statute or case law that may apply.
2.   If comparative negligence rules apply, indicate the type and your
estimate of each party's percentage of negligence.  (In complicated
losses, some explanation of how you decided the percentage of each
person's negligence should be included.)

H.   POSSIBLITY OF CONTRIBUTION
Identify all defendants and possible defendants, their involvement and the
names of their carriers, if known.

I.   NEGOTIATIONS – If none, write none.
List progression of all offers, demands and any time limits involved.

J.   SUGGESTED FUTURE INVESTIGATION AND RECOMMENDATIONS
1.   Is completed?  If not, what further information needed?
2.   List any specific ideas and recommendation for further handling.

K.   AUTHORIZATION REQUESTED   - If none, write none.
1.   Amount requested on each Claimant.
2.   Who will do the negotiating?

> This document must contain the signatures of the Claims Examiner,
> Claims Supervisor and the RLA or RCD.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## Documentation

All documents must be secured by *Acco* fastener with holes punched top center.  The CFA or CFS should be on top followed by the Summary Loss Report (data sheet/onion skin).  Place all related documents together; for example, you should not scramble medical records among witness statements or litigation documents.  Medical bills should be separated from treatment reports.  This may require reorganization of materials from the chronological organization of the regional claims file.  A logical grouping of documents is more important that blind adherence to chronological development.

A claims attorney is responsible primarily for review of coverage assessment, proper reserving, determination of liability, assessment of damages, extension of settlement authority, and determination of contribution or subrogation issues in control file cases.  The claims attorney needs adequate substantiation in order to make decisions or review recommendation.  At the same time, the claims attorney is less effective if the examiner submits documentation that is excessive or poorly organized.  Therefore, the examiner or supervisor must exercise some discretion in selecting relevant substantiation that is adequate but not excessive.  The following guideline will help:

## Opening the control file/notification

The following items should be submitted with the Control File Alert Form (CFA) when referring a claim to CHOL.  Check carefully through the claim file for:

a) Submit all documents relating to the facts of liability including police reports, photos and sketches; there is no need to transcribe the insured's and claimants recorded statement unless requested by the CHOL Attorney.

b) Witness statements should be <u>summarized in detail</u>; do not send tapes/CD. The CHOL attorney does have access to ECF wave files; therefore you should only transcribe these statements when requested.

c) Submit any substantive interchange of correspondence with our representatives, the insured or claimant including excess ad damnum letters and reservations-of-rights.

d) Submit applicable tax returns or other wage loss data when a wage claim is being presented.

e) Submit all medical reports such as hospital admission and discharge reports, emergency room records, operative records, diagnostic reports, including x-ray reports and interpretations, physician follow-up notes and reports as well as Independent Medical Examinations (IMEs)

f) A complete summary of medical bills by date, provider, and amount of charges. On liability files you need not send bills unless they are at issue.

g) Pleadings (Law Suit documents)

h) Other pertinent or informative material of value to CHOL

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

Be sure that all material that has been duplicated is legible. **DO NOT** duplicate or send copies of depositions. A summary of the testimony should be forwarded with duplicated material. Copies of all incoming and outgoing correspondence should be included in all files involving a question of coverage.

In cases where there appears to be excessive treatment or where psychosomatic injuries are raised, the entire medical record will probably be requested. In minimal impact cases, it is necessary to submit repairs estimates and photos on BOTH vehicles. Unless requested, **do not send defense attorney bills**. In reviewing file documents for inclusion in the control file, the examiner should apply the following tests:

*Will the information contained in the document assist the Claims attorney in making necessary decision in the file?*

If the examiner discovers *material* information in nursing notes or auto damage records, they should be submitted with a note of explanation. **Do not** send documents that are cumulative or redundant. Occasionally, a Claims Attorney may request records that are not normally submitted. Finally, an inexperience examiner may request assistance from a claims attorney in reviewing and screening records, but training is normally the function of the supervisor.

## Coverage Remarks

Forward a copy of a completed C-380, Coverage worksheet and a complete coverage problem worksheet with the CFA or CFS when coverage is at issue.

## Supervision of Control Cases by a Region or Branch Office

While claims managers approve Alert Forms or CFS, this **does not** in any way relieve the RLA, Regional Claims Director, or Branch Office Manager from responsibility for work quality. RLA's, Regional Claims Directors, or Branch Office Managers may review, at their discretion, certain types of correspondence or particular files. The CFA **will not be delayed to obtain a particular signature**; it is only required that someone in the supervisory chain review it and sign it. Approval by a manager or RLA indicates that the CFA or CFS meets all standards set out in this lesson.

Claims attorneys will routinely communicate and correspond directly with the claims examiner. A claims attorney may request intervention by regional managers in specific cases. Memos addressed to a supervisor should be routed directly to that addressee for review without delay.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**The INDEX/Critical Information and CLIQ Screens**

The examiner should check the INDX screens in IDOC or Critical Information screen in Oasis for pacesetter (GPUP) policy on all 300/300 limits and higher. The existence of a GPUP and exposed coverage limits must be confirmed with coverage underwriting. Do not delay the CFA for a response from coverage underwriting.

Claims Legal personnel will activate the "HO and "HO ATTY" fields whenever the file is opened in Claims Legal.  Code and name in TCM-298 identify claims attorneys. If the field is set up "no coverage", the "HO" and "HO ATTY" fields are not activated.



Control File is open

**Electronic Records**

Electronic Records must be considered part of the claims file and include CLIQ, CLINQI, SINQ, CLREG, ADTARI, and ALOGI.  Information that is substantive and appropriate should be on ALOGI including messages regarding reserving, updates, and authority.  Outlook may be used for informal remarks.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## Control File processing

**Progress Reports -** It is the examiner's responsibility to keep Claims Legal informed of developments in a case on control. Several methods of update are available such as E-mail via ALOG which is the preferred medium for Home Office notification, standard CFA memorandum, typewritten memorandum (word document), and by telephone. The examiner should keep a record of each document submitted to Claims Legal. Any teleconference should be summarized on ALOGI. Headers for control file memos should include a summary of existing reserves and, if applicable, any BI, UM/UIM or PIP payments already made on the file. Attached documents may be stapled, if the documents are too thick for a standard stapler, holes must be punched in the top center, and an Acco fastener must secure them.

A time limit or policy limit demand involving control authority must be conveyed to CHOL within **ONE BUSINESS DAY.** This includes files already on control or those within control file criteria.

Occasionally, files lapse into **periods of inactivity**. During a particular diary period, there may be no correspondence or any other communication. In this situation, there may be no change in the status of the file. Examiners are not expected to report a **"no change in status"** in any particular format. However, examiners are expected to review the adequacy of reserves each time a file comes up on diary.

Examiners must request permission from CHOL to extend the normal 30-day diary. Each feature should also show any amounts paid under advance payments or no-fault payments. PIP control file status reports should include all medical bills and reports, as well as any rehabilitation reports.

## Use of the Routing Slip

The purpose of the routing slip is to facilitate the transmittal of routine documents to the control file. Use of this form does not relieve the examiner of the duty to evaluate and comment on the effect of the documents on the disposition of the claim.

Analysis by the examiner is required in certain update situations. A detailed rationale must appear on the form or addendum if the transmittal is intended to:

- Obtain settlement authority,

- Initiate an adjustment in reserves, or

- Obtain Claims Legal approval for a file-handling recommendation

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

<div style="border:2px solid black; text-align:center; font-weight:bold;">
ROUTE TO: CLAIMS HOME OFFICE, GEICO PLAZA – 3E
</div>

## CONTROL FILE DOCUMENT TRANSMITTAL

REGION _____

TO: _____, Claims Legal

FROM: _____, Ext. _____

DATE: _____

CLAIM#:_____INSURED: _____

| RESERVES: | Feature | Current Reserve | Adequate?  (Yes/No) | Adjustment |
|---|---|---|---|---|
| **02 – Smith, Mary** | **ABI** | **$10,000** | **Yes** | **No** |

[Example]

FILE EXPENSES TO DATE: $ _____

DOCUMENTS ATTACHED: _____

HOME OFFICE ACTION REQUESTED: _____

REMARKS:

_____

_____

_____

_____

_____

| Remember, nothing is sent to CHOL without a supervisor/ manger signature. |
|---|

SIGNED:

_____        APPROVED: _____

C-568 (8-97) NS

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

CONFIDENTIAL!

## Authority

All settlement authority on control files for loss payments under BI, PD or UM/UIM coverages **MUST** be obtained from CHOL, even though the amount requested for the individual claim may be within the authority of the Examiner, Manager BOM or region.  Authority from CHOL on expense items is unnecessary unless the cumulative amount of expense payments already on the file exceeds the region's authorization or would exceed authorization if the expense under consideration were paid.

> **Exception** – When a settlement closes the file and the total of all loss payments is within the Region's authority, CHOL authority is not mandatory.

**This exception applies only to control files created by loss potential.**

Request for authority should be made as early as possible in claim handling and, absent a time limit demand; the requests for settlement authority must be in writing. If it is necessary to obtain a settlement authorization from CHOL by telephone or e-mail, the Claims Attorney will confirm the authority by ALOGI entry.  The claims supervisor must <u>not</u> be left out of the loop when settlement authority is granted to the claims examiner via e-mail.  Claims Legal will notify the supervisor, via e-mail, of any authority granted.

When authority is requested after the initial referral, the information below should be included with the written request.  If more than one claimant is involved, the memorandum should list separately the special damages, demands and requested authority for each claimant:

a) Brief description of the injuries.
b) A columnar listing of special damages, with Bodily Injury specials and Property Damage specials grouped separately for each claimant. Indicate which specials have been <u>verified and which have not.</u>
c) The progression of demands and offers.
d) Amounts previously authorized.
e) Evaluations of adjuster or attorney and comments on the liability.
f) Evaluations of the Regional or Branch Office.
g) In litigation cases, the defense attorney's opinion of our chances of successful defense, probably range of verdicts, present settlement value, and recommendations for future handling.
h) Requests for authority, with each claimant listed separately.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## Settlements

If a claim which is on control is settled, direct an e-mail or memorandum to CHOL to advise of this fact and that proper releases and closing suit papers have been received.  **Do not send copies of releases and suit closing papers unless specifically requested to do so by CHOL**.

## Closing control files

When a Region or a Branch Office control file is ready for closure, advise CHOL by memorandum or ALOGI message and close out in accordance with file closure procedures. If the file is a reinsurance file, send a memorandum only. If the file is a reinsurance file, do not close the file until the authority to do so is received from CHOL.

You may not close the claim file until the control file indicator is closed in the system. **The Claims Attorney will direct that the control file indicator be closed by CHOL personnel and then the Regional file may be closed.**

At the time of the control file closure, the contents will be destroyed.  Original photographs will be returned to the examiner, as well as any other material, which should be preserved.

## PIP Control Files

To comply with statutes and regulations, it may be necessary for an examiner to request payment of certain medical services by telephone.  All telephone authorizations must be acknowledged in writing by the examiner with copies of the bills and reports and Claims Legal should follow up with written authorization.

When noting the "file expenses to date" on a PIP Control file, you **must itemize the total expenses for each PIP feature**. Add the Rehabilitation Specialist's reports and mark their location in the file with slips of paper or "post-it" type notes.  Send complete medical records and bills.

As with normal liability files, in minimal impact cases, it is necessary to submit repairs estimates and photos on BOTH vehicles.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

INITIAL REPORT ☐

CONTROL FILE ALERT

SEE PRIOR CORRESPONDENCE ☐

CLAIM #: _____   INSURED: _____   COMPANY: _____

REGION/

DATE/THIS NOTICE: _____   DATE/LOSS: _____   RISK STATE: _____   BRANCH: _____

EXAMINER

LOSS LOCATION: _____   NAME/CODE/PH: _____

ALERT STATUS:

☐ ROUTINE   ☐ **URGENT**

☐ CALL MGR AT: _____

COVERAGE HAS BEEN VERIFIED?

COVERAGES INVOLVED @ LIMITS:   ☐ YES   ☐ NO   ☐ AT ISSUE  Explain in "Discussion"

☐ BI @ _____   ☐ UM/UIM @ _____   ☐ PIP @ _____

☐ Pacesetter Plus @ _____   ☐ OTHER INS. Explain in "Discussion"

REASON FOR NOTIFICATION:   ☐ MEETS CF CRITERION # _____   ☐ OTHER: _____

ISSUES REQUIRING HO ACTION:   ☐ COVERAGE  ☐ RESERVES  ☐ SETTLEMENT AUTHORITY  ☐ APPEAL ISSUES
☐ POLICY LIMITS DEMAND   ☐ PIP AUTHORITY   ☐ OTHER: _____

DOCUMENTS ATTACHED:   ☐ COMPLETE FILE  ☐ SELECTED DOCUMENTS  Listed Over  ☐ PENDING HO INSTRUCTION

(MUST BE LEGIBLE)

FACTS:

LIABILITY ASSESSMENT:   ☐ FULL   ☐ PARTIAL (COMPARATIVE NEGLIGENCE)   ☐ DOUBTFUL   ☐ UNKNOWN
LIABILITY INVESTIGATION:   ☐ COMPLETE   ☐ CONTINUING   ☐ UNNECESSARY

NUMBER OR BI/UIM FEATURES: _____   $$ PAID TO DATE (ALL FEATURES) _____

RESERVES: CURRENT TOTAL: _____   ADJUSTMENT: ☐ NOT NEEDED ☐ CALL MGR AT: _____

RECOMMENDED RESERVE ADJUSTMENT:
DIRECT RESERVE INSTRUCTION TO:

_____
COMPLETE SYSM/OUTLOOK NAME

LITIGATION:   ☐ IN SUIT   VENUE: _____   DEF ATTY: _____
☐ UM/UIM ARBITRATION

STATUS: _____   TRIAL DATE: _____   PLTF ATTY: _____

C-566 (10-99)NS

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM00214

INJURIES (List by Claimant Name, type of injury, occupation, and age.  For PIP claims, add wage loss and current treatment):

PLAN FOR FUTURE ACTION: DISCUSS ANY INVESTIGATIVE PROBLEMS:

DISCUSSION/DOCUMENTS ATTACHED:

SUPERVISOR COMMENT:

SIGNATURE:                                                                                    DATE:

C-566 (10-99) NS

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM00215

## CONTROL FILE CRITERIA

Any claim with a loss potential in combined amount exceeding regional authority (TCM-50).  In a double insured loss, the total value of all BI/UM/UIM exposures is the measure for control file purposes.

1.  Suits against the Company or an associate:
Involving alleged improper handling by a Company associate or agent, Seeking punitive damages, Alleging bad faith or extra-contractual liability, or Arising from a loss involving a Company car, a car leased by the Company, or a car owned by an associate used for Company business. Alleging a defective Company policy and/or procedure.

2.  Claims against BI/UM/UIM/PIP coverages with complex coverage issues such as material misrepresentation, failure to cooperate, or late notice where disclaimer must be seriously considered.

3.  Any case arising out of a claim file on the claims handling of a claim file, where it is contemplated that GEICO will be a plaintiff (or a party seeking affirmative relief) in a lawsuit.

4.  Catastrophic Injury cases where it is alleged that our offer of policy limits was late and is the reason for the failure for the case to settle.  Exposure to extra-contractual liability ("bad faith") may arise in cases with relatively low policy limits and catastrophic losses.  Notification (telephonic or by Outlook message) to Claims Legal is imperative whenever there is a catastrophic loss alleged and:

5.   A demand for policy limits is rejected or deferred for any reason, or a tender of the policy limits is not accepted because the claimant seeks to recover from an excess carrier or from the personal assets of the insured.  These files ordinarily should not be placed on control unless it is alleged our offer of the policy limits was late and it is the reason for the failure of the case to settle.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## Common catastrophic injuries include:

1. Fatality
2. Spinal cord Injury with paraplegia or quadriplegia
3. Fracture of multiple members or non-union
4. Brain damage with mental deficit
5. Massive internal injuries affecting body organs (especially removal)
6. Limb amputation
7. Blindness
8. Severe 2nd/3rd degree burns
9. Back injury resulting in incontinence
10. Brachial plexus nerve damage
11. Fractured bilateral oscalcis (Heel Fracture)
12. Ortho injuries requiring two or more surgeries (other than arthroscopic)

6. Medical specials exceed $30,000.

7. Accidents involving pollution of surface streams or groundwater.



**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM00217

## Instructions for Control File Alert form

The Control File Alert Form is intended to provide very early notification to Claims Legal of claims, which meet established control file criteria noted on next page.

**ALERT STATUS:**  The majority of files will fall in the "routine" category, which means that Claims Legal does not require emergency action in response to the notice.  If a file is characterized as "urgent", the submission must include sufficient file information to explain the issues and the action required.  "Call Mgr At:" indicates a need that the claims attorney calls the supervisor for further discussion.

**OTHER INSURANCE:**  Indicate any other coverage applicable to the loss from any carrier including, but not limited to, workers' compensation, secondary or excess coverage or umbrella coverage.

**REASON FOR NOTIFICATION:**  "Meets CF Criterion:" refers to an established list of control file criteria summarized on previous page.

**ISSUES REQUIRING HO ACTION:**  This section calls for selection of actions or processes needing immediate attention by Claims Legal.  For example, the CF criteria may be "catastrophic injury" but the actions needing attention are reserves and a response to a policy limits demand.

**DOCUMENTS ATTACHED:**  See Claims Manual page XIII-5.  List attached documents in the Discussion block.

**FACTS:**  Facts relevant to the control file issues may be presented in **legible** handwritten form with continuation on the reverse of the form.  The examiner should follow the "Coverage, Liability, Damages" format when completing the section.  Additional Continuation Sheets may be used.  You may print ALOGI screens, which convey facts regarding the file.

**LIABILITY ASSESSMENT:**  In BI cases, "Full" means all or predominant fault lies with the insured.  In a comparative negligence jurisdiction, "Partial" means some fault lies with both parties.  "Doubtful" means that we have at least one viable defense on the merits of the case against the insured.  In UM/UIM cases, these terms refer to the liability of the adverse party.  Use the Discussion block to cite cases, statutes, and for analysis.

**RESERVES:**  Total is gross total of all combined reserves.  Recommended reserve adjustment should be broken down by feature.

**SUPERVISOR COMMENT:**  Some comment is mandatory by first line manager only.  Submission of alert should not be delayed to obtain approval of claims manager, RLA, etc.

**DISCUSSION:**  Discuss any coverage issues, laws applicable to liability, or venue considerations.  List documents attached.  Set out any specific requests of Claims Legal

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**



Intentionally left blank

Confidential Information of GEICO Companies
© Government Employees Insurance Company

**Lesson Five**
**Suit Handling**
**Continuing Unit Manual**

## Objectives:

1. Correctly identify the causes for a lawsuit.
2. Correctly identify the four stages of a lawsuit.
3. Understand the insured's and GEICO's obligations once a suit has been filed.
4. Understand the elements to a Complaint.
5. Identify and understand the importance of Pleadings and Motions.
6. Identify proper service.
7. Be able to refer the lawsuit to Fee & Staff Counsel.
8. Understand the evidence of the discovery process.
9. Understand the elements of a Trial and suit closing documents.

CONFIDENTIAL!

# SUIT HANDLING

### Introduction

Across the nation, there has been a steady increase in the number of lawsuits filed by people who have been involved in automobile accidents. It is of the utmost importance that we at GEICO handle these suits properly and efficiently so that we protect the interests of both the insured and the Company.

All lawsuits, whether involving first-party or liability claims, must be regarded as very serious matters.

### What are the Causes of Litigation?

While some lawsuits cannot be avoided, the claim technician's function is to dispose of all claims properly and fairly. Generally, there are only three acceptable reasons for a lawsuit:

1. Excessive demand with no prior opportunity to settle on a reasonable basis.

2. Clearly no liability. (Generally, there is no objection to permitting such a case to go to suit as there is little else that can be done short of paying money that is not owed.)

3. The parties are not ready to settle and the statute of limitations period is ending.

Even a settlement that does not appear favorable is frequently better than a lawsuit with its attendant risk and expenses. We should not encourage a plaintiff's attorney to file suit by failing to make a timely offer or failing to suggest alternative dispute resolution.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

### Why Cases Go To Suit?

1. A breakdown in settlement negotiations
    2. Lack of early contact with claimant or attorney
    3. Lack of early investigation
    4. Personality conflict between attorney and examiner
    5. Heavy caseload of either attorney or adjuster
    6. Dispute as to liability
    7. Unrealistic settlement expectations of either or both party/parties
    8. Dispute as to causation of injury
    9. Dispute as to value of the injury
    10. An unresolved or disputed coverage issue
    11. Client pressure on the attorney
    12. Stay the statute of limitations
    13. Plaintiff's attempt to obtain nuisance settlement in a case of no legitimate value
    14. Plaintiff obtains service over the defendant before the defendant leaves the state
    15. Instances when the case has a value of more than the insured's policy limits and the plaintiff's attorney is attempting to go after the insured's personal assets
    16. Plaintiff's attorney is being innovative in the nature of his claim
    17. Following new trends in other jurisdictions, e.g., stacking of coverages

## Notes:

_____

_____

_____

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## Insured's Duties after suit is filed

The policy contract requires the insured to forward immediately any suit papers received.  Failure or unreasonable delay in getting the papers to the Company may raise a question of coverage that should immediately be discussed with the claims supervisor or manager, the Regional Liability Administrator (RLA) and Claims Legal.

## GEICO'S Obligations after suit is filed

It is our responsibility to handle expeditiously the suit against the insured.  It is imperative for the examiner to be cognizant of the fact that **THEY** are responsible for the direction of the claim file, regardless of the fact that litigation has been initiated. We should <u>do nothing to prejudice the insured's rights</u> or to expose the insured to any excess verdicts or judgments.

At all times, we must be sympathetic and understanding of the needs and feelings of the insured.  In most situations, this is probably the first time the insured has been sued.  He is unfamiliar with the litigation process.  He is not sure what we will do for him.  He is anxious about the outcome.  He is concerned about his financial future. Inform the insured of the litigation process step by step.  Our goal should be to keep him informed along the way.  We should let him know if we are in settlement negotiations.  If the negotiations have stalled and the case is being diarized, tell him.

We should promptly inform the insured when the suit has been resolved.  This should be done in all cases by mail.  The letter should inform the insured of the disposition of the case.  The letter should not be all "legalese," but sound like a friendly conversation. We should send this letter **within five days after disposition** of the case.  This will reinforce the fact that we have kept on top of the situation and have looked out for the insured's interest.  A copy of this letter must be sent to the defense counsel.

## Notes:

_____

_____

_____

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## Four Stages of Litigation

There are <u>usually four stages</u> in the litigation process; filing the suit, pre-trial discovery, pre-trial conference/pre-trial order &, ultimately, the trial.  The following is breakdown of these stages:

1. **<u>Filing the Suit</u>**

   - ➢ Jurisdiction/Venue
   - ➢ Service of process
   - ➢ Complaint (or petition)
   - ➢ Answer
   - ➢ Intervention and the intervener (e.g., workman's compensation carrier)
   - ➢ Amendments to the pleadings – supplemental pleadings

2. **<u>Pre-Trial Discovery</u>**

   - ➢ Interrogatories (may be addressed only to a PARTY)
   - ➢ Depositions (examinations before trial)
   - ➢ Medical examinations
   - ➢ Documents
   - ➢ Requests for admissions; stipulations
   - ➢ Time limitations on discovery; sanctions

3. **<u>Pre-Trial Conference, Pre-Trial Order</u>**

   - ➢ Motions
   - ➢ ADR (Alternative Dispute Resolution)

4. **<u>Trial</u>**

   - ➢ Selection of the jury
   - ➢ Opening statements
   - ➢ Plaintiff's case; defendant's case
   - ➢ Rebuttal and surrebuttal
   - ➢ Closing arguments
   - ➢ Judge's instructions to the jury
   - ➢ Jury retires for deliberations
   - ➢ Verdict and entry of judgment

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

# "FILING THE SUIT" MOTIONS

The following motions may be utilized during the "Filing the Suit" stage of litigation.  We will discuss each of these later in the lesson.

- Joinder

- Consolidation of Actions

- Motion to Sever

- Motion to Bifurcate

- Motion for Judgment on the Pleadings

- Declaratory Judgment

- Motion to Dismiss

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

# FILING THE SUIT

## Venue

Venue customarily refers to the county or district where the lawsuit is filed.  (Venue sometimes is used to refer to the location of where an accident/injury occurred.)

It is important to ask ourselves if the venue is appropriate and favorable to us and, if not, what we can do to get the case to a more favorable venue.  Some states have liberal laws as to where suit should be filed.  Where the parties live or where the accident occurred usually are proper locations for a suit to be tried.  A case may have more than one appropriate venue.

## The Complaint

The lawsuit begins when the party claiming injury (the plaintiff) files a complaint (or in some states services the summons) or petition with a court that the plaintiff believes has jurisdiction.

Depending on the rules of procedure as subscribed to by the jurisdiction, the complaint may be very detailed concerning the allegations.  The complaint must make a case against the defendant.  This also is true for a counterclaim, cross-claim or third party claim.  In other jurisdictions, the content of the complaint may be very general and non-specific.

Black's Law Dictionary states that the complaint shall contain: (1) the title of the case specifying the name of the court in which the action is brought, the name of the county in which the trial is required to be held, and the names of the parties to the action, plaintiff and defendant; (2) a plain and concise statement of the facts constituting a cause of action, without unnecessary repetition; each material allegation shall be distinctly numbered; and (3) a demand for the relief to which the plaintiff believes himself entitled. If the recovery of money were demanded, the amount thereof must be stated.  Code N.C. 1883, 233 (C.S. 506)

The complaint contains allegations that form the basis of the plaintiff's case and the answer contains the allegations that form the basis of the company's defense.  The examiner should point out discrepancies and inaccuracies in the complaint to the company's defense attorney. Additional investigation frequently is suggested by the pleadings.  Copies of pleadings should always be sent to Claims Legal when a claim on control goes into suit.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

If the pleadings contain a paragraph requesting **punitive damages** because of the circumstances surrounding the occurrence, you must bring it to the attention of the defense attorney. In the letter acknowledging the suit, if appropriate under the terms of the policy in question, the insured or insureds should be notified that an award for punitive damages <u>might not</u> be covered under the insurance policy. Questions concerning coverage for punitive damages should be discussed with the Regional Liability Administrator (RLA) and Claims Legal.

**The Summons**
After the complaint is filed with the court, the clerk of the court issues **a summons**. A summons is a legal document which the clerk of the court forwards to a sheriff, marshal, or other person empowered by law to serve defendants. The purpose of a summons is to notify the defendant that a suit has been filed against him/her, that an answer to the suit must be filed with the court within a specified period of time, and the penalty for failing to respond to the complaint within the specified time frame. If we do not respond within the period as listed on the summons, a default may occur.

In most jurisdictions, a copy of the complaint or petition is served with the summons. However, some states allow the plaintiff a period of time to file the complaint after the summons is served. In some others, only the summons is served and the defendant or the defendant's attorney must secure the complaint from the clerk's office.

**Service**
Prevailing law in a given jurisdiction determines what does or does not constitute proper service on a defendant. Some jurisdictions require that the defendant be personally served, while others view the leaving of the summons at the dwelling of the defendant as proper service. In some special circumstances, a summons may be mailed to a defendant. Law in all jurisdictions provides for Service upon infants and incompetents; this is usually handled through the appointment of a guardian. Corporations are served through "agents" authorized to accept service and, in absence of such, through a state official designated for this purpose, usually the Secretary of State.

**Notice of Service**
When an insured is served, he is then obligated by the terms of the policy to "send us all papers dealing with claims or suits immediately." While an insured has this obligation placed upon him or her by the terms of the policy, good practice is to remind the insured of the importance of this obligation while the investigation of the claim is underway. If the examiner feels there is a good chance that suit will be filed, remind the insured of his or her obligation in writing.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

The insured should be instructed to call us immediately upon receipt of a summons and complaint and to send to us the summons and complaint via registered or certified mail.

When the insured informs us of service, obtain the following information: **date of service, name of plaintiff, name of defendant(s), court, case number, answer due date, and how service was effectuated.**

If we are notified by plaintiff attorney that suit has been filed, we should investigate the status of service, contact the insured, advise him or probability of service and instruct the insured to contact us by telephone and to forward summons and complaint immediately as soon as he is served!

Once we have been informed of suit, we must locate the file and put it on daily diary until the summons is received. If we do not receive suit papers on schedule, we need to determine how much time (exact date) before answer is due. We may need to obtain a copy from the clerk of the court or request our counsel to get one. We may even need our defense counsel to put in an appearance or request for an extension of time. Bring this matter to the attention of a supervisor or Regional Liability Administrator.

**Checking for Service**

The manner in which service of process must be made effectively to subject the insured to the jurisdiction of the court is prescribed in each state. Always determine the time and place of service and the person served, and whether the service was made by mail, in person, or in some other manner. Give this information to our attorney so that he or she can determine whether service of process was proper.

**Waiving Defense of Defective Service**

If there is a defect in service, we should make every effort to avoid waiving it where there is some advantage to be gained in obtaining a dismissal. All information concerning the service should be given to the defense attorney as soon as possible, since a special type of initial pleading is necessary to avoid waiving a defect in service.

If there is no advantage to be gained from a dismissal for ineffective service, the effort will only add to legal expenses. If it appears advisable not to question service, even though there is some slight defect, obtain the insured's written consent to waive arguments regarding potentially defective service. This is especially important if the ad damnum exceeds the policy limits. If service is not questioned, the insured might later contend that he was exposed to liability that could have been avoided with proper handling.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

The Waiver of Defective Service form (C-92) (see Exhibit 1) has been prepared for the insured to consent to waiving a defect in service.  A personal meeting makes possible a thorough explanation of the situation and offers the opportunity for the attorney to answer any questions raised by the insured.  If it is impractical to set up an in-person meeting with the insured, his or her written consent may be obtained by correspondence if the claims supervisor approves.  Such a letter to the insured must be carefully written, explaining fully the advantages and disadvantages of the waiver.

**The Answer**
Once the insured (defendant) has been served with a summons, the defendant must "answer" the complaint within a specific time frame.  The answer is the formal written statement made by a defendant setting forth the grounds of his defense(s).

Under Federal Rule of Civil Procedure 12, a person may use an answer to set up all defenses, but he also has the option to use a motion to assert certain defenses.  Many states follow the federal rules.

It is the examiner's responsibility to insure a timely and proper response to the lawsuit.  When the summons is not answered timely, the court might enter a default against the defendant.  The examiner should ask the following questions when preparing to have a complaint answered:

1. Does the plaintiff have a proper cause of action?
2. Does the insurance policy cover the defendants?
3. Was the suit filed in the proper jurisdiction?
4. What is the statute of limitations?
5. Is there more investigation needed for a proper defense?

Counsel for the defendant develops the answer.  The function of the answer is to respond to the allegations.  Some states permit a very general response while other states require that the answer respond to each allegation stated in the complaint.  We normally request the court to award reimbursement for expenses that we incur in defending the suit.

**Forms of Denial to consider**
1. Outright denial of the allegation
2. If we are without knowledge or information as to the truth of an allegation, we must state so.  This has the effect of a denial.
3. We might deny only portions of the allegation and admit what is true.
4. If there are allegations in the pleading that do not permit or require a response, they are considered denied.
5. Some jurisdictions (MD for example) allow general denials in tort cases.  These can read, "Defendant denies generally all allegations of negligence and damages."
6. **If we fail to deny an allegation, it will be deemed admitted.**

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## Affirmative Defenses to consider

Under the Federal Rules of Civil Procedure (FRCP) and most state rules, all affirmative defenses must be raised in the answer.  Such defenses include:

|   |   |   |   |
|---|---|---|---|
| a) | Assumption of Risk | f) | Contributory Negligence |
| b) | Duress | g) | Comparative Negligence |
| c) | Guest Statute | h) | Estoppel |
| d) | Statute of Frauds | i) | Res Judicata |
| e) | Contract Specific Defenses | j) | Statute of Limitations |

### Agreements to Defer Filing Answer

Occasionally, a plaintiff's attorney will file suit merely to obtain service before the insured leaves the jurisdiction or to toll the statute of limitations.  The plaintiff's attorney might agree that it is unnecessary for the Company to file any pleadings at the present time if there is a possibility of negotiating a compromise settlement.  It is contrary to Company policy to rely on a verbal agreement of this nature, because a misunderstanding could result in future default judgment.  A written agreement should be obtained stating that the attorney will not take a default judgment for a specified period of time and that they will notify us if service is obtained on the insured.  If the agreement cannot be obtained in writing, our defensive pleadings must be filed.

It has long been customary in some jurisdictions to get an agreement with the plaintiff's attorney to extend the time to answer a lawsuit, in order to delay incurring the expense of a defense attorney on a case that we want to settle and which should be ripe for settlement in a very short period.  The usual practice is to get an agreement in writing that an answer or other plea must be **filed within ten days of written notice from the plaintiff's attorney**.  Because of possible delays in mail, change of personnel, the increasing volume of claims, etc., any such extension of time should be to a particular date in the future.  The examiner should have some record other than the claim file log notes and the claims manager should also have a control on this to avoid a default.

We must remember that this practice is not applicable in all jurisdictions so that it is not wise to do this in a jurisdiction in which we are not certain it has been approved.

Procrastination is not a sufficient reason for using this technique.  A proper case for such an agreement is one in which we are almost at a settlement or where suit is filed in order to get service on a transient insured and there are only a few items left to check out, either on damages or liability in order to reach a decision on settlement value.

If a second extension is needed, approval for the extension should be obtained from the branch managers or regional claims director.  The second extension should also be confirmed in writing with the plaintiff's attorney.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**Defaults**

A suit not answered within the time prescribed in the summons is eligible to be determined by the court to be in "default". There are many possible results of a default, all of which are bad. If an insured is served with a summons, fails to notify the Company, and allows the case to go into default, he or she may thereby have completely waived whatever protection he or she is entitled to under the policy.

If an insured is served and gives us proper notice, and we fail to have an answer filed, <u>then we</u>, the insurance company, become liable for all penalties the default may impose upon the defendant.



When the court enters a default, the defendant is precluded, as a matter of law, from defending on the facts; the question of liability has been decided against the defendant by virtue of the default. When the opportunity to defend on the question of liability is taken away, the insured's exposure normally increases. When this happens because of the Company's negligence, it is tantamount to removing the policy limit. The insured may undertake an action against GEICO for negligence that exposed the insured to substantial financial loss, causing him or her to suffer unnecessary additional expense, attorney fees, etc.

Any time a case goes into default, whether it was caused by the insured's failure to notify the Company or as the result of an error made by our Company, the examiner should immediately bring the default notice to the attention of his/her Supervisor, Manager or RLA. Claims Home Office Legal should also be notified immediately.

## Claim handling after suit is filed

The preferred practice is to negotiate and settle meritorious claims before suit is filed. If suit cannot be avoided, the continuing unit examiner bears primary responsibility for the direction of the case, including settlement efforts.

In some instances, it may be appropriate to attempt settlement <u>after</u> suit is filed and <u>before</u> referring a case to defense attorneys to file necessary pleadings. To allow sufficient time for a thorough exploration of settlement possibilities, we sometimes ask plaintiffs' attorneys for an extension of time within which to file our pleadings.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

Occasionally, the lawyer representing the plaintiff will offer to stipulate to an extension of time.  Whether sought by us or offered by a plaintiff's attorney, it is Company policy that an extension of time within which to file pleadings will not be accepted unless the agreement is in writing from the attorney representing the plaintiff.  This policy is applicable whether claims personnel, staff counsel or a defense attorney obtains the extension of time.

Additionally, our policy is expanded so that stipulations to extend time to file pleadings **should not be accepted for more than 60 days beyond the answer date**.  As a practical matter, if a case cannot be settled within a sixty-day period, it is not likely that a reasonable settlement will be obtained without substantial legal effort.  Handling suits beyond sixty days without filing an answer involves risks we want to avoid.  Claims Legal may approve exceptions to this policy.  In some jurisdictions, the court must approve an extension of time to file pleadings.

The claims supervisor/manager signing the Bodily Injury Suit Notification form (C-103) is responsible for establishing and maintaining appropriate controls to insure that default judgments are not taken in any case in which we are operating on an extension.  It is of extreme importance that there are known, well-defined controls over cases handled on an extension.

After a case has been referred to counsel, counsel has an ethical obligation to represent competently the insured.  Counsel cannot be effective unless he is kept informed of all aspects of the case, including the status of negotiations.  We must, therefore, inform our attorneys of demands and offers on a timely basis.  Failure to carry out this obligation will frequently place our attorneys in embarrassing situations and will deprive the Company of helpful suggestions and recommendations from counsel.  If a case is settled, the attorney assigned to handle the defense should be immediately informed of the fact of settlement and the settlement amount.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## Handling Courtesy Copies of Suit Papers

Courtesy copies of suit papers are copies of a lawsuit the plaintiff's attorney either plans to bring in the absence of a settlement or a lawsuit that has been filed but not yet served.

The following procedures are to be used for handling courtesy copies of suit papers:

1. Within seven days of receipt of the papers, the claim is to be evaluated, authority requested as needed, and the plaintiff's attorney contacted for settlement.

2. At the first contact with plaintiff's attorney after receipt of the courtesy copies he or she should be asked about the status of service upon the insured.

3. Within seven days of receipt of the courtesy copies, the insured must by contacted by mail advising the insured that suit papers have been prepared against the insured and advising the insured of his duty to promptly notify us if and when service takes place.

4. If the case does not settle within our evaluation of the claim, the examiner should suggest an alternative dispute resolution forum, e.g., mediation. If that fails, the plaintiff should proceed with service so that the matter can be concluded.

5. The examiner should monitor the file for service by checking every 10 days. If the examiner refers the matter to counsel to monitor service, the file must be referred exactly as if service has been accomplished with the added instruction that until service is accomplished, counsel is to monitor the case for service. Naturally, a case is not to be referred to counsel to monitor service unless that counsel will be handling the defense of our insured.

6. Precautions must be taken to ensure that an answer is not filed on behalf of the insured prior to proper service. An answer should not be filed merely on the basis of the receipt by the claims examiner of courtesy suit papers.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## Additional Responsive Pleadings to a Complaint

**Counterclaim**

Black's Law Dictionary defines this as a claim presented by a defendant in opposition to or deduction from the claim of the plaintiff.  Federal Rule of Civil Procedure 13 (FRCP).  If established, such may defeat or diminish the plaintiff's claim.  Under federal rule practice, and in most states, counterclaims are either compulsory (required to be made) or permissive (made at option of defendant).

**Note**:  Our counsel would file a counterclaim against a plaintiff driver for contribution and/or indemnification on the Injuries of plaintiff's passengers, as appropriate, but would not file a counterclaim for personal injuries of the client.   The client <u>must</u> be advised of his right to make such a claim, especially in compulsory counterclaim jurisdictions.

> **Example: Howard Jones (plaintiff) sues Susan Smith (defendant) because Susan rear-ended Howard.  As a result, Susan files a *counter-claim* against Howard for not having operational brake lights.**

**Cross-Complaint**

Black's Law Dictionary states that whenever the defendant seeks affirmative relief against any named co-defendant, relating to or depending upon the contract or transaction upon which the action is brought, or affecting the property to which the action relates, he may, in addition to his answer, file at the same time, or by permission of the court subsequently, a cross-complaint against that co-defendant.  The cross-complaint must be served upon the parties affected thereby and such parties must respond to the cross-claim as they would to the original complaint.  This is allowed when a defendant has a cause of action against a co-defendant that affects the subject matter of the action.  The only real difference between a complaint and a cross-complaint is that the first is filed by the plaintiff and the second by the defendant against a co-defendant.  This is usually for contribution and/or indemnification.  Both contain a statement of the facts and each demand affirmative relief upon the facts stated.  The difference between a counter-claim and a cross-complaint is that in the former the defendant's cause of action is against the plaintiff and the latter against a co-defendant.

> **Example:  Howard Jones (plaintiff) sues Susan Smith and Jonathan Mills (defendants).  Mrs. Smith barely rear-ended Mr. Jones but was then violently rear-ended by Mr. Mills and forcefully pushed back into Mr. Jones.  As a result of the first suit, Mrs. Smith files a *cross-complaint* against Mr. Mills.**

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**Third Party Complaint**

A defendant may bring in a new person or entity as a third party defendant alleging that the new party is liable for any amounts assessed against the defendant in favor of the plaintiff.  A third party action must be served – just like a complaint – on the third party defendant and he or she can end up in default if he or she fails to answer.  It is an action for contribution and/or indemnification against a person not originally named as a party by the plaintiff.  The plaintiff will frequently file an amended complaint naming the third party defendant as a defendant after the third party has been brought in. (This process is called the plaintiff's "amending over" to include the third party defendant in the plaintiff's lawsuit).

> **Example:  In the same scenario above, Mr. Jones solely named Mrs. Smith in the original suit.  Mrs. Smith files a *third party complaint* against Mr. Mills**

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**Suit Processing**

Upon the receipt of suit papers, the examiner must review the documents and do the following: check coverage again, check service, check venue, determine affirmative defense and consider the need for a declaratory judgment.

After considering all of the above, the examiner must take the following steps:

> ➢ Assign defense counsel
> ➢ Develop a suit referral letter
> ➢ Suit acknowledgment letter
> ➢ Complete C-103 (BI Suit Notification)
> ➢ Processing CRIS suit data

**Acknowledging the Suit**

Suit papers require priority handling by all personnel at all times, and the procedures contained in this manual are to be instituted as soon as the Company is advised of any filing, even if service of process has not been attempted.

The examiner is responsible for directing the handling of a suit and must be guided by the facts developed in the investigation, by Company policy and technical procedures, and by knowledge of and experience with defense counsel representing the insured.

All suit papers must be acknowledged in writing to all persons named in the suit for which we are providing a defense. Review the suit papers to determine the appropriate acknowledgment letter. (See the "Exhibits" Chapter in this manual for sample Suit Acknowledgment, Excess Ad Damnum, and Punitive Damages letters.) A copy of the acknowledgment should be sent to the defense attorney handling the case.

**Other Acknowledgments of Suits**

When the amount asked in the suit is not in excess of the policy limit or limits, an acknowledgment must still be sent to anyone to whom we owe a defense, since the plaintiff upon application to the court may increase the ad damnum at any time. If suit is brought against several insureds, separate acknowledgments should go to each.

All letters described above should be sent by regular mail, in duplicate, with a request that one copy be signed and returned to the Company. If we do not receive the signed copy, the letter must be sent again by certified mail, return receipt requested, addressee only.

**Amendments to Original Suit**

If the original complaint is amended, then a new applicable letter should be sent to the insured with copies to the defense attorney.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## Liability in excess of policy limits

When the amount sued for in the lawsuit exceeds the policy limits, the insured should immediately be advised of this fact and informed that he or she may employ an attorney (at the insured's own expense) to protect his or her interests beyond the policy limits.  In some states, and in some extraordinary circumstances, the attorney will be at our expense.  By first class mail, send an **Excess Ad Damnum Letter** to the insured.  Include a copy of the letter and request that the insured sign and return the copy to the Company.  If the copy is not returned, send a copy of the letter by certified mail.

The Company may elect to settle or defend a suit against the insured but it has a duty to settle if there is an opportunity for a reasonable disposition commensurate with the liability, injury and damages involved.  Failure to take advantage of such settlement opportunities may result in the Company being required to pay the entire amount of any resulting judgment, even in excess of the policy limits.

Liability of the Company in excess of the policy limits is of real concern.  In the early days of automobile insurance, companies had the right to control the defense of litigation, but the duty to settle was not recognized.  Because of the obvious inequity in permitting an insurance company arbitrarily to subject its insured to a substantial loss on the mere possibility of the Company's saving money, the theory of excess liability came into existence.

Under this theory, an insured may recover from the Company any loss in excess of the policy limits if the insured can establish that the Company did not deal in good faith or that it was negligent in the handling of the claim.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**Guidelines to reduce the danger of a finding of excess liability:**

1) When any letter or call is received which threatens excess liability, the examiner must immediately discuss the case with the claims supervisor.  This includes letters or calls containing policy-limit demands and time-limit demands.  If there is any reasonable probability that such a case would have a potential recovery value in excess of the policy limit, the claim supervisor is to discuss it with the Regional Liability Administrator and, if appropriate, Claims Legal.

2) Conduct a prompt and thorough investigation.

3) Be fair and reasonable in settlement negotiations; never take an arbitrary or unreasonable position.

4) Be certain that the case is realistically evaluated.  If much less is offered in settlement than is carried in the reserve, this fact might be introduced as evidence of bad faith.

5) Send an Excess Ad Damnum Letter immediately upon learning that the insured has been served with a summons in which the amount sued for is in excess of the policy limits.  Be sure that the letter includes all points covered in the sample in the Exhibits Section of Chapter X of this Manual.

6) Engage competent trial counsel to represent the insured.

7) Make sure that the case is properly prepared for trial.  Know the identities of all the witnesses and how they will testify.

8) Give careful consideration to the opinions of trial counsel as to liability and settlement value.  An in-depth discussion with trial counsel on the possible outcome of the case should be conducted as soon as possible prior to the commencement of the trial.

9) Advise the insured of significant developments as they occur.

10) Occasionally, a case involves close questions of liability and value.  If the Company and the insured's attorneys do not agree and the case is sufficiently large, consider obtaining an unbiased opinion from a competent attorney who is not connected with the case

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

For an insured to establish a right of action against the Company for liability in excess of the policy limits, the insured must show that he or she has been damaged because the Company did not fulfill its obligations.

If claims are properly handled, there is no cause for undue concern over the vague possibility of an excess verdict.  Threats to hold the Company for excess liability should not deter the intelligent claims handler from following sound practices.

> **Remember that all letters and memoranda in any claim file or Claims System may be used against the Company in trial of excess liability**

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM00263

**Excess AD Damnum Letters**

An Excess Ad Damnum Letter adapted to the individual case is to be sent to anyone to whom we owe a defense, when the amount demanded in the suit exceeds the policy limit or limits.  If we are defending several persons, a separate letter must be sent to each defendant.  Amended complaints may require additional Excess Ad Damnum Letters.

Certain jurisdictions do not require the plaintiff to state an exact ad damnum in the initial pleadings.  A special "Excess" letter, the 'Unlimited Excess Ad Damnum" letter, is then used.  If, prior to settlement, the plaintiff makes known an exact ad damnum, a second, regular Excess Ad Damnum Letter must be sent to the defendant(s).

### Example

**We have received a copy of the lawsuit filed against you by [plaintiff] in the [court] Court of [venue] because of the accident referenced above.  As provided by your policy, we have referred the defense of this lawsuit to the law firm of [defense firm name, address, phone number].  Please notify them immediately if you intend to pursue a claim against [plaintiff] or another party.**

**This defense is provided subject to all the terms, conditions and provisions of the policy contract. Please do not discuss this suit or the facts of this accident with anyone other than our authorized representative or your own counsel.**

**Since the amount you are being sued for is more than the insurance policy limits, you may want to exercise your right to obtain your own attorney, at your expense, to cooperate with the defense attorney we have retained on your behalf to protect your interests for any amount that may be in excess of your policy limits.  You need not hire your own attorney, but you have the right to do so under the policy.  The defense attorney provided by GEICO will do his or her best to protect your interests.**

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM00264

**Punitive Damage Letters**

A request/demand for punitive damages requires a letter to all defendant(s) to whom we owe a defense under the policy.  If the Ad Damnum Clause(s) exceeds the policy limits, or the inclusion of a Punitive Damage Clause would put the total ad damnum over the policy limits(s), a special letter (Excess Ad Damnum and Punitive Damages Letter) should be sent.

If the punitive damage clause and the ad damnum clause do not, together, exceed the policy limit(s), a regular Punitive Damages Letter must be sent.

### Example

**We have received a copy of the lawsuit filed against you by [plaintiff] in the [court] Court of [venue] because of the accident referenced above.  As provided by your policy, we have referred the defense of this lawsuit to the law firm of [defense firm name, address, phone number].  Please notify them immediately if you intend to pursue a claim against [plaintiff] or another party.**

**This defense is provided subject to all the terms, conditions and provisions of the policy contract. Please do not discuss this suit or the facts of this accident with anyone other than our authorized representative or your own counsel.**

**Since there is a claim for punitive damages in the lawsuit filed against you and your policy does not provide coverage for punitive damages, you may want to exercise your right to obtain your own attorney, at your expense, to cooperate with the defense attorney we have retained on your behalf to protect your interests for any amount that may be in excess of your policy limits, including punitive damages.  You need not hire your own attorney, but you have the right to do so under the policy.  The defense attorney provided by GEICO will do his or her best to protect your interests.**

---

There are additional examples of Suit letters in the appendix section of this manual.

---

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

### Defense Counsel

The examiner has (3) three types of defense counsel to choose from and consideration should be as follows: **staff counsel**; **designated fee counsel**; and **fee counsel not previously approved.**

#### A.  Staff Counsel Referral Guidelines

The examiner is responsible for identifying appropriate lawsuits to be referred to Staff Counsel. The following are general guidelines for litigation cases that <u>should</u> <u>not</u> normally be referred to Staff Counsel.

a)  Lawsuits involving a conflict of interest or having the potential for or appearance of a conflict.

b)  Lawsuits involving two insureds; e.g., both sides in a double insured case.

c)  Lawsuits involving a claim with an excess verdict almost certain; e.g., policy limits were offered in settlement and refused, a missed time limit response, etc.

d)  Lawsuits against any of the GEICO insurance companies without Claims Legal approval, except UM/UIM and no-fault claims where suing the Company is the usual procedure.

e)  Lawsuits demanding punitive damages against the insured, because such a demand can create the potential for a conflict of interest.  If punitive damages are first requested after the referral, the case should be immediately reviewed for any potential conflict of interest.  If punitive damages are routinely demanded, your judgment will be needed as to when it really represents a potential conflict.

f)  Lawsuits involving a coverage question; i.e., reservation of rights or non-waiver agreement involved unless the expressed permission of Claims Legal has been obtained prior to the referral.

g)  Lawsuits with unusual or complicated questions of law unless previously discussed with Claims Legal if on control and with Staff Counsel if not on control.

h)  Any case on appeal without express permission from Claims Legal in advance.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## B. Designated Fee Counsel

The Company has a number of outside defense counsels who has been approved to handle suits for us.  Examiners should consult with their supervisor to get information on attorneys used in a particular geographic area.

## C. Fee Counsel Not Previously Approved

We sometimes will encounter situations where suit is filed in an area where we do not have a designated defense attorney, or we do not have a record of having used local counsel in a previous case.  There can also be instances where a conflict of interest develops making it necessary to utilize alternate counsel and we have only one attorney designated for the area.

Under these circumstances, the region must select a defense counsel and get authorization from Claims Legal.  The examiner should first discuss the alternate counsel with the Claims Manager and RLA and then submit a Notice of Change to Attorney/Adjuster Listing form (C96-A) (Exhibit 2) to Claims Legal for approval.

## Assignment of Defense Counsel

It is the examiner's responsibility to transmit the summons to defense counsel who will file an answer with the court within the time frame as outlined by the summons. Appearance on behalf of an insured in a lawsuit should be authorized only after a determination of proper service upon the insured.  Every precaution should be taken to prevent a default against an insured.

Careful consideration must be given to the recommendation of counsel retained by the Company to represent the insured.  It must always be recognized that counsel is the legal representative of the insured and claims technicians should never ask counsel to do anything adverse to the interest of the insured.

When selecting which defense firm to use, the examiner must consider:

> ➤ venue (where is the suit filed)
> ➤ seriousness of the injuries
> ➤ punitive damages
> ➤ liability and damages
> ➤ whether to defend or settle
> ➤ experience, reputation, and effectiveness of counsel
> ➤ staff counsel (guidelines below)

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## Suit Referral Letter

Whether the suit papers go to the attorney with or without a copy of the claim file, the examiner should write a referral letter to the defense attorney containing a summary of the file. The summary should include an evaluation of the liability and damage issues involved and our recommendation for future handling. If our attorney disagrees with our thinking, he or she should then give us an opinion and recommendation for future handling including additional investigation and the use of discovery proceedings. Finally, we should always advise our attorney whether we will conduct settlement negotiations. Normally, the examiner will negotiate with plaintiff's attorney, but if the defense attorney is really a talented negotiator, the examiner may feel it is more advantageous for defense counsel to deal with the plaintiff's counsel.

### A.    Suit Referral Letter Checklist

Tailor each suit referral letter to the specific facts and issues of the individual case. Include only as much detail as the situation warrants. Only those points pertinent to the individual case should be covered in the letter. The following checklist is a guideline:

➢ Identify why suit was filed. Is there disagreement as to value? As to liability? Is there an attempt to obtain a nuisance settlement? Disagreement as to causation or injury?

➢ Give the accident facts that are material to the liability or damages issues.

➢ Identify any coverage issue and advise how it is being handled and whether any non-waiver or reservation of rights has been issued. (See Chapter IV.)

➢ Identify potential legal issues. Emphasize those that may be used as an affirmative defense, assumption of risk, intra-family immunity, Federal Tort Claims Act, etc. (See Chapter VI)

➢ Identify instances where there is potential exposure in excess of the policy limits in light of the facts or damages and the Ad Damnum clause. Provide the attorney with a copy of the Ad Damnum Letter to the insured. (See Chapter X)

➢ Discuss material discrepancies in the testimony of witnesses.

➢ Describe what investigation remains outstanding, and provide names and phone numbers of adjusters working on the case.

➢ Briefly describe each plaintiff. Give name, age, martial status, employment situation and salary, and detail the injury and special damages, noting those that have been verified.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

➢ Outline the material to be obtained through pretrial discovery and the form of discovery to be undertaken, e.g., interrogatories or depositions.  Specify who is to be deposed.

➢ Give your opinion as to value and the status of settlement negotiations.

➢ Specify who will conduct settlement negotiations - the attorney or the Company.

➢ Discuss questions of service of process, joinder of additional parties to the suit, and counter claims, etc.  Give specific details as to how service was accomplished.

➢ State recommendations as to further handling.

➢ Ask for the attorney's opinion on coverage, liability, and damage issues, and recommendations for future handling.

➢ An attorney needs to know what is in the claim file to defend his/her client. Therefore, you must describe what is in the recorded statement and add language to the referral that tells the attorney we will provide the recorded statement upon their request.

**Notes:**

_____
_____
_____
_____
_____
_____
_____

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

# "PRE-TRIAL DISCOVERY" MOTIONS

The following motions may be utilized during the "Pre-Trial Discovery" stage of litigation. We will discuss each of these later in the lesson.

- Joinder

- Consolidation of Actions

- Motion to Sever

- Motion to Bifurcate

- Motion for Judgment on the Pleadings

- Motion to Compel

- Motion to Preclude

- Motion in Limine

- Offer of Judgment

- Motion for Summary Judgment

- Declaratory Judgment

- Motion to Dismiss

- Motion for Further Bill of Particulars

- Motion to Secure Medical Reports from Plaintiff

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

# PRE-TRIAL DISCOVERY

A.        **Discovery**

### 1.  Discovery Procedures



In most jurisdictions, discovery procedures exist
which allow one party to a lawsuit to compel the
disclosure of information by the adverse party.
Examiners and adjusters should be familiar with
the procedures in each state with which they are
concerned.  There are significant differences between states.  In some, the defense
is entitled to a medical examination by a doctor of its choice, and in other states, it
is not.  In some states depositions of witnesses may be taken by the insured's
attorney, and in other jurisdictions, there is no such provision.  In a few states,
either party can require the other to disclose the identities of witnesses.  If an
accident occurs in one state and suit is filed in another, discovery and other
procedural matters are governed by the rules of the court in which the suit is filed.

While it is important to develop evidence in every way possible, discovery
procedures should not be used if the information can be obtained efficiently by
other means.  Every effort should be made to ensure that the cost of defense is in
proportion to the importance of the case.

### 2.  Discovery Defined

Black's Law Dictionary defines discovery in a general sense as the ascertainment of
what was previously unknown; the disclosure or coming to light of what was
previously hidden; the acquisition of notice or knowledge of given acts or facts; as
to the regard of discovery of fraud affecting the running of the statute of
limitations, or the granting of a new trial for newly discovered evidence.

In other words, discovery is a term describing the process by which one party finds
out about the other party's case, which includes securing the sworn testimony of
witnesses.  The provisions governing discovery also, as a rule, provide the
opportunity to view and conduct reasonable examinations of any tangible evidence
that may be used in the trial.  Discovery concerns getting the facts, seeing the
people involved in the accident in an atmosphere similar to what will be
experienced in the courtroom, determining the chances of success and providing
access to witnesses who may have refused to cooperate.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

### 3. Scope of Discovery

In general, under the Federal Rules of Civil Procedure, parties may obtain discovery regarding <u>any matter, not privileged, which is relevant to the subject matter involved in the pending action</u>, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter.  It is not grounds for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

### 4. Degree of Discovery

The degree of discovery needed in a given case is most often dictated by the quality of the initial investigation.  The better our investigation the better we will be able to control discovery.  We will be able to know exactly what we need to develop throughout this process.  Generally, a great deal of discovery is not required in a case that contains a thorough investigation.

We need to analyze the case and identify the questions that need to be answered before defenses can be formulated.  We then identify the witnesses who most likely have the needed answers.  Decide which method (i.e., deposition, interrogatory, or medical examination) will be sufficient to get the needed answers.  Then proceed based on these conclusions and limit the discovery to the areas identified.

**Notes:**

_____
_____
_____
_____
_____
_____

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## B.   Evidence

The legal definition of "evidence" is "any species of proof, or probative matter, legally presented at the trial of an issue, by the act of the parties and through the medium of witnesses, records, documents, concrete objects, etc., for the purpose of inducing belief in the minds of the court or jury as to their contention".

A better explanation for our purposes might be:  the trial of a lawsuit is a process whose objective is the resolution of conflict.  The court and jury are the parties charged with the responsibility of performing this function.  Since the court and jury have no means of investigating the case before them, they must rely upon information furnished by the interested parties.  This information is called <u>evidence</u>.

We are responsible for securing and preserving evidence that may be needed at trial months or years later.  Physical evidence should be labeled and kept in a secure place. Names, addresses and telephone numbers of all witnesses and nearest relatives or others should be promptly ascertained.  A periodic check on the whereabouts of all witnesses should be made until the case is settled.  The best time to gather evidence is as early in the case as possible, while the facts are still fresh.

There are three types of evidence.

1. **Oral** is the testimony of the witnesses.
2. **Documentary** consists of written data, i.e., books, papers, reports, public and private records.
3. **Demonstrative** is of a visual nature i.e., movies, videos, photographs and x-rays.

To be admitted, i.e. accepted, by the judge at the trial, evidence must be <u>material</u>, <u>relevant</u> and <u>competent</u>.  Material means it must prove or disprove a matter at issue. Relevant means it must have a clear connection to the case.  Competent means it must come from a source that is able or qualified to give the information.  A witness who had the ability to see, hear and recall the event is an example of a source of evidence that is all three of the above.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**Admissible Evidence**

1. The plea of guilty at a motor vehicle hearing is admissible but the defendant is allowed to explain the plea.

2. The majority rule is that conviction of a prior crime (criminal offense arising out if the same situation that produced the civil case) cannot be admitted in the civil case. However, evidence of a prior conviction of certain types of crimes, especially perjury or fraud, usually will be admitted to impeach a witness.

3. Testimony in prior proceedings is allowed as an admission against interest if it qualified as such against a party to a lawsuit. However, if it is testimony of a witness, it may not be introduced at a later trial unless the witness again takes the stand and then only to impeach his testimony.

4. Compromise offers (settlement offers) are not admissible as evidence of negligence. The fact that repairs are made, so that no further accidents occur, is not admissible on the issue of negligence. Certain safety investigations are inadmissible.

5. Admission against interest is a statement or conduct that asserts facts that are contrary to that person's best interest.

6. A prior inconsistent statement is a statement made previously which indicates a different position from the position being taken at trial.

7. A statement of conduct by an agent of a principal can be admissible as if were the actual statement or conduct of the principal if the agent was acting within the scope of his authority when he made the statement/conduct.

8. Declaration of pain and suffering can be admissible.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM00274

**Hearsay Rule**

"Hearsay" is defined as an out-of-court statement made by someone other than the declarant, offered for the truth of the matter asserted.  Hearsay evidence is normally inadmissible at a trial.  The above definition of hearsay is very technical and best left to the lawyers.  For our purposes, we need to understand that a witness, under most circumstances, will be permitted to testify about those persons, places and things that are <u>personally known by that witness.</u>  The hearsay rule prevents (under most circumstances) the witness from testifying about <u>what someone else said.</u>

Generally, the hearsay rule bars second-hand statements offered for the <u>truth</u> of the matter.  If some other purpose can be shown, like intent or mental status, the statement can be admissible.

## <u>Discovery Methods</u>

Under the Federal Rules of Civil Procedure and the governing rules in most states, parties may obtain discovery by one or more of the following methods:

  ➢ Depositions upon oral examination or written questions.
  ➢ Written interrogatories
  ➢ Bill of particulars
  ➢ Production of documents for inspection and other purposes
  ➢ Physical and mental examinations
  ➢ Requests for Admission (Facts or factors that will be admitted during trial).

**Interrogatories**

Another method of discovery is the use of interrogatories that are written questions that one party sends to another party.  Any party may serve any other party written interrogatories.  Interrogatories may be served upon plaintiff after commencement of an action.  Each interrogatory is answered separately and fully in writing under oath.  They are signed by the person making the answer and any objections signed by the attorney making them.  Under the Federal Rules of Civil Procedure, the answer and objection must be completed within 30 days after service of the interrogatories.  Interrogatories may be used at the trial to the extent permitted by the rules of evidence in the jurisdiction in question.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## Production of Documents for Inspection and Other Purposes

Any party may serve on any other party a request (1) to produce and permit the party making the request, or someone acting on the requestor's behalf, to inspect and copy any designated documents including writings, drawing, graphs, charts, photographs, compilations from which information can be obtained, or to inspect and copy, test, or sample any tangible things; or (2) to permit entry upon designated land or other property in the possession or control of the party upon whom the request is served for the purpose of inspection and measuring, surveying, photographing, testing, or sampling the property. The request may be served upon the plaintiff after commencement of the action, with or after service of the summons and complaint. The request shall set forth the items to be inspected either by individual item or by category, and described each item and category with reasonable particularity. The request shall specify a reasonable time, place, and manner of making the inspection and performing the related acts. The Federal Rules of Civil Procedure allow 30 days for a written response after the request. The documents for inspection shall be produced as they are kept in the usual course of business and should be organized and labeled. If an item is objected to, reasons shall be specified.

## Request for Admissions

A party may serve upon any other party a request for the admission of the truth in a matter that relates to statements or opinions of facts, application of law, or the genuineness of documents.

The Federal Rules of Civil Procedure provides that the matter in question will be admitted unless 30 days after service a denial is made. If an objection is made, the reason shall be stated. The answer should specifically deny the matter or explain why the party cannot truthfully admit or deny the matter. If a matter is admitted, then it is conclusively established unless the court, on motion, permits withdrawal or amendment of the admission!

## Records Deposition (Subpoena Duces Tecum)

In some jurisdictions, a party may request a records deposition of a person or business entity such as the plaintiff's health care provider or employer. A representative from the deposed organization is scheduled to appear with all records but may provide a complete copy of all records and <u>not</u> appear. This is being used more frequently to make sure complete records are obtained and/or to get prior medical history.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**Depositions or EBT's** (Examination before Trial)

A deposition (called on EBT in some states) is a method of obtaining information from witnesses. It is the testimony of a witness, made under oath, but not in open court, and written down so that it can be used when the case comes to trial. It can be taken either orally or in written form. Oral depositions are sworn statements that the witness gives verbally in the presence of the attorneys who ask the questions. Depositions are usually recorded by a stenographer and then transcribed. Written depositions are also sworn statements given by the witness who answers written questions with written responses.

When we desire an oral EBT or deposition of a witness, most states do not require that a petition to the court be made. In some states, depositions can only be taken with the court's permission. In order to take a deposition (with or without a court's permission) all parties are entitled to advance notice; the amount of time for the notice varies from state to state.

As with oral depositions, we must give reasonable written notice when taking a written deposition. The notice is served upon the witness and all other parties to the suit and must include the questions along with the name and address of the person who is to question them. The Federal Rules of Civil Procedure state that within 30 days after the notice and the written questions are served, a party may serve cross-questions upon all of the parties. Within 10 days after being served with these cross-questions, a party may redirect questions upon all other parties. This 10-day rule also applied to further redirect questions and cross-questions.

For our purposes, depositions/EBT's help us determine what the witness will testify to at trial and what the overall impression the witness will make on a jury. They also help us to uncover additional facts. Depositions may lead to a stronger or weaker defense. They may also bring about settlement. At a trial, any part or all of a deposition of a party may be used against the party who was deposed. The deposition may be used for the purpose of contradicting or impeaching the testimony of the witness.

Videotape depositions may be used in lieu of a witness appearing at trial if the witness is a great distance from place of the trial or is unable to testify because of age, illness, imprisonment or infirmity.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## Physical and Mental Examinations of Persons

When the mental or physical condition of a party is in question or controversy, the court in which the action is pending may order the party to submit to an examination by a physician.  The order may specify the time, place, manner, condition and scope of the examination and the person or persons by whom it is made.  After the examination, we must deliver to the party examined a copy of the examining physician's report on his findings to include results of test diagnosis and conclusions.

In some jurisdictions, medical examinations or physicals may be accomplished prior to a court order.  Some jurisdictions limit the number of examinations.

## Bill of Particulars (New York)

A Bill of Particulars in New York acts the same as interrogatories.  It is designed to aid the defendant in developing a proper answer and preparing for trial by giving detailed information regarding the cause of action as stated in the complaint.  In practice, it is a written statement of the particulars of a demand.  After the complaint and answer, the Bill of Particulars is the next procedure in the litigation process.  Sometimes the special damages (medical bills and wage loss information) will accompany the bill of particulars.  In the other states, a defendant (in addition to interrogatories) can request that the court require the plaintiff to flesh out the complaint.  Such a request is called a motion for a more definite statement.

## Limit of Discovery

Under the Federal Rules of Civil Procedure, the frequency or extent of use of discovery can be limited if:

➢ the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive;

➢ the party seeking discovery has had ample opportunity by discovery in the action to obtain the information sought;

➢ the discovery is unduly burdensome or expensive, taking into account the needs of the case, the amount of controversy, limitations on the parties' resources, and the importance of the issues at stake in the litigation.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## Limitations of Time and Complying with Discovery

A court may impose sanctions against a party who is dilatory in complying with the time limitations of discovery.  Therefore, do not let defense counsel permit the case to drag on because plaintiff is not complying with discovery.  We can force discovery by applying to the court for an order.

## Notes:

_____

_____

_____

_____

_____

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

# "PRE-TRIAL CONFERENCE / PRE-TRIAL ORDER" MOTIONS

The following motions may be utilized during the "Pre-Trial Conference/Pre-Trial Order" stage of litigation. We will discuss each of these later in the lesson.

- Joinder

- Motion to Bifurcate

- Motion to Compel

- Motion to Preclude

- Motion in Limine

- Offer of Judgment

- Motion for Summary Judgment

- Motion to Dismiss

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM00280

# PRE-TRIAL CONFERENCE
# PRE-TRIAL DISCOVERY

**A.**     **Handling Courtesy Copies of Suit Papers**

Courtesy copies of suit papers are copies of a lawsuit the plaintiff's attorney either plans to bring in the absence of a settlement or a lawsuit that has been filed but not yet served.

The following procedures are to be used for handling courtesy copies of suit papers:

➢ Within **seven days of receipt** of the papers, the claim is to be evaluated, authority requested as needed, and the plaintiff's attorney contacted for settlement.

➢ At the first contact with plaintiff's attorney after receipt of the courtesy copies, he or she should be asked about the status of service upon the insured.

➢ Within **seven days of receipt** of the courtesy copies, the insured must by contacted by mail advising the insured that suit papers have been prepared against the insured and advising the insured of his duty to promptly notify us if and when service takes place.

➢ If the case does not settle within our evaluation of the claim, the examiner should suggest an alternative dispute resolution forum, e.g., mediation. If that fails, the plaintiff should proceed with service so that the matter can be concluded.

➢ The examiner should monitor the file for service by checking every 10 days. If the examiner refers the matter to counsel to monitor service, the file must be referred exactly as if service has been accomplished with the added instruction that until service is accomplished; counsel is to monitor the case for service. Naturally, a case is not to be referred to counsel to monitor service unless that counsel will be handling the defense of our insured.

➢ Precautions must be taken to ensure that an answer is not filed on behalf of the insured prior to proper service. An answer should not be filed merely based on the receipt by the claims examiner of courtesy suit papers.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**B.      Referring Counterclaims to Counsel**

If our insured has filed an action for damages against a party and has received a property damage counterclaim, the claims supervisor should consider assignment of this defense to the insured's own attorney under the following guidelines:

> ➤ The insured's attorney should be experienced and capable.

> ➤ The fee should be reasonable and consistent with the counterclaim and agreed upon before assignment, if possible.

> ➤ Consideration should also be given as to whether the counterclaim was initiated merely as a defensive step or whether it is meritorious.

Failure to file a proper pleading within the prescribed period may result in a default judgment against the insured or the Company.  Every precaution should be taken to avoid such a possibility.  This is one of the most serious errors a claims handler can make.

If we have a written stipulation from the plaintiff's attorney that he or she will not take a default judgment and up-to-date negotiations indicate the possibility of settlement, we should so inform defense counsel.

**C.      Referral of Property Cases**

> ➤ First-party property cases may be referred to Staff Counsel but Staff Counsel retains the right to refuse the case.

> ➤ Third-party property liability cases will be referred to Staff Counsel unless approval to use outside counsel has first been obtained from the Claims Legal AVP.  Staff Counsel may refuse third party suits referred to Staff Counsel.

> ➤ The policy limit involved is not a determining factor as to whether or not a case would be referred to Staff Counsel.  Furthermore, certain cases are especially appropriate for referral to Staff Counsel and whenever possible should be so referred.  (i.e., threshold defense cases in No-Fault states).

> ➤ Exceptions to the above guidelines may be obtained on individual cases by contacting Claims Legal in advance of the referral.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

# Counting Suits or Opening Suit in CRIS

Before opening the suit in CRIS, you need to determine the suit count. Each feature counts as a separate suit. The inclusion of several defendants in the same action does not increase the number of suits, but if separate features are opened and suits filed against one or more insureds, the suits are counted separately.

## Count as Suits

➢ Each plaintiff and cause of action against an insured under BI or PD coverages. This includes small claims actions.

➢ Each declaratory relief action in which the Company is named as a defendant.

➢ Each action in which the Company is a defendant in a suit to enforce contribution.

➢ Each cause of action under BI or PD coverages where the Company is the excess carrier and the value of the ad damnum is in excess or might be in excess (not specifically set out) of the limits of coverage of the primary carrier.

➢ Actions that the Company is defending in court under Uninsured Motorist Coverage.

GTM00283

**Do Not Count as Suits**

➢ Friendly suits

➢ Court-approved settlements of non-litigated cases

➢ Declaratory relief actions in which the Company is the plaintiff

➢ Actions which the Company is defending in arbitration under Uninsured Motorist Coverage

➢ Actions under BI or PD coverages where the Company is the excess carrier and the ad damnum is within the limits of coverage of the primary carrier. When the value and ad damnum or the demand figure are known to lie within the limits of the primary carrier, the examiner should discuss with his supervisor whether further action should be taken or if the file should be closed.

**General Rules for Counting Suits**

In determining the number of suits, the number of plaintiffs shall be used regardless of whether they are joined in one summons or not. Each separate and distinct cause of action should be reported as an individual suit.

Where several plaintiffs join in one suit and only one summons and complaint is actually served on a defendant, the suit count shall be the same number of suits as there are plaintiffs and causes of action.

A claim shall be construed to be "in suit" as soon as notice of service is received at the Company office responsible for the control of the claim file. It shall only be removed from such classification when it has been settled or a final disposition otherwise reached.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## Illustrations of Suit Counts

Wife only injured, one suit brought, husband and wife plaintiffs.  Husband's count is for loss of service.  Do not open a separate feature for husband claim for loss of service.

**Suit Count = 1**

Wife and husband injured, one suit brought.  Both named plaintiffs.  Husband sues for own injuries and includes another count for his loss of consortium.

**Suit Count = 2**

Wife and minor child injured, one suit brought covering injuries to both.  Husband also named as plaintiff with separate counts for loss of services of each.  Do not open a separate feature for husband claim for loss of services.

**Suit Count = 2**

Same as above, but husband is also injured and includes count for own injuries.

**Suit Count = 3**

Wife killed, one suit brought.  Husband sues as heir and also has count for special damages including funeral expenses.

**Suit Count = 1**

Individual killed, one suit brought by four heirs.

**Suit Count = 1**

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

The following screen shots will assist you in opening the suit in CRIS. From your ECF select the 3270 option as noted below:



From here you will need to select the appropriate feature to open the suit under by placing an "X" as indicated above and then hit your "Ctrl" key on your keyboard.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

43



Suit indicator

From this screen (feature-1) place a number "1" under the suit "IND" and enter the Defense Attorney adjuster code provided by your region.  Once this is entered, hit your "Ctrl" key on your keyboard. For the example below, we used "45-099" for the Defense Attorney code.



One suit opened for code 45-099

Once you correctly enter the indicator number, Defense Attorney adjuster code and hit control, you should now see the suit opened in mainframe as noted in the below

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

illustration:



Your final screen shot shows you once again back at the "CLIQ" screen with the suit count as "O" for open.



Confidential Information of GEICO Companies
© Government Employees Insurance Company

## Trial preparation

Each case is different.  Therefore, we should consider this when preparing for trial.  What has worked in the past does not necessarily guarantee the same results on other cases.  In preparing for a trial, the examiner should (in consultation with defense counsel) consider each of the following points:

- ➢ Is there a need for additional discovery?

- ➢ What witnesses need be called?

- ➢ Who will be the trial judge and what can we expect from the judge at trial?

- ➢ Do we want a jury or bench trial?

- ➢ Is a bifurcated trial permitted and, if so, desirable?

- ➢ What is the jury-appeal of the plaintiff, the defendant, the doctors and the various witnesses?

- ➢ Has a final pre-trial order been entered?

**Before trial, the examiners should do the following**:

- ➢ Review coverage

- ➢ Review the facts.

- ➢ Review physical evidence.

- ➢ Review medical information.

- ➢ Review special damages.

- ➢ Discuss case with manager.

- ➢ Make sure reserve is proper.

- ➢ Keep in constant touch with defense counsel and the insured.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

# "TRIAL" MOTIONS

The following motions may be utilized during the "Trial" stage of litigation:

- Motion to Preclude

- Motion in Limine

- Motion to Strike



**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM00290

# The Trial

This is the last stage of the litigation process, unless an appeal is instituted based on the outcome.  This is where all our effort and the defense counsel's preparation will finally be tested.

When we are notified of the trial date, we should review the claim file to ensure that it is ready for trial.  We should contact defense counsel to make sure everything is in order.  Negotiation for settlement should always be on our mind.  If we settle before trial, we should obtain a dismissal or withdrawal.

Another thing to do when we are notified of the trial date is to complete the appropriate trial forms.  The Suit Calendar form (C-20) (Exhibit 4) must be completed.  This form notifies Regional Management (and Claims Home Office on CONTROL FILES) of a trial date.  This is a manual form that is generated by the examiner.  The C-20 must be completed in duplicate (in triplicate on control files) immediately upon receipt of a trial date, either definite or approximate.  The carbon copy is stapled in the left inside section of the file jacket.  The original is forwarded to the office assistant (or to whomever is designated by your management) who will record the information on the Division Trial Calendar.  Claims management reviews this Division Trial Calendar weekly.  A new C-20 should be prepared if a change in trial dates is made or if a case is removed from a court calendar.

The Weekly Trial Calendar form (C-98) (Exhibit 5) is prepared by the claims technician who maintains it at his desk.  It is used to record suits scheduled for the week and their disposition.

Pursuant to TCM-214, Claims Legal must be consulted before the commencement of any case to be tried before a jury or a case to be tried before a Judge if he or she has the power to award damages above $50,000.  The consultation should take place at least 10 days before trial when possible.  Examiners should consult TCM-298 to determine whom they should call in Claims Legal.

## Notes:

_____
_____
_____
_____

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## Trial Process Check List

- ➢ Has the attorney kept you informed about the progress of the suit and how the witnesses are presenting themselves at trial?

- ➢ Are all the witnesses available?  If not, how does this influence our case?

- ➢ What is the impact of any circumstantial evidence?

- ➢ What is the make-up of the jury?  Ask counsel to describe each juror. Differences in employment, health and accident history tell a great deal about attitudes and beliefs.  We should be aware of juror bias in some localities.
- ➢ What evidence will the defense attorney put on at trial?

- ➢ Who are the witnesses that will be called at trial (all parties) and how persuasive or influential does counsel expect their testimony to be?

- ➢ Will the videotape deposition testimony be used at trial?  If so, why?



**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## Post-Trial

Once a verdict has been rendered, the following issues should be considered:

- ➢ What were the components of the jury's damage award?  Is the award excessive in light of the evidence presented?

- ➢ Was a motion for judgment, notwithstanding the verdict, filed?  If no, why?

- ➢ Are there legitimate grounds for appeal?  If so, what are they and what is the likelihood of our prevailing on the appeal?

- ➢ Did counsel poll the jurors following the verdict?

Where a verdict is returned against the insured in excess of the policy limit, the question of whether an appeal is to be authorized by the Company must be made as expeditiously as possible so that if the Company decides not to appeal, the insured will still have sufficient time to take an appeal on his own if that is his desire.  Where a verdict is obtained against the insured in excess of the policy limit and an opportunity exists for the settlement of the claim for the policy limit, the decision not to settle is a very serious one and Claims Legal must be consulted before any such final decision is made.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**



## CLOSING THE SUIT

The first step is to promptly inform the insured when the suit has been resolved by phone and then in writing, within five days of the disposition of the case.  The letter should not be all "legalese," but sound like a friendly conversation.

At this stage, we will be receiving the closing papers from our attorney, which may include a bill for fees from fee counsel.  Complete the C-20, if used by your region, by checking the disposition of the case on the face of the C-20 and forward it to the manager.

The C-103 must also be completed if used by your region.  Pull the copy from the claim file.  Note the disposition such as settled, defense verdict, etc.  Issue the necessary expense and/or loss drafts.

The suit must be closed in CRIS.  This is done by keying a suit disposition code, the ATTNY-ADJ code and then pressing enter.  If we have multiple suits opened on the feature, each suit must be closed one at a time, with a valid disposition code and ATTNY-ADJ code.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**Attorney performance review**

The Attorney Performance Review form (C-39-A) (Exhibit-6) is intended to gather information on the law firm that handled the suit. This information will produce a record of the quality of the attorney's performance. The examiner will complete a C-39-A upon closure of all C-103s and control files involving the use of defense counsel. No copy will be kept in the claim file. The original is to be given to the claims manager for review. If there has been only superficial handling of the file by the attorney, there is no need to complete a C-39-A. The form should be completed whether the case is resolved through negotiation, ADR or trial.

The claims manager should review all C-39-A for any significant problems including appropriateness of billing. If the examiner has been critical of an attorney's performance, the claims manager should review the file to see whether the examiner's comments are justified. Claims Home Office should be advised of serious difficulties. Completed forms are to be permanently stored in the Attorney's Performance Review (APR) file.

On an annual basis, the claims manager should go over each APR file and summarize the C-39-A accumulated over the past year. A report of any negative findings should be given to the Regional Assistant Vice President for Claims with a copy to Claims Home Office. If the performance of a firm is deteriorating, a discussion should be held with the managing partner in the firm to whom we look for responsibility. The Regional Assistant Vice President for Claims must agree in any case before a warning is given. Any change in representation must have the concurrence of Claims Home Office. Where possible, the AVP for Claims should visit the firm in person to advise them of any adverse findings as noted in the annual APR review and to discuss steps to correct them.

<div style="border:1px solid black">

## _Never place the C-39-A in a file._

</div>

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**Completion of Form C-39-A**

Complete each section in detail. The questions in the first five sections of the C-39-A are self-explanatory. Use the space for "Comments" to explain the reasons for the checked ratings in each category. Use a separate sheet if more elaboration is desired. The "Overall Rating" section of the form reflects the attorney's overall handling of that particular case and should not indicate the examiner's general feelings about the firm. The "Excellent" category should usually be reserved for successful handling of unusually complex or difficult cases.

The Summary Comments Section should be completed by the examiner to summarize the overall performance of the firm. A poor or unsatisfactory rating should be explained in detail. Claims Home Office will verify the adequacy and timeliness of the C-39-A reviews in conjunction with the regular Claims Quality Performance Review. The C-39-A is produced in duplicate, upon closure of the litigation. No copy will be kept in the claim file. The original will be given to the claims supervisor and manager for review. The claims supervisor will review all C-39-A's.

**We Must Avoid the Obvious Pitfall Related to Litigation Management**

The real client is the insured. We must not allow our zeal to control costs to interfere with the insured's interests. Remember, the defense attorney's primary duty is to the insured. We must never put an attorney in a conflict of interest position. We have an obligation to protect the insured's interests. We must not place the Company' interests ahead of the interests of the insured. In the dispute between an insured and a third party, protection of the insured must outweigh our interest in cost control.

**Appeals and Appeal Bonds**

Whenever possible, all bonds (appeal, supersedeas, release of attachment, discharge of injunction, counter replevin, cost removal or any other defendant's bond) should be arranged through Fidelity and Deposit (F & D) Company. The application for one of these bonds must be submitted on the Request for Bond form (C-175) (Exhibit 7) signed by an authorized person. **Appeal of a verdict by a jury or a judge's decision cannot be made without Home Office authorization**. Where a bond is necessary to perfect an appeal or prevent execution on an underlying judgment, any bond application (other than a jury bond) must be approved by Claims Home Office. All bond applications must be discussed with Claims Legal before being submitted.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

In any case in which there is a question as to whether all of the damages contained in the verdict are covered by our policy, special attention must be given.  For example, if there is a verdict in excess of policy limits or for punitive damages where such are not insurable, the insured's agreement to the appeal must be obtained, unless authority is given by Claims Home Office Legal to assume the risk and accept liability for the uncovered damages. Unless otherwise authorized, the insured must obtain that part of the appeal bond pertaining to damages not covered by the policy.  Under no circumstances is the insured's name to be signed to an appeal bond by a Company associate. See TCM-26 for list of F & D offices and list of regional personnel authorized to apply for bonds.



**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## Other Pleadings and Motions

1.      **Joinder**

<u>Black's Law Dictionary</u> defines this as "joining or coupling together; uniting two or more constituents or elements in one; uniting with another person in some legal step or processing; union; concurrence". This motion is utilized to add individuals whose participation in the suit is necessary to protect an interest of justice or to assure that complete relief can be accorded among those already parties to the suit. A party asserting claim to relief can join as many claims together as they have against an opposing party. The court can still grant relief in accordance with the relative substantive rights of the parties.

> **Example:    A Worker's Compensation carrier paid for the plaintiff's medical bills. The plaintiff later files suit against the defendant for her injuries. The Worker's Comp carrier would file a *JOINDER* to be added as a co-plaintiff for their lien to insure they are reimbursed**.

2.      **Consolidation of Actions**

<u>Black's Law Dictionary</u> defines this as the act or process of uniting several actions into one trial and judgment, by order of a court, where all the actions bear sufficient relationship to each other, pending in the same court and involving substantially the same subject-matter, issues and defenses; or the court may order that one of the actions be tried, and the others decided without trial according to the judgment in the one selected.

> **Example:    Twelve injured passengers of a city bus file twelve separate suits against our insured arising out of a single loss. We would want the Defense counsel to file a *MOTION TO CONSOLIDATE* the twelve suits into a single suit against our insured.**

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

### 3.    Motion to Sever

This is a motion to separate one suit from another where a consolidated trial would prejudice a party's position.  Motion to sever is also appropriate when a party wishes to separate a particular issue in a lawsuit from other issues.

> **Example:    The plaintiff files a single suit naming two defendants with two separate dates of loss.  Our insured's loss was a minor loss with soft tissue only injures.  The second loss was very severe with major injuries.  The defense counsel would file a *MOTION TO SEVER* the suit into two separate actions**

### 4.    Motion to Bifurcate

The order or ruling of a judge that one issue in a case can be tried to a conclusion or a judgment given on one phase of the case without trying all aspects of the matter.  The court may bifurcate the issues, hear evidence on the defendant's liability, and decide that issue before going ahead with a trial on the amount of damages.  If the court rules there is no liability, then the amount of damages is meaningless and no further trial is necessary.

> **Example:    GEICO denies the plaintiff's claim for injuries due to a red light dispute.  In response, the plaintiff files suit against our insured.  The plaintiff's injuries appear to be loss related.  Defense counsel could file a *MOTION TO BIFURCATE* to have a trial solely to decide who is negligent and to what degree.  The ruling would be applied to the claim for damages.**

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

### 5.    Motion for Judgment on the Pleadings

<u>Black's Law Dictionary</u> states that under FRCP 12 (c) any party may move after the pleadings are closed for judgment thereon.  It is a device for disposing of cases when the material facts are not in dispute and only questions of law remain.

> **Example:    In some jurisdictions, all suits involving auto claims are bifurcated.  If there is no liability dispute, either Defense or Plaintiff counsel may file a *MOTION FOR JUDGMENT ON THE PLEADINGS* with regard to liability and focus on the damages.**

### 6.    Motion to Compel

A motion to compel asks the court to order either the opposing party or a third party to take some action. This sort of motion most commonly deals with discovery disputes, when a party who has propounded discovery to either the opposing party or a third party believes that the discovery responses are insufficient. The motion to compel is used to ask the court to order the non-complying party to produce the documentation or information requested, to order the non-complying party to appear for a deposition and/or to sanction the non-complying party for their failure to comply with the discovery requests.

> **Example:    Plaintiff fails to respond to defendant's discovery requests within the specified time limit.  Defense files a *MOTION TO COMPEL* Discovery Responses against the plaintiff.**

### 7.    Motion to Preclude

A motion to prohibit the other side from introducing evidence which it would have been able to introduce had they complied with the earlier request, e.g., for failure to service a Bill of Particulars or failure to provide answers to interrogatories.

> **Example:    At our request, SIU does surveillance on the Plaintiff that demonstrates the Plaintiff's allegation about the severity of their injury is greatly exaggerated.  Unfortunately, the videotape is lost and not located until after the discovery phase of the trial has ended.  Plaintiff's counsel would file a *MOTION TO PRECLUDE* to keep the tape out of evidence.**

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**8.      Motion *in Limine***

A motion in limine can be made at any time during the discovery process, but most usually, it is utilized at the start of a trial.  A motion in limine is a motion requesting that the judge rule that certain evidence may not be introduced in trial.

> **Example:      On the date of the accident, the defendant's blood alcohol level content was .074.  In the state where the accident occurred, a person with a B.A.C. level of .08 or above is considered to be legally intoxicated (D.U.I.).  Plaintiff attorney wants to submit the defendant's toxicology report as evidence of intoxication.  Defense counsel would file a *MOTION IN LIMINE* to keep the toxicology report out of evidence due to its prejudicial nature.**

**9.      Motion to Strike**

A request for a judge's order to eliminate all, or a portion, of the legal pleading (complaint, answer) of the opposition on any one of several grounds. It is often used in an attempt to have an entire cause of action removed ("stricken") from the court record. A motion to strike is also made orally during trial to ask the judge to order "stricken" answers by a witness in violation of rules of evidence (laws covering what is admissible in trial). Even though the jury is admonished to ignore such an answer or some comment, the jury has heard it, and "a bell once rung, cannot be unrung." FRCP 12 (f).

> **Example:      In most jurisdictions, a police report is inadmissible as evidence.  However, a few Plaintiffs' attorneys may add it to the Complaint.  If this occurs, the Defense counsel would file a *MOTION TO STRIKE* the police report from the official court record.**

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

10.      Offer of Judgment

In most states, allows the Defendant to enter an offer to permit judgment against them for the money in the offer.  If the Plaintiff declines the offer and is later awarded an amount less than the offer, the Plaintiff is responsible for the defense cost incurred after the date the offer was made.

> **Example:**    Prior to suit, GEICO offers the Plaintiff $15,000 as a compromise settlement versus a demand of $25,000.  Once suit is filed, Defense counsel may file an *OFFER OF JUDGMENT* for $15,000.  If the matter goes to trial and the plaintiff is awarded any amount less than $15,000, the Plaintiff is required to pay a portion of the Defense cost incurred from the date the Offer of Judgment was filed until the Judgment was entered.

11.      Motion for Summary Judgment

Black's Law Dictionary states that FRCP 56 permits any party to a civil action to move for a summary judgment on a claim, counterclaim or cross-claim when he believes that there is no genuine dispute of material fact and that he is entitled to a judgment as a matter of law.  The motion may be directed toward all, part of a claim or defense and it may be made on the basis of the pleadings or other portions of the record in the case, or it may be supported by affidavits and a variety of outside material.

> **Example:**    GEICO denies a claim for bodily injury because our investigation reveals the claimant's injuries do not breach the statutory threshold.  Her attorney has a different opinion and files a suit against our insured.  Defense counsel can file a *MOTION FOR SUMMARY JUDGMENT* to have a Judge decide if there is a legal basis for the Plaintiff's suit.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

### 12.   Declaratory Judgment

<u>Black's Law Dictionary</u> defines this as a statutory remedy for the determination of a justifiable controversy where the party bringing the action is in doubt as to his legal rights.  This type of lawsuit results in a binding adjudication of the rights and status of litigants even though no consequential relief is awarded.  Such judgment is conclusive in a subsequent action between parties as to matters declared and, in accordance with the usual rules of issue preclusion, as to any issue actually litigated and determined.

Declaratory Judgment Act.  Federal statute enacted in 1934, which permits the bringing of a complaint for a declaration of rights if there is an actual controversy between the parties.  The judgment is binding as to present and future rights of the parties to the action.  Most states have statutes patterned on the Uniform Declaratory Judgments Act.

> **Example:    GEICO's first notice of a loss is a call from the Plaintiff's attorney in reference to a Default Judgment arising from a suit filed against our insured for which there was coverage. GEICO, in response, could file an action <u>against our insured</u> (*DECLARATORY JUDGMENT/D.J.*) citing the CONDITIONS portion of our contract.  A Judge would then rule on the validity of the policy.**

### 13.   Motion to Dismiss

Motion to Dismiss - a motion filed before trial used to assert the following defenses to a Complaint:

- the court lacks personal jurisdiction over the defendant
- venue of the case is improper
- service of process is insufficient or defective
- the Complaint, even accepting everything alleged as true, fails to state a claim upon which relief can be granted
- the Complaint fails to join a necessary party

In cases pending in federal court, a motion to dismiss must be made before or at the same time a responsive pleading such as Answer is filed or the defense is deemed to have been waived.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

In state court, motions to dismiss can also be used for failure to answer discovery. For example, if Plaintiff fails to answer discovery after a court order requiring answers by a date certain, the defense can file a motion to dismiss for failure to answer discovery.

> **Example:**    **The plaintiff's attorney files suit in the wrong jurisdiction.  Rather than file an Answer, the Defense counsel can file a *MOTION TO DISMISS*.  If the motion is granted, the Plaintiff's attorney, subject to the applicable statute of limitations, can correct whatever the problem was and re-file.**

## 14.    Motion for Further Bill of Particulars (New York)

This is used when the complaint does not clearly set forth the nature of the plaintiff's claim.

> **Example:**    **In New York, the Defense attorney must file a *MOTION FOR FURTHER BILL OF PARTICULARS* in order to demand the Plaintiff's attorney supplement information not in the original Bill of Particulars such as wage information or Provider information.**

## 15.    Motion to Secure Medical Reports from Plaintiff

In some states, medical reports can only be "discovered" pursuant to an order of the court.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**EXHIBIT 1**

## WAIVER OF DEFECTIVE SERVICE

RE: Claims Number
Accident:
Suit Title:

I do hereby waive any defect there may have been in the service of the Summons and/or Complaint concerning the captioned matter and consent to the entering of an appearance in my behalf by the legal representatives of Government Employees Insurance Company.

_____          _____
          (Date)                                              (Signature)

## MEMBER NATIONAL INSURANCE CRIME BUREAU

C-92 (06-02) NS

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

CONFIDENTIAL!

EXHIBIT 2

## NOTICE OF CHANGE TO ATTORNEY – ADJUSTER LISTING

**IDENTIFICATION (PLEASE PRINT OR TYPE ONLY)**

| PRESENT CODE | PRESENT FIRM NAME |
|---|---|

| CITY | STATE |
|---|---|

ACTION REQUIRED:                                  INSTRUCTIONS

| | | |
|---|---|---|
| ADD TO: | ☐ Attorney-Adjuster Code Book | If you check the 'ADD' book complete all items below. |
| CHANGE TO: | ☐ Attorney-Adjuster Code Book | If you check the 'CHANGE' block complete only those items to |
| be changed. | | |
| DELETE FROM: | ☐ Attorney-Adjuster Code Book | If you check the 'DELETE' block no further information is |
| needed. | | |

SEND TO V. P. CLAIMS
UNDER 'NEW INFORMATION' YOU MUST INCLUDE 'IRS ID #' and 'OCCUPATION CODE (S)'.

**NEW INFORMATION:**

| FIRM NAME | | STREET ADDRESS | | |
|---|---|---|---|---|
| MAILING ADDRESS | CITY | STATE | | ZIP |
| DAY PHONE | NIGHT PHONE | IRS ID # | OCCUPATION CODE(S) | |

| OCCUPATION CODES | | | | |
|---|---|---|---|---|
| A - ADJUSTER SUBROGATION | D - DOCTOR | I - INVESTIGATOR | P - APPRAISER | S - |
| C - COURT COST | G - PHOTOGRAPHER | L - LAWYER | M – MISCELLANEOUS | |

**APPROVALS:**

| REGIONAL AVP FOR CLAIMS | DATE |
|---|---|

| VICE PRESDIENT – CLAIMS | DATE |
|---|---|

========================================================================
COMMENTS:_____
_____
_____
_____
_____
_____

DATE COMPLETED _____DATE REGION NOTIFIED _____

C-98-A (5-88) NS

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM00306

**EXHIBIT 3**

| **BODILY INJURY SUIT NOTIFICATION** | Examiner | | Date |

| Insured | | | | Claim No. | | | |
|---|---|---|---|---|---|---|---|
| Clmts | Driver | Ins. Pass | Clt. Pass | Ped | Age | Date of Accident | |
| 1. | | | | | | Anticipated Trial Date | |
| 2. | | | | | | Ad Damnum 1.     3.     2.     4. | |
| 3. | | | | | | Suit Opened on CRT? ☐ Yes ☐ No | |
| 4. | | | | | | Excess Letter Sent?  Atty. Referral Lts. Sent? ☐ Yes ☐ No     ☐ Yes    ☐ No | |

| Punitive Damage Count? ☐ Yes ☐ No | Co-Defendant? ☐ Yes ☐ No |
|---|---|

| Location of Suit: Court | City | County | State |
|---|---|---|---|

| Policy Limits: BI | P.D. | U.M. | Reserve: B.I. $ | P.D. $ | U.M. $ |
|---|---|---|---|---|---|

| Defense Attys: | Plaintiff Attys: |
|---|---|

| Demand: | Authorization: | Offer: | Cause of Suit: |
|---|---|---|---|
| 1._____ | 1. _____ | 1. _____ | 1. Questionable Liability    4. Plaintiff's excessive demand |
| 2. _____ | 2. _____ | 2. _____ | 2. Threshold Issue    5. Plaintiff's Refusal to Negotiate |
| 3. _____ | 3. _____ | 3. _____ | 3. Investigation Not Complete    6. Evaluation/Discovery Not Complete |
| 4. _____ | 4. _____ | 4. _____ | 7. Other |

Manager's Evaluation:

Originals 1. _____ To: _____ 6 Month 1. _____ To: _____
           2. _____ To: _____        2. _____ To: _____

Manager's Remarks:

| Claims Manager | Alternate Dispute Resolution Offered? YES ☐ NO ☐ N/A ☐ |
|---|---|

☐ Case for Settlement  ☐ Ques. Liab.  ☐ Case for Defense  ☐ Other  Structured Settlement Offered? YES ☐  NO ☐

C-103 (5-94)

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

# EXHIBIT 4

**SUIT CALENDAR**

TO:    □ HOC □ Regional Claim Director or Manager      Date: …………………………..

From: ……………………………………………...      Trial Date:……………………..…
        [Examiner]

Claim No………………………………………….....      Continued from: ……………...

Insured: ………………………………………..      □ Control File  □ C-103 File □ P. D.

Plaintiff:………………………………………………………………………………………..

Place of Trial:
…………………………………………………………………………………………………..
          (City)            (State)

Defendant's
Atty:………………………………………………………………………………….

| Policy Limits | Reserve | Demand | Offer | Authorized | Reinsurance |
|---|---|---|---|---|---|
| □ BI | | | | | |
| □ PD | | | | | |
| □ UM | $ | $ | $ | $ | □ Yes □ No |

Structured Settlement Offered? □ Yes  □ No  Alternative Dispute Resolution Offered? □ Yes  □ No  □ N/A

Supervisor
Evaluation:…..……………………………………………………………………..

Remarks:


C-20 (5-87)

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM00308

**EXHIBIT 5**

### WEEKLY TRIAL CALENDAR

**WEEK OF** _____

| TRIAL DATE | CLAIM NUMBER | INSURED | PLACE OF TRIAL | DEFENSE ATTORNEY | DISPOSITION |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

C-98 (2-56)

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**EXHIBIT 6**

## ATTORNEY PERFORMANCE REVIEW
(for C-103 and Control files)

REGION: _____          TOTAL AMOUNT OF FEE
$_____

CLAIMS EXAMINER:                    CLAIMS MANAGER:

CLAIM:              INSURED:          LOSS DATE:

FIRM:              CITY:        ATTORNEY HANDLING:
      ATTORNEY CODE:

_____STAFF COUNSEL    _____OUTSIDE COUNSEL (Listed) _____ UNLISTED COUNSEL

**GENERAL OFFICE CHARACTERISTICS**
1.      Was assignment acknowledged promptly?                    _____ Yes _____ No
2.      Were timely status reports submitted?                    _____ Yes _____ No
3.      Were phone calls returned timely?                        _____ Yes _____ No
4.      Did attorney cooperate with Company personnel?           _____ Yes _____ No
5.      Was the fee?                          _____ High _____ Average _____ Low

**PRE-TRIAL PREPARATION**
1.      Did attorney submit a thorough analysis of the file on a timely basis? _____ Yes _____ No
2.      Were the appropriate pleadings filed? _____ Yes _____ No
3.      Were discovery procedures properly utilized? _____ Overdone _____ OK _____ Inadequate
4.      Were any serious errors made? _____ Yes _____ No  If yes, explain below (e.g., allowed case to go into default)
5.      Did attorney provide us with final recommendations well in advance of trial? _____ Yes _____ No
6.      COMMENTS:

**NEGOTIATIONS**
1.      If this was a case to settle, did our attorney initiate negotiations on a timely basis? _____ Yes _____ NO
2.      Was our attorney's evaluation realistic? _____ Yes _____ No
3.      Were the actual negotiations, if any, well handled? _____ Yes _____ No
4.      Results obtained? _____ Poor _____ Fair _____ Good _____ Excellent
5.      Did attorney recommend ADR? _____ Yes _____ No _____ Not applicable
6.      COMMENTS:

**TRIAL**
1.      Was adequate notice of trial given? _____ Yes _____ No
2.      Did our attorney keep the company closely informed during the course of the trial? _____ Yes _____ No
3.      Was our attorney properly prepared for trial? _____ Yes _____ No
4.      Demonstrated trial ability (if personally observed)? _____ Poor _____ Fair _____ Good _____ Excellent
5.      Results obtained? _____ Poor _____ Fair _____ Good _____ Excellent
6.      COMMENTS:


**SUMMARY COMMENTS**


**OVERALL RATING**      _____ Excellent            _____ Satisfactory
                        _____ Unsatisfactory
Would you recommend using this firm/attorney again?      _____ Yes _____ No

C-39-A (2-97) NS

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM00310

**EXHIBIT 7**

**GOVERNMENT EMPLOYEES COMPANIES**
**WASHINGTON, D. C.**

_____ GEICO
_____ GEICO

**General**
TO FIDELITY AND DEPOSIT                                          _____ GEICO
**Indemnity**
COMPANY OF MARYLAND                                         _____ GEICO
**Casualty**

**REQUEST FOR BOND**

Please execute a bond as hereinafter described under our General Application and Indemnity Agreement with your Company.

Policy No. _____Claim No. _____ Date:_____

Name of Insured _____ Address _____

Name of our Attorney _____ Address _____

Description of Bond Requested
_____

Amount of Bond $ _____ Application Policy Limits _____

Name of Plaintiff
_____

Name of Principal _____ Address _____
                            (Person to be Bonded)
GIVE THE FOLLOWING INFORMATION FOR:
☐ Appeal Bonds  - Attach Notice of Appeal
            Amount of Judgment $
_____

            Time for Perfecting Appeal Expires on
            _____

☐ Other Judicial Proceedings Bonds
_____
                  (Note: Complete either 1 or 2 below)
For additional information, contact
_____

1. I CERTIFY that the amount of the bond herewith requested is WHOLLY WITHIN THE POLICY LIMITS and that
   there is coverage.                                    **Government Employees Companies**
                                                          BY
   _____

   _____
                                                          (Authorized Official or Attorney)

                                                          _____
                                                          (Telephone Number)
2. If the bond is NOT WHOLLY WITHIN THE POLICY LIMITS, complete the following:

   The amount of the bond exceeds the coverage of the policy by $ _____

       With respect to the Excess:
☐ The insured has been requested to make his own arrangements for providing security.
☐ The Company will assume the risk and accept liability in excess of the policy limits.
                                    **Government Employees Companies**

C-175 (10-86) NS                      BY_____
                                         (Authorized Official or Attorney)

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM00311

**Lesson Six**
**ClaimIQ Litigation Tab**
**Continuing Unit Manual**

## Objectives:

1. Understand TNOS.
2. Understand the ClaimIQ Litigation Tab (page15).
3. Understand the suit referral process.
4. Understand the insured's and GEICO's obligations once a suit has been filed.
5. Identify and understand the life of a suit.
6. Identify proper service.
7. Be able to refer the lawsuit to Fee & Staff Counsel.

GTM00312

# TNOS Procedures

The purpose of this project is to provide uniformity of format and functionality to the Telephone Notice of Suit process to facilitate call sharing, and so that all FCCs can benefit from the interface between the TNoS and ClaimIQ. With the web-based TNoS, any CSR in any office taking a TNoS and any recipient of the TNoS in any office will be using the identical electronic form. With the addition of the Litigation Tab in ClaimIQ, the benefits of the new TNoS will be increased and a great deal of redundant keying for upper level adjusters will be eliminated.

## GETTING STARTED



A **Get ECF ClaimID** bar will appear across the top of your screen. To access a new TNoS for the current claim displayed in ECF, click on the Get ECF ClaimID"button. You also have the option to manually enter the claim number. The TNoS Launcher can be minimized or closed when not in use



After retrieving or entering the Claim number, click on the **<Process This Claim** button to access the TNoS website.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

The **T**elephone **N**otice **o**f **S**uit web page will be displayed.  Data such as policy number, FCC, Company Code, Current Adjuster and Date of Loss will be pulled from Mainframe and pre-fill corresponding fields on this web-page.  This will occur on either open or closed files unless the closed file is so old that it has been purged from Mainframe.

For CSRs, the Feature Code box below the claim number will be disabled.  The box will be enabled for a TCR I, TCR II, or CU Examiner.



If this error message is displayed, check to be sure you have keyed the claim number correctly.  If not, make your corrections and press your Enter key to pull claim data from Mainframe.  If the Mainframe is experiencing an outage, TNoS Launcher will be unable to retrieve data until that service is restored.



**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

At the end of the Insured and Driver information sections, there is a Verified Insured Information/Verified Driver's Information checkbox.  Checking this box will not prevent you from going back to change information if necessary.



**IMPORTANT!!**

If Insured or Driver information has changed since the loss occurred, it is strongly recommended that you update in ECF before accessing the TNoS page.  Any updating you may do on the TNoS page will NOT update ECF/Mainframe.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

After verifying Insured and Driver information you will complete the fields regarding the lawsuit and receipt of suit papers.  Some of the fields are freeform text and others offer a selection menu.  Continue to scroll down, ask the applicable questions and fill in the blanks. None of these fields are mandatory and some of the information may not be available to the caller, so complete as thoroughly as possible.



**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

In most locations, CSRs will frequently be taking the TNoS on files assigned to TCR1, TCR2 or already at the CU level.  A file may be open or closed.  If authorized in your region, a CSR can assign/reassign the file by entering the receiving Examiner's code in the Assigned To: field (Adjuster's name and Email address will pre-fill) and then clicking Submit to process the TNOS. Otherwise, the CSR will simply click Submit and follow the approved procedure for having the file transferred.  CSRs will not have permission to **Complete or Complete And Send To ClaimIQ** and those buttons are disabled for them.



The "Instructions to caller" at the bottom of the page will reflect the correct information for your location and the person submitting the TNoS will give this information to the caller prior to clicking the Submit button.

After the **Submit** button is clicked, the submitter should receive a bright green message indicating that it was submitted successfully.

If for any reason, this does not occur and an error message is displayed, the associate should not keep the caller on hold any longer than necessary.  The information obtained from the caller should still show on the screen.  Quickly re-verify all information to ensure nothing was lost and conclude the phone call.  Then you may proceed with your region's prior method of capturing the suit information (paper form, Word document etc.).  Any problems with the TNoS application should be reported to your Regional Coordinator.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

There will be regional variations on whether a CSR, TCR1 or TCR2 may assign a CU Examiner, or whether this will be done by a Supervisor, but for TCR1, TCR2 or CU Examiners, the process for taking the Telephone Notice of Suit is nearly identical to that of the CSR.

For upper level adjusters, the **Feature Code** selection menu will be enabled and all features on the claim, open or closed, will be offered.  If you are the file handler or are certain of the feature applicable to the suit, make your selection from the menu.  Completion of the remainder of the TNoS is the same as for CSRs



For upper levels, the **Complete** and **Complete And Send To ClaimIQ** buttons are enabled.  However, ONLY the person who will be handling the file should use the Complete buttons.  All others, including CU Examiners taking a TNoS on someone else's file, should only select the **Submit** button.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

Once the Submit button is pressed, the TNoS will go into a holding queue.  If there is no adjuster assigned, an email (example shown below) will be sent to an FCC-specific Outlook distribution list which will be covered in more detail shortly.  Clicking on the link in the email will navigate the user to the TNoS for review and assignment/ reassignment.  The TNoS is time-stamped when it reaches the queue and will remain in the queue until it is attended to.

> Click on the link and you will be navigated to the TNoS.

```
-----Original Message-----
From: Direct Net
Sent: Tuesday, April 17, 2007 10:44 AM
To: FCC06 TNOS
Subject: NOTICE ****** Telephone Notice of Suit ****** NOTICE

A new TNOS has been submitted for 3110883380101410 on 4/17/2007 10:44:21 AM.
Please review this TNOS for further action.
http://GP2K0065:80/businessapps/tnos/TNOS.aspx?claimNumber=3110883380101410&fea
ture=

This email/fax message is for the sole use of the intended
recipient(s) and may contain confidential and privileged information.  Any
unauthorized review, use, disclosure or distribution of this email/fax is
prohibited. If you are not the intended recipient, please destroy all paper and
electronic copies of the original message.
```

If there is an adjuster assigned to the claim, the submitted TNoS will still go into the queue, but the underlined Examiner will be recipient of the email (example shown below).

> Click on the link and you will be navigated to the TNoS.

```
-----Original Message-----
From: Direct Net
Sent: Thursday, April 05, 2007 3:03 PM
To: Lanham, Thomas
Subject: NOTICE ****** Telephone Notice of Suit ****** NOTICE

A new TNOS for 4000313750101205 has been assigned to you. Please review and
handle accordingly.
http://GP2K0055:80/staffdepartments/isd/apdl/claimssystems/tnos/TNOS.aspx?claim
Number=4000313750101205&feature=03-ABI
===================
This email/fax message is for the sole use of the intended
recipient(s) and may contain confidential and privileged information.
Any unauthorized review, use, disclosure or distribution of this email/fax is
prohibited. If you are not the intended recipient, please destroy all paper and
electronic copies of the original message.
```

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

At the present time, there is no automated copy of the email being sent to the assigned Examiner's Supervisor.  Until this enhancement is in place, Examiners must follow the steps below to forward notice of the TNoS to their Supervisor:

In Outlook:
1) Click on Tools.
2) Click on Rules and Alerts.
3) Click on New Rules.
4) Click on Start from a blank Rule.
5) Click on Next.
6) Click on the box that says "with specific words in the subject"
7) Click on the link that says "specific words"
8) Type Telephone Notice of Suit
9) Click on Add
10) Click on Ok.
11) Click on Next.
12) Click on the box that says "Forward to people or distribution list."
13) Click on the link that says "people or distribution list."
14) Double click on your supervisor from the list.
15) Click on Ok.
16) Click on Finish.

Once your mailbox is set up this way, when the assigned Examiner receives the TNoS email, it will automatically be forwarded to the Examiner's Supervisor.

On the TNoS page, before the Complete or **Complete And Send To ClaimIQ** button is pressed, the data fields are open for entry, allowing corrections to be made. After either of the Complete buttons is pressed, the TNoS is "locked down" and although it is still accessible via the link, it can no longer be modified.  Remember that only the handling examiner should be using the Complete buttons.

Complete is to be used by the handling examiner for suits on those features that do not feed to ClaimIQ, such as No Coverage files or suits against the Company.

**Complete And Send To ClaimIQ** should always be selected by the handling examiner for a suit under a ClaimIQ recognized feature.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**



Print button

## TNOS DISTRIBUTION MAILBOX

The TNoS distribution mailbox for your FCC will receive notification that a TNoS has been submitted on an unassigned claim.  The mailbox will be owned by the Regional Coordinator(s) who will be responsible for maintaining it.  Regional Management will determine who should be on the list and will provide this information to the Coordinator.



**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**GTM00321**

## THE TNOS QUEUE

Each FCC has established a protocol for monitoring and managing their queue.
Access to the TNoS queue will be limited to designated individuals in each office.
Those who are authorized to access the queue will be provided with a link to it which
should be saved as a "Favorite".  Clicking on the link will navigate to the page shown
below.  In this example, the queue is empty.



If the queue contains one or more notices (as shown below).  The designated queue
"monitor(s)" will determine if the file is appropriately assigned (or assign/reassign it)
and document the file with any needed instructions.  When the assigned Examiner
reviews the TNoS and selects the Complete or Complete And Send To ClaimIQ
button, the listing will be dropped from the queue.



**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

When the suit is opened in mainframe, information on the TNoS will prefill corresponding fields in "LIT".



After the assigned Examiner completes applicable fields, he/she will go to Documents and have an opportunity to select Suit Referral.



**Confidential Information of GEICO Companies**
© **Government Employees Insurance Company**

GTM00323



Upon completion of the TNoS the Suit Referral template is already partially completed which we will be discussing shortly! Based on the TNoS information, data pulled from Mainframe (ie: policy limits) and data entered by the handling Examiner, such as defense counsel information. When the handling Examiner reaches the point when a C-103 or Trial Calendar is needed, data already in ClaimIQ will migrate to the electronic equivalent of those paper forms, eliminating a great deal of duplicative entry.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**TNoS Summary:**  There are Three Outcomes when using TNoS they are;

**SUBMIT** = Sends TNOS to adjuster or the queue.

**COMPLETE** = Locks down TNOS to Handling adjuster only. This is for a Non-CIQ feature and a Non suit.  The only option if TNOS already sent on the same feature

**COMPLETE and SEND TO CLAIMIQ** = Always selected by handling examiner for a suit under a CIQ recognized feature

When a Non-handling adjuster submits a TNoS to the CU examiner assigned an Email sent to examiner and supervisor.  The TNOS is moved into holding queue to allow the examiner access to link for a review of the TNOS.  Then, the examiner chooses the best of the three options above

When a CSR/TCR1/TCRII Adjuster is assigned to the file and a TNoS is taken, an email sent to distribution list and the TNOS moves into queue.  Please follow regional guidelines for file reassignment.  The file should be assigned in ECF.  The TNOS retrieved from queue & Adjusters code entered field and then the TNOS is submitted.

When the handling examiner Submits or receives Submitted TNOS remember to complete documentation of TNOS and review for accuracy!  You must then choose proper feature, confirm the TNOS is an actual suit (as opposed to LOR, etc) then choose "Complete" or "Complete and Send to ClaimIQ"

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

# ClaimIQ Litigation Tab

The ClaimIQ Litigation tab is the location for documenting the referral of the lawsuit to defense counsel and the details of the lawsuit during its lifetime.  Understanding the complete process and following these instructions will save you time and provide you with a reliable, consistent form of suit documentation.

A completed Telephone Notice of Suit is the preferred starting point for using the LIT tab, but there will be occasions when the electronic TNOS that is linked to LIT has not been used.   The greatest benefit of the TNOS is that the information about the suit feeds directly to the LIT tab as soon as suit is opened in mainframe, and the TNOS button "Complete and Send to ClaimIQ" is pressed provided the suit is under a feature recognized by ClaimIQ.

These are the steps that will most fully utilize the capabilities of this electronic process:
1) New Telephone Notice of Suit is taken and Submitted
2) TNOS is Completed and Sent to ClaimIQ by the handling examiner.
3) Suit is opened in mainframe

When accessing the consultation, you will see the following screen (if the above steps are completed):

You will access the Litigation Consultation from the left side bar



Confidential Information of GEICO Companies
© Government Employees Insurance Company

The CIQ Litigation tab is to be used for tracking cases assigned to either Staff or Fee Counsel for defense, but is not to be used for documenting suits against the Company (bad faith, contract disputes) or "Friendly Suits".

Following these steps will result in data from the TNOS to feed to the Litigation Summary.  The suit, service of process, identity of plaintiff and plaintiff attorney, and coverage information from mainframe will pre-fill and eliminate having to re-enter this information on the CIQ Suit Referral and other documents as the suit progresses.

## Litigation Summary

When you navigate to the Litigation Suit Handling page, Litigation Summary panel, you can tell at a glance whether suit has been opened for your Interested Parties.  In the illustration below, claimant Jeff Jackson has an "A" displayed. The "A" represents arbitration. If suit was open, an "S" would display. If no Suit/Arb indicator has been established for him, the Litigation Suit Handling panel (lower portion of the screen) is blank.



Confidential Information of GEICO Companies
© Government Employees Insurance Company

## Suit Referral Process

When taking a TNOS, many items from the claim file will pre-fill into the form. After sending the information from the TNOS to ClaimIQ, these items along with anything completed within the TNOS will pre-fill into the Suit Details portion of ClaimIQ.  As you can see below, it is possible for the entire "Suit Details" section to be complete when you receive the TNOS.  As the handling examiner, you should review the information for accuracy prior to sending to defense counsel.



If the TNOS has not been completed and these items do not pre-fill, then you will need to complete.  It also should be noted that if the items are pre-filled from TNOS but changes are needed, the adjuster can make changes and/or updates directly into the "Suit Details" textboxes on the Litigation Tab.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

The Outlook icon shown next to the "Answers Due Date" gives you the option of adding this event to your Outlook calendar.  When you choose the Outlook icon, you will receive the following pop-up message:



Choosing "Open" will bring up an appointment in your Outlook calendar.  You have many options to make this functional for you.



**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## Other Integrated Items

There are other items that integrate from ECF and ClaimIQ that you will notice as we move through the consultation. These items will assist in decreasing multiple documentation tasks.

## Attorney Information

Attorney information pre-fills from varying sources.

1) The defense attorney information will pre-fill based on the attorney code you use when opening the suit count.

2) The plaintiff attorney information will be present if you have already added the attorney *in ClaimIQ.*

3) If there is an additional Defense attorney or Plaintiff attorney or if you need to add the information, you are provided with the space to do so



Adding the Plaintiff attorney and updating the plaintiff attorney is done just as you would on the Negotiation Conduct page. You should search to see if the attorney is in the database and if they are not, add them and assign them to this claim.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

All fields for the Defense Attorney are editable except the Attorney Code.



Update the attorney information as necessary on the claim you have brought to class. If the attorney information is correct, double click the attorney's name so that you can review the information on record.

## Suit Referral Section

An Examiner's knowledge, experience and file documentation are key to completion of the remainder of the Litigation Summary. Your first action in the Suit Referral panel is to select a Primary Cause of Suit from the menu.



**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

The Company Name should be selected from the drop-down list.



The "Coverage Issue" and "Reservation of Rights Sent" fields are next.  Selecting the "Yes" radio button will generate a textbox. Notice that the Explain caption has an asterisk. If Yes was selected, you must complete this text field.  This is also the case with the ROR Sent question; providing a Reason is mandatory.  The text field has a character capacity of 60-90 so the explanation should be limited to the basic coverage issue or reason for the Reservation of Rights.



You have the opportunity to record if GEICO is primary in the defense of the case.



Answer additional coverage yes or no.  If there is, you are required to explain.  This character capacity is 300.



**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

22

There is a space to document whether ADR and/or structured settlement has been offered.  As you are reviewing Litigation files, you will no longer have to search through numerous Alog entries to determine if these items have been discussed.  You have a consistent place-holder for vital details regarding litigation.



Your management has a specific preference on the referral method that you should use when referring the file to counsel.  Choose the method used by your office and complete the dates referred and the dates the file was sent to defense.



The "Additional Plaintiff Injury Information" and "Instructions to Counsel" freeform text fields provide you with a number of "Word"-type tools such as Bold, Bullets, Cut & Paste.



The "Instructions to Counsel" section allows you to type any additional information to defense counsel that is not included in the suit referral.  There are reminders for possible instructions; this space will allow 5000 characters.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

There are textboxes that are regularly used in ClaimIQ that will also migrate to the suit referral letter. As part of the suit referral process, these fields should be reviewed thoroughly for accurate and up to date documentation.

## Loss Description

This textbox is regularly completed by all levels of claims adjusters. However, since the text is being used as part of the suit referral letter, the adjuster should review not only for clear and concise accurate information but also for spelling, grammar and punctuation. Remember, this information is now going to an external customer. (defense counsel).



## Injury Diagnosis

All injuries entered on the Diagnosis consultation will also carry over the Suit Referral letter.



## Injury/ Treatment Information

In addition, text entered into the "Injury/Treatment Info" box on the Evaluation page will display on the suit referral letter. Again the information should be complete and accurate.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**




## Injury Specials

Information from the Specials consultation page to include Providers and Specials Amounts also display on the Suit Referral Letter.



Finally, document whether or not you have sent a Suit Acknowledgement letter and an Excess letter along with the date the letters were sent and acknowledged.  If you do not have those dates at this time, you can complete them in the future.



**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**



When you access the Suit Referral document, you have the option to "Export" the letter or "Send to Printer". When the document is exported, a copy is sent to the Advanced Document Tab and automatically placed in the Litigation file. At the same time, the document is sent to you as an email. You can forward this email or fax it electronically. These options provides flexibility when referring a claim to defense.

> The limits of coverage, details of the suit, facts of the accident, Plaintiff Injuries and the Additional Plaintiff Injuries notations & Instructions to Counsel keyed earlier are all completed in the Suit Referral document!

Confidential Information of GEICO Companies
© Government Employees Insurance Company

## Life of the Suit

During the normal course of many suits, there are often Pleadings, Motions, Settlement Conferences and Expert witnesses to document and identify.  There is a specific location in the Litigation Tab where this information should be documented.



At-a-glance, you will be able to determine the current status on any of these items.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

27

When adding a pleading, deposition, motion, expert or conference, you click on the link:



You will receive a pop-up.  After completing the drop-down, date requested, date filed and date of hearing, you have the opportunity to document the outcome.  You can save this information to CIQ only by selecting "Save" or you can "Save and Create Notes" which will also send the note as an ALOG entry in ECF.  After saving the information to ClaimIQ, the view of the Suit History changes to this:



Notice that the pleading is listed and you can delete it if entered in error.  You also may notice a feature we discussed earlier.  You can add these items to your Outlook calendar with the same functionality as you saw in other parts of the application.



**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## Trial Preparation

A great advantage to the litigation consultation is the ability to document suit details throughout the life of the suit.  All regions have a requirement of completing a trial summary some time period before trial.  The time periods vary, but the trial summary is similar in every office.  We have provided a place for you to document the required information when receiving it, instead of waiting until fifteen days or thirty days prior to trial.

The top of the Trial Prep section includes a location to list the witnesses, note if discovery is complete, whether the driver will be present at trial, the trial date, judge information and the history of the Plaintiff attorney (300 characters for attorney history).



You will also have the opportunity to enter information about the strengths and weaknesses of the case, special or unusual circumstances, recommendations from defense counsel and yourself, and any additional trial summary details.  Each text box has a 1000 character limitation.  They also have the word tools we showed you earlier.



**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM00339

## Documents

To review the below document you must select the "documents" within the feature
tool bar of ClaimIQ.



Then you must select the "Litigation Summary".   Notice that the following
components are pre-filled:

   1)  Claim Information
   2)  Suit Information
   3)  Coverage Information
   4)  Facts of Accident
   5)  Injuries
   6)  Trial Prep details

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**



You also have a location for the manager, the RLA, and Claim Home Office to note their recommendations.  These fields are not open for entry in CIQ and if used need manual entry.  Depending on Regional preferences, Managers and above can document their instructions and recommendations in ALOG or add a Note in ClaimIQ.



**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

You have the same options with the Litigation Summary as you had with the Suit Referral. You can export it and it goes to the Advanced Documents Tab with an email sent to you. You can also print the document.



Review the   

Notice the injury information for the other parties in the loss is listed in this addendum.

## Exception Handling

We have walked you through the procedures for most litigation files that you will handle.  There are often exceptions to the average litigation.  We will address the features we have included for those cases.

## Grouping

Often multiple features are handled as one suit.  There are several reasons depending on jurisdictions and/or circumstances.  We will be showing you the Litigation Summary at the top of the Litigation consultation to demonstrate this point.



A Litigation Consultation is created with each suit count that is opened in mainframe. It may be appropriate to handle the documentation for all features on one single LIT consult (called the Lead feature, in the case above, 02ABI Charles Wells)

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM00343

To indicate if multiple features are to be handled in the same suit, select the feature you want to be the lead feature.  In the example below, the suit for Kevin Green and Fred Jones, Kevin Green is going to be the lead feature.  For the lead feature, select the appropriate non-asterisked letter. For instance, if 02ABI and 03ABI are handled by the same suit with 02ABI as the lead, select Litigation Group "A" for 02ABI and "A*" for 03ABI.



After the selection is made, ClaimIQ will clearly indicate the lead suit. It is appropriate to document most of the information on that lead feature screen. Exceptions would be IMEs and expert information. IMEs and/or other expert information should be documented based on a specific feature. You do not want to document the IME results for ABI03 under the ABI02 Litigation screen as that is not "shared" information.  Even if there is a lead suit with companion suits, information can be documented on the companion suits if needed and/or preferred.  Motions are filed and interrogatories are sent/received for three plaintiffs. In most cases, it is not necessary to document this on all three screens as it will be apparent which feature is the lead and thus contains most of the information regarding the status of that lawsuit.

> **When you revisit the LIT tab, if there is more than one suit documented for one Interested Party, or more than one IP has filed suit, you will need to select the one you want to update from the Select Litigation dropdown menu**

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

When the trial is over, return to the Litigation Tab, Litigation Summary section and complete the Trial Summary and Trial/Arb results fields.  Return to mainframe to close the suit.



## Arbitration:

In some locations, binding or non-binding arbitrations are handled in the same manner as suits.  The Add Arbitration option is only available when NO SUIT has been opened.  Once arbitration has been added, you will no longer be able to change the Litigation Tab to a suit.  It will remain an arbitration for that feature.



**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## Reopening a Suit

If you have closed a suit and for some reason the suit reopens, you would need to reopen the suit disposition on the Litigation Summary.



On claims that this was necessary, the handling adjuster will go in to the disposition code again and "close" it in ClaimIQ after you have closed the mainframe suit indicator. If you have closed a suit and for some reason the suit reopens, you would need to reopen the suit disposition on the Litigation Summary.

> If the disposition code indicates a closed file, the suit referral document will not have all information needed to refer a file to counsel

> **The TNOS can be taken on a feature multiple times, but can only be sent to ClaimIQ once per feature. If the file is closed and adjuster "Completes to ClaimIQ" and there is a delay in reopening the feature, the TNOS information will appear as long as another suit has not been opened for that feature.**

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**Lesson Seven**

**Defense Counsil Billing Procedures**

**Continuing Unit Manual**

**Objectives:**

1. Identify the guidelines for procedural, frequency, hourly rates for partners, associates, and paralegals.
2. Understand the process of analyzing defense counsil billing.

## ANALYSIS OF SUIT HANDING BY DEFENSE COUNSEL

Defense costs consist of various tasks performed.  The cost of these tasks is directly related to the time necessary to accomplish them (i.e., a firm's proximity to the court house, expertise and research time).  The time varies, based on the complexity of the task performed, which varies based on the individual case.

This discussion is about the approximate, reasonable time needed for an attorney to perform his duties.  Each case must be looked at on its own individual merits when determining reasonable cost.

There are two ways we assign a case to defense counsil.  The first is an initial call and follow-up with suit papers to inform counsil of the litigation. The second is a formal referral that includes a referral letter, a copy of the suit papers and our file.

A telephone assignment consists of the examiner's calling the appropriate counsil and giving a designated person the necessary information. That person then creates some internal form and gives it to a managing attorney or a specific attorney to review to see if, and what, immediate action is needed.

After a phone assignment, the examiner may not have enough time to type referral letters and copy file contents. He may need to send the suit papers immediately by mail or fax.  Any calls from the defense firm for clarification after the referral telephone call and/or receipt of the suit papers will add time.

When defense counsil receives the suit papers, they will be matched to the file (if called-in) or a new case will be created. They will then be given to a managing attorney/senior attorney, reviewed, and then assigned to an individual attorney for handling.

Once the defense firm receives a copy of our file contents, the assigned defense attorney must do a complete review.  He will mark the documents of greatest importance.  The file will be compared to your suit referral letter. The more complete the referral letter, the easier the review and the less time consumed.

After this initial file review, there may be questions or a disagreement with some aspects of the referral letter or the instructions given. These may generate a phone call or letter to the examiner. After the file review, the defense attorney may:

- ➢ Telephone the claims examiner to discuss the case and/or service.
- ➢ Contact the client/insured by phone.
- ➢ Prepare an answer that may include interrogatories.

**Confidential Information of the Government Employees Insurance Companies**
**Copyright © 2004 GEICO**

2

GTM00348



Confidential Information of the Government Employees Insurance Companies

Copyright © 2004 GEICO

3

GTM00349

## Acceptable billing format for substantive legal work

When reviewing bills submitted by Defense Counsel there are generally contracts formed between GEICO and the billing attorney.  Typically these contracts obtain an agreed rate for a particular service.  An example may be something as simple as an agreement to charge GEICO only $300.00 for an infant settlement, rather than an hourly fee.

With this in mind there are many generic steps or processes to every suit that can be accomplished at an average rate of time.  We will discuss these processes and some general time guidelines to follow.

The billing attorney must date a "specific" itemization of task, time in tenths/hour.  Block entries and "bundling" billing are unacceptable Billing procedures and should be addressed with senior managements.  You will then need to request the specific itemization of tasks from the billing attorney.

Each "**phone call**" must include the names of the parties communicated with and the topic discussed to include the time of the conversation and duration.

All **"legal research"** must include a brief description and a need for such legal research.  It is imperative that your referral letter specifically state if research is needed or not.  If you fail to include such a statement an attorney may, on their own conduct countless hours of research and bill GEICO for their work.  We more than likely would owe such charges.

| BILLABLE HOURS BILLING SCALE | | | |
|---|---|---|---|
| **Billable Hr.** | **Minutes** | **Billable Hr.** | **Minutes** |
| .1 | 0 – 6 | .6 | 31 – 36 |
| .2 | 7 – 12 | .7 | 37 – 42 |
| .3 | 13 – 18 | .8 | 43 – 48 |
| .4 | 19 – 24 | .9 | 49 – 54 |
| .5 | 25 – 30 | 1.0 | 55 – 60 |

**Confidential Information of the Government Employees Insurance Companies**
**Copyright © 2004 GEICO**

GTM00350

**<u>Acceptable billing format for overhead charges:</u>**

Fees incurred for **photocopies and documents** must include the total cost, the cost per page, and the total number of pages.

Fees incurred for any **express mail & delivery** of critical and urgent documents or when requested by GEICO Travel must list specifically **who, when, where, how, and why** such travel was necessary.  Receipts and pre-clear out-of-town travel for administrative, secretarial, and paralegal functions are not billable.

What is a reasonable amount of time for?

> ➤ Initial Handling of File
> ➤ Paper Discovery to Parties
> ➤ Preparation and Review of Discovery Responses
> ➤ Depositions
> ➤ Legal Research and Investigation
> ➤ Motions and Motions Practice
> ➤ Trial Preparation
> ➤ Trial
> ➤ Post Trial Motions and Appeals

---

**The following suggested times are only guidelines to assist you in your review.  Actual times could be significantly less or more depending on the simplicity or complexity of the individual case.**

---

**Notes:**

_____

_____

_____

_____

_____

_____

**Confidential Information of the Government Employees Insurance Companies**
**Copyright © 2004 GEICO**

5

GTM00351

## Suggested allowable billing time for initial suit file handling:

- ➢ Phone referral: (if billed) 5-10 minutes
- ➢ Receipt of suit papers only: 10-15 minutes
- ➢ Initial file review: 60-90 minutes
- ➢ Answer to suit: 45-90 minutes
- ➢ Total Time: 2 to 3 ½ Hours

---

**We will not pay for costs associated with transfer of a file from one attorney to another.**

---

## Suggested allowable billing time for Paper Discovery/Interrogatories:

Complexity of litigation must be taken into consideration when reviewing this portion of any bill. When the defense attorney receives the plaintiff's answers to interrogatories, he or she must review them and then send a copy of the actual answers to the interrogatories, along with any recommendations for further handling.

Defense counsil will receive interrogatories from the plaintiff's attorney which must be completed. One method is to contact the client/insured by phone or letter and ask him or her to come to the office to meet with the attorney. The attorney reviews the questions with the client/insured for review and signature. Upon their return, the papers are reviewed and signed by the attorney.

The other method is to have the interrogatories answered by mail. This is the most common method, do to scheduling difficulties or travel distance. The client/insured is sent the interrogatories with a cover letter asking him or her to draft answers and return them. Upon receipt if the draft answers, the attorney will review them along with the claims file. Usually a call to the client is needed to clarify some of the answers. The attorney then edits and inserts information from investigative material. The answers are typed in final form and mail to the client/insured for review and signature. When the answers are returned, the attorney will review and sign them.

The same Interrogatories and Request for Production of Documents should not result in multiple billing for identical work

If the case involves non-routine or unique issues, hopefully defense counsil will have covered the basics, but also tailored specific discovery requests to address those issues of Coverage (residency) Alcohol – Death Claims. The total time for a routine case should be 30 minutes to 1 hour per party.

## Suggested allowable billing time for Preparation of Discovery Responses:

GTM00352

<u>Answers to Interrogatories</u>
- ➢ Prepared from written draft answers and meeting with the client.
- ➢ Response to Request for Production of Documents
- ➢ Total Time to Finished Product should be about 2 to 4 hours

<u>Review of Discovery Responses of the Plaintiff</u>
- ➢ Plaintiff's Answers to Interrogatories
- ➢ Total Time: ½ hour to 1 hour

<u>Plaintiff's Response to Request for Production of Documents</u>

- ➢ This will depend on whether it is the same material received by us pre-suit, was it in fact responsive, and are there records we have never seen before?
- ➢ Total Time is Variable from 1 hour to several hours
- ➢ Time would be similar to review of records received in response to a subpoena

<u>Review of Discovery Responses of the Co-defendant</u>

- ➢ Co-defendant's Answers to Interrogatories and Co-defendant's Response to Request for Production of Documents.
- ➢ Total Time: ½ hour to 1 hour



**Confidential Information of the Government Employees Insurance Companies**
**Copyright © 2004 GEICO**

GTM00353

## Suggested allowable billing time for Depositions:

**Records Depositions:**
After review of the plaintiff's answers to interrogatories, defense counsil will decide if further records are necessary and if so, will subpoena the doctor's and employer's records.  Normally, the records are mailed in compliance with the request and no actual deposition takes place.  Review time is totally dependent on the amount of records.  Copies are usually sent to the examiner.

**Plaintiffs Deposition/Examination Before Trail:**
The attorney will prepare to take depositions by reviewing the file which contains investigative material; the police report, recorded interviews, medical reports, bills, the answers to interrogatories and prior history.  The attorney takes the deposition by thoroughly questioning the plaintiff on all aspects of liability and damages.  Time will be allowed for travel to and from the state of deposition.  The attorney prepares a report to the company which contains a summary of the deposition and a discussion of further action to be taken.

**Defendant's Deposition/Examination Before Trail:**
The defense attorney will meet with the client/insured and have him/her review the answers to interrogatories and the recorded interview.  The attorney will then prepare the client/insured by explaining the process and what to expect.  The defense attorney is present while the plaintiff's counsil takes the client/insured's deposition and will enter any necessary objections.  Time will be allowed for travel to and from the site of deposition.

The following suggested times are only guidelines to assist you in your review; actual times could be significantly less or more depending on the simplicity or complexity of the individual case.

The billing for Depositions will include the following areas:

- ➢ Preparation
- ➢ Actual Time of Deposition
- ➢ Travel to and from the deposition
- ➢ Report to GEICO


Plaintiff Deposition:
- ➢ Preparation
  - 1 to 3 hours
- ➢ Actual Time of Deposition
  - 1 to 2 hours
- ➢ Travel to and from the deposition
- ➢ Report to GEICO
- ➢ 15 to 45 minutes

**Confidential Information of the Government Employees Insurance Companies**
**Copyright © 2004 GEICO**

8

GTM00354

Client Deposition:
- ➢ Preparation
    - ½ hour to 1 hour
- ➢ Actual Time of Deposition
    - 1 to 2 hours
- ➢ Travel to and from the deposition
- ➢ Report to GEICO
    - 15 to 45 minutes


**Treating Doctor's Deposition:**

In preparation for conducting a treating doctor's deposition, defense counsil will review the medical reports, bills, and the medical field and may research professional books.  The defense attorney will thoroughly question the doctor on all aspects of the injury.  He/she will then prepare a summary of the outcome to include his/her opinion of testimony, chances of defending successfully and further action needed.  Time will be allowed for travel to and from this site of deposition.


Treating Physician Deposition:
- ➢ Preparation
    - 2- 4 hours
- ➢ Actual Time of Deposition
    - 1 ½ to 2 hours (We are paying doctor per hour)
- ➢ Travel to and from the deposition
- ➢ Report to GEICO
    - 15 to 45 minutes


**Defense Physician (IME) Deposition:**

In preparation, defense counsil will review the IME report, other medical reports and research professional literature.  Throughout the deposition the defense attorney will be present while the plaintiff's attorney questions the defense physician's findings, relationship, and causation by the accident and treating doctors finding's.  The defense attorney will prepare a summary of the outcome to include his/her opinion of testimony, chances of defending successfully and further action needed.  Time will be allowed for travel to and from this site of deposition.

IME Physician Doctor Deposition:
- ➢ Preparation
    - ½ hour to one hour
- ➢ Actual Time of Deposition
    - 1 to 2 hours
- ➢ Travel to and from the deposition
- ➢ Report to GEICO

**Confidential Information of the Government Employees Insurance Companies**
**Copyright © 2004 GEICO**

9

15 to 45 minutes

**Fact Witness Deposition:**

In preparation for conducting a fact witness deposition, the defense attorney will review liability issues evidence.  Her or she will question the witness about the facts of the loss and then prepare a report to the Company summarizing the deposition and provide an opinion of testimony, and recommend further action.  Time will be allowed for travel to and from this site of deposition.

Witness Deposition:
- ➢ Preparation
    ½ hour to 1 hour
- ➢ Actual Time of Deposition
    1 to 2 hours
- ➢ Travel to and from the deposition
- ➢ Report to GEICO
    15 to 45 minutes

**Expert Witness Deposition:**

The defense attorney will prepare by reviewing the expert's report and related material.  He/she will question the expert on the findings and send a report top the company.  Time will be allowed for travel to and from this site of deposition.

Expert Witness Deposition:
- ➢ Preparation
    1 to 2 hours
- ➢ Actual Time of Deposition
    1 to 2 hours (We are paying expert per hour)
- ➢ Travel to and from the deposition
- ➢ Report to GEICO
    15 to 45 minutes

**Notes:**

_____

_____

_____

_____

_____

**Confidential Information of the Government Employees Insurance Companies**
**Copyright © 2004 GEICO**

10

GTM00356

**<u>Suggested allowable billing time for Pre-trial conference:</u>**

When preparing for a pre-trial conference, the defense attorney will review the file and have a discussion with the client/insured.  He/she will then discuss the case with the examiner, as well as strategy and any settlement authority.  In some jurisdictions, he/she may have to prepare a pre-trial statement. There may be a short waiting time. An effective counsil will be able to accomplish other tasks while waiting for the judge and will charge minimally for waiting.  The assigned claims examiner may be required to attend.

The following are the areas reviewed for the Pre-trial conference and the suggested allowable billing time.

- ➢ Review of File
- ➢ Conference with Examiner
- ➢ Preparation of Pre-trial Statement
- ➢ Appearance for Actual Conference
- ➢ Waiting and Travel Time
- ➢ Total Time: 1 to 8 hours

**<u>Suggested allowable billing time for Mediations:</u>**

The Defense attorney will review the file and have a conversation with the client/insured. He/she will discuss the case, strategy and settlement authority with the examiner. There may be travel and waiting time. As to waiting time, see above.  The assigned claims examiner may be required to attend.

- ➢ Review of File
- ➢ Conference with Examiner/Insured
- ➢ Mediation Statement
- ➢ Waiting and Travel Time
- ➢ Total time: 4 to 8 hours

**Confidential Information of the Government Employees Insurance Companies**
**Copyright © 2004 GEICO**

GTM00357

## Suggested allowable billing time for Motions practice:

The defense attorney will research the matter, write up and present arguments to the court.  There may be travel and waiting time.  An effective counsil will be able to accomplish other tasks while waiting and will charge minimally for waiting.  The suggested allowable time will depend on complexity of Motion and whether there is a lot of research, a hearing, and preparation for argument, travel, waiting time, and court argument.

- ➢ Motion for Summary Judgment
    Time for Motion: 2 ½ to 3 ½ hours

- ➢ Simple Motion to Compel; the defense attorney prepares and then presents arguments to the court.  Time will be allowed for travel to and from the court.
    Time for Motion: ¾ to 1 ½ hours

## Suggested allowable billing time for Pre-trial preparation:

Prior to trial, an attorney may visit the accident scene. The attorney will meet with the client/insured to review trial procedures and explain what mist likely will happen.  This time is critical for the defense attorney to properly prepare for the trial to ensure no allegations of bad faith can be made.  During this preparation the Defense counsil will review areas such as;

- ➢ Witness examination
- ➢ Meeting client/witnesses
- ➢ Instructions/voir dire
- ➢ Exhibits
- ➢ Accident scene visit
- ➢ Opening and closing
- ➢ Trial
- ➢ It is usual to see 10-12 hour days for this phase.

**Confidential Information of the Government Employees Insurance Companies**
**Copyright © 2004 GEICO**

GTM00358

## Suggested allowable billing time for Trials:

Firms will usually have a per-day charge for trial time.  There may be an additional charge for trial preparation time after business hours on trial day.  The attorney will review the file for the next day's testimony and proceedings. Expect to see two to three hours of trial preparation time per day during trial. Pre-trial charges will have a separate fee. In a typical soft tissue case, six to ten hours preparation time might be appropriate.

The length of the trial depends on the jurisdiction, the complexity of the case, the number of witnesses, settlement posture, etc.  Even the simplest trial may take up to a day and a half. The preceding discussion is a summary of what a defense attorney will do in a typical case. Each bill must be evaluated on its merits in light of the nature of the case involved.  It is up to the examiner to know the case and what he wants to happen. The more the examiner does, the less time the attorney will spend and the lower the cost will be.  These fees include before and after trial review of notes, conference with witnesses, and preparation for the following day.

- ➢ Review the bill
- ➢ Be thoroughly familiar with all the above.
- ➢ Use a calculator.
- ➢ Did attorney follow assignment letter instructions or was there unnecessary investigation, discovery, or research?
- ➢ Compare your file to billings
- ➢ Letters, pleadings/motions, phone calls.

**Remember when review the final billing you must constantly review the following:**

- ➢ Was there an overlap?
- ➢ Ws there any double billing?
- ➢ Is the charge reasonable?

A simple deposition in an uncomplicated case will usually take 2-3 hours. If you cannot account for the time you will need an explanation. The key here is to exercise reasonable professional judgment versus "nit-picking".

---

### If the bill is questionable, bring it to the attention of your manager.

Confidential Information of the Government Employees Insurance Companies
Copyright © 2004 GEICO

GTM00359

The following are Expense Payment Codes used within GEICO that identify the type of expense payment.  There are 10 categories of expenses. The first position identifies the category; the second describes in detail what the expense type is. Each category is defined on separate help panels.  (Please be advised that this is not an all inclusive list of Expense codes.  For an all inclusive list, please reference this link :

directnet.geico.net/staffdepartments/isd/apd1/claimssystems/deskreferenceguide/Html/ExpensePaymentCodes.htm )

## LEGAL (OLD CODE = 30)

LA   Attorney Professional Time (Other Than As Listed Below)
LC   Clerical/Overhead Expense
LF   Friendly Suit "Prove Up" Hearings
LG   Gallivanting - Travel Time
LI   Issuing Payments
LM   Attorney's Fees For ADR (Time)
LN   Non Litigation Case Management
LO   Legal Opinion
LP   Paralegal Services
LR   Develop Release Or Other Legal Format
LT   Attorney's Fees For Trial (Time)
LZ   All Other

## COURT COSTS/TRIAL PREP (OLD CODE = 32, 35)

CC   Fees Paid To Court
CE   Cost For Non Med Expert
CI   Fees To Independents To Attend ADR, Trial Or Deposition
CL   Locate Witness/Make Available For Trial
CM   Fees To Mediators/Arbitrators
CP   Fees For Service Of Process
CR   Reconstruction
CS   Stenographer
CW   Costs Paid To Court
CZ   All Other

## POLICE REPORT (OLD CODE = 34)

FB   Bureau Of Vital Statistics (Death, Marriage, Autopsy, Birth, Etc.)
FF   Police Report Prior Or Subsequent Accidents
FH   Homicide Reports
FM   Military Reports
FP   Police Reports (Current Accident)
FZ   All Other

**Confidential Information of the Government Employees Insurance Companies**
**Copyright © 2004 GEICO**

GTM00360

EITHER IRS OR ATTY/ADJ CODE REQUIRED

**ADJUSTER (OLD CODE = 37)**

AA     Credit Or Asset Report

AC     Cost For Claims Staff To Attend Trial Or ADR

AF     Hourly Fee/Flat Rate To Appear As Company Rep At ADR

AH     Hourly Fees/Flat Rate

AM     Miscellaneous/Overhead

AZ     All Other

**PHOTOS (OLD CODES = 60)**

PA     Appraisal Photos

PI     Independent Adjuster Photos

PP     Police Reports

PS     Professional Photos

PT     Trial Exhibits

PZ     All Other

**These codes can be found in the claim payment screen by entering PF1 under the "exp" feature as noted in the screen shot below.**

**Confidential Information of the Government Employees Insurance Companies**
**Copyright © 2004 GEICO**

15

GTM00361



**GTM00362**

# BAKER & KNOTTS, PC

**A PROFESSIONAL CORPORATION**
**10557 34TH STREET, SUITE 233**
**ABILENE, KANSAS, 67410**
**Tax Identification Number:   72-1733782**

TOM A. BAKER
DONALD T. KNOTTS
JOHN T. SIMON

September 4, 200X

C.U. Examiner                           Invoice #        0001    TAB
GEICO                                   Our File #       07-1233
1 GEICO Landing                         Billing thru:    August 31, 200X
Virginia Beach, VA 23454

ALICE WILSON v. KIMBERLY JORDAN
Circuit Court of Some City, Case No. CV-07-1233

Claim No.:      xxxxxxxxx-0101-010
Insured:        James C. Defendant
Claimant:       Mary Ann Plaintiff
DOL:            January 31, 200X

PROFESSIONAL SERVICES

| Date | Initials | Activity | Hours | Amount |
|------|----------|----------|-------|--------|
| 8/20/200X | TAB | Review of new file; assigned to JTS | 1.00 hrs | $150.00 |
| 8/21/200X | JTS | Review of new file; letter to C.U. Examiner | 1.00 hrs | $100.00 |
| 8/21/200X | JTS | Conversation with C.U. Examiner in re to new file | .20 hrs | $20.00 |
| 8/21/200X | JTS | Conversation with client/insured James C. Defendant in re to accident and Plaintiff's Suit Petition | .60 hrs | $60.00 |
| 8/22/200X | JTS | Review of Plaintiff's Suit Petition in preparation for drafting Defendant's Answer | .20 hrs | $20.00 |
| 8/22/200X | JTS | Prepare Defendant's Answer to Plaintiff's Suit Petition | .80 hrs | $80.00 |
| 8/22/200X | ANN | Deliver Answer to Some City and file with Clerk of Court | .50 hrs | $30.00 |
| 8/22/200X | JTS | Review of Plaintiff's Interrogatories in preparation for drafting Defendant's Response | .20 hrs | $20.00 |

**Confidential Information of the Government Employees Insurance Companies**
**Copyright © 2004 GEICO**

17

GTM00363

| Date | Initials | Activity | Hours | Amount |
|------|----------|----------|-------|--------|
| 8/22/200X | JTS | Prepare Defendant's Answers to Plaintiff's Interrogatories | 1.80 hrs | $180.00 |
| 8/22/200X | JTS | Review of Plaintiff's Request for Production of Documents in preparation for drafting Defendant's Response | .20 hrs | $20.00 |
| 8/22/200X | JTS | Prepare Defendant's Responses to Plaintiff's Request for Production of Documents | 1.40 hrs | $140.00 |
| 8/22/200X | JTS | Correspondence to Plaintiff Attorney with Defendant's Answers to Plaintiff's Interrogatories and Responses to Plaintiff's Request for Production of Documents as attachments | .20 hrs | $20.00 |
| 8/22/200X | JTS | Correspondence to client/insured James C. Defendant with ccs of Answer, Answers to Interrogatories, and Responses to Request for Production of Documents | .30 hrs | $30.00 |
| 8/22/200X | JTS | Correspondence to GEICO C.U. Examiner with ccs of Answer, Answers to Interrogatories, and Responses to Request for Production of Documents | .20 hrs | $20.00 |
| 8/27/200X | JTS | Conversation with GEICO C.U. Examiner in re to Discovery to Plaintiff and Plaintiff Deposition | .20 hrs | $20.00 |
| 8/27/200X | JTS | Prepare Defendant's Interrogatories to Plaintiff | 1.00 hrs | $100.00 |
| 8/27/200X | JTS | Prepare Defendant's Request for Production of Documents to Plaintiff | 1.00 hrs | $100.00 |
| 8/27/200X | JTS | Prepare Defendant's Request of Admissions to Plaintiff | .50 hrs | $50.00 |
| 8/27/200X | JAG | Conversation with Plaintiff Attorney in re to Deposition dates for Plaintiff | .20 hrs | $15.00 |
| 8/27/200X | JTS | Correspondence to Plaintiff Attorney with Defendant's Discovery requests as attachments | .20 hrs | $20.00 |
| 8/27/200X | JTS | Correspondence to client/insured James C. Defendant with ccs of Defendant's Discovery requests | .20 hrs | $20.00 |

**Confidential Information of the Government Employees Insurance Companies**
**Copyright © 2004 GEICO**

18

GTM00364

| Date | Initials | Activity | Hours | Amount |
|------|----------|----------|-------|--------|
| 8/27/200X | JTS | Correspondence GEICO C.U. Examiner with ccs of Defendant's Discovery requests | .20 hrs | $20.00 |
| 8/29/200X | JAG | Conversation with Plaintiff Attorney in re to Deposition dates for Plaintiff; date confirmed | .10 hrs | $7.50 |
| 8/29/200X | JTS | Prepare Notice of Deposition of Plaintiff | .50 hrs | $37.50 |

$1,280.00

EXPENSES

| 8/22/200X | Copying (In-House) | $15.23 |
|-----------|--------------------|--------|
| 8/22/200X | Postage | $2.46 |
| 8/27/200X | Copying (In-House) | $27.39 |
| 8/27/200X | Postage | $4.92 |
| | | $50.00 |

| BILLING SUMMARY | Total professional services | $1,280.00 |
|-----------------|------------------------------|-----------|
| | Total expenses incurred | $50.00 |
| | Total of new charges for this invoice | $1,330.00 |
| | **Total balance now due** | **$1,330.00** |

The associates in this bill are as follows:

TAB= Managing Attorney

JTS = Junior Attorney

JAG = administrative assistant

ANN = Paralegal/Runner

**Confidential Information of the Government Employees Insurance Companies**
**Copyright © 2004 GEICO**

19

GTM00365



Intentionally left blank

GTM00366

**Lesson Eight**
**Fatality Claim Handling**
**Continuing Unit Manual**

CONFIDENTIAL!

**Objectives:**

1. Be able to identify when a Wrongful Death claim can be brought.
2. Be able to recognize who can bring action for a Wrongful Death claim.
3. Be able to identify when a Survival Action claim can be brought.
4. Be able to recognize who can bring action for a Survival Action claim.

# FATALITY CLAIM HANDLING

The first question that comes to mind is; do fatality claims present unique problems to you as the claims examiner? Yes they do! For one thing, the claims examiner may run into terms and phrases that he or she is not familiar with. Another unique problem is identifying who can actually bring a fatality claim and that the damages recoverable in fatality claims are different than those you would find in your ordinary personal injury action. Not to mention that settling fatality claims often present special considerations for the claims examiner, such as court approval in some states. Finally, fatality claims often present special problems in information gathering.

Let's begin with some of the terminology that a claims associate may encounter when handling a fatality claim.  Many of these terms may be defined a little differently in some jurisdictions.

1. **Administrator:**  this is a person who usually settles and distributes the estate of the person who died.

2. **Beneficiary:**  a person who is entitled to take the proceeds from the estate.

3. **Custody:**  the care, control and maintenance of a child or other person, as ordered by a court.

4. **Decedent:**  the person who died.

5. **Estate:**  the total property owned by a decedent, including probable assets

6. **Executor:**  a person appointed to carry out the directions and requests of someone's will

7. **Guardian:**  a person who is legally charged with the care and management of a minor or other person.

8. **Guardian ad litem:**  this is a special Guardian, usually someone other than a parent, appointed by the court to represent the interest of a minor or some other person.

9. **Jurisdiction:**  this refers to the power and authority of a court to hear and determine a judicial proceeding.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM00368

10. **Loss of consortium:**  a loss of consortium claim is for the damage done to the marital relationship.  It includes loss of society, affection, assistance ad conjugal fellowship, including loss or an impairment of sexual relations.

11. **Loss of society:** loss of mutual benefits each family member receives from the other's continued existence, including love, affection, care, attention, companionship, comfort ad protection.

12. **Loss of solatium:** this generally describes damages allowed for injury to one's feelings.

13. **Pecuniary loss:** loss of money and can include the reasonable expectation of pecuniary benefit from the continued life of the person who is died for loss services, including training, nurture, education, guidance, and society.

14. **Personal Representative:** executor or administrator of the estate.

15. **Survival action:** a legal claim for personal injury that survives the person, as defined by statute.

16. **Venue:** the particular county or geographical area in which a court with jurisdiction may hear and determine a case.

17. **Wrongful Death action:** this is a lawsuit or claim on behalf of a deceased person's beneficiaries that alleges that the death was caused by a willful or negligent act by another.

**Notes:**

_____

_____

_____

_____

_____

_____

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

An important factor in handling fatality claims would be to know the law. That means you have to be familiar with a specific law of the applicable jurisdiction.

Wrongful death claims and survival actions are creatures of statute. Generally speaking, prior to the 19th-century they didn't exist. If a person died, his or her claim died as well. During the 1800s, state legislatures enacted laws which permitted a claim to survive a person's death.  Two different types of laws were enacted.

One was survival actions and the other created wrongful death actions. They are often confused and unfortunately, sometimes discussed interchangeably.  Depending on your state, persons who can bring wrongful death claims and/or survival claims may be the same.  But they may be different. Damages recoverable under a survival action are usually different than damages for wrongful death.

Although the procedures and terminology may look similar in all jurisdictions, they are definitely not identical. And in some instances, may not be at all alike. A person, who could bring a claim in one state, may be precluded from bringing that same claim in another state.  Damages recoverable under one state's laws may not be recoverable in another.

Failure to know the law could result in our paying the policy limits and getting a release, but not extinguishing all viable claims. This could result in a significant exposure to an insured and maybe even GEICO.

If you do not know what is recoverable, you could evaluate claims incorrectly. We certainly do not want to settle a claim which includes an item of damage which is not recoverable under the law.  Generally, there are two types of fatality claims. One is a claim for wrongful death and the other is the survival action.

**Notes:**

_____

_____

_____

_____

_____

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## Wrongful Death

Wrongful death claims are usually brought on behalf of the deceased person's beneficiaries, or "next of kin." In many jurisdictions this is brought by the personal representative of the estate. However in other states, it may be brought directly by surviving family member, such as a spouse, parent or child. This is a claim for personal injury that's survives the death of a person. The wrongful death action is brought on behalf of the survivors.

## Survival Action

To keep the wrongful death claims separate, some like to refer to survival actions as the "estate claim." The survival action or estate claim provides for the recovery of damages that the deceased person would have been entitled to receive had he lived or had he survived.

Here are a few examples; In Maryland, the survival action is brought by the personal representative. The wrongful death claim is brought individually by persons designated in the statute as wrongful death beneficiaries. In Florida, there is only a single action for wrongful death brought by the Personal Representative. However, the beneficiaries under the statute include not only the designated survivors, but the estate of the decedent as well.

There is a lot of case law in various states regarding attorneys who confused survival actions and wrongful death actions. We don't want any of our associates making this same mistake.

As we mentioned in the beginning of this lesson; we said that wrongful death claims and survival actions present unique problems in claims handling. Survival actions and wrongful death actions present unique proof problems. In order to properly identify the personal representative of the estate, you usually request letters of administration.

**Notes:**

_____

_____

_____

_____

_____

_____

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## Verification

Getting proper identification of wrongful death beneficiaries can present unique proof problems as well.  If you feel you have legitimate issues as to whether or not two people were married, you may ask for written documentation.

You may ask, "How would this come up?" Let's say you get a letter from an attorney who says he represents the spouse of the decedent. But you notice that the last names are different or that an obituary did not list the "spouse" as a survivor.  You could encounter these problems when verifying children. A spouse is identified by marriage license; a child, by birth certificate. In order to properly identify an adopted child, you'll need a copy of the court order.

Wrongful death beneficiaries are specifically identified under any given statutory scheme.  As an example; only a natural child or a child by adoption may qualify as a wrongful death beneficiary in some states.  A stepchild may not.  Many states permit recovery by a child who is born outside of marriage. As another example of a problem; what you do when the decedent was a national of another country? You'll need satisfactory proof with valid marriage certificates or birth certificates from another country.

We cannot overemphasize how important it is that you have to know the law specific to the claim you are handling. In addition, try to break down damages into economic damages and non-economic damages. Damages are often distinguished this way in a statute, as well as in the case law. This is a good analytical tool.

## Economic Damages

This is usually the loss of pecuniary benefit to the beneficiaries.  In other words, had the decedent lived, what benefits could be projected into the future on behalf of those who are left behind?  In some jurisdictions, the pecuniary loss is measured as lost future earning capacity of the deceased.

Another thing you have to look at insofar as economic damages are concerned, are setoffs. For example, a statute may only provide for "net" pecuniary benefit.  In other words, you would deduct the decedents "cost of living" in order to arrive at a net amount. Non-economic damages include loss of solatium, affection and society and companionship. Some states permit recovery for the grief one feels for the loss of a loved one; you may hear this referred to as the grief claim.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

Some states have statutory caps on damages as well.  It is important to know this, especially when you have large policy limits involved or if the cap is applicable to one aspect of the claim, but not another.  Damages in survival actions can be broken down the same way. Look at economic damages and non-economic damages.

Economic damages can include the medical care that the decedent received up until the time he died. Reasonable funeral expenses are usually recoverable.  In some jurisdictions, the estate can recover net loss to earnings.

If you remember only one thing from this lesson we hope it is the importance of knowing the law.  Different states permit different people to recover different things. Your Region will provide training for you in those states where you are handling claims.  Your supervisor, manager, and regional liability administrator can also provide you with assistance. If you need additional help, look at your Claims Home Office – Legal consultation list.

## Evaluation

It is important to get information about the decedent like how old he/she was, what he/she did for a living, how much he/she earned a year, whether he/she had any conscious pain and suffering.  Ask whether he/she was married, if they had any children.  If there were children, find out how old they are and whether they lived with the decedent.  Did the decedent provide child support for them?  Were the support payments up-to-date?  If you aren't sure about these relationships, ask for supporting documentation like a marriage certificate or adoption records.

If the decedent was a young person, did he/she live with her parents?  What was the financial relationship between them?  Who supported whom?  You will need to identify all parties who can bring a claim.  Checking newspaper articles or obituaries can be very helpful to discover whether the person left any family behind.

Find out if an estate has been set up and who the administrator is.   If a lawsuit was filed, check carefully to see whether the proper party brought the action and whether it was filed within the statute of limitations.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM00373

8

## Special Considerations

Usually, the wrongful death action is a complete and separate cause action than a survival action. However, they are derived from the death of a single person. It is therefore, what we call a "derivative" claim. Accordingly, in most jurisdictions it is subject to the single per person limit and not a multiple per occurrence limit. Once again, if have any questions, talk to your supervisor, manager or regional liability administrator. And please don't forget home office legal. We have discussed this issue many times when a region calls with this question.

It is important to know whether court approval is required to settle the claim. Some states require it to settle a wrongful death claim and/or survival action. Other states to not require any court approval. Still other states do not require court approval as long as all the beneficiaries agree. Finally, court approval may be needed if there is a minor beneficiary. The necessity of court approval is specific to each state.

The applicable statute of limitations can present unique problems. A wrongful death action usually must be brought within a specified number of years after the date of death. On the other hand, for a survival action, a statute of limitations is usually the applicable statute of limitations for the tort action. This is usually two, three, or four, years from the day the accident. You can see these can actually be different dates. Just remember what we said. Learn the law! Under no circumstances do you want to be negotiating a settlement of a claim when a statute of limitations has expired.

Although you want to be as efficient and thorough as possible, remember that when you make that first contact with the decedent's family, you are dealing with a real people who lost someone important to them. Be patient and sensitive to their needs. Any correspondence that is sent should likewise be sympathetic and thoughtful— regardless of the liability situation.

**Notes:**

_____

_____

_____

_____

_____

_____

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

# Sample #1

# Summons

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**IN THE CIRCUIT COURT FOR THE STATE OF ANY STATE
IN AND FOR YOUR COUNTY**

Name (s)

MARY ANN JOHNSON

Plaintiff (s),                                        Civil Action No. CV-123456

V.

Name (s)

JAMES C. SMITH

Defendant (s).

TO THE SHERIFF OF COUNTY, YOU ARE COMMANDED:
To Summon the above named defendant(s) and serve upon said defendant(s) a copy
of this summons and complaint.

TO THE ABOVE NAMED DEFENDANT(S):
Within twenty (20) days after you receive this Summons, excluding the
day you receive it, you must file an Answer to the attached Complaint if you want
to deny the allegations. The original of your Answer must be filed with the
Clerk's Office of the Circuit Court, **SOME CITY, YOUR COUNTY**
_____, Any State and must include proof that a copy of the
Answer was served on the plaintiff or his/her attorney who is named on this
Summons.

Failure to file an Answer denying the allegations will result in a judgment against you,
and action may be taken by the plaintiff or his/her attorney to satisfy the judgment.

DATED:_____   _____
                                                 Clerk

I.M Plaintiff-Attorney
Attorney and Attorney, LLC
Top Towers, Suite 222
9876 Big Highway
Some City, Any State 11111
321-456-1000
321-456-2000 - FAX

**Confidential Information of GEICO Companies
© Government Employees Insurance Company**

# Sample #2

# Complaint

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM00005



|  |  |  |
|---|---|---|
| **MARY ANN JOHNSON** | * | IN THE |
| Plaintiff | * | CIRCUIT COURT |
| v. | * | FOR |
| **JAMES C. SMITH** | * | SOME CITY |
| Defendant | * | CIVIL ACTION NO.: CV-123456 |

\* \* \* \* \* \* \* \* \* \* \*

COMPLAINT

PRAYER FOR JURY TRIAL

Mary Ann Johnson, Plaintiff, by I.M Plaintiff-Attorney, and Attorney, Attorney and Attorney, LLC, her attorneys, sues the Defendant, James C. Smith, and in support, states as follows:

PREAMBLE

1. Mary Ann Johnson, Plaintiff, is a resident of Any State.
2. James C. Smith, Defendant, is a resident of Any State.
3. The Defendant regularly visits and is engaged in business in Some City, Any State.
4. This action arises from an auto collision which occurred on May 22, 2006, on Any State Route 123 at Main Street Road. Both are public roads in Any State.

STATEMENT OF FACTS

5. On May 22, 2006, the Plaintiff, Mary Ann Johnson, was carefully and prudently stopped in her motor vehicle on Route 123, when her vehicle was violently struck from behind by the Defendant.
6. At the same time, a motor vehicle operated by James C. Smith, Defendant, was traveling, and smashed into the Plaintiff's vehicle, causing the Plaintiff to sustain serious permanent injuries.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

COUNT ONE

**3,4,5. This section establishes Duties Breached, Proximate Cause and Damages**

Plaintiff, Mary Ann Johnson re-alleges and incorporates by reference all those facts and allegations in paragraphs 1 through 6 above and further alleges:

7. The collision was caused by the recklessness, carelessness and negligence of the Defendant, James C. Smith, for that among other acts and omissions the Defendant:

a. operated the motor vehicle at a high, dangerous and excessive rate of speed under the circumstances then and there existing;

b. failed to reduce speed to avoid a collision;

c. failed to observe due care and precaution and to maintain proper and adequate control of the motor vehicle;

d. failed to keep a proper lookout for other vehicles lawfully upon the highway;

e. failed to exercise reasonable care in the operation of the motor vehicle under the circumstances then and there existing; and

f. In other respects not now known to the Plaintiff but which may become known prior to or at the time of trial.

8. As a direct and proximate result of the negligence and carelessness of the Defendant, the Plaintiff:

a. suffered serious, painful and permanent bodily injuries, great physical pain and mental anguish, severe and substantial emotion distress, loss of the capacity for the enjoyment of life;

b. was, is and will be required to undergo medical treatment and to incur medical costs and expenses in order to alleviate injuries, pain and suffering;

c. was, is and will be precluded from engaging in normal activities and pursuits, including a loss of ability to earn money and of actual earnings;

d. and, otherwise was hurt, injured and caused to sustain losses.

9. All of the Plaintiff's losses were, are and will be due solely to and by reason of the carelessness and negligence of the Defendant, James C. Smith, without any negligence or want of due care on the Plaintiff's part contributing thereto.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**6. This section establishes the Remedy (this is the Ad Damnum)**

WHEREFORE, this Plaintiff demands relief in the amount of FIVE HUNDRED THOUSAND DOLLARS ($500,000.00) in General Damages, of FIVE HUNDRED THOUSAND DOLLARS ($500,000.00) in Punitive Damages, ONE HUNDRED THOUSAND DOLLARS ($100,000.00) in Loss of Consortium and any other damages that the court sees fit to award including but not limited to court costs and expenses, attorney fees and interest accrued from the date of the loss.

Respectfully submitted,

Attorney, Attorney and Attorney, LLC

_____

I.M Plaintiff-Attorney, Top Towers, Suite 222

9876 Big Highway

Some City, Any State 11111

321-456-1000

321-456-2000 - FAX

**Name and address for the attorney of record**

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

CONFIDENTIAL

# Sample #3

# Answer and
# Grounds of Defense

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM00009

| | | |
|---|---|---|
| **MARY ANN  JOHNSON** | * | **IN THE** |
| **Plaintiff** | * | **CIRCUIT COURT** |
| **v.** | * | **FOR** |
| **JAMES C. SMITH** | * | **SOME CITY** |
| **Defendant** | * | **CIVIL ACTION NO.: CV-123456** |

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

### ANSWER TO PLAINTIFF'S COMPLAINT

**COMES NOW,** Defendant James C. Smith by and through his attorney W.E.B. Defense, by way of answer to the complaint of plaintiff Mary Ann Johnson now answers the Complaint against him alleging the following affirmative defenses.

### JURISDICTION AND VENUE

1.      Answering paragraph 1 of the Complaint, Defendant lacks information sufficient to form a belief as to the facts alleged, and on that basis, Defendant denies them.

2.      Defendant admits the allegations of personal jurisdiction in paragraph 2.

3.      Defendant admits the allegations of subject matter jurisdiction of paragraph 3.

4.      Defendant admits the allegations of the nature of the case in paragraph 4.

5.      Answering paragraph 5 of the Complaint, Defendant lacks information sufficient to form a belief as to the facts alleged, and on that basis, Defendant denies them.

6.      Defendant denies the allegations of paragraph 6.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**GTM00010**

## COUNT ONE

Defendant repeats each answer in paragraphs 1 through 6 as if set forth herein at length.

7.      Defendant denies the allegations of paragraph 7 in its entirety.

8.      Answering paragraph 8 of the Complaint, Defendant lacks information sufficient to form a belief as to the facts alleged, and on that basis, Defendant denies paragraph 8 in its entirety.

9.      Defendant denies the allegations of paragraph 9 in its entirety.


## AFFIRMATIVE DEFENSES

As separate, distinct and affirmative defenses to the claim on file herein and to each cause of action thereof, this answering Defendant alleges as follows:

10.     The claim, and each cause of action alleged therein, fails to state facts sufficient to constitute a cause of action against this answering Defendant. *(general demurrer)*

11.     Defendant's conduct was neither the cause in fact nor the proximate cause of any injury, loss, or damage alleged by Plaintiff. *(causation)*

12.     Plaintiff was careless and negligent in the operation of her vehicle and thus was comparatively at fault and any damages recovered by Plaintiff should be reduced, be abated, reduced or eliminated to the extent Plaintiff's fault caused or contributed to plaintiff's damages if any. *(comparative negligence)*

13.     The damages complained of, if any there were, were proximately contributed to or caused by the carelessness, negligence, fault or defects created by the remaining parties in this action, or by other persons or entities unknown to this answering Defendant at this time, and were not caused in any way by Defendant or by persons for whom these Defendant is legally liable for these reasons specified herein and for other reason to be proved at the time of trial. *(contributory negligence)*

Confidential Information of GEICO Companies
© Government Employees Insurance Company

14.     Defendant alleges that should plaintiff recover damages against any

defendants, said Defendant is entitled to have the amount abated, reduced or eliminated

to the extent other third parties' fault caused or contributed to plaintiff's damages, if any.

*(conduct of others)*

15.     Defendant contends that the sole and/or proximate cause of the damages

claimed by plaintiff was and is due to the willful and intentional acts of persons and/or

entitles other than this answering defendant. *(intentional acts of others)*

16.     Plaintiff's alleged damages or injuries if any there were, were aggravated by the

Plaintiff's failure to use reasonable diligence to mitigate them. *(failure to mitigate*

*damages)*

**WHEREFORE**, Defendant prays this Honorable Court for the following relief:

1.     For dismissal of the Plaintiff's action with prejudice;

2.     For an order that Plaintiff shall take no relief from her complaint herein;

3.     For an award of Defendant's costs and attorneys' fees herein incurred; and

4.     For such further and other relief and the Court deems fair and just.


Respectfully submitted,


_____

W.E.B. Defense, Esq. #01234

Defense, Defense, & Defense, LLC

567 Litigation Lane; Suite 888

Some City, Any State 99999

987-654-3210 - telephone

987-654-3211 - facsimile

Attorney for Defendant James C. Smith

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

# Sample #4

# Interrogatories

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

IN THE CIRCUIT COURT FOR SOME CITY, ANY STATE

| | | |
|---|---|---|
| MARY ANN JOHNSON | * | |
| v | * | CASE NO. CV-123456 |
| JAMES C. SMITH | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

### PLAINTIFF'S INTERROGATORIES TO DEFENDANT

TO:      **JAMES C. SMITH, DEFENDANT**
              **Through his attorney of record,**
              **W.E.B. Defense, Esq.**

Plaintiff Mary Ann Johnson, by her attorneys, I.M Plaintiff-Attorney, and Attorney, Attorney and Attorney, LLC, her attorneys, hereby propounds Interrogatories upon the Defendant, James C. Smith, to fully, under oath, and in accordance with the Any State Rule of Civil Procedure, Rule 2-A21, subject to the instructions set forth below:

### INSTRUCTIONS

a.      These Interrogatories are continuing in character so as to require you to file supplementary answers if you obtain further or different information before trial.

b.      Unless otherwise stated, these Interrogatories refer to the time, place, and circumstances of the auto accident and personal injuries mentioned or complained of in the Complaint.

c.      Where name and identity of a person is required, please state full name, home address and also business address, if known.

d.      Where knowledge or information in possession of a party is requested, such request includes knowledge of the party's agents, representatives, and unless privileged, his attorney's. When answer is made by corporate defendant, state the name, address and title of persons supplying the information and making the affidavit, and announce the source of his or her information.

e.      The pronoun "you" refers to the party to whom the Interrogatories are addressed and the parties mentioned in clause (d).

f.      "Identify" when referring to an individual, corporation, or other entity shall mean to set forth the name and telephone number, and if a corporation or other entity, its principle place

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

of business, or if an individual, the present or last known home address, his or her job title or titles, by whom employed and address of the place of employment.

g.      "Auto Accident" is defined as the car accident that occurred on April 12, 2005 as referenced in Plaintiff's Complaint.

## INTERROGATORIES

INTERROGATORY #1:
Please state your full name, maiden name (if applicable), any aliases, home address, home telephone number, cellular telephone number, social security number, date of birth, marital status, spouse's name, and your employer's name and address.

INTERROGATORY #2:
Please state each address at which you have resided within the past five (5) years, and the inclusive dates thereof.

INTERROGATORY #3:
Please state the name and address of your employer, your position and duties, and your wages at the time of the auto accident and at the present time.

INTERROGATORY #4:
Please state in detail your itinerary on the date of the auto accident, including each place at which you were present, your length of stay at each such place, and a detailed account of whom you saw and what you did at each such place.

INTERROGATORY #5:
Please identify all persons known to you to have personal knowledge of the facts pertaining to the occurrence, and indicate those who were eye witnesses, and state the substance of their knowledge and articulate their expected testimony.

INTERROGATORY #6:
Please identify all persons (excluding attorneys) who investigated the cause and circumstances of this personal injury auto accident for you.

INTERROGATORY #7:
Please identify all persons who arrived at the scene of the auto accident within one (1) hour after the auto accident.

INTERROGATORY #8:
Please identify the motor vehicle you were operating at the time of your collision with the Plaintiff, including its make, year, registration number, and registered owner.

INTERROGATORY #9:
If you were not the owner of the vehicle mentioned in Interrogatory No. 8, please identify its owner, stating his, her, or its relationship to you, whether you had his, her, or its permission to operate said vehicle, the purpose for which you were operating said vehicle, and how you came to be operating said vehicle.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

INTERROGATORY #10:
Please identify all persons to whom you have given signed statements regarding the auto accident, the date thereof, and the name of the person in whose custody each is at this time.

INTERROGATORY #11:
Please identify all persons who have given you signed statements regarding the auto accident or the personal injuries suffered by the Plaintiff in the accident.

INTERROGATORY #12:
Please state whether your have within your possession or control photographs, plats, or diagrams of the scene of the auto accident or objects connected with said motor vehicle accident, stating what those objects are.

INTERROGATORY #13:
If you contend that either Plaintiff acted in such a manner as to cause or contribute to his or her personal injuries, state all facts upon which you rely to demonstrate this.

INTERROGATORY #14:
Please identify all expert witnesses who will be called at the trial of this case, the area of expertise of each, and a summary of the expected testimony of each.

INTERROGATORY #15:
Please state whether you consumed any drugs, medicines, or alcoholic beverages within twenty-four (24) hours prior to said occurrence, the place where such drugs, medicines, or alcoholic beverages were obtained, the nature of the drugs, medicines, or alcoholic beverages, and the amount thereof.

INTERROGATORY #16:
Please list all insurance agreements you have made regarding the vehicle you were operating at the time of the occurrence, including the name of the owner, the name of the insurance carrier, the policy number, the type of coverage, the amount of coverage (specifying its upper and lower limits) and the effective dates of said policy for the past five (5) years.

INTERROGATORY #17:
Please state whether you had any other insurance policies in effect at the time of the auto accident covering bodily injuries caused to other person. If so, please provide all pertinent information, including the name of the insurer, the policy number, the type of coverage, the amount of coverage, specifying its upper and lower limits, and the effective dates of said policy.

INTERROGATORY #18:
Please list all prior motor vehicle accidents in which you have been involved, either with other persons or with property. Please include the name of any other driver or property owner involved, the location of the collision, the date and time of the collision, and disposition of the matter.

INTERROGATORY #19:
Please list all violations of the motor vehicle laws of the State of Any State or any other jurisdiction with which you have been charged since you obtained your driver's license.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

INTERROGATORY #20:
Please state in detail which part of your vehicle came into contact with which part of the vehicle of the Plaintiff.

INTERROGATORY #21:
If you and the Plaintiff had any conversation after the auto accident, please state the substance of any such conversation.

INTERROGATORY #22:
Please state in detail all actions you took or attempted to take to avoid the auto accident.

INTERROGATORY #23:
If you contend that the personal injuries of the Plaintiff were not caused by the collision with your vehicle, state with particularity the facts upon which you base your contention.

INTERROGATORY #24:
Without reiterating the allegations and/or responses set forth in your responsive pleadings, please give a concise statement of facts as to how you contend the car accident took place.


Respectfully Submitted,


_____

I.M Plaintiff-Attorney

Attorney, Attorney and Attorney, LLC

Top Towers, Suite 222

9876 Big Highway

Some City, Any State 11111

321-456-1000

321-456-2000 – FAX

Attorney for Plaintiff Mary Ann Johnson

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**Certificate of Mailing**

I hereby certify that a true and correct copy of the above and foregoing was mailed via U.S. Mail, first-class, postage prepaid, this 5th day of August, 2006, to the following:

W.E.B. Defense, Esq. #01234

Defense, Defense, & Defense, LLC

as attorney of record for Defendant JAMES C. SMITH

567 Litigation Lane; Suite 888

Some City, Any State 99999

987-654-3210 - telephone

987-654-3211 - facsimile

_____

I.M. Plaintiff-Attorney, Esq.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

# Sample #5

# Request for Production of Documents

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**IN THE CIRCUIT COURT FOR SOME CITY, ANY STATE**

MARY ANN JOHNSON ,

      Plaintiff

                                       CASE NO. CV-123456

v

JAMES C. SMITH,

      Defendants

    **PLAINTIFF'S REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS**

**TO: JAMES C. SMITH, Defendant**, to be answered individually
**FROM: MARY ANN JOHNSON , Plaintiff**

You are requested to file within thirty (30) days a written response to request on the
(attached Document Schedule) and to produce those documents for inspection and copying
on

(a) Your written response shall state with respect to each item or category, that inspection-
related activities will be permitted as requested, unless request is refused, in which event the
reasons for refusal shall be stated. If the refusal relates to part of an item or category, that
part shall be specified.

(b) In accordance, the documents shall be produced as they are covered in the usual course
of business or you shall organize and label them to correspond with the categories in the
request.

(c) These requests shall encompass all items within your possession, custody or control.

(d) These requests are continuing in character so as to require you to promptly amend or
supplement your response if you obtain further material information.

(e) If in responding to these requests you encounter any ambiguity in construing any request,
instruction or definition, set forth the matter deemed ambiguous in the construction used, in
responding.

### DEFINITION

As used in these requests, the following terms are to be interpreted in accordance with these
definitions:

(a) The term "person" includes any individual, joint stock company, unincorporated
association or society, municipal or other corporation, state, which agencies or political
subdivisions, and court, or any other governmental entity.

(b) The terms "you" or "your" include the persons to whom these requests are addressed,
and all that person's agents, representatives or attorneys.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

(c) In accordance, the terms, "document" or "documents" includes all writings, drawings, graphs, charts, photographs, recordings, and any other data computations from which information can be obtained, translated, if necessary by (you), through detection devices, into reasonably usable form.

(d) The term "occurrence" means the incident complained out in the Plaintiff's complaint.

## DOCUMENTS TO BE PRODUCED

1. All documents identified in your answers to Interrogatories.

2. All written reports of each person whom you expect to call as an expert witness at trial.

3. All documents upon which any expert witness you intend to call at trial relied to form an opinion.

4. The most recent resume or curriculum vitae of each expert whom you expect to call as an expert witness at trial.

5. All notes, correspondence, bills, invoices, diagrams, photographs, x-rays or other documents prepared or reviewed by each person whom you expect to call as an expert witness at trial.

6. All invoices generated by expert witnesses generated for performing all expert witness services to the defendant, including but not limited to, the fees for the medical examination, the records review, the pretrial preparation, any telephone conference, any trial testimony anticipated and any other fee paid by the defendants for expert fees.

7. All written, recorded, or signed statements of any party, including the Plaintiff, Defendant, witnesses, investigators, or agent, representative or employee of the parties concerning the subject matter of this action.

8. All photographs, videotapes or audio tapes, x-rays, diagrams, medical records, surveys or other graphic representations of information concerning the subject matter of this action, the Plaintiff, or property damage.

9. Any documents which afforded liability insurance for the incident which is the subject matter of the Plaintiff's Complaint.

10. Any documents identified in any other parties' Answers to Interrogatories.

11. Any documents received pursuant to a subpoena request.

12. Any document prepared during the regular course of business as a result of the incident complained of in the Plaintiff's Complaint.

13. Copies of any treaties, standards in the industry, legal authority, rule, case, statute, or code that will be relied upon in the defense of this case.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

14. All maintenance records concerning the vehicle being driven by the Defendant on the date of the accident for the two (2) years prior to the accident.

15. Any and all invoices, logs, sales receipts, itineraries, or schedules for the Defendant.

It is requested that the aforesaid production be made within thirty (30) days of service of this request at the offices of Law Offices of Attorney and Attorney, LLC, Empire Towers, Top Towers, Suite 222, 9876 Big Highway, Some City, Any State 11111.

Respectfully submitted,

Attorney, Attorney and Attorney, LLC

I.M Plaintiff-Attorney.

Top Towers, Suite 222

9876 Big Highway

Some City, Any State 11111

321-456-1000

321-456-2000 - FAX

Attorneys for the Plaintiff

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

# Sample #6

# Request for Admissions

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## IN THE CIRCUIT COURT FOR SOME CITY, ANY STATE

MARY ANN JOHNSON

v

JAMES C. SMITH

*
*
*
*
*

CASE NO. CV-123456

### PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSION TO DEFENDANT

Plaintiff, MARY ANN JOHNSON, by and through her attorneys, I.M Plaintiff-Attorney, and Attorney, Attorney & Attorney, LLC, requests that Defendant, JAMES C. SMITH, admit or deny the following statements of law. If objection is made, please state the reason for the objection. Please specifically deny the matter or set forth in detail the reasons why the answering party cannot truthfully admit or deny the matter. Also, please note that the term "car crash" refers to the motor vehicle collision which is the subject of this lawsuit and which occurred on or about May 22, 2006.

### REQUESTS FOR ADMISSION

REQUEST FOR ADMISSION #1:
Admit that you or a resident of your household were properly served with the Writ of Summons and Complaint in the above-captioned case.

REQUEST FOR ADMISSION #2:
Admit that you were driving a 2000 Anytype with Any State motor vehicle tags on the date of the car crash.

REQUEST FOR ADMISSION #3:
Admit that you were the registered owner of a 2000 Anytype with Any State motor vehicle tags on the date of the car crash.

REQUEST FOR ADMISSION #4:
Admit that immediately prior to impact, the vehicle operated by Plaintiff was in the same lane on the date of the car crash.

REQUEST FOR ADMISSION #5:
Admit that immediately prior to impact, you failed to reduce speed to avoid a collision on the date of the car crash.

REQUEST FOR ADMISSION #6:
Admit that the front of the vehicle you were operating struck the rear of the vehicle the Plaintiff was operating on the date of the car crash.

REQUEST FOR ADMISSION #7:
Admit that Plaintiff did not contribute to the cause of the car crash.

REQUEST FOR ADMISSION #8:
Admit that your actions were the sole cause of the car crash.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

REQUEST FOR ADMISSION #9
Admit that the Defendant has no evidence to support any affirmative defenses regarding the car crash.

REQUEST FOR ADMISSION #10:
Admit that Plaintiff sustained severe and/or permanent injuries as a result of the car crash.

REQUEST FOR ADMISSION #11:
Admit that the Plaintiff's medical bills, medical treatment, and out of pocket expenses for medical devices and/or supports were medically necessary and causally related to the car crash complained of in the Plaintiff's Complaint.

REQUEST FOR ADMISSION #12:
Admit that you consumed drugs, medicines, or alcoholic beverages within twenty-four (24) hours prior to said occurrence.

REQUEST FOR ADMISSION #13:
Admit that you maintained insurance that covers your liability in this lawsuit.

REQUEST FOR ADMISSION #14:
Admit that your insurance company offered only $25,000 to settle this lawsuit.


Respectfully submitted,


_____
I.M. Plaintiff-Attorney, Esq. #00006

Attorney, Attorney & Attorney, LLC

9876 Big Highway

Some City, Any State 11111

321-456-1000 – telephone

321-456-2000 – facsimile

Attorney for Plaintiff Mary Ann Johnson

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**Certificate of Mailing**

I hereby certify that a true and correct copy of the above and foregoing was mailed via U.S. Mail, first-class, postage prepaid, this 5th day of August, 2006, to the following:

W.E.B. Defense, Esq. #01234

Defense, Defense, & Defense, LLC

as attorney of record for Defendant JAMES C. SMITH

567 Litigation Lane; Suite 888

Some City, Any State 99999

987-654-3210 - telephone

987-654-3211 - facsimile

_____

I.M. Plaintiff-Attorney, Esq.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

IN THE CIRCUIT COURT FOR SOME CITY, ANY STATE

| | | |
|---|---|---|
| MARY ANN JOHNSON | * | |
| | * | CASE NO. CV-123456 |
| v | * | |
| JAMES C. SMITH | * | |
| | * | |

**DEFENDANTS RESPONSES TO PLAINTIFF'S FIRST SET**

**OF REQUESTS FOR ADMISSION**

Defendant, JAMES C. SMITH, by and through his attorney, W.E.B. Defense, Esq. of Defense,

Defense, & Defense, LLC hereby responds to Plaintiff's First Set of Request for Admissions as

follows:

**RESPONSES TO FIRST SET OF REQUESTS FOR ADMISSION**

REQUEST FOR ADMISSION #1:
Admit that you or a resident of your household were properly served with the Writ of
Summons and Complaint in the above-captioned case.

RESPONSE TO REQUEST FOR ADMISSION #1:
Admitted.

REQUEST FOR ADMISSION #2:
Admit that you were driving a 2000 Anytype with Any State motor vehicle tags on the date of
the car crash.

RESPONSE TO REQUEST FOR ADMISSION #2:
Admitted.

REQUEST FOR ADMISSION #3:
Admit that you were the registered owner of a 2000 Anytype with Any State motor vehicle
tags on the date of the car crash.

RESPONSE TO REQUEST FOR ADMISSION #3:
Admitted.

REQUEST FOR ADMISSION #4:
 Admit that immediately prior to impact, the vehicle operated by Plaintiff was in the same lane
on the date of the car crash.

RESPONSE TO REQUEST FOR ADMISSION #4:
Denied.

REQUEST FOR ADMISSION #5:
Admit that immediately prior to impact, you failed to reduce speed to avoid a collision on the
date of the car crash.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

RESPONSE TO REQUEST FOR ADMISSION #5:
Denied.

REQUEST FOR ADMISSION #6:
Admit that the front of the vehicle you were operating struck the rear of the vehicle the
Plaintiff was operating on the date of the car crash.

RESPONSE TO REQUEST FOR ADMISSION #6:
Admitted.

REQUEST FOR ADMISSION #7:
Admit that Plaintiff did not contribute to the cause of the car crash.

RESPONSE TO REQUEST FOR ADMISSION #7:
Denied.

REQUEST FOR ADMISSION #8:
Admit that your actions were the sole cause of the car crash.

RESPONSE TO REQUEST FOR ADMISSION #8:
Denied.

REQUEST FOR ADMISSION #9
Admit that the Defendant has no evidence to support any affirmative defenses regarding the
car crash.

RESPONSE TO EQUEST FOR ADMISSION #9:
Denied.

REQUEST FOR ADMISSION #10:
Admit that Plaintiff sustained severe and/or permanent injuries as a result of the car crash.

RESPONSE TO REQUEST FOR ADMISSION #10:
Denied.

REQUEST FOR ADMISSION #11:
Admit that the Plaintiff's medical bills, medical treatment, and out of pocket expenses for
medical devices and/or supports were medically necessary and causally related to the car
crash complained of in the Plaintiff's Complaint.

RESPONSE TO REQUEST FOR ADMISSION #11:
Denied.

REQUEST FOR ADMISSION #12:
Admit that you consumed drugs, medicines, or alcoholic beverages within twenty-four (24)
hours prior to said occurrence.

RESPONSE TO REQUEST FOR ADMISSION #12:
Denied.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**GTM00028**

REQUEST FOR ADMISSION #13:
Admit that you maintained insurance that covers your liability in this lawsuit.

RESPONSE TO REQUEST FOR ADMISSION #13:
Admitted that Defendant maintained insurance that would cover his liability, if any, in this lawsuit.

REQUEST FOR ADMISSION #14:
Admit that your insurance company offered only $25,000 to settle this lawsuit.

RESPONSE TO REQUEST FOR ADMISSION #14:
Denied.


Respectfully submitted,


_____

W.E.B. Defense, Esq. #01234

Defense, Defense, & Defense, LLC

567 Litigation Lane; Suite 888

Some City, Any State 99999

987-654-3210 - telephone

987-654-3211 - facsimile

Attorney for Defendant James C. Smith


**Certificate of Mailing**

I hereby certify that a true and correct copy of the above and foregoing was mailed via U.S. Mail, first-class, postage prepaid, this 15th day of August, 2006, to the following:


I.M. Plaintiff-Attorney, Esq.
Attorney, Attorney & Attorney
as attorney of record for Plaintiff MARY ANN JOHNSON
9876 Big Highway
Some City, Any State 11111
321-456-1000
321-456-2000 – FAX


_____
                              W.E.B. DEFENSE, ESQ.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

# Sample #7

# Subpoena Duces Tecum

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**SUBPOENA DUCES TECUM (CIVIL) –**
**ATTORNEY ISSUED**  Any State. CODE §§ 8.01-413, 16.1-89, 16.1-265;

**Case No.:** CV-123456

**Any Sate**
Supreme Court Rules 1:4, 4:9

December 31, 2006 at 10:00 a.m.
HEARING DATE AND TIME

### Some City Circuit Court

123 Main Street, Some City, Any State  11111
COURT ADDRESS

MARY ANN JOHNSON .v./*In re:* . JAMES C. SMITH

## TO THE PERSON AUTHORIZED BY LAW TO SERVE THIS PROCESS:
**You are commanded to summon**

**Dr. I.C Bones, MD**
NAME

**987 Medical Way**
STREET ADDRESS

Some City, Any State  11111
CITYS        TATE        ZIP

**TO the person summoned: You are commanded to make available the documents**
**and tangible things designated and described below:**
Any and all medical records and or notes and including but not limited to any diagnostic tests
performed or ordered or records regarding referrals for *MARY ANN JOHNSON* related to an
accident that occurred on or about May 22, 2006, on Any State Route 123 at Main Street Road,
Some City, Any State and any prior records including but not limited to **Any and all medical**
**records and or notes and including but not limited to any diagnostic tests performed or ordered or**
**records regarding referrals for** *MARY ANN JOHNSON* **going back for a period of 10 years**.

**At :**  Law office of , D. Fen D'Ewe, 678 law Way, Some City, Any State, 11111
LOCATION

December 31, 2006 at 10:00 a.m.
DATE AND TIME

**to permit such party or someone acting in his or her behalf to inspect and copy, test**
**or sample such tangible things in your possession, custody or control.**

**This Subpoena Duces Tecum is issued by the attorney for and on behalf of**

JAMES C. SMITH

PARTY NAME

D. Fen D'Ewe
NAME OF ATTORNEY ANY STATE

123456789
TATE BAR NUMBER

678 law Way
OFFICE ADDRESS

123-456-7890
TELEPHONE NUMBER OF ATTORNEY

123-456-7891
FACSIMILE NUMBER OF ATTORNEY

...................................................................................................................
OFFICE ADDRESS

**December 1, 2006**
DATE ISSUED

SIGNATURE OF ATTORNEY

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**GTM00031**

Notice to Recipient: See page two for further information.
RETURN OF SERVICE (see page two of this form)

**Page 2**

FORM DC-498 7/00
(MASTER, PAGE TWO OF TWO)

**TO the person summoned:**

If you are served with this subpoena less than 14 days prior to the date that compliance with this subpoena is required, you may object by notifying the party who issued the subpoena of your objection in writing and describing the basis of your objection in that writing.

TO the person authorized to serve this process: Upon execution, the return of this process shall be made to the clerk of court.

**NAME:**
......................................................................................................................................................

**ADDRESS:**
......................................................................................................................................................

**PERSONAL SERVICE**
....................................................................................................................
Telephone Number

Being unable to make personal service, a copy was delivered in the following manner:

Delivered to family member (not temporary sojourner or guest) age 16 or older at usual place of abode of party named above after giving information of its purport. List name, age of recipient, and relation of recipient to party named above:
......................................................................................................................................................
......................................................................................................................................................

Posted on front door or such other door as appear to be the main entrance of usual place of abode, address listed above. (Other authorized recipient not found.)
not found ............................................................................................, Sheriff ...................................
                                                                                                          DATE

by ......................................................................., Deputy Sheriff

**CERTIFICATE OF COUNSEL**

I, ................................................, counsel for ............................................ , hereby certify that a copy of the foregoing subpoena duces tecum was

.................................................................... DELIVERY METHOD
to ................................................, counsel of record for ............................................,
on the ..................... day of ................................., ........................................ .

Confidential Information of GEICO Companies
© Government Employees Insurance Company

GTM00032

_____ SIGNATURE OF ATTORNEY



**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

1. A plaintiff retains the right to later file suit after which type of dismissal is issued?

2. Define the difference between a **Denial** and a **Disclaimer** of coverage and give an example for each.

    a.

    b.

3. When reviewing bills from fee counsel, what is required for paying a charge for a telephone call?

    a.
    b.
    c.

4. List and describe three triggers for a Mandatory Control File

    1.

    2.

    3.

5. Name two types of damages in civil torts and give an example of each.

    a.

    b.

6. Name the two listed reasons for bypassing ClaimIQ

    a.

    b.

7. Define the following:

> Summary Judgment

> Motion to compel

> Motion to Preclude (Motion in Limine)

> Motion to Bifurcate

> Declaratory Judgment

> Lex Loci

> Summons

8. What is the Answer to a Complaint used for?

9. Define Waiver/Estoppel and give an example of each

> Waiver:

> Estoppel:

GTM00035

10.  What is the Glasgow Coma Scale?  What it is comprised of?

11.  List and describe three responses a defendant has to a suit

     a.

     b.

     c.

12.  List your responsibilities when GEICO is notified by our insured that a suit has been filed due to a covered loss.

13.  Disc desiccation is defined as:

14.  What are the four factors that ClaimIQ uses to arrive at a value recommendation?

     a.
     b.
     c.
     d.

15.  Schmorl's Nodules are _____

_____
_____

and are considered   TRAUMATIC   DEGENERATIVE   in nature.  (circle one)

16.  What are the four elements of legal liability?

     a.

                       b.
                       c.
                       d.

17.  What motion should we instruct defense counsel to file if not all factors above are met?

18.  Name the five spinal regions and the number of vertebrae in each

                       a.
                       b.
                       c.
                       d.
                       e.

Read TCM 20K (TCM+20+K)

CONFIDENTIAL!

| Lesson 1 | Lesson 2 | Lesson 3 | Lesson 4 | Lesson 5 | Lesson 6 |
|----------|----------|----------|----------|----------|----------|
| Introduction | Service & Communication | "A" Experience | Good Faith | Liability Review | Medical Review & Investigation |

CONFIDENTIAL!

GTM00640

**Lesson 7**
How to Evaluate a BI Claim

**Lesson 8**
ClaimIQ

**Lesson 9**
Negotiation & Settlement Techniques

**Appendix**



GTM00641

**Lesson One**
**Introduction to GEICO Claims**
**TCR2 Manual**

## Objectives:

1. Understand and adhere to the classroom rules of conduct and TCR2 guidelines.
2. Identify and comprehend key elements of the job functions and tasks of the TCR2 Claims Examiner.
3. Discuss career development and personal growth within GEICO.
4. Review and understand the GEICO Claims Department Mission Statement.

CONFIDENTIAL!

2

# Welcome!

Congratulations on successfully passing Preparatory School within your region and welcome to the second phase of your TCR2 training; Central Liability School. Before we begin the training process, we will take some time to meet your trainers, talk about the Claims Home Office Training and Education Department, and learn something new about each other.

Your training class will be a combination of classroom discussion, practice exercises, quizzes, live practice (role plays), and live application which will last two weeks. You are here to learn and since we work as a team, we will allow each other the same courtesy that we would expect for ourselves.

You are expected to attend class every day.  Material will not be repeated and you are responsible for any material missed if you are unable to be here.  If you will be late or absent, please call the trainer.

Tardiness is unacceptable. If you are late, the time will be subtracted from your time sheet. You must return from all breaks and lunches in timely fashion or you will be marked as tardy. The training class adheres to the Tardy Guidelines established by Human Resources.

In order to move on to post-school, you must successfully pass the two week Central School phase here at GEICO – Virginia Beach!



**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**GTM00648**

# TCR2 Central School Training Rules

- **In order to progress to the TCR2 position, you must complete this course with a minimum class score of 85% <u>and</u> obtain a minimum grade of 85% on the final exam.** Your class score is an average of your quiz grades which account for 50% of your class score and the final examination (requires a minimum score of 85% to pass) contributes the remaining 50% of your class score.

- **The instructor will present the material but learning and training will not take place unless you take an active role in learning it.** You can do this by participating in practice sessions including role-plays and by actively participating in classroom discussions.

- **Once the classroom portion of Central School training is completed you will travel back to your respective profit center for post-school to fine-tune your on-the-job application of the skills you have been taught.** The post-school phase will include coaching, monitoring, instruction on handling new/transfer files, multi-tasking, obtaining "A" calls and files and overall preparation for the TCR2 desk. Regional specific items will be discussed in this phase.

- **Upon your successful completion of post-school, your application of lessons learned is continuously monitored and measured. This is your orientation period and will last approximately 6 months.** Your post-school trainer, supervisor, or manager will provide you with your goals for your orientation period.

- **Beepers and personal communication equipment, such as cell phones, must be <u>turned off</u> while in class. The calls and pages received on your equipment are considered personal and, therefore, must be handled during your breaks or lunch. Class interruptions for non-emergency situations will not be tolerated.**

Confidential Information of GEICO Companies
© Government Employees Insurance Company

GTM00649

4

# Training Guidelines and Scoring Requirements

<u>Scoring Requirements</u>
<u>In order to progress to the next phase,</u> you must score a minimum of 85% on the Final Exam and have an Overall Class Average of 85%. The Overall Class Average is a composite of your scores from quizzes, CBT/CD-ROM* courses, and the Final Examination. The quizzes, CBT courses, and CD-ROM's account for 50% of your Overall Class Average, while the Final Exam contributes the remaining 50% to your Overall Class Average.

**Note:** The CBT/CD-ROM courses, if applicable, must be mastered within the allotted classroom time. Failure to complete the course <u>will result in a zero when calculating the Quiz Average</u>.

> **You must achieve an 85% overall average <u>and a minimum score of 85% on the final exam</u> to successfully complete the Central School phase of training and continue on to the next phase.**

<u>**Example**</u>:

| Example | Quiz Average | Final Exam | Overall Class Average | Result |
|---------|--------------|------------|-----------------------|--------|
| **Student 1** | 95 | 84* | 89.5 | Student <u>**does not**</u> pass. |
| **Student 2** | 80 | 85 | 82.5* | Student <u>**does not**</u> pass. |
| **Student 3** | 83 | 90 | 86.5 | Student may progress to the next phase. |

*Does not satisfy the 85% passing requirement.

<u>Dependability (100%)</u>
You are expected to be on time and present EVERYDAY.  We understand that emergencies do occur and these will be evaluated on an individual basis. Absenteeism and tardiness are unacceptable.  Tardiness to class from lunch and breaks etc… will not be tolerated, and will be considered "late to work."

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

Classroom Conduct

To make sure everyone receives the full benefit from our training programs; there are certain rules of professionalism that are strictly enforced.

- 100% of your attention is required at all times
- We are all professionals and are expected to conduct ourselves as professionals at all times.  Profane, racial and sexual comments are prohibited
- Cheating will not be tolerated.  Cheating will result in disciplinary action up to and including termination of your employment
- Refrain from making negative comments in the classroom—there are no dumb questions
- DO NOT conduct personal business during class time.
- DO NOT discuss your salary.  This is confidential information.
- Side bar conversations are discouraged while in class.  You should direct all questions to your trainers.  Mutual respect must be maintained at all times.
-

Transmitting and Receiving Devices

Use of cellular phones and beepers are prohibited in class.  If there is an emergency situation which requires you to keep a device on vibrate, please discuss with your trainer.

Electronic Communication Policy

As you know, GEICO's computer network is for business purposes only.  Do not e-mail anyone for personal reasons.  This includes GEICO associates and external e-mail addresses.

Dress Code

GEICO maintains a business casual environment.  Please refer to the following list when determining acceptable business casual attire.

- Slacks (Khakis/Chinos)
- Culottes or Skorts (must have the fullness of a skirt)
- Blouses or shirts with collars or turtlenecks (must be tucked in)
- Women may wear dress T-tops
- Casual shoes with socks
- Traditional business attire (shirt, tie, suit, sports jacket)
- Skirts of reasonable length
- No denim of any color
- No tennis shoes (except on jean casual days)

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**6**

## TRAVEL SAFETY AND CONDUCT

Associates travel on company business for a variety of reasons. We want all travel to be safe and productive. When we travel we represent the company, not only in the course of business, but after business hours. Our personal behavior and practices reflect not only on ourselves, but on the company.

The following guidelines are intended to enhance the safety of your personal and business travel and conduct. They are not intended as a substitute for good judgment and common sense.

1. Anytime you travel be aware of your surroundings. If you are traveling with others, it is best to travel in a group.

2. Do not answer the door to your hotel/motel room without verifying who is at the door. If the door has a "peep hole", use it. If a person claims to be a hotel employee and you have not previously been informed of their visit, call the front desk and ask if someone from the hotel's staff has been given permission to access your room and the purpose of that visit.

3. Use a well traveled public entrance to the hotel/motel.

4. Be particularly observant in parking lots. Do not leave valuables in your vehicle.

5. Close and lock your hotel door securely whenever you are in your room. Use all of the locking devices provided.

6. Do not give your room number to anyone. Do not display your guest room key in public or leave them on restaurant tables, at the swimming pool, or other places where they may be stolen or observed.

7. Do not draw attention to yourself by displaying large amounts of cash or expensive jewelry.

8. Do not invite strangers to your room.

9. Place all valuables in the hotel/motel's safe deposit box.

10. Check to see that any sliding glass doors, windows and any connecting room doors are locked.

11. If you observe any suspicious activity, report your observations to the hotel/motel management or call 911.

12. Upon arrival, please notify the hotel's front desk or security department if you will require special assistance in the event of an emergency evacuation.

13. If you leave your hotel/motel room in the evening, leave a light, radio or TV on and hang the "Do Not Disturb" sign on the door.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

**7**

14. Do not use the stairs to get to your room; even if it is good exercise, take the elevator.

15. Ask the hotel staff about the safety of walking from your hotel to nearby restaurants, movie theaters, or the parking lot. Don't hesitate to ask about transportation shuttle services and escorts to your car or room. If you inquire about safe jogging or walking areas verify that the hotel/motel's employee giving the advice has experience walking in the area.

The following guidelines are intended to address your personal and business travel and conduct.  They are not intended as a substitute for good judgment and common sense.

1. Keep a reasonable schedule so that you will have time for dinner, sufficient time to study and complete assignments if you are participating in a training class,  and time to get enough sleep so that you are well rested and ready and alert for the next day's work.

2. Maintain a professional demeanor with hotel staff, the public, and other associates.  You represent GEICO and your Planning Center so be prudent in what you say and do.

3. If you drink alcohol, limit your consumption so that you are not "considered under the influence" by any standard set for operating a motor vehicle whether or not you are operating a vehicle.  If you are assigned a company car, or are renting a motor vehicle while on travel for the company you may not consume any alcoholic beverages and drive any motor vehicle.

4. You may not charge any alcoholic beverages to your hotel/motel account. The company travel reimbursement policy does not provide for reimbursement of alcoholic beverages.

5. Any associate who observes another associate under the influence of alcohol/drugs or who observes another associate demonstrating inappropriate or unprofessional conduct is **required** to report the conduct to their manger and human resources as soon as possible and in no event no later than the next business day.

6. Any associate whose behavior is found to be in violation of any company policy, or whose conduct is deemed to reflect adversely on the company in any way is subject to disciplinary action up to and including termination of employment.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

8



Intentionally left blank

Confidential Information of GEICO Companies
© Government Employees Insurance Company

**GTM00654**

I have read and understand the above company guidelines for Travel Safety & Conduct and above stated policies.


PRINT NAME: _____


SIGNATURE: _____


TODAY'S DATE: _____

Confidential Information of GEICO Companies
© Government Employees Insurance Company

GTM00655

10

# Training Expectations

- **"A" Experience** performance criteria.  You are familiar with the "A" call and "A" file from TCR1.  TCR2 is also committed to providing the "A" experience to the customer. Discussion of what the "A" experience entails will come in Lesson three.

- **Build negotiation techniques.** We will build on your negotiation skills learned in TCR1 and apply them to negotiating bodily injury claims.

- **Build injury knowledge**.  We will develop and enhance your knowledge of injuries and apply that knowledge to common TCR2 scenarios.

- **Navigate all claims computer systems and efficiency in navigation.**  You will learn new tabs and consultations within Claim IQ.

- **Develop and maintain positive and proactive file handling habits and procedures.**

- **File Handling**.  You will learn how to handle different types of files by gaining knowledge on investigation techniques and how to communicate with customers effectively.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM00656

## Personal Development

- **Undergraduate** completion with tuition reimbursement from GEICO

- **Claims Investigation** Pictorial

- **Continuing Education** courses offered by regional trainers

- **Licensing Continuing Education** if required by your region

- **Claims Leadership** Development Programs

- **Introduction to Property and Liability Insurance**
  Focuses on how property-liability insurance works

- **General Insurance Program** leads to the Certificate in General Insurance (Completion of the program satisfies the requirement to complete CPCU 553- Survey of Personal Risk Management and Insurance)
  - INS 21 Property and Liability Insurance Principles
  - INS 22 Personal Insurance
  - INS 23 Commercial Insurance

- **Claims Law** (see regional management for approval)
  - Legal Principles
  - Law of Automobiles – Claims and Coverages
  - Liability
  - Law of Claims Fraud Investigation and Defense

- **Associate in Claims** (Completion of AIC 33, 34 and 36 plus CPCU 553, 555 or INS 22 earn the Associates in Personal Lines Auto and Liability)
  - AIC 33 The Claims Environment
  - AIC 34 Worker's Compensation and Managing Bodily Injury Claims
  - AIC 35 Property Loss Adjusting
  - AIC 36 Liability Claim Practices

12

- **CPCU** (Chartered Property and Casualty Underwriter Program)

  Foundation Courses:
  - 510 Foundation of Risk Management, Insurance and Professionalism
  - 520 Insurance Operations and Regulation
  - 530 The Legal Environment of Risk Management and Insurance
  - 540 Business and Financial Analysis for Risk Management and Insurance Professionals
  - 560 Financial Services Institutions

  Personal Concentration Courses:
  - 555 Personal Risk Management and Insurance: Property and Liability
  - 556 Personal Financial Planning
  - 557 Survey of Commercial Risk Management and Insurance

  Commercial Concentration Courses:
  - 551 Commercial Property Risk Management and Insurance
  - 552 Commercial Liability Risk Management and Insurance
  - 553 Survey of Personal Risk Management

## Mission of the Claims Department

The Claims Mission statement is as follows:

**"Affect a prompt, courteous, and equitable disposition of claims through direct customer contact."**

In order to be effective in completing this mission, we have to **be willing to go above and beyond for the customer.** We must be willing to put ourselves in our customer's shoes and provide them with the service that we would expect ourselves. It is not always an easy task, but it is vital to our mission.

*Good Service depends on:*
- *The knowledge you have,*
- *The judgment you develop,*
- *How well you organize your work,*
- *How you deal with customers*

Confidential Information of GEICO Companies
© Government Employees Insurance Company

## What is the job function of a TCR2 Examiner?

As a TCR2 you are responsible for the following high-impact service areas:

- ➢ **OPEN CLAIMS:** Opens claim files as new loss reports or transfers in. Verifies policy and coverage's. Establishes proper features. Determines what investigation is needed.

- ➢ **INVESTIGATE AND DETERMINE LIABILITY:** Queries (by telephone and in writing) insureds, claimants, police, witnesses, physicians, attorneys and so forth to accumulate facts and information about the claim. Evaluates the facts and determines policyholder's negligence. Consults with supervisor as required. Recognizes necessary transfer files to the Continuing Unit.

- ➢ **PROVIDE INFORMATION:** Gives information to insureds and claimants about the claim investigation process to assure customer understanding and cooperation in settling the claim. Provides information to other departments.

- ➢ **NEGOTIATE AND MAKE CLAIM PAYMENTS:** Uses facts and information about the loss to confer with claimants and their representatives (attorneys, doctors, beneficiaries, etc.) to arrive at monetary settlements of losses. Makes or obtains authorization to make claim payments.

- ➢ **DOCUMENT AND CLOSE FILES:** Writes record of correspondence, conversations and payments made on the claim file; keeps file up to date. Reviews files to determine that all paperwork is complete and losses are satisfied. Summarizes file for closing and forwards to appropriate department. Includes documentation of activity.

- ➢ **MONITOR OPEN FILES:** Deals continuously with adjusters, attorneys, claimants, insureds and so forth to maintain a flow of activities surrounding a file to move the claim toward rapid settlement. Includes dealing directly with car rental agencies, body shops, etc. Also involves prioritizing daily activities to keep files moving toward closure.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**14**

## Overview of a TCR2 Claim

After viewing the initial loss report, the next step is to make immediate contact with all interested parties.  Our standard is to make all contact attempts within an hour of receiving the file and to actually secure contact within 24 hours.

---

**The urgency of making contact with all parties cannot be overstated.**

---

First impressions are always remembered.  Your intent is to establish a professional relationship with each claimant and /or their representative; one that is founded on empathy, concern, professionalism and trust.

Recognize that each party needs the understanding and assistance of the other in order to accomplish mutual objectives.  The initial contact demonstrates our willingness to shoulder the insured's problems.  In order to develop mutual trust, keep in mind that information must be shared.  The Insured and Claimant must know and understand how the claims process works and how problems will be handled.  At the same time, this initial contact allows the TCR2 an opportunity to gather information and facts while they are still fresh in everyone's mind.

At the time of first contact, the TCR2 will also begin to document the activities in order to help us control the direction of the claim.  The TCR2 will initiate and direct others to help us in our investigation of unresolved issues by requesting medical/employment authorizations, investigating prior injuries, AD assignments, ordering police reports, sending underwriting requests for confirmation of coverage and securing recorded interviews of all involved parties.

As the investigation unfolds, you will want to reevaluate each bit of evidence for its value and credibility.  Each time the claim is reviewed, the you will want to analyze what needs to be done to bring the claim to conclusion.

As the claim evolves, maintain frequent contacts with the parties and demonstrate what is being done to bring the claim to conclusion.  This will reinforce your professional relationship with the parties involved and the insured.  At the same time, this will give us better information to set reserves and resolve the claim quickly.

---

**The TCR2 examiner is a problem solver, a decision maker and a negotiator with a capacity to visualize the essence of each individual claim.  The TCR2 uses facts and information about the loss to confer with claimants and their representatives to arrive at monetary settlements of losses.**

---

Confidential Information of GEICO Companies
© Government Employees Insurance Company

**Notes**

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Confidential Information of GEICO Companies
© Government Employees Insurance Company

GTM00661

# Customer Service

## TCR2 Manual

**Objectives:**

1. Understand how Maslow, hierarchy of needs theory operates in a claims environment

   Recognize the Impact of Freedom of Movement based on the Automobile

   Understand the Nature of the Adjuster/Claimant Partnership

   Recognize the Importance of Listening

   Develop interactive skills that Demonstrate Empathetic Care, Concern and Understanding

   Practice Communication Exercises

CONFIDENTIAL!

# Customer Service

## Understanding Needs in the Claim Process

In 1943 Herman Maslow developed his hierarchy of needs theory published in his "A Theory of Human Motivations".   Today these concepts serve as a basis for a variety of studies in how and why we behave in the manner we do under given circumstances. As with any event involving people, these concepts have application in the claim environment.   Let's consider how and when these needs may exist during the life of a claim and how understanding and supporting them can be of value.



Consider what happens to an individual when they are involved in a loss, even a minor one. Their life is suddenly disrupted.   Typically there is damage to the vehicle and possibly an injury.   This has an impact on the most basic of needs, the ability to provide for physiological needs.   In the U.S. we are reliant on our automobiles.   Many of us if asked what the symbol of freedom is would say the Flag, the Bald Eagle or some other symbol reflective of our government or country.   But consider the automobile?

GTM00678

O

n October 1, 1908, Henry Ford introduced the Model-T.   Within 12 years of its introduction a majority of Americans had learned to drive and had taken to the roads. We were no longer limited by our ability to walk or ride a horse to our destinations. We were freed and thus took to the roads.   By 1927 nearly 16 million T-Models had been sold.   In 1927 the population of the United States was 119,035,000.   That means that approximately 13.5% of the population owned a vehicle.   Today there are an estimated 254.4 million registered passenger vehicles in the United States according to a 2007 DOT study with a 305,529,237: U.S. population estimate for Jan. 1, 2009.   That means that that over 83 % of us own a vehicle.

When an automobile accident occurs, there is a loss of freedom to the individual or individuals owning the vehicles.   For those injured their lives are disrupted.

Individuals are challenged at the very basic level of needs and control over their lives, at least as they see it.   How do I get to work, the grocery store; how do I pick up the kids! What about the doctor, how do I get better?

By meeting these immediate needs you assist insured's and claimants in restoring a sense of control over their lives and in eliminating the feeling that they are on a roller-coaster ride.   How are we able to accomplish this?   First remember that the claim(s) you are handling are the claims of individuals with individual needs.   Second understand that the claim(s) is theirs and they should have ownership over it.   Only the claim file, not the claim itself is owned/assigned to the adjuster/examiner.     Thirdly assist the individual in gaining some control by educating them in the various processes involved with their claim or claims and provide and assist them in making choices in that claim.   This is a positive and proactive posture and recognizes that insured's' and claimants' are partners in resolving their claims.

You are the professional in this partnership.   You possess a unique set of skills and knowledge, that when applied in an empathetic and supportive manner, assists our customers, both first and third party, to recover and restore themselves to their pre-accident status.

There are 4 key elements that define what kind of service people involved in accidents expect:

Courteous, knowledgeable and professional service

Availability for questions/discussions/explanations

Prompt Settlement

Fair Settlement

The TCR2's responsibility to the customer includes being efficient, professional, knowledgeable and friendly.   The most important thing to remember is to express interest and understand the customer's perspective and to work efficiently to handle their requests or resolve their problems.

One of the most effective means of satisfying the most basic needs, those physiological needs, is assisting our customers in resolving claims related to transportation.   In doing so you will aid them in regaining a sense of control over their lives as well as supporting an assurance that they will be able to feed and sustain themselves as they move forward.   If we are handling property damage or collision claims, ARX provides a superior opportunity in achieving this end.   If we are not in a position to handle those damages for a customer we should provide options.

Perhaps they have their own first party coverage that can handle their damages or they have rental reimbursement available to them.   Sometimes they have these benefits and are not even aware of them.   Offering opportunity for solutions and providing options offers customers the ability to regain a measure of control, creates confidence and aids in establishing the partnership in the processes of resolving their claims.

GTM00680



GTM00681

The next stage deals with safety. This plays out in the claims environment as those individuals with claims move from a disabling situation to a more familiar routine.   If this were a property damage only claim this may occur when the individual obtains alternate transportation and returns to work.   In doing so, regaining the normal routine, there is a security that the income needed to support a home and family is stable.   This enables those that were affected to continue, what to them are normal life activities.   It is important to recognize however that anything that challenges this, even minor inconveniences that occur, causes a return, if only minor and temporary, to the previous stage.

Safety | Security of: Shelter, Work, Family, Home

Challenges might include an issue arising with alternate transportation, an issue when car repairs are complete and it is time for the hand off between owned vehicle and rental or even during recovery periods involving medical care with injured claimants. Failing to recognize these shifts and/or not giving the support and assistance to the customer will result in doubts and mistrust.   This can damage the foundation that has been built and make it difficult or impossible to move forward in the partnership. This is a period that requires a high level of communication between the Adjuster/Examiner and the customers, claimants and possibly others related to the claimants that are providing assistance in the process of resolving claims.   It is very important that you, the Adjuster/Examiner, verify with those presenting claims who you may communicate with regarding the claims being presented.

Understanding the significant importance of the communication between the Adjuster/Examiner and the customers and revisiting elements that are crucial to this process is warranted.   Perhaps one of the most significant elements to the communication process is listening.   To fully understand the concerns and issues that our customers have we must be good listeners.   What makes for good listening and a good listener? Below are a few guidelines to help you become an active listener.

CONFIDENTIAL!

**1. Ask probing questions**.

Don't just ask yes or no questions. Have the customer explain what the answer is. Then confirm the answer later. An example: "So what did you do after the truck crossed over into your lane?"

**2. Listen for facts.**

Try to get a picture set in your mind about what the customer is saying. Listen for important facts. Don't judge the delivery of the message. An example: "Where exactly did the accident happen?"

**3. Listen for feeling.**

Listen selflessly with all your senses.

Listen carefully for clues on how the customer is feeling. An Example: When a customer says, "I'm not quite sure what is going to happen now" an appropriate response might be, "This can be a confusing process because there are so many things that need to happen to get your car back in great condition."

**4. Understand the customer's perspective**

By actively listening, you will gain an understanding of the customer's perspective of the accident, investigation, etc… An Example: "It can be unsettling to have your life turned upside down by a careless driver." "When your kids are involved in the accident, it really changes your perspective, doesn't it?"

**5. Listen with your whole body.**

Concentrate on the speaker. Don't fiddle around with anything that is distracting even while on the telephone and the customer cannot see you. You may take notes about what the customer is saying but do not start writing a letter!

**6. Put off evaluation**

Don't jump to conclusions…. let the customers explain themselves completely before making a decision.

**7. Be genuine.**

When expressing terms of empathy to the customer, don't sound robotic or uncaring; if this accident had happened to you, what would you want to hear from your insurance adjuster? So when you are asking how they are doing, this is a great opportunity to use empathy, which is not "I understand" or "I'm sorry." And Example: "It's hard to have to add physical therapy sessions to your already busy schedule, huh?" or "It's a little unnerving to have to be driving a car that is not like your car at all, huh?"

**8. Use positive words and phrases to avoid pitfalls**

Encourage the customer to talk freely and not become defensive in their conversation with you. Positive words will help the customer feel more confident in speaking with you. It is important to tell them what you can do for them more than what you can't do. Example: "I can help you with that." "Let's see what we can do to help you out." "My job is to make it easy for you to navigate through this process so let's see what I can do to get you started off on the right foot."

**9. Stop talking about yourself.**

Don't discuss your personal life and/or struggles in your life while trying to listen to a customer. The customer has their own troubles. Don't burden the customer with your troubles.

Love/belonging

Frindship, Caring, Relationship

In this stage of the claim process, our customers are taking a critical look at the relationship that they have with us.   They begin asking if we are looking after their interests, our interests or a balance of both.   If at anytime in the relationship they believe that we are only concerned with our interests or that the balance is tipped to our side, they will loose confidence in us.   They will no longer place trust in the relationship.

Our regular and meaningful follow-up with those having claims that require an extended period of time to resolve is pivotal to sustaining a positive relationship.   It is not enough to simply have a regular diary event.   We must demonstrate on each and every contact that the customer and our relationship are valued.   Demonstrating care and concern for the customer and their progress toward resolution is paramount.

**Example:** "Our customers are important to us especially when they are trying to recover from an accident that interrupts their whole lives." "You are important to me and I want to make this process as painless as possible especially with all the things you are going through right now."

Esteem

Self-esteem, Confidence, Achievement, Respect of others, Respect from others

As customers move forward they want to feel that they are gaining full control over their lives.   As they return to normal or more normal activities they regain their sense of achievement. Provided we continue to support the earlier phases and effectively work to resolve any fall backs, their confidence in the adjuster/examiner, themselves and the relationship can strengthen As issues involving transportation fall to the side and are fully resolved, any injuries begin to resolve, a sense of achievement begins, confidence in a positive future resolution and outcome begin to come into focus.

The relation with you, the adjuster or examiner strengthens and mutual respect can begin to blossom.   As a claimant or claimants sense respect for themselves, their ability to understand the complexities of their claim and their ability to be a full partner in its resolution, a sense of self-esteem grows.   Fostering this sense by fully engaging the claimant or claimant's in the various processes of information gathering, analyzing and understanding solidifies a strong partnership.

Assuring that the claimant or claimant's have the tools and information to fully participate and engage in the resolution of their claim will build their confidence in themselves and you the adjuster/examiner as well as support their ability to exercise knowledgeable control over those elements of the claim that are rightfully theirs.   As these achievements culminate the final stages in moving the claim or claims toward resolution approach!



The final stages involve the creativity of the parties in resolving differences, solving problems and reaching a common understanding of the facts or reaching an acceptance of differences being realistic possibilities.   This phase generally plays out during the final stages of negotiations.   It is vital that we remember that elements of prior stages continue to operate and play out during this.

As we move through the various elements that present themselves in this finale, recognitions of the realities that face the parties when presented to each other in a respectful manner culminate in a final resolution.   Generally referred to as a Win-Win situation, here the parties come to terms that are acceptable to both and are satisfied.   In doing so the parties and especially those presenting claims reach the stage of Self-actualization as it relates to their claim.

With agreements reached, releases executed and consideration rendered, the claimant or claimant's are now fully able to move forward free of the encumbrances presented by the elements that existed during the stages of their claim.

Now lets compare some positive and negative feelings and how they impact the customer.

**Negative Feelings (when your needs are not satisfied)**

**AFRAID**
apprehensive
dread
frightened
mistrustful
panicked
scared
suspicious
terrified
wary
worried

**ANNOYED**
aggravated
dismayed
disgruntled
displeased
exasperated
frustrated
impatient
irritated
irked

**ANGRY**
furious
incensed
irate
livid
outraged
resentful

**AVERSION**
appalled
disgusted
dislike
hate
horrified
hostile
repulsed

**CONFUSED**
baffled
bewildered
dazed
hesitant
lost
mystified
perplexed
puzzled
torn

**DISCONNECTED**
alienated
apathetic
bored
cold
detached
distant
distracted
indifferent
removed
uninterested
withdrawn

**BOTHERED**
agitated
alarmed
disturbed
perturbed
restless
shocked
startled
surprised
troubled
uncomfortable
uneasy
unnerved
unsettled
upset

**EMBARRASSED**
flustered
guilty
mortified
self-conscious

**FATIGUE**
beat
burnt out
exhausted
listless
tired
weary
worn out

**PAIN**
agony
anguished
devastated
grief
heartbroken
hurt
lonely
miserable

**SAD**
depressed
dejected
despair
despondent
disappointed
discouraged
disheartened
forlorn
gloomy
heavy hearted
hopeless
melancholy
unhappy

**TENSE**
anxious
cranky
distressed
distraught
edgy
fidgety
frazzled
irritable
jittery
nervous
overwhelmed
stressful
stressed out

**VULNERABLE**
fragile
guarded
helpless
insecure
leery
reserved
sensitive
shaky

**AFFECTIONATE**
compassionate
friendly
loving
sympathetic
tender
warm

**ENGAGED**
absorbed
alert
curious
engrossed
fascinated
interested
intrigued
involved
stimulated

**HOPEFUL**
expectant
encouraged
optimistic

**CONFIDENT**
empowered
open
proud
safe
secure

**EXCITED**
amazed
animated
ardent
aroused
astonished
dazzled
eager
energetic
enthusiastic
giddy
invigorated
lively
passionate
surprised
vibrant

**EXHILARATED**
elated
radiant
thrilled

**GRATEFUL**
appreciative
moved
thankful
touched

**INSPIRED**
amazed
awed
wonder

**JOYFUL**
amused
delighted
glad
happy
pleased
tickled

**PEACEFUL**
calm
clear headed
comfortable
centered
content
fulfilled
mellow
quiet
relaxed
relieved
satisfied
serene
still
trusting

**REFRESHED**
enlivened
rejuvenated
renewed
rested
restored
revived

**Positive Feelings when your needs are satisfied**

CONFIDENTIAL!

GTM00687

## 2010 TCR/CU SPR Criteria

This criteria document is to be used on Claims Home Office Performance Reviews, and on Profit Center Telephone Claim Representative I (TCRI), Telephone Claim Representative II (TCRII) and Non-Suit Continuing Unit (CU) Performance Reviews. **These guidelines are not intended to be an all-inclusive list of potential downgrades in an audit.**   They are a guide for the CHO Performance Review Analyst, and the Profit Center Supervisors and Managers while conducting SPR's and Performance Reviews. **Auditor judgment is an integral part of the performance review process** and can not be replaced by a checklist of potential downgrades. Profit center supervisors and managers should exercise appropriate regional-specific or state-specific judgment when completing performance reviews.   The purpose of the CHO Performance Review Team is to audit for appropriate compliance with state and company guidelines and procedures.   The Claims Manual, TCM's, State Memorandums and Regional requirements, among other documents, is reviewed to ensure compliance.

Appropriate regional and state-specific judgment should be administered in conducting SPR's and profit center reviews.   It is recommended that the profit center review be more critical and detailed than the CHO review.   Specific scenarios that are not covered in the guidelines should be addressed in relation to the facts of the claim file being reviewed, and the effect on the handling of the claim.   CHO Performance Review may be consulted for guidance on particular scenarios that arise.

**Most general Critical Errors** are identified and listed in this document.   These are errors that are deemed to have or potentially have an affect on the either **1) service rendered to our customer and/or 2) the amount paid on the claim (loss or expense).   Also included are those actions deemed to be in violation of State requirements.**

**Critical Downgrades:**

1.

Unfair claims practice violations

Market conduct violations

Failure to comply with State required regulations/letters

Inadequate or unnecessary delays in coverage/liability/medical investigations

Inadequate reserving

Improper settlements/payments

CIQ – failure to complete; late/improper completion

Failure to submit a claim to PRU when appropriate within 30 days of posting

Late or inaccurate denial letters

    10. Failure to address supervisor instructions.

GTM00689

f there are no coverage issues, this category should be N/A.

**I.**

**Timely-Investigation:**

The file handler(s) should recognize and verify the applicable coverage timely. **Coverage issues should be resolved well within State specific requirements or 30 days (whichever comes first). Adequate documentation for the need of a prolonged investigation, coupled with aggressive attempts to secure the needed information, is required for investigations beyond 30 days.** All coverage conditions, including non-fatal codes, must be documented regarding how it was resolved.

Questions to consider:

Did the file handler(s) review the policy contract, coverage conditions, policy issues and state regulations?

Was a Reservation of Rights letter necessary?

Did the file handler(s) obtain evidence to resolve the coverage issue? Was there appropriate RLA, Manager, CHO, and Underwriting involvement?

Permissive use addressed?

Did we obtain a copy of the rental agreement, if necessary?

Did the file handler make a referral to Underwriting (C-51) upon discovery of pertinent information that may affect the policy?

B.

**A.**

**Coverage:**

**Liability:** The extent of the investigation required depends on the nature of the claim. **Investigations should normally be resolved within 30 days of the report.** Adequate documentation for the need of a prolonged investigation, coupled with aggressive attempts to secure the needed information, is required for investigations beyond 30 days. All pertinent information relevant to the investigation must be secured. **The liability decision must be supported by the documentation in the file.** All mandatory file reviews (C71, C63, C178, etc.) must be completed timely and adequately by both the examiner and supervisor. Failure to complete timely or adequately can result in a category or an **overall** downgrade depending on the file.

I

CONFIDENTIAL!

**nable attempt** to contact all interested parties to verify third party PD exposures.   What constitutes a **reasonable attempt** is determined by the nature of the claim, the information available, and the reviewer's judgment.  Therefore, a **reasonable attempt** could be various attempts, no attempts or only one attempt.   If this is not done, the category should be rated N/S.   If no contact attempts are made by the file handler, appropriate ALOG documentation must be present.   If the insured strikes a non-vehicle object (pole, fence, etc.) and indicate there is no damage to that object, you are not required to attempt contact to confirm.   ALOGI should be documented confirming there was no damage.

Questions to consider include:

**Was the correct LDC updated and correct % negligence entered?**

**Was the liability decision delayed or made prematurely?**

Was the liability decision reasonable based on the information contained in the file?

Was SIU involvement considered if warranted?

Were reasonable attempts made to contact all necessary interested parties (including Insured Drivers, Passengers, Witnesses, and Claimants)?   Were their statements taken?

Were reasonable attempts made to verify all property damage exposures?

Was the police report ordered timely?   Scene investigation or scene photos secured?  Were photos of all vehicles secured if needed?

Did the file handler look for evidence of alcohol/drug involvement?

Additional considerations could include:   weather conditions, traffic laws, time of day for visibility, citations given and their outcome.

Was the file transferred within 24 hours to the appropriate level?

Was the 1-2-4-6 process followed? (TCR1)

C.   **Medical:**   The reviewer is rating the quality of the medical investigation. The file handler is required to make a **reasonable attempt** to contact all interested parties to verify first and third party injuries.   In most cases, the driver of the vehicle can rule out injuries for **any** passenger (except minor children) in that vehicle.   The parents/guardians of a minor child should rule out injuries for the minor child.   All

passengers without an age listed will be assumed to be minors unless documented in file to the contrary.   If the extent of the damages or nature of the loss is significant, direct contact with passengers to rule out injuries should be made.

What constitutes a **reasonable attempt** is determined by the nature of the claim, the information available, and the reviewer's judgment. Therefore, a **reasonable attempt** could be various attempts, no attempts or only one attempt.   If this is not done, the category should be rated N/S.   If no contact attempts are made by the file handler, appropriate ALOG documentation must be present.

**T**
**h**
**e**

**thin 10 days of known injury).**   For BI or UBI claims, a CL200, or other appropriate correspondence to obtain a medical authorization, should be sent to all unrepresented claimants (that are presenting an injury claim) within the first 30 days of notice.

**P**
.

Additional questions to consider:

Was the file updated with injury information in the Parties/SINQ screen?

Was the file updated with injury information required by Medicare/Medicaid (See link below, i.e. Name & Address, DOB, SS#, Injury/Complaints) in the Parties/ SINQ screen within 30 days of receipt?

**l**

Were the appropriate forms sent within 10 days or sooner if required by the state? Did the file handler follow up to obtain the medical authorization forms?   Was the medical authorization used properly?

**t**
**i**
**o**
**n**

http://gnie.geico.net/sites/performance_review/Liability/Shared%20 Documents/TCM_MEDICARE_MEDICAID_ALL.doc

D.

**Statements:**   The file handler(s) should obtain statements on all cases of questionable and disputed liability, which include an application of comparative negligence, permissive use, fatal coverage questions or where supervisor instructions are given. Statements are necessary on injury cases to define the nature and extent of injury, job/wage loss, prior injuries and anything else that could be used later to identify a possible exposure.   If a required statement is not taken, the file documentation must reflect the reason.

**s**
**e**
**n**
**t**

If the statement was needed and taken, the "YES" box should be marked. If the statement was needed and not taken then the "NO" box should be marked. The category should be marked N/A in the case where the statement was not needed, if the adjuster was unable to make contact, or our request for a recorded statement was refused.

**t**
**i**
**m**
**e**
**l**
**y**

**(**
**w**
**i**

A "NO" for statements may adversely affect the Overall File and/or Investigation Category.   <u>Auditor's judgment will be used to make that determination.</u>   If in the auditor's judgment, the adjuster could have taken a recorded statement (or did not make reasonable attempts to do so) from an interested party that was necessary to the investigation of the claim, at a minimum the Investigation category will be downgraded for improper investigation.

CONFIDENTIAL!

GTM00694

I
t
e
m
s

i
n

b
o
l
d

a
r
e

c
o
n
s
i
d
e
r
e
d

o
v
e
r
a
l
l

f
i
l
e

d

owngrades. This is not an all-inclusive list.   It will be left to auditor judgment whether category downgrades on each specific claim file may warrant a complete file downgrade.



GTM00696

II.

**II. Loss-Cost-Management:**

A

**Reserve/ Feature Maintenance:**   As soon as the exposure is known a feature should be opened. For SPR purposes, the feature should be opened within 7 calendar days of a known exposure.   All PD, BI, NBM (PIP), and UMBI features must be closed within 15 calendar days of final payment posting/notice to the file handler.   All other features must be closed within 30 calendar days of final posting/notice to the file handler.   **Failure to open BI, UMBI and UIM features within the 7 day guideline will result in an overall file downgrade.**   Any other violations related to opening and closing of features will result in category downgrades only.

Consideration <u>must</u> be given to Reserve Adequacy <u>every</u> time the file is reviewed.   Reserves should be set and/or adjusted based upon information that is known or developed such as expenses incurred to date, injury diagnosis, treatment plan, treatment frequency and treatment length.   **Reserves must be changed from Stat to Case at C71 time** and a reserve review must be made at each review period thereafter (C63, C178, etc.) Consideration should be given to the expense component, the proper use of No Coverage features and if the inflation factor is current.

**Reserves must be documented and authorized according to Regional Authority Levels.   Absent extraordinary circumstances, settlement offers in excess of the current reserve will be considered improper reserving.   Case reserves that do not reflect the exposure known will be considered improper reserving.**

CONFIDENTIAL!



GTM00698

B.
**Injury Handling:**

**Questions to consider:**

Was there appropriate follow-up with injured parties/attorneys/providers every 30 days or documentation why it was not necessary?

Was ISO sent on all injured parties and checked for response by C71 time and prior to the injury evaluation for settlement?

Were all medical providers identified and all appropriate records and bills secured?   Any need to discuss and explore pre-existing conditions, medication usage, and a working diagnosis?   What is the expected treatment?

The file should contain loss of income verification, time period of disability, and self-employed loss wage claims.

**For double insured losses, did the cross-file adjuster have consent in securing any information from the cross file?**

C.
**Timely & Proper Settlements:**   This sub-category measures RBI, ABI, UBI, UIM settlements. Every effort should be made to make a settlement as soon as sufficient information is secured to evaluate the injury.

**There must be an offer to all demands within 30 days of receipt. However, if there is a Time Limit Demand (TLD) or if the state requires a time limit, those time limits should be met.**   Settlement without written verification can be obtained on smaller cases (usually less than $1,000) in which the injury is minor and the general or special damages are minimal.   A First Call Settlement is defined as a settlement in which the bodily injury claim is negotiated and settled with the injured party upon initial contact after a proper investigation has been completed and liability has been determined.
Written verification and a release should be secured on all other settlements and on smaller cases if there are any suspicious circumstances.   Documentation requirements include, but are not limited to, authorizations forms, medical bills/records and loss wage supports.

Other factors to consider are:

.

**Is the evaluation supported by the information in the file?   Were all pertinent factors considered in the evaluation?**

**Were the negotiations handled appropriately and properly documented? Were the offers and settlements supported by the documentation in the file and within the appropriate Regional Authority Levels?**

**Were all liens and known subrogation interests protected?   Was the necessary Court Approval obtained?   Was the appropriate release utilized?**

**Settlement offers should not be below the low end of your evaluation range.**

D.

 **Timely & Proper Payments:   All payments should be paid/denied/delayed within company TIP standard of 30 days (or sooner if the specific state requires), once the pertinent supporting documentation has been obtained, or an amount has been agreed upon.   Payments must be made in accordance with Regional Authority Levels.**

.

**Were all payments accurate - the correct payee, feature and amount?**

**Is there supporting documentation for the payment?   Were payments made that were not owed?**

**Was the appropriate TIN/Expense code used?**

E.

 **PRU:**  Is there recovery potential?  **Did the file handler refer the case to the Payment Recovery Unit timely? <u>(Once the liability investigation is completed - 30 days after the posting of that first recoverable feature).</u> However, should your PRU department require a referral only after the last recoverable feature closes; you may follow those published guidelines.**  Was information provided that would develop the file for recovery? Was the adverse/responsible party placed on notice?

**III.**

 **Customer Service:**

A.

 **Diary Maintenance:**

 Was the diary worked at appropriate intervals?   Did the file require a tighter diary to resolve coverage and liability issues?    Documentation is required for a diary period of more than 30 days.

 Were updates to CHOL done timely?

B.

 **ALOGI/File Documentation:**

 Were all customer contacts and actions properly and timely documented?

 Are the notes logical and concise?

 Are they appropriate in content and professional?

 If double insured loss, are ALOG documentations proper?

 Was the subrogation indicator updated correctly?

 Were the documents filed in the proper folder for the proper IP & appropriately named?

C.

 **Timely & Proper Communication:**

 **Did we explain all coverage, their rights under the policy, under the state laws and the claims process to the customer?   Was the conversation documented?**

 Did the file handler keep the customer informed of the status of the claim on a regular basis, including prompt contact upon initial assignment of the file (within 24 hours)?  Was the insured advised of the

CONFIDENTIAL!

liability decision?

 Were all telephone calls, voice mail and e-mails acknowledged or addressed within 2 hours?

 **Is a parties' information being given without their consent?**

 **Replies to written correspondence which require a response must be done within 10 days of receipt in writing.   All state mandated letters must be sent according to the specific state requirements.   All letters required by TCM or Regional Requirements must be sent timely.   All requests within a LOR should be addressed within our acknowledgement responses.**

 Was correspondence from the claims handler professional and well written?

 **Denials letters should be accurate and timely (within 15 days of decision), and must be in the file (or ECF documents).**

CONFIDENTIAL!

## IV. CLAIM IQ

### A.
### Investigation/Liability:

**The Claim IQ Investigation and Liability Consultations must be completed prior to making the liability decision.**

The proper Question Guide along with the loss description box on the Investigation Header page must be selected.

**The proper scenario on the Liability Assessment page in Claim IQ must be selected and the appropriate breaches must be properly categorized as Low/Med/High.** Only the breaches that apply need to be categorized. It is acceptable to "not" categorize a breach that does not apply to an individual person or claim. It is unacceptable to fail to categorize a breach that does apply.

The proper covered by policy, CBP, box must be checked. The proper Negligent Free Party, NFP, box must be checked.

**Any improper bypass of Liability Claim IQ**

The required (*) % negligence on the Liability Decision page must be filled out. If multiple vehicles involved, the negligent party(s) % must be entered on this page to equal 100%.

If a file is transferred from another level, the new level file handler has 10 days to update Claim IQ if it is not already complete.

### Injury/Negotiation

**Any improper bypass of Injury Claim IQ**

Claim IQ Injury Consultation must be started as soon as the injury has been identified. All injuries and medical specials/expenses must be properly identified and documented in Claim IQ. Any injury information received thereafter including diagnoses or specials/expenses should be entered into Claim IQ within 30 days of receipt,

The injury evaluation and venue must be properly identified and completed prior to negotiations unless properly bypassed. T

CONFIDENTIAL!

he Decision and Conduct pages must be completed prior to negotiations unless
properly bypassed.



GTM00704

.

  The Negotiation Conduct records exchange must have the offer/demand, date, % liability, value and accepted box checked upon final settlement.

  For proper file documentation on a First Call Settlement, the Claim IQ injury diagnosis page should be updated, the "no medical records" box checked and the FCS bypass selected. The offer and acceptance should also be documented.   If medical bills/records are received with the executed release, these are <u>not</u> required to be entered into Claim IQ; however ALOG or Claim IQ notes should be documented that medical bills/records were received with the release.   If the claimant rejects the FCS, and medical bills/records are received, then the FCS bypass should be reversed, and the medical bills/records entered into Claim IQ. Normal Claim IQ file handling procedures would apply going forward.

> **We have provided a visual aid document located with the SPR criteria that will show you screen by screen what we look for when reviewing Claim IQ in our file reviews.**

**Here is the PRT link:**

**http://gnie.geico.net/sites/performance_review/Liability/default.aspx**

**Lesson Three**
**"A" Call/"A" Experience**

**Student Manual**
**TCR2 Module**

## Objectives:

1. Define "A" call.
2. Familiarize the TCR2 trainee with the established "A" call and "A" file guidelines.
3. Understand and review the P.I.C.T.U.R.E. method of speaking to a customer.
4. Define proactive call handling and file handling.
5. List and give an example of the features of an "A" call and an "A" file.
6. Define how good communication skills can be used in making every call an "A" call.
7. Monitor and rate taped calls as a group.
8. Define the TIP attempt and contact requirements on a new claim file.
9. Know what the "A" experience is and review SPR goals for each file.
10. Conduct an SPR on a TCR2 file.

GTM00706

2

# The "A" Experience

Customer service is our No. 1 priority.  So how do we ensure that every customer gets prompt and courteous service in a timely manner?  The answer is simple – provide the customer with the "A" experience.

**What is the "A" experience?**  It is the method in which we provide service to our customers through proper phone etiquette and sound file handling.

We want to set the expectation that each call should be handled as an "A" Call.  We want our TCR2's to exercise their best customer service skills in every call, whether it's a new assignment or follow up.  We do not want our claims associates to hold discussions in ways that come across as robotic, scripted or unnatural.  When we are communicating with our customers on the telephone, they are forming a mental picture of the TCR2 representative. We recognize it is not always possible to delight every customer, satisfy every need, or resolve every conflict. Regardless, we must exercise courtesy, respect, and professionalism on every call.  The customer is the reason we are in business.  Did we handle the call appropriately?

Another aspect of the "A" experience relates to the customer's opinion of you.  The customer will form an opinion of our company based on their opinion of you. That is why we expect and demand that all TCR2's be efficient, professional, knowledgeable and friendly. Rapport building, expressing interest, understanding the customer's perspective and efficiently working to resolve their request is keys to an "A" call.

## GEICO's Concept of Service



### Tony Nicely speaks on CLAIMS and the "A" Experience

Tony Nicely, Chief Executive Officer says, "We must ensure the execution of the straight-forward rules for great claim handling – in every case getting the necessary facts, evaluating coverage, liability and damages, accomplishing a resolution that complies with laws and regulations, fulfilling the promises made to our policyholders when they bought our policy, and ensuring that we do it all, effective and efficiently.  Accomplishing it

Confidential Information of GEICO Companies
© Government Employees Insurance Company

2

every day, at every level, will require the commitment and dedication of every associate within the GEICO claims community."

"We must continue our progress towards the "A" Experience in all customer contacts – phone calls, face-to-face, and written communications. We must ensure that the GEICO customer has a better experience than any of our competitors can provide. This alone has a tremendous impact on customer service ratings and willingness to recommend GEICO to others."



### Nancy Pierce speaks on The "A" Experience

Nancy Pierce, Vice President, Claims Home Office talks about the "A"- Experience by stating: "We work in an extremely competitive business. Nearly all of our customers were insured by another company just before they switched to GEICO. They shopped for insurance because of price, service or both. When our customers shop for new insurance, they do so for exactly the same reasons. That's why the primary claims responsibilities are price and service. Virtually everything we do is done to create a price or service advantage for GEICO.

Every interaction with a customer can be the one that creates loyalty to our company. It can also be the one that causes the customer to switch to another insurance company. That's why every communication with our customers---both insured's and claimants---must be handled as if our success depends on it. No matter what we have to say or do, it must be done courteously, promptly, and professionally. We must also look for opportunities to show our customers just how much we appreciate their decision to be insured by our company. Every interaction is an opportunity to be a caring, helpful professional; that's just how we should approach our work.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM00708

**4**

You will talk with many customers every week, which means you will have many chances to produce loyalty to GEICO.  Please take that challenge seriously.  You can make a great difference in the happiness of our customers and the growth of our company."



Confidential Information of GEICO Companies
© Government Employees Insurance Company

GTM00709

# Composition of an "A" Call

## The Definition

**An "A" Call is a call in which we efficiently and accurately resolve the phone calls purpose in a professional and courteous manner and take the appropriate next steps.**

The expectation is that each call will be handled as an **"A" Call.**  The TCR2 should exercise their best customer service skills in every call, whether it's a new assignment or a follow up call.



> ➢ Do not hold discussions with customers in ways that come across as robotic, scripted or unnatural.

> ➢ When we are communicating with our customers on the telephone, they are forming a mental picture of the TCR2. It is important that we have a "Smile" in our voice.

> ➢ The customer is the reason we are in business.  Did we handle the call appropriately? Were we professional and courteous?

The top of the monitor sheet is used to identify the caller, adjuster and the person who is listening to the phone call along with the claim number and date/time of the call. The categories are Greeting and Rapport, Body of Call/Resolution and Closing and Documentation.  First, let's discuss the Greeting and Rapport section of the "A" call monitoring sheet.

## 1.  <u>Greeting and Rapport:</u>



We expect and should demand that all TCR2's be efficient, professional, knowledgeable and friendly.  The ways that they build relationships with our customers will vary greatly.  Good common sense and good claims judgment should be used at all times.  Building rapport, expressing interest, understanding the customers' perspective and efficiently working to resolve their requests is the key to an **"A" Call.**

The interaction between the customer and the TCR2 is critical in our customer service. Rapport should be empathetic, helpful and demonstrated throughout the conversation.  For the most part, the customer must feel that we delighted them and took care of their needs.

GTM00710

**6**

a) **Enthusiastic, Friendly and Professional Greeting:**  Our customers should be greeted professionally, with courtesy and respect every time we answer the phone.  "Thank you for calling GEICO Claims, this is (**Full Name**) speaking, how may I help you?"  We should not sound robotic or monotone in anyway on the greeting or in any part of the conversation.  Since many calls to the TCR2's are transfers from our Loss Report Center the appropriate greeting after the CSR introduces the TCR2 would be "This is (**Full Name**) how may I help you?" Empathetic statements should be made at appropriate times in response to the customer (i.e. "I'm sorry to hear…", "I'm glad you are OK…")

b) **Verified Caller Information:**  It is extremely important that we verify to whom we are speaking with before discussing a claim.  On the initial call with our insured we should verify home address, home and business phone numbers, any alternative phone numbers (i.e.: cell phones) and most importantly the social security number.  We should also do the same for any other interested parties.  Why do we verify?  To protect the privacy of our customers and to verify with whom we are speaking.

The TCR2 should advise, "for security purposes I need to verify …" On follow up calls the TCR2 should say, "I know we spoke earlier but for security purposes I need to verify…" Did the TCR2 ask the customer to verify the information instead of repeating the information already recorded?

Please refer to the **VERIFICATION MATRIX** for detailed information at the end of this lesson.  See also DIRECTNET/Claims Home Office/JIT.

c) **Customer's Name Used Effectively:**  The TCR2 should listen/ask for the customer's name.  We should use the name of the customer at appropriate times during the conversation.  Research has shown using the customer's name increases satisfaction. If a customer has a long, complicated last name, then we should <u>ask permission</u> to use their first name.  If they refuse, the use of "sir" or "ma'am" is appropriate.  A good place to use the customer's name is when coming back on the phone after a closed hold or during an open hold.

At the TCR 2 level we recognize there are many conversations with industry professionals (attorneys and adverse carriers) where a relationship has been established. In these cases, the use of the caller's first name is considered acceptable.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**GTM00711**

7

d) **Positive, Friendly and Upbeat Tone:**

Remember **P.I.C.T.U.R.E.** from the lesson on Service and Communication.
P.I.C.T.U.R.E. stands for:

- **P**itch
- **I**nflection
- **C**ourtesy
- **T**one
- **U**nderstandability
- **R**ate
- **E**nunciation

**P**itch -- Speech experts say low pitch (instead of high pitch) is desirable because it projects and carries better.  It is also more pleasant.

**I**nflection -- Do not speak in a monotone manner – use feeling to express an idea or mood.

**C**ourtesy -- Common everyday courtesy applies the same as if face-to-face; it may be more important because you cannot see the person to whom you are speaking.

**T**one -- Many times it isn't what you say but how it is said.  The TCR2's voice can reflect sincerity, pleasantness, confidence and interest.

**U**nderstandability -- The TCR2 should not talk with anything in his/her mouth, i.e. chewing gum, pencil, ice or anything of that nature.

**R**ate -- Too fast or too slow is not effective.

**E**nunciation -- Clear enunciation will help avoid misunderstanding and the need for the TCR2 to repeat himself/herself.

8

e) **Proper Use of Hold:**  Our customers expect quick and fast service without unnecessary delays, but there may be times when a hold is necessary.  At that time, the TCR2 should explain why he/she needs to place the caller on hold, ask for permission to do it and always thank the customer for holding.  If the hold is long, the TCR2 should break in and explain to the customer what he/she is doing so the customer doesn't feel that they are in a black hole. Although closed holds are often necessary, open holds are preferable. When using an open hold the same principles apply and dead silence should be avoided.

f) **Listened and Responded to the Customer Appropriately:**  Did the TCR2 listen to our customer throughout the call?  Did he/she acknowledge the customer's concerns? Did the TCR2 display good listening skills? The response of the TCR2 sets the tone for the entire dialogue between the customer and the TCR2.  We must be attentive and sound concerned.  We should always respect the customer and respond to their questions and inquiries.  We should offer appropriate responses to the customer from start to finish.

g) **Appropriately Responded to Stress and Continued Professionalism**: The TCR2 is faced with difficult situations throughout the day.  How did he/she handle stress, based on the nature of the call (i.e.: a demanding customer, a frustrated customer or a hard to understand customer)?  Was the TCR2 able to avoid showing frustration?  The TCR2 should allow the customer time to speak, empathize with the customer, and apologize to the customer when appropriate. If the customer's stress arose from a customer service failure, we should recognize the error with an apologetic statement:  "I'm sorry that we overlooked that fact, Mrs. Smith.  I will get this taken care of for you right now."  We should gather information, explain and ensure professional handling and follow up at all times.

h) **Established Good Rapport:**  Was the TCR2 professional and helpful?  Was this demonstrated throughout the call?

GTM00713

## Body of Call/Resolution:

How we address and handle the customer's needs is important as it shows the examiner's knowledge and eliminates unnecessary callbacks.  Did we anticipate and identify the customer's needs?  Did we explain the processes?  Did we work the file as far toward closure as possible?  Did we resolve the call?

a) **Accurate Explanation of the Claims Process:**  We should always explain claim processes to our customers.  There are more explanations necessary in first calls than in follow-ups, but they exist for both.  If the explanation is not given, or is not given correctly, problems can occur.

> **There may be calls where this is not necessary (i.e.: a call back from a customer to add information). Was the TCR2 accurate and appropriate in the information given to the customer?  Did the TCR2 provide correct and credible explanations of policies or procedures concerning claim handling?**

**Coverage:**  Explain/Confirm Coverage/Benefits as they relate to the loss. In some states this may include asking for a verbal assignment of benefits. Did we discuss fatal coverage conditions and potential limits problems with the customer?  Did we acknowledge these problems and take all necessary steps to resolve coverage issues?  Did we index names?  Concerning benefits, did the TCR2 discuss the deductibles with the insured?  Did we document that all applicable benefits were explained to the customer?

**Liability:**  Explain the investigation process, the need for RI's of the interested parties and liability decisions.  Did the TCR2 explain in detail why and how liability was determined?  No matter how difficult, the TCR2 must communicate to the customer, concisely and confidently, our liability determination or what further investigation is needed to determine liability.

**Damages:**  Explain Inspection, Rental, ERS, PRU, Medical, BI, UM, UIM etc.   Did the TCR2 explain our DI, ARX or field assignment procedures and the benefits of our Drive-In/ARX for all drivable vehicles?   Did the TCR2 explain when to obtain a rental, how, and the amount we would pay?  We should also make clear what is going to happen and the duties of both the company and the customer with respect to payment recovery.

b) **Reviewed ALOG and Addressed Claim Status:**  To work the file toward closure, ALOG documentation should be reviewed to answer customer inquiries and verify what needs to be done.  Reviewing the ALOG documentation ensures that we provide the customer with accurate information regarding the claim status.

GTM00714