10

c) **Obtained All Necessary Information:**  Did we obtain all the necessary information from the customer?  Did we obtain what was needed to work the claim toward closure?  Did we listen actively, verifying facts and information as shared by the customer?   Do we have enough information to process the claim and resolve all outstanding coverage/liability issues (i.e. obtaining information on unlisted drivers in order to notify underwriting, verifying permissive use in order to establish coverage)? Did we obtain medical status and current medical expenses? Did we obtain any lost wage information and other possible special damages? Did we obtain enough information to address reserves?

d) **Explained Timeframe Expectations to the Customer:**  Did we explain to the customer what would happen next, what needs to be done and give a realistic timeline?

e) **Implemented Appropriate Processes Timely:**  (DI/MD Appointments., ERS, ARMS, paycode updates and necessary forms).  Was all the necessary information given to the AD adjuster to enable successful contact with the customer for vehicle inspection?  Was the correct paycode information provided or updated timely?   Did TCR2 discuss and properly open an ARMS Reservation?   Did the TCR2 examiner send for the ISO search? Were the necessary forms (i.e.: medical authorizations and releases) sent?

f) **Took or Explained Next Step as Needed:**  On every call, the TCR2 needs to evaluate the claim and work the claim toward closure.  Based on the merits of the call, he/she may be required to make a contact attempt or follow-up call concerning vehicle repair or for a medical status.  Ordering police reports, contacting the coverage gate and SIU referrals are also considered next steps.

   **Exception:** If a TCR2 handles a call on that is assigned to another TCR2, the TCR2 who handles the call is not required to take all of the next steps. **They should however, handle all that is required in the call.** The next steps to include TIP are the responsibility of the TCR2 assigned to handle the claim.

g) **Gave Correct Follow-Up Information:**  Did the TCR2 give the correct 800-number and direct extension to the customer for any follow-up contact with him?  Did we advise what hours we work?  Did we prevent unnecessary calls to the Loss Report Center?

h) **Were Negotiations Attempted Where Appropriate:**  Did the TCR2 solicit a demand or make an appropriate offer?  Were negotiations pursued in an effort to settle the claim?

GTM00715

i) **Handled Call promptly and completely**:  Were All Steps Taken to Resolve the Call:  At the completion of the call, there should be no confusion or unresolved concerns.  Did the TCR2 actively listen to the customer's whole statement and meet the customer's needs appropriately?  Did the TCR2 do all that was needed (i.e.: RI, set up AD assignment, change paycode, makes every attempt to settle)?

## 2. <u>Closing and Documentation:</u>

How well did we document the call?  Did we address the customer's needs and leave the customer with the appropriate expectations?

a) **Reviewed Expectations:**  Did the TCR2 summarize (recap) the conversation with the caller?  The TCR2 should confirm all information and actions taken.

b) **Properly Documented Call In ALOG/ClaimIQ:**  Accurate ALOG/file documentation should include a notation of all conversations, especially of benefits to the customer (i.e. Collision, Med, UM, Rental, PRU, Liability).  Were negotiations properly documented (in Alog/Activity log or ClaimIQ)?

c) **Properly Updated SINQ/ECF:**  Did the TCR2 update SINQ/ECF appropriately, accurately, and timely?

d) **Transferred Call Appropriately:**  If the call needs to be transferred was it done appropriately?  Did the TCR2 explain the need for the transfer; did the TCR2 announce the call properly?

e) **Recognized Need for File Transfer: Properly Transferred File**:  Did the TCR2 recognize the need for file transfer? Did the TCR2 advise the customer of the transfer?  The TCR2 should request the transfer immediately and document it.

f) **Call Closed Properly** ("Is there anything else I can do…", "Thank You for calling GEICO" ,"Thank you for your time", Thank you for your help"): "Bye-bye" alone statements are not appropriate. <u>"Thank you for calling GEICO"</u>, <u>"Thank you for your time"</u> and <u>"Thank you for your help"</u> are the preferred closing statements after the TCR2 has determined all questions and concerns have been addressed with the customer.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM00716

12

# TIP Guidelines

Time in Process (TIP) is divided up into 1 hour TIP attempt and 24 hour TIP contact. An attempt is defined as making a call but not being able to leave a message or reach the interested party. A contact is defined as talking to the person, leaving a message with another person or answering machine. Activity log documentation is required on all TIP attempts and contacts.

## 1-Hour TIP Attempt

Generally, the file handler has 1 hour from the time of initial assignment to attempt contact to those parties who have not spoken directly to a GEICO claims representative. Attempts made by another file handler at the same level and any after-hour contact teams are acceptable. If the report was filed outside of the TIP hours, 1-hour Attempt is exempt and this category would be rated N/A. Please see the Claims Manual Chapter XIV, TIP section for clarification.

This will be measured between the hours of 8:00 a.m. and 8:00 p.m. (local time) on Monday through Saturday, 10:00 a.m. and 6:00 p.m. on Sundays and Holidays. For the losses reported outside of these time frames, the 1-hour contact attempt is exempt (N/A), but 24-hour contact guidelines will still apply.

The region or profit center has developed off-hour staffing to address 1-hour TIP attempt requirement on weekends and holidays. The TCR2 is responsible for TIP during their working hours.

On transfer cases and newly assigned losses, for those interested parties who already have spoken directly to a GEICO Claims Handler (CSR, TCRI, TCRII, CU, PIP or Total Theft), 1-hour attempt is exempt (N/A). All TCR2s will do a courtesy notification to these interested parties within 24 hours.

## 24-Hour TIP Contact

If the file handler or contact team was unable to make contact within 1 hour, they have 24 hours from the time of initial assignment to make actual contact. A letter may be used if the posture of the case has not changed since the last contact. The customer will be considered contacted if a message is left with a person or on an answering machine at their household or place of business. If actual contact was not made within 24 hours, were aggressive attempts made to reach the party? Please see the Claims Manual Chapter XIV, TIP section for clarification.

GTM00717

There are situations where we have a valid phone number, but are not able to leave a message. In these cases, aggressive attempts should be made to contact the interested party. These attempts need to be clearly documented in ALOGI/ACTIVITY LOG in order to satisfy the 24-hour TIP Contact requirement.

## What is an Interested Party?

Interested parties are defined as those individuals who present an exposure to our named insured and GEICO, or can provide necessary information in the resolution of the claim. While witnesses and adverse adjusters can provide valuable information, they are not considered "interested parties" in the context of 1-hour Attempt and 24-hour Contact TIP.

The following interested parties are subject to 1-hour Attempt and 24-hour Contact TIP:

1. Named insured and/or spouse
2. Insured driver
3. All passengers -
   If an adult resident relative confirms the minor passenger is not injured, contact requirements are waived for the minor
4. Claimant owner and/or spouse
5. Claimant driver

All attorney represented interested parties are exempted from the TIP requirements. If there is incomplete or incorrect information (i.e. phone numbers or addresses), or the interested party is unknown they are exempted from the TIP requirements. However, once the correct information has been obtained and the interested party is known, 1-hour attempt is exempt (N/A) but the 24-hour contact TIP requirement is required.

## Voice Mail and Email Requirements

Occasionally a voice mail is left on the phone because all the lines are busy or the adjuster is away from their desk. It is required that a return call be made within 2 hours of the message being left.

The same requirements are in place for OUTLOOK messages. Messages requiring action by the adjuster need to be acknowledged in the ALOGI/ACTIVITY LOG and the action needs to be taken with 2 hours.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM00718

**14**

**For example**:
A supervisor puts instructions in an email to the adjuster to call Joe Burns to let him know of a lost wage payment that was sent yesterday.  The adjuster is required to acknowledge the email message in ALOGI/ACTIVITY LOG and call Joe Burns within 2 hours of the message.

## TCR2 SPR Review

The SPR is a "Self Performance Review" that gives guidelines to the TCR2 on how files should be reviewed.  This form is used on all Claims Home Office and regional performance reviews.

The use of judgment calls at this level should be minimal.  The "A" handling should speak for itself.  **Therefore, for a file to qualify as an "A file", each category must be rated an "S".  There cannot be any "NS" ratings for any subcategory.**

What does "S" mean?

_____

_____

What does "NS" mean?

_____

_____

What does "NA" mean?

_____

_____

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM00719

## TCR2 File Review

| | | | |
|---|---|---|---|
| Date: | 2/16/2009 | File Rating | File state | Policy Type |

Date: 2/16/2009
File Owner: 111111
Section Code: test
Reviewer: 10000
Claim Number: 1111111111-1111-01

File Rating
O Sat
O Non-sat

File state
O Open
Oclosed

Policy Type
O Auto
O Cycle

Loss State:          Loss Date:          Report Date:

### Timely Investigation:

| | S | N/S | N/A |
|---|---|---|---|
| | O | O | O |

**Things to Consider:**

| | S | N/S | N/A | Comments: |
|---|---|---|---|---|
| Coverage: | O | O | O | |
| Liability: | O | O | O | |
| Medical: | O | O | O | |
| **Statements Needed/Taken:** | **Yes** | **No** | **N/A** | |
| Insured | O | O | O | |
| Claimants | O | O | O | |
| Passengers | O | O | O | |
| Witnesses | O | O | O | |

### Loss Cost Management:

| | S | N/S | N/A |
|---|---|---|---|
| | O | O | O |

**Things to Consider:**

| | S | N/S | N/A | Comments: |
|---|---|---|---|---|
| Reserves/Features | O | O | O | |
| Injury Handling | O | O | O | |
| Timely/Proper Settlements | O | O | O | |
| Timely/Proper Payments | O | O | O | |
| PRU | O | O | O | |

### Customer Service:

| | S | N/S | N/A |
|---|---|---|---|
| | O | O | O |

**Things to Consider:**

| | S | N/S | N/A | Comments: |
|---|---|---|---|---|
| Diary Maintenance | O | O | O | |
| ALOG Documentation | O | O | O | |
| Timely/Proper Comm. | O | O | O | |

### Claim IQ:

| | S | N/S | N/A |
|---|---|---|---|
| | O | O | O |

**Things to Consider:**

| | S | N/S | N/A | Comments: |
|---|---|---|---|---|
| Liability Investigation | O | O | O | |
| Injury/Negotiation | O | O | O | |

### Overall Comments:

Confidential Information of GEICO Companies
© Government Employees Insurance Company

15

GTM00720

16

This criteria document is to be used on Claims Home Office Performance Reviews, and on Profit Center Telephone Claim Representative I (TCRI), Telephone Claim Representative II (TCRII) and Non-Suit Continuing Unit (CU) Performance Reviews.  **These guidelines are not intended to be an all-inclusive list of potential downgrades in an audit**.  They are a guide for the CHO Performance Review Analyst, and the Profit Center Supervisors and Managers while conducting SPR's and Performance Reviews. **Auditor judgment is an integral part of the performance review process** and can not be replaced by a checklist of potential downgrades.  Profit center supervisors and managers should exercise appropriate regional-specific or state-specific judgment when completing performance reviews.  The purpose of the CHO Performance Review Team is to audit for appropriate compliance with state and company guidelines and procedures.  The Claims Manual, TCM's, State Memorandums and Regional requirements, among other documents, is reviewed to ensure compliance.

Appropriate regional and state-specific judgment should be administered in conducting SPR's and profit center reviews.  It is recommended that the profit center review be more critical and detailed than the CHO review.  Specific scenarios that are not covered in the guidelines should be addressed in relation to the facts of the claim file being reviewed, and the effect on the handling of the claim.  CHO Performance Review may be consulted for guidance on particular scenarios that arise.

**Most general Critical Errors** are identified and listed in this document.  These are errors that are deemed to have or potentially have an affect on the either **1) service rendered to our customer and/or 2) the amount paid on the claim (loss or expense).  Also included are those actions deemed to be in violation of State requirements.**

Critical Downgrades:
1. Unfair claims practice violations
2. Market conduct violations
3. Failure to comply with State required regulations/letters
4. Inadequate or unnecessary delays in coverage/liability/medical investigations
5. Inadequate reserving
6. Improper settlements/payments
7. CIQ – failure to complete; late/improper completion
8. Failure to submit a claim to PRU when appropriate within 30 days of closure
9. Late or inaccurate denial letters
10. Failure to address supervisor instructions.

**Items in bold are considered overall file downgrades.  This is not an all-inclusive list. It will be left to auditor judgment whether category downgrades on each specific claim file may warrant a complete file downgrade.**

Confidential Information of GEICO Companies
© Government Employees Insurance Company

16

I.  **Timely Investigation**:

A.  **Coverage:**  If there are no coverage issues, this category should be N/A.

The file handler(s) should recognize and verify the applicable coverage timely. **Coverage issues should be resolved well within State specific requirements or 30 days (whichever comes first). Adequate documentation for the need of a prolonged investigation, coupled with aggressive attempts to secure the needed information, is required for investigations beyond 30 days**. All coverage conditions, including non-fatal codes, must be documented regarding how it was resolved.

Questions to consider:

- Did the file handler(s) review the policy contract, coverage conditions, policy issues and state regulations?
- Was a Reservation of Rights letter necessary?
- Did the file handler(s) obtain evidence to resolve the coverage issue?  Was there appropriate RLA, Manager, CHO, and Underwriting involvement?
- Permissive use addressed?
- Did we obtain a copy of the rental agreement, if necessary?

B.  **Liability:**  The extent of the investigation required depends on the nature of the claim.  **Investigations should normally be resolved within 30 days of the report**.  Adequate documentation for the need of a prolonged investigation, coupled with aggressive attempts to secure the needed information, is required for investigations beyond 30 days.  All pertinent information relevant to the investigation must be secured**. The liability decision must be supported by the documentation in the file.**

The file handler is required to make a **reasonable attempt** to contact all interested parties to verify third party PD exposures.  What constitutes a **reasonable attempt** is determined by the nature of the claim, the information available, and the reviewer's judgment. Therefore, a **reasonable attempt** could be various attempts, no attempts or only one attempt.  If this is not done, the category should be rated N/S.  If no contact attempts are made by the file handler, appropriate ALOG documentation must be present.  If the insured strikes a non-vehicle object (pole, fence, etc.) and indicates there is no damage to that object, you are not required to attempt contact to confirm.  ALOGI should be documented confirming there was no damage.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

GTM00722

Questions to consider include:

- Was the liability decision delayed or made prematurely?
- Was the liability decision reasonable based on the information contained in the file?
- Was SIU involvement considered if warranted?
- Were reasonable attempts made to contact all necessary interested parties (including Insured Drivers, Passengers, Witnesses, and Claimants)? Were their statements taken?
- Were reasonable attempts made to verify all property damage exposures?
- Was the police report ordered timely? Scene investigation or scene photos secured? Were photos of all vehicles secured if needed?
- Did the file handler look for evidence of alcohol/drug involvement?
- Additional considerations could include: weather conditions, traffic laws, time of day for visibility, citations given and their outcome.
- Was the file transferred within 24 hours to the appropriate level?

C.  **Medical:**  The reviewer is rating the quality of the medical investigation. The file handler is required to make a **reasonable attempt** to contact all interested parties to verify first and third party injuries.  In most cases, the driver of the vehicle can rule out injuries for <u>any</u> passenger (except minor children) in that vehicle.  The parents/guardians of a minor child should rule out injuries for the minor child.  All passengers without an age listed will be assumed to be minors unless documented in file to the contrary.  If the extent of the damages or nature of the loss is significant, direct contact with passengers to rule out injuries should be made. What constitutes a **reasonable attempt** is determined by the nature of the claim, the information available, and the reviewer's judgment. Therefore, a **reasonable attempt** could be various attempts, no attempts or only one attempt.  If this is not done, the category should be rated N/S.  If no contact attempts are made by the file handler, appropriate ALOG documentation must be present.
**The PIP application must be sent timely (within 10 days of known injury).** For BI or UBI claims, a CL200, or other appropriate correspondence to obtain a medical authorization, should be sent to all unrepresented claimants (that are presenting an injury claim) within the first 30 days of notice.

Additional questions to consider:

- Were the appropriate forms sent within 10 days or sooner if required by the state?  Did the file handler follow up to obtain the medical authorization forms?  Was the medical authorization used properly?

**Confidential Information of GEICO Companies**
© **Government Employees Insurance Company**

GTM00723

D.   **Statements:**  The file handler(s) should obtain statements on all cases of questionable and disputed liability, which include an application of comparative negligence, permissive use, fatal coverage questions or where supervisor instructions are given.  Statements are necessary on injury cases to define the nature and extent of injury, job/wage loss, prior injuries and anything else that could be used later to identify a possible exposure.  If a required statement is not taken, the file documentation must reflect the reason.

If the statement was needed and taken, the "YES" box should be marked. If the statement was needed and not taken then the "NO" box should be marked. The category should be marked N/A in the case where the statement was not needed, if the adjuster was unable to make contact, or our request for a recorded statement was refused.

A "NO" for statements may adversely affect the Overall File and/or Investigation Category.  Auditor's judgment will be used to make that determination.   If in the auditor's judgment, the adjuster could have taken a recorded statement (or did not make reasonable attempts to do so) from an interested party that was necessary to the investigation of the claim, at a minimum the Investigation category will be downgraded for improper investigation.

II.   **Loss Cost Management**:

A.   **Reserve/ Feature Maintenance**:  As soon as the exposure is known a feature should be opened. For SPR purposes, the feature should be opened within 7 calendar days of a known exposure. All PD, BI, NBM (PIP), and UMBI features must be closed within 15 calendar days of final payment posting/notice to the file handler.  All other features must be closed within 30 calendar days of final posting/notice to the file handler.  **Failure to open BI, UMBI and UIM features within the 7 day guideline will result in an overall file downgrade.**  Any other violations related to opening and closing of features will result in category downgrades only.

Consideration must be given to Reserve Adequacy every time the file is reviewed. Reserves should be set and/or adjusted based upon information that is known or developed such as expenses incurred to date, injury diagnosis, treatment plan, treatment frequency and treatment length.  Consideration should be given to the expense component, the proper use of No Coverage features and if the inflation factor is current.  **Reserves must be documented and authorized according to Regional Authority Levels.  Absent extraordinary circumstances, settlement offers in excess of the current reserve will be considered improper reserving. Case reserves that do not reflect the exposure known will be considered improper reserving.**

Confidential Information of GEICO Companies
© Government Employees Insurance Company

GTM00724

20

B.  **Injury Handling**:

   **Questions to consider:**

- Was there appropriate follow-up with injured parties/attorneys/providers every 30 days or documentation why it was not necessary?
- Were all medical providers identified and all appropriate records and bills secured?  Any need to discuss and explore pre-existing conditions, medication usage, and a working diagnosis?  What is the expected treatment?
- The file should contain loss of income verification, time period of disability, and self-employed loss wage claims.
- **For double insured losses, did the cross-file adjuster have consent in securing any information from the cross file?**

C.  **Timely & Proper Settlements**:  This sub-category measures RBI, ABI, UBI, UIM settlements. Every effort should be made to make a settlement as soon as sufficient information is secured to evaluate the injury.

   **There must be an offer to all demands within 30 days of receipt. However, if there is a Time Limit Demand (TLD) or if the state requires a time limit, those time limits should be met.**  Settlement without written verification can be obtained on smaller cases (usually less than $1,000) in which the injury is minor and the general or special damages are minimal.  A First Call Settlement is defined as a settlement in which the bodily injury claim is negotiated and settled with the injured party upon initial contact after a proper investigation has been completed and liability has been determined.

Written verification and a release should be secured on all other settlements and on smaller cases if there are any suspicious circumstances.  Documentation requirements include, but are not limited to, authorizations forms, medical bills/records and loss wage supports.

Other factors to consider are:

- **Is the evaluation supported by the information in the file?  Were all pertinent factors considered in the evaluation?**
- **Were the negotiations handled appropriately and properly documented?  Were the offers and settlements supported by the documentation in the file and within the appropriate Regional Authority Levels?**
- **Were all liens and known subrogation interests protected?  Was the necessary Court Approval obtained?  Was the appropriate release utilized?**

Confidential Information of GEICO Companies
© Government Employees Insurance Company

GTM00725

D. **Timely & Proper Payments:  All payments should be paid/denied/delayed within company TIP standard of 30 days (or sooner if the specific state requires), once the pertinent supporting documentation has been obtained, or an amount has been agreed upon.  Payments must be made in accordance with Regional Authority Levels.**

- **Were all payments accurate - the correct payee, feature and amount?**
- **Is there supporting documentation for the payment?  Were payments made that were not owed?**
- **Was the appropriate TIN/Expense code used?**

E. **PRU:**  Is there recovery potential?  Did the file handler refer the case to the Payment Recovery Unit timely? **(Once the liability investigation is completed - 30 days after the closure of that first recoverable feature).  However, should your PRU department require a referral only after the last recoverable feature closes; you may follow those published guidelines**.  Was information provided that would develop the file for recovery?  Was the adverse/responsible party placed on notice?

III. Customer Service:

A. **Diary Maintenance:**
- Was the diary worked at appropriate intervals?  Did the file require a tighter diary to resolve coverage and liability issues?   Documentation is required for a diary period of more than 30 days.
- Were updates to CHOL done timely?

B. **ALOG Documentation**:
- Were all customer contacts and actions properly and timely documented?
- Are the notes logical and concise?
- Are they appropriate in content and professional?
- If double insured loss, are ALOG documentations proper?

C. **Timely & Proper Communication**:

- **Did we explain all coverages, their rights under the policy, under the state laws and the claims process to the customer?  Was the conversation documented?**

Confidential Information of GEICO Companies
© Government Employees Insurance Company

GTM00726

**22**

- Did the file handler keep the customer informed of the status of the claim on a regular basis including prompt contact upon initial assignment of the file?
- Were all telephone calls, voice mail and e-mails acknowledged or addressed within 2 hours?
- **Is a parties' information being given without their consent?**
- **Replies to written correspondence which require a response must be done within 10 days of receipt by phone or in writing. All state mandated letters must be sent according to the specific state requirements. All letters required by TCM or Regional Requirements must be sent timely. All requests within a LOR should be addressed within our acknowledgement responses.**
- Was correspondence from the claims handler professional and well written?
- **Denials letters should be accurate and timely (within 15 days of decision), and must be in the file (or ECF documents).**

IV. **CLAIM IQ**

A. **Investigation/Liability**:

- **The Claim IQ Investigation and Liability Consultations must be completed prior to making the liability decision.**
- The proper Question Guide along with the loss description box on the Investigation Header page must be selected.
- **The proper scenario on the Liability Assessment page in Claim IQ must be selected and the appropriate breaches must be properly categorized as Low/Med/High.** Only the breaches that apply need to be categorized. It is acceptable to <u>"not"</u> categorize a breach that does <u>not</u> apply to an individual person or claim. It is unacceptable to fail to categorize a breach that does apply.
- The proper covered by policy, CBP, box must be checked. The proper Negligent Free Party, NFP, box must be checked.
- In a complex liability case, or disputed liability case, it is recommended that the file handler document the Summarize Claim Text area on the Analysis page in Claim IQ. The reviewer will evaluate the proper categorization of liability breaches based on the file handler's documentation in this text box on the Analysis page.
- **Any improper bypass of Liability Claim IQ**
- The required (*) % negligence on the Liability Decision page must be filled out. If multiple vehicles involved, the negligent party(s) % must be entered on this page to equal 100%.
- If a file is transferred from another level, the new level file handler has 10 days to update Claim IQ if it is not already complete.

GTM00727

**B.** **Injury/Negotiation**

- **Any improper bypass of Injury Claim IQ**
- Claim IQ Injury Consultation <u>must be started</u> as soon as the injury has been identified.  All injuries and medical specials/expenses must be properly identified and documented in Claim IQ.   Any injury information received thereafter including diagnoses or specials/expenses should be entered into Claim IQ within 30 days of receipt,
- The injury evaluation and venue must be properly identified and completed prior to negotiations unless properly bypassed.
- The Decision and Conduct pages must be completed prior to negotiations unless properly bypassed.
- The Negotiation Conduct records exchange must have the offer/demand, date, % liability, value and accepted box checked upon final settlement.
- For proper file documentation on a First Call Settlement, the Claim IQ injury diagnosis page should be updated, the "no medical records" box checked and the FCS bypass selected. The offer and acceptance should also be documented.  If medical bills/records are received with the executed release, these are <u>not</u> required to be entered into Claim IQ; however ALOG or Claim IQ notes should be documented that medical bills/records were received with the release.  If the claimant rejects the FCS, and medical bills/records are received, then the FCS bypass should be reversed, and the medical bills/records entered into Claim IQ.  Normal Claim IQ file handling procedures would apply going forward.

V. **Additional Reviews**:

A. **Control Forms**:  Were the Time Reserve Reviews: C-71 (3 month), C-63 (6 month) and C-178 (18 month) completed accurately and timely by the supervisor?  Were the supervisor instructions adequate to address the issues and place the file back on track?  There must be commentary about the adequacy of the <u>injury</u> reserves, unless they are adjusted during that period.  Did the file handler make a referral to Underwriting (C-51) upon discovery of pertinent information that may affect the policy?  The category should be rated N/A if no forms were necessary in the life of the claim file.

B. **Keying Quality:**  This will include ordering the ISO when appropriate, and updating CLREG/FPM timely and correctly.  Was accurate and complete information entered into SINQ/ClaimIQ? Was it updated timely?  Was the correct loss description code used?  If the investigation revealed a different loss description, was the code updated timely and correctly?  Was the negligence indicator code appropriate? Was the subrogation indicator updated correctly?

C. **Advanced Doc. Tab**:  Were the documents classified properly and in the proper folders under the proper interested party?

Confidential Information of GEICO Companies
© Government Employees Insurance Company

GTM00728

**24**

D. **1-Hour Attempt**:  Generally, the file handler has 1 hour from the time of initial assignment to attempt contact to those parties who have not spoken directly to a GEICO claims representative.  Attempts made by another file handler at the same level and any after-hour contact teams are acceptable.  If the report was filed outside of the TIP hours, 1-hour Attempt is exempt and this category would be rated N/A.  Please see the Claims Manual Chapter XIV, TIP section for clarification.

E. **24-Hour Contact**:  If the file handler or contact team was unable to make contact within 1 hour, they have 24 hours from the time of initial assignment to make actual contact. A letter may be used if the posture of the case has not changed since the last contact. The customer will be considered contacted if a message is left with a person or on an answering machine at their household or place of business.  If actual contact was not made within 24 hours, were aggressive attempts made to reach the party?  Please see the Claims Manual Chapter XIV, TIP section for clarification.

## TCR1, TCR2, C/U, PRU Verification

**Purpose of Verification**

Verification of contact information is critical in providing excellent customer service, and for proper and prompt claim settlement. It is also crucial in protecting the privacy of our customers.

**Timing of Verification**

Verification must be done prior to discussing or releasing claim information. For example, "I can help you with that but for security purposes, please first verify you're..."

**Transfer Call Verification**

**Incoming Transfer**: If accepting a call transfer from another GEICO associate, confirm verification has been done.  If not, you will need to verify the caller, as outlined by the verification matrix.

**Outgoing Transfer**: If you are receiving a call not intended for you, verification is not necessary prior to transferring the call to the correct department or claim adjuster.  Be sure to notify the counselor or adjuster that verification had not been completed.

**Frequency of Verification**

Verification must be done on every call. Exceptions are calls requesting only GEICO's fax number or address, or if the associate is certain of the identity of the caller because of frequent contacts.

GTM00729

25

### Objections to Verification
If the caller refuses to verify information, explain the purpose of verification and why it is important. If the caller still refuses, advise the caller we cannot provide or discuss any claim and/or policy information.

### Release of Personal Information
Personal information of our Insured or any interested party cannot be released without their consent. Written consent is required to release any medical information.

### Social Security Guidelines
Complete social security number needs to be obtained and updated if not already on file or the adjuster should verify at least the last four digits if already pre-filled.  If social security number is not already on file and caller refuses to provide it after valid attempts have been made by the adjuster, then obtaining only the last four digits is acceptable.  The examiner must key this in the last four in the "Comments" field.

### PIN Guidelines
If caller refuses last 4 or does not have a social security number, ask for a 4 digit PIN that bears significance to the caller (e.g. mother's birth month and day - 0415). The PIN should be documented in the "Comments" field along with what it represents.

> When an attorney calls in for the first time for a new client, it is required to obtain Caller's name, the name of the IP they represent, and one of the following:  claim #, policy #or the last 4 digits of client's social security number.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM00730

## TCR 2 MONITORING SHEET

Name of Associate _____  Date_____ Time _____   Overall ☐
Claim Number _____  Exam Code _____
Caller's Name _____  Monitored by _____   1-2-3-A
Type of call: ☐New Loss ☐Transfer file ☐Inquiry Call   ☐In Call ☐Out Call

### Was this an "A" Call Yes ☐   No ☐

☐ 1-2-3-A

## GREETING/RAPPORT:

The initial handling of a call is very critical to our customer service. Being empathetic and helpful must be demonstrated from the beginning and <u>throughout</u> the call. Things to consider:

Enthusiastic, Friendly and Professional Greeting_____
Verified Caller Information_____
Customer's Name Used Effectively_____
Positive, Friendly and Upbeat Tone_____
Proper Use of Hold_____
Listened and Responded to the Customer Appropriately_____
Appropriately Responded to Stress and Continued Professionalism _____
Was Good Rapport Established_____
Comments _____
_____
_____
_____

## BODY OF CALL/RESOLUTION:

☐ 1-2-3-A

How we address and handle the caller's needs is important as it shows the examiner's knowledge and eliminates unnecessary callbacks. Did we anticipate and identify their needs, explain the processes? Did we work the file toward closure? Did we resolve the call? Things to consider:

Accurate Explanation of the Claim Process_____
  *Coverage: Explained Coverage/Benefits as they relate to loss_____
  *Liability: Explained liability investigation and decisions_____
  *Damages: Explained Inspection, Rental ,ERS, PRU, Med., etc._____
Reviewed Alog and Addressed Claim Status_____
Obtained All Necessary Information_____
Explained Timeframe Expectations_____
Implemented Appropriate Processes Timely_____
Took or Explained Next Step as Needed_____
Gave Correct Follow Up Information (Who to call, phone number,  hours etc.)_____
Were Negotiations Attempted Where Appropriate_____
Was Call Handled Promptly and Completely (R/I taken, MD/DI set up, rental process explained), Was Call Resolved_____
Comments: _____
_____
_____
_____

## CLOSING/DOCUMENTATION:

☐ 1-2-3-A

How well did we document the call? Did we satisfy the customer's needs and leave the customer with the appropriate expectations?

Reviewed Expectations _____
Properly Documented Call in ALOG/ClaimIQ_____
Properly Updated SINQ/ECF_____
Transferred Call Appropriately_____
Recognized Need for File Transfer/Was it Done Properly_____
Was Call Closed Properly ("Is there anything else I can do for you?"  "Thank you for calling GEICO Direct" "Thank you for your time"
"Thank you for your help")_____
Comments: _____
_____
_____

06/22/04

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

26

GTM00731

Intentionally left blank

Confidential Information of GEICO Companies
© Government Employees Insurance Company

GTM00732

**Lesson Four**
**Good Faith Claim Handling**
**Student Manual**
**TCR2 Module**

## Objectives

1. Understand the importance of good faith claim handling.
2. Correctly identify two types of bad faith claim handling.
3. Identify unfair settlement acts.
4. Identify a Policy Limit Demand
5. Identify a Time Limit Demand
6. Identify specific conditions of settlement within a demand letter

GTM00733

# What is "Bad Faith"?

Generally, it is the failure to act <u>fairly</u>, <u>promptly</u>, and <u>reasonably</u>.  Fair, prompt, and reasonable are three keys to good faith claims handling.  In addition, there are two types of bad faith:

 &ndash;common law bad faith
 &ndash;statutory bad faith

Bad faith claims generally spring from a failure in one or more of these areas – fairness, promptness and reasonableness.  Every decision made on a file and every aspect of the file should reflect that the decisions made and actions taken were fair, prompt and/or reasonable under the circumstances of the claim.

<u>**Extra-contractual Damages**</u> – are monetary damages awarded at trial against an insurance company as a consequence of an insurer's bad faith.  Typically, extra-contractual damages include punitive damages to punish and deter the conduct, interest, attorneys' fees, costs and litigation expenses as well as consequential damages incurred by the insured and/or claimant as a result of the bad faith.  Consequential damages can include things like inconvenience, emotional distress and mental anguish.  Damages awarded against an insurer as a result of bad faith in the handling of claims are paid outside of the insurance contract and are thus referred to as extra-contractual damages.

A suit for bad faith, depending on the jurisdiction, can arise either from a first party claim filed by the insured or from a third party claim brought against the insured.

## <u>First-Party Bad Faith</u>

About one-half of the states recognize a common law tort for bad faith in first-party insurance claims.  Of these, most requires the plaintiff to show the insurer was unreasonable in denying the claim and the insurer's "knowledge or reckless disregard of the lack of a reasonable basis for denying the claim."  The other states follow the approach which only requires the plaintiff to show unreasonableness in denying the claim. Claims for first-party bad faith are commonly based on inadequate claim processing, improper investigation of a claim, delay in payment and unreasonable denial of a claim.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

3

## Third-Party Bad Faith

Liability insurance policies apply to claims against the insured by third parties. Liability insurance is also known as third-party coverage. Liability policies set forth the insurer's duties, which typically include paying covered claims, investigating claims and defending the insured in claims by third parties that fall within the scope of the policy. Third-party bad faith claims usually relate to an insurer's failure to settle an underlying suit (for example, by an injured party) against the insured; the insurer's wrongful failure to defend a suit against the insured; or the insurer's bad faith or negligence in defending the insured.

## Unfair Claims Practices:

• Origin – codification of the common law

• Similar from state-to-state because many jurisdictions adopted the NAIC's  Model Unfair Claims Practices Act.

• Some state specific differences

Almost all Unfair Claims Settlement Practices Acts are derived from the Model Act promulgated by the National Association of Insurance Commissioners (NAIC) who drafted the Model Act as a distillation of cases analyzing insurance company conduct. Since most states have adopted the Model Act in whole, or in part, as their unfair claims settlement practices act, the acts look generally the same from state to state. Some states have added to the Model Act with additional descriptions of unfair claims practices – i.e. it is an unfair practice in some jurisdictions for an insurer to direct claimants or insureds to particular body shops for repairs.   However, by and large, the acts are the same from one state to the next.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM00735

(1)  Misrepresenting pertinent facts of insurance policy provisions relating to coverage's at issue.

 *… if it's covered, <u>it's covered</u>

Example - Applying a Section III exclusion to a Section I claim.

Be careful when drafting disclaimer letters – make sure to quote from the policy of the correct state, check that you are quoting from the correct company (i.e. GEICO, GEICO General, GEICO Indemnity, GEICO Casualty), quote the correct version, by date, of the policy in effect for that insured, and if unsure which version applies, contact underwriting for confirmation, and lastly check to see if any amendments apply that change the basic policy.  Of course, if an amendment is in effect, the language of the amendment controls.

(2) Failing to acknowledge, act reasonably and promptly upon communications with respect to claims arising under insurance policies.

    *Be responsive to insureds, claimants, and attorneys

Nothing sends a claim down the wrong path faster than a failure to communicate. Communication needs to be prompt and responsive.
Example – an attorney sends you a letter stating that he represents the claimant and requests acknowledgment of his Letter of Representation (LOR) and requests a copy of his client's recorded interview (RI).  The response, albeit prompt, should not state "I acknowledge your LOR.  Please send in the medicals."  Why? It does not address the request for the RI.   Communication needs to address the points that are raised.


(3)  Refusing to pay claims without conducting a reasonable investigation based upon all available information.

An insurer must readily be able to answer questions like "Why is this claim being denied?"  "Why is coverage being disclaimed?"  "Why is a compromise offer in this amount being made?"  If an insurer cannot answer these types of question, it cannot answer them to claimants or insureds.  An insurer is not at the stage where its investigation is complete until it can readily answer these types of questions.

 *Conduct a solid investigation and have a reasonable factual & legal basis for denying a claim

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

5

(4) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been submitted.

*Promptly secure all facts needed to make a coverage decision

When a claim is made, the clock starts running for the completion of the coverage investigation. Failure to complete the investigation in a timely fashion can result in an insurer being precluded from disclaiming coverage. An insurer can be precluded from disclaiming coverage under these circumstances by reason of estoppel and waiver. Promptly secure the necessary facts to make the coverage decision.

Essentially, waiver and estoppel are doctrines that can preclude an insurer from enforcing policy provisions such as exclusions or conditions unless they are asserted or raised in a timely fashion.

**Estoppel** is a legal doctrine recognized both at common law and in equity in various forms. It is meant to complement the requirement of consideration in contract law. In general it protects one who would suffer detriment if: The defendant has done or said something to induce an expectation. The plaintiff reasonably relied on the expectation and would suffer detriment if that expectation were false.

Estoppel is generally only a defense that prevents a representor from enforcing legal rights, or from relying on a set of facts that would give rise to enforceable rights (e.g. words said or actions performed) if that enforcement or reliance would be unfair to the representee. Because its effect is to defeat generally enforceable legal rights, the scope of the remedy is often limited.

**Waiver** is the voluntary relinquishment or surrender of some known right or privilege. While a waiver is often in writing, sometimes a person's actions can act as a waiver. In civil procedure, certain arguments must be raised in the first objection that a party submits to the court, or else they will be deemed waived.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

(5) Not attempting in good faith to effectuate prompt, fair and equitable settlements of claims when liability has become reasonably clear

 *When liability is reasonably clear, attempt a fair, prompt, and reasonable settlement

1st Party claims – If liability is clear, and the amount owed is clear, unreasonable delay in the resolution of the insured's claim can be taken as an unfair claims practice.

Furthermore, when making settlement offers in first party and third party claims, the settlement offer must be within the evaluated range of the claim.

<u>Example</u>.  A UM claim is evaluated for settlement at between $5000.00 and $10,000.00.  The first offer to the insured must at least be $5000.00.  It cannot be below $5000.00 as that offer does not fall within the evaluated range. The same applies to a third party claim brought against the insured.  The settlement offer must be within the evaluated range.

If the file can be evaluated for settlement purposes, do not wait for a demand.  Evaluate the file and make an offer within the evaluated range.  A demand is not a precondition to a settlement offer.

(6) Compelling insureds to file suit to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds.

    *Make fair and reasonable offers; <u>do</u> <u>not</u> "low-ball".

<u>Example</u> - in an Uninsured or Underinsured motorist claim, do not make a "low ball" offer.  The offer must be within the evaluated settlement range on the claim.  Note:  A "low ball" offer would be an offer that is below or under the evaluated settlement range.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

(7) Making claims payments without specifying the coverage under which the payment is being made.

*Specify the involved coverage <u>and</u> the amount being paid under that coverage.

The purpose here is to avoid confusion.  A check that does not specify what it is for does not advise an insured or claimant about what the payment is for and whether they are receiving that to which they are entitled.

<u>Example</u> – An insured has an accident implicating medical payments, UM, collision, rental, etc.  A check sent to the insured for $1,000, without any indication of what it is for, does not advise an insured about what he is receiving, what he is receiving under each coverage, or whether he is receiving that to which he is entitled under the policy.

(8) Advising an insured or claimant of a policy of appealing decisions that favor an insured or claimant in order to compel them to accept settlements or compromises less than the amount awarded in arbitration

*Never threaten!

Suggesting lengthy litigation or delay as an inducement for someone to accept a settlement offer is improper because it advances reasons why the offer should be accepted that are other than the offer being fair and reasonable.  The only reason to advance for acceptance of an offer is that the offer is fair and reasonable under the circumstances of the claim.  Resolve claims early when able.

(9)  Delaying the investigation or claim payment by requiring an insured, claimant, or his/her physician to submit a preliminary claim report and then requiring the subsequent submission of formal proof of loss forms, both of which submissions contain substantially the same information.

*Do not request unnecessary information that delays resolving the claim

Rarely does an insurer have each and every document needed to evaluate a claim.  With some claims, the insurer has the information needed to evaluate the claim but the information is in a different form than what the insurer is typically used to.  If an insurer has what is needed to make a decision, in whatever form, as long as reliable, an insurer needs to act and make the decisions that need to be made and not wait for unnecessary or duplicative information.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

<u>Example</u> – The insured negligently hits a motorcyclist.  The insured has BI coverage of $25, 000.00.  The insurer learns from interviewing the insured, the officer, and a witness that the motorcyclist lost a leg.  The motorcyclist's attorney sends in a demand for the insured's policy limits to settle the claim.  The insurer's response letter should <u>not</u> say "We can neither accept nor deny the demand as we have insufficient information.  Please submit the medical reports and bills."   Why?  Because the insurer has reliable information that the motorcyclist lost his leg.  The BI limits of $25, 000.00 should be offered to settle the claim.  Medical reports, bills, permanency ratings and the like are unnecessary for making the decision to offer the BI limits of $25, 000.00 because reliable information exists to make the decision to offer the policy limits to settle the claim.


(10)  When liability is reasonably clear, failing to promptly settle claims under one portion of the insurance policy coverage in order to influence settlements under other portions of the insurance policy coverage.

*Do not delay settling a PD claim to influence settlement of a rental or other claim An insurer should never use settlement of a claim under one coverage to influence settlement under another coverage.

<u>Example</u> – The claimant makes a BI claim and a PD claim against the insured.  An insurer should <u>not</u> negotiate the claims by stating that if the claimant accepts X amount on his BI claim, then the PD will be paid at Y.  The inducement to accept the offers is other than the offers being fair and reasonable.  Rather, an insurer must evaluate each claim separately and make fair and reasonable offers on each.  The negotiations for the two claims, BI and PD, are not tied to or conditional on each other.


(11)  Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denying a claim or for offering a compromise settlement.

   *Explain the facts and/or law supporting the denial or compromise

An insurer needs to be able to answer questions about why certain action was taken regarding a claim.  When a claim is denied or when a compromise offer is made, an insurer must have the facts and/or law readily available to be able to answer questions like "Why was the claim denied?" or "Why was a compromise offer made?"

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

(12)  Negotiating liability insurance claims and ascribing a percentage of fault to a person seeking to recover from an insured party, in spite of an obvious absence of fault on the part of that person.

*Make fair and reasonable evaluations of Fault

The facts and/or law must support an assignment of any percentage of fault to another party.  Arbitrary assignments of fault as a negotiating tool is an unfair settlement practice.

## Worst Practices:

We are proud of GEICO's claim practices.  We have a claim philosophy that says we treat all those that we encounter fairly and honorably.

Mistakes happen when obligations are not understood and when guidelines are not followed.  Mistakes fall into two categories.  Mistakes can be an act of <u>Omission</u> – which is the failure to do something that should have done, or mistakes can be an act of <u>Commission</u> – which is doing something that should not have been done.

•Failing to <u>responsively</u> answer phone calls and correspondence from a claimant or their attorney.
Point 1 – The Claims Manual, and state specific guidelines, set forth the time limits within which responses to phone calls and correspondence must be made.   These guidelines must be followed.

•Rejecting a claimant's contentions without fully investigating the contentions.
Point 2 – Assume the following file note:
       "Secure claimants RI.  Then deny this claim.  This is fraud."
This is <u>not</u> correct file handling.  The investigation comes first and once the investigation is complete a decision is made on the claim, not vice versa.

•Failing to initiate settlement discussions because no demand has been made.
Point 3 – Pursue prompt, fair, and equitable disposition of claims.  If an insurer has the information needed to make a fair and reasonable evaluation, it should do so and initiate settlement discussions.  Remember, a demand is not a precondition to a settlement offer.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

• Using delay tactics to holdup a settlement.
Point 4: An insurer should never delay initiating settlement discussions in order to obtain unnecessary information.  An insurer should never wait on the receipt of an official record when copies of such record have been received and are reliable.

• Not properly defending the insured or noting negative remarks in the file.
Point 5: Assume this file note:

> "An accident reconstruction would probably be beneficial for the insured, but the costs outweigh the benefits".

Here, an insurer would be placing its interests in saving costs ahead of the insured's interests in being defended.  Remember, the policy provides coverage for the costs of litigation.  In this example, if an accident reconstruction expert is deemed necessary and relevant to the insured's defense, an accident reconstruction should be obtained.  (Accident reconstructionists are independent forensic engineers and physicists that through forensics determine how and why an accident happened - accomplished first by correctly interpreting the clues left by the remaining physical evidence of the accident, then by reconstructing and studying the events preceding, during, and following the accident).

*Or assume this note:* "The claimant is lying!" This reflects a personal opinion.  The file should reflect facts, not personal opinions.  Rather, the file should simply state the facts – "Claimant testified she had no prior history of back complaints.  Dr. Smith's records however show an extensive Past Medical History (PMH) of back complaints."  All file notes should be clear, concise, accurate and factual.

• Failing to tell the insured of the potential for personal exposure.
Point 6:  Insurers have a duty to advise an insured of the following:
- the  nature of the claim or suit against them,
- the potential, where applicable, that the claim could exceed their coverage limits,
- their right to retain personal counsel of their own choice, at their own expense, to protect their interests in excess of the policy limits, (of course, the Company will provide them with counsel to defend them per the terms of the policy),
- and their right to personally contribute to any settlement above the policy limits.

An insurer should not lose sight of the fact that a third party claim or suit is against the insured, not the insurer.  An insurer should keep an insured advised and updated of the status of the claim or suit.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

When appropriate, an insured should update its insured with phone calls and/or letters about significant new developments in the claim and matters of which they need to be aware.  The letter below is an example of an update letter (of course, all letters must be tailored to the circumstances applicable to the particular case):

"Dear Insured,

This is an update on the current status of this matter.  Please be advised that our investigation into the accident and the claimed damages is continuing.  As you know, you have bodily injury liability limits of $100,000/$300,000 under your Family Automobile Policy.

Our investigation shows that claimant Sally Smith's injuries from the accident include: . . .

We will attempt to resolve this claim within your bodily injury liability limits.

We are writing to advise that if a jury were to believe claimant's version of the accident as well as the claimed damages and ongoing complaints, a jury verdict could exceed your policy limits.  We do want to advise you that you have the right to obtain your own personal attorney, at your own expense, to protect your interest above the policy limits and to discuss the implications if the damages exceed the policy limits. You need not hire your own attorney, but you have the right to do so.  Of course, the Company will provide defense counsel to defend you should suit be filed and defense counsel will work with any personal counsel you may wish to retain.

You also have the right to personally contribute from your own personal assets towards any settlement above the policy limits, although you are not required to do so.   If you wish to consider making a personal contribution to a settlement above the policy limits, please let us know.

We will continue to try and resolve the claim against you and will advise you of further developments.  Should you have any questions, please feel free to call.  Thank you for your attention to this matter.

Sincerely,

GEICO Claim Examiner"

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

• Failing to treat First-Party claims differently than Third-Party claims.

  Acceptable for 3rd Party claim:
  "IME needed to rebut permanency claim"

*versus*

  Not Acceptable for 1st Party claim:
  "IME needed to rebut permanency claim"

Words and terms are important. Suppose the claim involves a third party claim against an insured and the file says "IME needed to rebut permanency claim". This suggests a strong defense for the insured.

But suppose now that it is not a third party claim, but a first party claim where the insured is making a claim under his or her own policy.

The same file note could be misinterpreted to suggest that it was an insurer against their insured. In a first party case, it is not the insured vs. their insurer. Rather, an insurer should simply be fairly, reasonably and promptly evaluating an insured's claim. The file handler should simply seek an IME to evaluate the permanency claim.

IME= Independent Medical Examination
PMH= Past Medical History

• Substantially increasing settlement offers with no new information about the claim. Point 7: Substantial increases in settlement offers with no new information suggests that the first offer was not fair and reasonable.

Example – The first offer in a first party claim is $10,000. Six months later, despite no new information having been received, the offer is raised to $30,000. What does that say about the fairness and reasonableness of the first offer?

Remember, make a fair and reasonable evaluation and offer. If new information is received that changes the evaluation, document the file with the receipt and evaluation of the new information, the new evaluated range on the file, and make a new offer within the evaluated range.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

•Treating ALOG like "Dear Diary".

Point 8: File documentation should be a chronological account of the handling of the file. Assume a file note like this:

> "This case clearly exceeds the policy limits.  I will try to settle it for less".

This would be treating file documentation as "Dear Diary" and is <u>not</u> correct.   It does <u>not</u> reflect a fair and reasonable offer.

•Documenting the file with an "off the cuff" value before the file is actually ready for evaluation.

Point 9: A file should be evaluated when it is ready to be evaluated and not before. Suppose an examiner receives a new file very early on in the investigation and writes

> "Probably a limits case."

The file is <u>not</u> yet ready to be evaluated.  This would be an example of an "off the cuff" speculation about value made before the matter was ready to be evaluated. Evaluate the file only when the information necessary to do so has been received.

## Best Practices:

Point 1: Avoid <u>all</u> of the "Worst Practices"!

•Complete prompt liability and damage investigations. "Resolve early when able."

Point 2:  Adhere to all company policies and procedures for claim handling.  If a first call settlement is warranted, make an effort to resolve the claim in a fair and equitable manner.

•Bifurcate claim files when conflicts exist.

Point 3: When an insurer bifurcates a file, i.e. a Personal Injury Protection (PIP) claim and an Uninsured Motorist Bodily Injury (UBI) claim to different examiners, the files must be treated by all as bifurcated.  The communications between the examiners and <u>supervisors</u> should be no different and no more than if they worked for different insurers.

•ALOG is for documenting file handling only.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM00745

Point 4: As we previously stated, ALOG is only for the documentation of claim handling.  Documentation should be clear, concise, accurate and contain only factual representations.

• Being careful when writing and speaking because we can bind the company.

Point 5: All employees handling claims are agents of an insurer and speak and write with the apparent authority of the insurer.  Make sure to have the authority to make representations before they are made.

• Make only representations and assurances that can be met.

Point 6: It is better to tell people what can be accomplished, and by when it can be accomplished, than it is to tell them what they want to hear at that moment but which cannot be accomplished.  I.e., if it is represented that a check is in the mail, the check must be in the mail.

• Keep the insured aware of significant developments and of settlement negotiations.

   Especially in excess cases, take care to:
       − protect the insured
       − inform the insured of developments
       − advise the insured of their right to personal counsel of their own choice and
         at their own expense to protect their interests above the policy limits
       − advise the insured that they can personally contribute to any settlement over
         the limits

• Advise insureds of the coverages available under the policy pertinent to their claim.

   Examples: Med Pay, Rental
   Reimbursement, UM/UIM, etc.

• Document in ALOGI discussions held with the insured about coverage and benefits under their policy. Document all discussions about coverage with an insured.  Make sure to inform an insured of all the coverages implicated – i.e. collision, med pay, rental, Under Insured/ Uninsured Motorist protection (UM/UIM).  For example, document file discussions about coverage with: "Explained collision, med pay, rental, UM to insured." You must also document significant developments and settlement negotiations.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

Documentation of discussions about coverage should ordinarily be made in ALOGI. However, if the coverage discussions are deemed to be important and critical, documentation of the coverage discussions should also be made in the form of a confirmatory letter to the insured.  <u>Document!  Document!  Document!</u> because . . ."If it isn't in the file, it <u>never</u> happened"

•The insured's interests receive equal weight as the interests of the insurer. You must be fair, prompt and reasonable.

Point 7: The file is how an insurer defends its handling of the claim.  If a file is silent, an insurer cannot prove what it did or did not do and cannot establish that its handling was fair, prompt and reasonable.

•Use ALOG to <u>highlight</u> fair file handling.  The ALOG entry you write now is your opportunity to support decisions that may be questioned in the future.

•Write Email messages in the same manner as ALOG entries.
Each file entry is an opportunity to document how fairly, reasonably, and promptly a matter has been handled.  Use file entries to document fair file handling at every stage of the claim. Emails should be written with the same attention as any other file note and should reflect the same fairness of file handling.

## Third-Party Bad Faith verses First-Party Bad Faith:

<u>Common themes in Third-Party bad faith suits</u>: The interests of the insurer were placed before the interests of the insured.

Point 1 – Remember the example:  "An accident reconstruction would probably be beneficial to the insured but the costs outweigh the benefits".
If a loss involves questionable liability and a reconstructionist is necessary for an insured's liability defense, obtain the accident reconstruction.

o   The basis for the offer and the offer itself were not reasonable.

Point 2 – Remember the example "This claim clearly exceeds the limits.  I will try to settle it for less."
If the fair evaluation is that the claim clearly exceeds the limits, than the offer should be the limits.

o   The insurer did not notify or update the insured on the status of settlement
        negotiations and the likelihood of an excess verdict.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM00747

Point 3 – Consider the following example:

The insured was negligently involved in an accident in which the claimant was killed. The insured has a policy with BI limits of 20k.  A settlement conference occurs and the settlement demand is $20,500.  The insured is not notified of the demand above his policy limits and no settlement occurs.

Remember, if the limits have been offered and a demand is made for an amount above the insured's limits:

o   Notify the insured of the demand and memorialize the notification in writing,
o   Advise the insured of their right to make a personal contribution to the settlement of the matter,
o   And then memorialize in a letter to the insured his or her decision as to how he or she wishes to proceed.

## How to avoid a Third-Party bad faith suit:

o   Fully investigate; fairly evaluate.

o   Inform the insured that a judgment could exceed their limits.  Advise of the right to counsel at their own expense to protect their interests above the policy limits.

o   Keep the insured advised of significant developments <u>and</u> settlement demands.

## Common themes in First-Party bad faith suits:

o   Failure to communicate with the insured.

o   Failure to act promptly.

o   Failure to make a reasonable offer.  These three points describe the primary grounds asserted in first party bad faith claims.

## How to avoid a First-Party bad faith suit:

o   Promptly communicate with the insured and quickly gather necessary information to resolve the claim.

o   Make only fair and reasonable offers.

o   Show fair-mindedness.

o   "Murphy's Law" – If it can go wrong, it will.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## First-Party (UM):
- Claim range = $16-17,000
- Fee counsel's opinion of the value = "$20,000 or so."
- File says "need to see manager for UM limits of $40,000k"
- Demand $40,000; Offer $7,000
- Insured sues for Bad Faith

What happened . . . ??? This example shows how the file evaluation at every stage was no less than $16,000 and that the first offer of $7,000 was not within the evaluated range and was not fair and reasonable.

## Third-Party: BI policy limits = $25,000:
- Plaintiff's attorney says the case can be settled for $25,000; insurer offers $25,000
- Plaintiff's attorney then says settlement is contingent on reimbursement of $348 for copying the client's medical records that the insurer requested
- Insurer refuses to pay the $348; the PH is not advised of the negotiations. Settlement falls apart.

What happened . . . ??? This example illustrates why insureds must be notified of demands above their policy limits and why they must be advised of demands above their policy limits and advised of their right to personally contribute to any settlement above their limits.

## Demands Outside of the Insured's Coverage:
- BI limits – $25,000; PD limits – $10,000.
- Pat demands the BI and PD limits and also demands $500 in miscellaneous expenses unrelated to the loss and not covered by the insured's policy.
- Insurer offers the BI and PD limits and advises Pat of no coverage available for the claimed miscellaneous expenses of $500.
- No settlement occurs and Pat files suit.

What should have occurred . . . ? This example illustrates what is in effect a demand above/outside of the insured's policy limits.  The demand included a demand for $500 for expenses not covered under the insured's policy.  Consequently, the $500 claim was a demand above/outside of the insured's policy limits and was also a demand for damages not covered by the insured's policy.  Since Pat was conditioning the settlement of the BI and PD claims against the insured on the payment of the $500 in miscellaneous expenses not covered by the insured's policy, the insurer here should have immediately contacted the insured to advise of the demand for the $500 in expenses not covered by the policy and should have advised the insured of their right to personally contribute $500 to effectuate settlement of the claims.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

The insurer should follow that conversation with the insured with a confirmatory letter memorializing that the insured was advised of the demand for the $500 in miscellaneous expenses and also memorializing the insured's decision to either make a personal contribution or to decline to make a personal contribution.



**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

# Responding to settlement demands

Responding to settlement demands is a core function of the claims department.  In order to respond properly you must first be able to identify two important types of settlement demands.

**"Time Limit Demand" –** This is a demand for settlement within a specific period of time mandated by either the injured party(s) or his/her attorney. This time starts when GEICO receives the demand in the office, not the time it is delivered to your desk.

The second type of settlement demand is a **"Policy Limits Demand."**  This is a demand that requests payment of our insured's policy limits or an amount in excess of our insured's applicable policy limits.  **You must review and log these claims with your supervisor immediately.**  You will further review your specific states requirements for the proper handling and response in post school.  A key step in the demand-response process is the evaluation of the claim.

It is important that adjusters not make offers on claims when we do not have the required documentation to support a casual relationship between the loss and alleged injuries.  As a claims examiner, it is equally important that we follow all applicable Technical Claims Memorandums, specifically "Response to Settlement Demands", regarding the requirement to not only evaluate a claim for bodily injury, but also to make offers, even if more information has been requested by the examiner to prove the alleged injury is related to the loss.

There has been an increase in the number of responses to settlement demands where the adjuster simply requests additional information without an evaluation of the claim being completed.  The above mentioned TCM serves as a reminder that a claim should first be evaluated before sending correspondence to the injured party(s) attorney requesting additional information.  Furthermore, additional information should be requested only when we believe the information is absolutely necessary to evaluate the claim(s).

Often a demand package fails to provide complete documentation of the claimed injuries and damages, but this fact alone does not relieve us of our obligation to evaluate the information we do possess.  When possible, we must make a reasonable attempt to settle claims based upon what has been documented.  We should also alert the attorney or injured party(s) that if other documentation is forthcoming we would re-evaluate the claim's value.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

In some cases missing documentation may be so significant that a reasonable evaluation of the claim cannot be made.  However, this determination can only be reached after first attempting to evaluate the claim.  There should be only a limited number of circumstances when an offer of settlement cannot be made and the company's sole response is a request for additional information.

A letter asking for additional information or documentation should **never be sent simply to avoid evaluating a file or as a delay tactic**.  We should not request additional information if that information will not significantly change the case value or evaluation nor should we be requesting information we already have within our claim file.

When evaluating a claim where the injured party(s) (either represented or unrepresented) is in active therapy prior to our loss we must review the medical records supplied in the original demand for an exacerbation of a pre-existing condition or additional treatment because of our loss.

**For example:** the injured party(s) was treating every other week with a chiropractor for cervical pain before the date of loss.  Immediately after the accident, she began to treat three times per week for a total of six weeks and underwent diagnostic testing for complaints of cervical and neck pain.  Six weeks later, the injured party(s) was treating two times per month.  Finally, after three additional months, she was released from treatment.  Her medical bills total $6,430.  $1,125 is for the diagnostic tests. In this case, you would *consider* the entire treatment period, but *accept* only six weeks of care with the diagnostic testing as related to the loss due to the exacerbation of a pre-existing condition.

---

### REMEMBER
**All policy limit and time limit demands must be logged with your supervisor!**

---

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## Time Limit Demand & Policy Limit Demand Tenders

> All claims associates are reminded to review TCM 275B, 3rd Revision (dated June 2, 1997) titled:  TCM-Claims-Response to Policy Limit Time Limit Demand-ALL / TCM-Limits-Demand-Response-ALL / TCM-Claims-Response to Demand in Excess of Authority-ALL. Particular attention should be paid to Florida claims in the light of the decision in Berges v. Infinity, No. SC01-2846, Supreme Court of Florida, November 18, 2004.  (See Florida TCM's 1000931 and 1000944.)

When appropriate, tendering policy limits is only one of the many duties consistent with our obligations to act in good faith.  This is true whether our tender is in response to a time demand, or when we have an affirmative obligation to tender in jurisdictions such as Florida.  We must be constantly vigilant to watch for time limits with which we must comply.  Time limits and duties may be imposed by state law.  There may also be time limit demands made by the injured party(s) attorneys, to perform some act or take a series of actions in addition to the payment of the limits.

**For example**, even after a decision is made to pay our policy limits, we still must comply in a timely manner with legally sanctioned requests to provide information regarding the available limits, including proper certification of those limits. Failure to do so may be considered inconsistent with our obligation to act in good faith.  In some jurisdictions, particularly Florida, this failure to act in and of itself has been construed as evidence of bad faith.

In jurisdictions that have legally sanctioned "recipe demands," all claims personnel must be fully cognizant that a failure to comply timely with a single reasonable request can have the same effect as not tendering our limits.  Therefore, it is imperative that examiners respond **in writing** to each item in a recipe demand.  (an example format of a response is provided at the end of this lesson).

Confidential Information of GEICO Companies
© Government Employees Insurance Company

Furthermore, if our ability to comply with a demand is outside of our control, yet falls within the control of the insured (the most common example is a request for the insured to execute a notarized affidavit of assets), we must ensure that we have communicated the request to the insured as soon as possible. We also have the duty to emphasize the time constraints, and follow-up with the insured. The insured must have ample opportunity to comply timely and/or have a reasonable opportunity to consider the request and consult with personal counsel, at their won expense, if necessary. A single attempt to communicate such information is usually not sufficient.

Finally, we cannot overemphasize the importance of documenting and confirming telephone conversations **in writing** where substantive issues pertinent to the payment of limits and/or compliance with a time limit demand are discussed. Those examiners handling Florida claims must be aware of the impact of the decision in the civil case known as "Berges." In this situation, the insurance company received an extension to a deadline over the telephone. The extension was later disputed by the injured party(s) attorney. The court specifically observed that since neither the insurer nor the insurer's retained counsel "…memorialized in writing their understanding…" of the extension, the deadlines had **not** been extended.

An entry in ALOG or notation to the file regarding discussions of substantive issues is not by itself considered documenting the file. **Memorialize it in a letter!** Make certain to follow up and confirm that your correspondence was received. Keep any fax confirmation reports or overnight mail receipts in your file.

All claims associates should be familiar with standards and practices of good faith claims handling, especially in those jurisdictions where they have specific responsibilities.

While some states have set the legal standard for bad faith high (i.e. negligence alone is not bad faith but is one of the factors to consider), other jurisdictions such as Florida have set the bar much lower. Florida statutes state that using "the same degree of care and diligence as a person of ordinary care and prudence should exercise in the management of his own business" is the standard.

However, all standards take into consideration and scrutinize the totality of the claim handling. Potential extra-contractual exposure does not end because we have decided to pay our limits in the case. When exercising your duties, your actions and/or failure to act in accordance with this information can have significant consequences.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM00754

# Example of a Time Limit Demand
## Winfield & Associates, LLC
Attorneys and Counselors

University Tower
3500 Tower Boulevard, Suite 1500
Dunn, NC 22270

Alexis Winfield                                           Telephone (919) 441-1212
Arnold Palmer                                            Facsimile   (919) 440-4454
Willie Etheridge

January 2, 200X

Geico Insurance Company
1 GEICO BLVD
Chevy Chase, MD 20815

Re:     Our client:        Laura Shaffer
          Your insured:      Chad Hill
          Date of Loss       February 15, 200X
          Claim/policy:      4000073520

Dear Ms. Adjuster;

The purpose of this letter is to determine whether you are interested in settling this claim.  Therefore, for settlement purposes only, we would recommend that our client accept the sum of $25, 000.00 in full compromise and settlement of this claim via overnight mail.  We will leave this offer open for twenty days.  If we have not heard form you within twenty days, we will discuss the possibility of litigation with our client. Please return all photographs and estimates upon receipt of this letter.

In addition, my client's signature on any release is contingent upon this specific additional language:
   "By executing this release, my client does not waive his right to pursue his underinsured/uninsured motorist coverage carrier for any additional/supplemental monies which would be deemed recoverable." Furthermore you will not pursue my client with respect to any property damage claim and I am requesting signed insurance affidavits from your insured.

We look forward to hearing from you shortly and are confident that we can reach an amicable settlement of this claim.

Sincerely yours,
Alexis Winfield, Esq.
CC: Client

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM00755

The time limit an attorney/injured party(s) can impose varies from state to state.  If the insured's policy limits were $25,000 or less, this would have been an example of a Time Limit & Policy Limits Demand.

Let's look at some of the conditions mentioned in the above demand letter.

Condition 1 - $25, 000.00 in full compromise and settlement of this claim.
Condition 2 - within twenty days
Condition 3 - via overnight mail
Condition 4 - contingent upon this specific additional language;
Condition 5-  return all photographs and estimates upon receipt of this letter.
Condition 6 - not pursue your client with respect to any property damage claim
Condition 7 - signed insurance affidavits from your insured.

As you can see, a demand letter may not address specific conditions in a bullet form. It is our job as claims examiners to identify the necessary exposure to our insured and GEICO upon receipt of the mail and handle the matter both efficiently and effectively.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**



GTM00756

## **EXAMPLE of a response to a Time Limit/Policy Limit Demand**

January 12, 200X

Law Offices of Winfield & Associates, LLC
University Tower
3500 Tower Boulevard, Suite 1500
Dunn, NC 22270

Sent via Overnight Delivery and Fax to (919) 440-4454

| | |
|---|---|
| Insured: | Chad Hill |
| Claim Number: | 500400007-0101-520 |
| Date of Loss: | 2-15-0X |
| Your Client: | Laura Shaffer |

Dear Ms. Winfield:

Enclosed is our proposed Release of All Claims and check in the amount of $25,000.00 made payable in the manner you prescribed {Condition 1}.  The check and release are being sent together via overnight mail and will be delivered to your office during business hours prior to the expiration of your time deadline {Conditions 2 & 3}.

This letter will confirm my telephone conversation with (ATTORNEY) in your office, on (DATE), wherein he advised that your office will handle the pending lien. It is our understanding that you will protect and pay any and all liens against this settlement out of the proceeds of the settlement.

The enclosed Release of All Claims, with the additional language you requested {Condition 4} is a proposed release, appropriate to your client's claim, to be signed by your client after your review and approval.  Not all release forms precisely fit the facts and circumstances of every claim.  Should you have any questions about any aspect of the release terms, please call me immediately.  You may also send me any suggested changes, additions or deletions with a short explanation of the basis for any changes you suggest; or if you have a revised proposed release that you desire to use, please forward it to me. We consider the enclosed proposed Release a document that represents our settlement of this case on behalf of the insured party.  We do not consider this release a document which creates any new terms or conditions governing our resolution of this claim.

I have enclosed an estimate and color photos of (INSUREDS) vehicle {Condition 5}.  I do not have any photos of your client's vehicle, but I have enclosed a copy of the estimate received in this office from Crawford and Company.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

Finally, I am enclosing a notarized statement signed by me as an authorized GEICO representative and the (INSUREDS) indicating that we will not pursue your client with respect to any property damage claim {Condition 6}.   I am also enclosing insurance affidavits signed by the (INSUREDS) as requested {Condition 7}.

If you feel that there is any aspect of the enclosed documents which does not reflect our settlement of your client's claim, please contact me immediately so that we can revise the document to reflect the exact terms of our agreement.

Sincerely,

TCR2 Examiner
1-800-000-0000 Ext 1111
Enclosures
cc: Mr. and Mrs. Insured

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM00758

TCM- Claims-Response to Policy Limit Time Limit Demand-All
TCM-Limits-Demand-Response-All
TCM-Claims-Response to Demand in Excess of Authority-All

TCM-275B
3rd Revision

**MEMORANDUM**

TO:          ALL CLAIMS TECHNICAL PERSONNEL

FROM:      A. S. Kalinsky, Claims Legal - Ext. 2645

SUBJECT:   Claims Response to Time Limit-Policy Limit Demands

DATE:       June 2, 1997

Even though policy limit, time limit demands have become almost routine, a timely and appropriate response from claims must be made to such demands.

Therefore, the following guidelines should be implemented immediately:[1]*

I.   All new mail should be promptly reviewed by the claims examiner to determine if it contains any time limited material. This would also include a supervisor review of any new mail on the desk of an associate who might be out of the office due to vacation, illness or other reasons.

2.   All policy limit demands in all cases must be discussed with the Claims Supervisor as soon as possible after receipt of the demand. If the supervisor is unavailable, discuss with the claims manager, RLA or AVP of Claims.

3.   Prepare the appropriate response to the demand and discuss it with the RLA in all cases not on control. If the RLA is unavailable, call the appropriate Claims Attorney. If the case is already on control, then the letter should be discussed with the Claims Attorney before mailing.

4.   Once aware of the demand, the Supervisor must be certain the reply is prepared and sent timely.

---

*[1] The purpose of this revision is to clarify that these guidelines apply to any demand above your authority that you are seeking to reject if the value of the case also exceeds your authority. The applicability of the guidelines is not limited to time limit - policy limit demands. See VII herein.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

5.  Any policy limit demand on a case involving catastrophic injury should be discussed with the Supervisor, Manager or RLA regardless of the amount of the policy limit or the apparent lack of liability.

6.  Policy limit demands which involve extremely serious injuries and extremely tenuous liability even if the policy limit is within your authority should be discussed with Claims Legal prior to absolute rejection of the demand.

7.  Any questions about any case involving a policy limit demand or policy limit-time limit demand must be resolved promptly with the appropriate Supervisor, RLA or Claims Attorney.

8.  The Supervisor must maintain a combination desk diary and log of all policy limit-time limit demands to be certain that all receive an appropriate and timely response.

9.  All such demands must be initialed and dated by the Supervisors when received and entered into the log.

10. If it is decided that the demand is to be met or the case settled for some lesser amount, in all cases there must be a cover letter accompanying the settlement draft. Furthermore,  the supervisor must initial the file that the claim has been settled or the demand met and be certain that the cover letter accompanies the draft. The cover letter need only recite the agreed upon settlement amount and indicate the settlement draft is enclosed.

We must be sure to accomplish a timely response in all cases and improve the quality of our responses. A two or three paragraph statement of our conclusions in response to a detailed analysis from the plaintiffs attorney is not adequate.

In that regard, the following outline should be useful in preparing a response to a detailed demand letter.

I.   Liability

A.   Where liability is a strong issue, clearly set out the defense theory of the case. Don't utilize percentages but indicate our position (i.e. little, no, some liability) and give your reasons.

B.   Where liability is against our insured, point to any arguing points we do have, such as seat belt defenses, any grounds for comparative or contributory negligence upon which we intend to rely.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

    C.   Where investigation is incomplete, explain why and give some idea of how long it should take to complete your investigation.

II.    Damages

A. Where information is still needed to evaluate the claim:

    1.   Advise the attorney that you can neither accept nor reject the demand based upon the information in the file.

    2.   Then identify the information you need;  and

    3.   Indicate when and how often you have requested the information.

    4.   Request it again and provide authorizations, and

    5.   If you need an IME, tell them so and again ask that it be arranged.

B.    Where you have all the information you need and liability investigation is also complete and you are <u>not</u> going to meet the demand:

    I.   Advise as to your theory of the case on liability.

    2.   Discuss damages and indicate whether or not they are related or not related to the loss, and why we believe this to be the case.

    3.   Discuss permanency and whether or not it is pre-existing. Where applicable, discuss thresholds, collateral sources, etc. as well as matters in mitigation such as seat belt defenses, comparative negligence, etc.

    4.   Don't use words like "unreasonable" and "exorbitant". If you don't agree or strongly disagree with plaintiffs evaluation, tell them and tell them why in clear understandable language.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

III.   In Suit - Discovery

If the case is in suit, review the items set out above and:

    a.   Discuss the case with our attorney.

    b.   Review discovery done and advise the plaintiff of any further discovery necessary before responding to his demand.

IV.   Extensions

When you want an extension of time, request it _in writing._ Give your reasons and request a response in writing . If you have an extension by phone, confirm it _in writing._

V.   Review

Review every response to a policy limit-time limit demand with your supervisor and/or your RLA. If the case is on control, review it with the Claims Attorney.

VI.   Supervisory Authority

POLICY LIMITS LIMIT DEMANDS- policy limit demands with or without a time limit that are within your authority to settle would also be within your authority to reject.  Policy limit demands that are not within your authority to settle are therefore, not within your authority to reject. Policy limit demands which involve extremely tenuous liability even if the policy limit is within your authority should be discussed with Home Office Claims Legal prior to absolute rejection of the demand.

We are _not_ going to discuss _every_ policy limit or policy limit-time limit demand that we receive. We must discuss those policy limit-time limit demands which might result in a verdict in excess of your authority and which rejection appears to be a termination of further settlement efforts.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

Remember, any policy limit-time limit demands received and the time to respond has already expired, should be brought to the attention of Home Office Claims Legal for discussion as soon as possible.

Lastly, the insured must be kept advised in writing of these critical negotiations.

"VII. Demand Exceeds Authority, But Is Not Time Limit - Policy Limit

A demand which exceeds your authority, but is not a time limit - policy limit demand, may not require all of the steps delineated above. It does, however, always require discussion with your supervisor and a written response.

A.S. Kalinsky

ASK: jkt

CC: John J. Geer, Jr.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

# Lesson Five
# Liability Review
# Student Manual
# TCR2 Module

## Objectives:

1. Review and understand the fundamentals of an investigation.
2. Understand and navigate the liability consultations of ClaimIQ.
3. Define and discuss affirmative defenses to liability.
4. Correctly identify and apply negligence theory to real life scenarios.
5. List three areas of every investigation.
6. Review and understand Multiple GEICO insured guidelines.
7. Review and understand guidelines to Associate Claims Handling.
8. Define Auto Insurance Fraud
9. Identify elements of insurance Fraud
10. Identify Staged Auto Accidents

**2**

## Legal Liability

Definition of legal liability:

- Accountability and responsibility to another enforceable by civil remedies or criminal sanctions.
- Legally enforceable duty of a wrongdoer to respond in money damages to an injured party because of some act or failure to act.

Each person owes the duty of reasonable care to all other persons and the failure to exercise that care constitutes negligence. The law provides a means of recovery when one fails in his duty to another. The liability portion of the contract states GEICO agrees to pay, on behalf of the insured, which the insured becomes legally obligated to pay. GEICO's obligations are generally to an insured only and payments are based on the legal liability of the insured. The insuring agreement obligates GEICO to pay when an insured becomes financially responsible to another party because of some act or failure to act.

GEICO's policy is to settle all claims fairly and promptly. The amount of investigation depends upon the size and nature of claims. Prompt handling of third party claims saves GEICO money by minimizing expenses brought on by defending suits against the insured.

## Criminal Law vs. Civil Law

Criminal law deals with the conduct of the individual in relation to society. Prosecution and punishment of the criminal is brought by and at the expense of the government.

For example: Criminal law is being applied when the insured gets a speeding ticket. He is breaking the traffic laws of the state.

Civil law is divided into broad areas. As an auto insurance company, GEICO is concerned with contract and tort law.

- Contract law concerns a voluntary relationship between two or more parties. A contract is binding between the two parties.
- Tort law concerns the involuntary or implied rights and duties existing between individuals. For instance: the obligation at law to exercise care for the safety of the person or property of others.

**For example:**

When an Insured fails to yield the right of way to the claimant, he/she is breaking a traffic law (criminal law). He/she is also breaking tort law because he/she is not acting in a reasonable manner and not exercising due care for the safety of others.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

**Common Law** is the body of law which originated in largely unwritten form through custom and court decisions in England prior to the American Revolution.  This body of law came with the early settlers to America.  When a dispute is litigated in court, the judge must base his decision on similar cases decided in the past.  This is known as precedent.  In the absence of a statute with respect to a particular matter, common law is usually applied.

**Statutes** are enacted by Legislatures.  When a new statute is enacted, it will be the task of the court to construe and determine its legal effect.  The court will interpret the law and make a decision based on the statute. If the statute is not clear, the court will have more leeway in applying the statute to the case in court.

## Conflict of Laws

Since there is little uniformity among states as to the rules of law to be applied in various situations, it is important to know which law to follow.  Problems appear when an accident occurs in one state and a suit is filed in another.  Insofar as liability claims are concerned, the law of the state in which the accident occurred must be applied to determine whether the substantive elements are present to make an enforceable claim.  The court procedure is determined by the laws of the state in which a suit is pending.  Such things as rules of evidence, burden of proof and statute of limitations are considered procedural.

**For example**:
Our insured travels out of state and is involved in an accident.  The laws of the state where the accident occurred should apply.

What is negligence?
**Negligence may be defined as conduct that falls below the standard established to protect society from unreasonable risks or harm.**

What is a tort?
A tort is defined as a "wrong."  It is an unreasonable interference of one party with the legally protected rights of another party.  A tort is a civil wrong other than a breach of contract.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM00766

4

## Tort liability may arise in one of the three following ways:

- **Intentional Tort** – An act which is done with the intent and design of causing an injury to the person or property of another.  Although most policy contracts exclude coverage when the bodily injury or property damage is caused intentionally, occasionally, intentional acts are alleged and are covered losses.  In all instances, we must investigate thoroughly.

  **Example:**  An insured has not been able to pay for the auto loan so he intentionally runs into a brick wall trying to cause major damage to his vehicle for the insurance money.

- **Absolute Liability (**Liability Without Fault) or **Strict Liability** – This is a legal theory which places a more rigid obligation on those who engage in activities involving more than usual dangers.  The doctrine has its greatest application to situations where injury or damage appears to be almost inevitable.  Although strict liability has little application to automobile liability claims, it can be important in claims under the Comprehensive Liability Policy.

  **Example:**  When the manufacturer of an automobile makes a gasoline tank that explodes upon impact in an automobile accident, the manufacturer is strictly liable for any injuries since they make an inherently dangerous product.

- **Negligence** – Failure to exercise ordinary care.  Negligence may arise out of an act (commission) or a failure to act (omission).  The claims person is generally concerned with claims arising as a result of some act of negligence by the insured.  In some instances, legal liability may be imputed to the insured as a result of some negligent act by another person.  This is known as vicarious liability.

  **Example:**  When a driver runs through a red stop light, they are failing to use ordinary care in their driving.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

## Four Elements of Legal Liability

Legal liability was previously defined as accountability and responsibility to another enforceable by civil remedies or criminal sanctions.  We will be dealing with civil remedies.  The law will allow a recovery to the injured party in money damages.
In order for a plaintiff to receive a monetary recovery, the 4 elements of legal liability must be present.  They are as follows:

1. **Duty owed**
   Common law recognizes certain basic rights as being legally protected.  They are the right to liberty, security of person, property and reputation.  All people owe a duty to use due care toward others in order to protect them from unnecessary risk of harm.

2. **Breach of duty**
   Breach of duty is an intentional or negligent invasion of the legally protected right.  The duty owed must be violated.

3. **Proximate cause**
   The injured party must establish that he sustained an injury as a direct result of the breach of duty.  Courts often use the "but for" test…but for this negligent act, the injury would not have resulted.  The doctrine of proximate cause can be defeated by showing a superseding cause:  an independent cause, person or thing, which occurs between when the original negligent act was committed and when the claimant sustained damages.

4. **Damages**
   Injury and damages are often used synonymously.  Damages may be bodily injury, damage to a reputation or property harm to a person.  Proof of bodily injury must be established by medical experts, lay witness testimony, photos, demonstrative evidence or physical evidence.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**6**

## Prudent Man Theory:

An individual must act with the degree of care that a reasonable, prudent man would use under the same circumstances.

What rules of the road can you apply to the Prudent Man Theory?

1. <u>Keeping a proper lookout</u>
2. <u>Keeping an appropriate distance</u>
3. <u>Maintain control of vehicle</u>
4. <u>Driving at an appropriate speed for the vehicle conditions</u>
5. <u>Swerve to avoid an accident</u>
6. <u>Brakes applied in a timely manner</u>

## Forms of Negligence

1. *Slight negligence*

failure to exercise the great degree of care typical of an extraordinarily prudent person

2. *Ordinary negligence*

failure to exercise the degree of care expected of a person of ordinary prudence in like circumstances in protecting others from a foreseeable and unreasonable risk of harm in a particular situation; *also* **:** conduct that reflects this failure is also called *ordinary negligence* or *simple negligence*

3. *Gross Negligence*

negligence that is marked by conduct that presents an unreasonably high degree of risk to others and by a failure to exercise even the slightest care in protecting them from it and that is sometimes associated with conscious and willful indifference to their rights

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## Individual Responsibility for Torts

Generally all individuals are held responsible for their own acts of negligence.  This is true even of insane persons and infants (minors), though in most states, children under age 7 cannot be guilty of negligence.  The degree of care required of a minor over age 7 is that of a normal, reasonable and prudent person of the same age under the same or similar circumstances.

The standard of conduct for an insane person has not been clearly established.  Some decisions say that the standard should be the same as of sane people, and others contend it should be what would normally be expected of a person in the same or similar mental condition.

Generally a parent is not legally responsible for the torts of his child, unless the child was acting for the parent or has dangerous propensities known to the parent who took no action to curb them.  A parent may also be held responsible if the tort was one that should have been anticipated and prevented by the parent.

## Joint and Several Liability

The concept of joint and several liability concerns the obligation of one joint tortfeasor to pay an entire judgment even if it exceeds that tortfeasor's proportionate share of liability.  At common law, any joint tortfeasor is jointly liable for the entire judgment without a direct right to seek contribution from other joint tortfeasors. The injured party may seek 100% of his/her damages from either one.  This may arise as a result of **Concurrent** negligence or **Successive** negligence

Concurrent negligence is where the acts of two or more individuals occur at the same time producing a single accident that causes injury or damage.  Successive negligence is where the acts of two or more individuals do not combine to form a single accident but do combine to produce the same injury.

**Example:**  A GEICO insured and an uninsured vehicle are involved in an accident which results in damage to an innocent third party.  The Insured is only 25% negligent and the uninsured owner/driver is 75% negligent.  The uninsured person has no job, assets or any way to pay damages.  If Joint and Several Liability is recognized in the jurisdiction, the innocent party can collect 100% from the GEICO insured.

Be aware of the rules regarding joint and several liability in your jurisdictions.  Where joint and several liability is applied, care must be taken to avoid undervaluing a claim where there is an uninsured or otherwise judgment proof co-defendant (joint tortfeasor).  In such situations, the fact that the GEICO insured bears only a small portion of the liability in comparison to the co-defendant will not in reality reduce the exposure of the insured to the full value of the claim.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

8

# Defenses to Liability

## Affirmative Defenses to Liability

**Affirmative defenses** can mitigate the claimant's recovery even where the claimant proves all of the elements necessary to support the case.   Affirmative defenses work to limit or excuse a defendant's liability even if the plaintiff's claim is proven, based on facts outside those claimed by the plaintiff.  The insured has a duty to raise the following defenses in answer to the claimant's action.

Contributory Negligence, for example, is an affirmative defense.  Some additional affirmative defenses are:

1.  Contributory Negligence
2.  Comparative Negligence
3.  Assumption of Risk
4.  Duress
5.  Statute of Frauds
6.  Statute of Limitations
7.  Contract Specific Defenses
8.  Guest Statute

Remember that an affirmative defense can mitigate or bar the claimant's recovery even where the claimant proves all of the elements necessary for a cause of action. They are called affirmative defenses because the defendant has an affirmative duty to raise them in its answer to the plaintiff's complaint and to prove them at trial.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## Contributory Negligence

Contributory Negligence is rooted in common law of tort liability. Any contribution of negligence on the part of the injured party bars his recovery of damages. The slightest act of negligence on the part of the injured party, if found to be causally connected with the injury, would rule out a recovery.

When speaking of negligence involved in a percentage measurement, an act which proximately contributed could, in theory, preclude recovery entirely.

Once contributory negligence is alleged and evidence submitted on the allegation, the TCR2 must decide whether or not the claimant contributed to his own injuries. If the TCR2 decides there has been some contributing factors in the accident that can be attributed to the claimant, he/she must advise the claimant of this and will issue a denial of liability letter to the claimant. Today, contributory negligence is applied only in Alabama, North Carolina, Virginia, Maryland and the District of Columbia.

## Comparative Negligence

This form of liability is used to reduce the harshness of contributory negligence. It is used primarily for the following reasons:

- To avoid the possibility of a capricious application of such a rule when it would seem to favor some equitable recovery for an injured party.
- To avoid relieving the tortfeasor of liability when he or she is the proximate cause of injury to the plaintiff.

Comparative negligence is when the degree of negligence of the claimant is compared to the degree of negligence of the insured. There are different forms of comparative negligence; Pure Form and Modified Form which includes both "Not greater than" and "less than" forms of negligence.

The **Pure Form** of comparative negligence is when each tortfeasor is required to pay for their part in an occurrence. Pure comparative negligence operates to award the injured party some part of his total damages even though the injured party's negligence could be as much as 99% of the total negligent conduct of all parties. If the insured is found to be 75% negligent, the award to the claimant would be 75% of the total damages; also the insured would be eligible for 25% payment for his damages. If both parties were injured, each could bring an action against the other and collect some part of his own damages.

Few states use the Pure Form of comparative negligence. The majority follow the modified form. Under the modified form of comparative negligence, the injured person will not be awarded a recovery when his negligence is "more than" that of the at-fault party.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**10**

Next the Modified Form of comparative negligence is categorized into 2 different types.  The forms of this rule are "Not Greater Than and Less Than:

---

"**Not Greater than**"
The injured party is allowed a recovery if his negligence is **equal to or less than** that of the tortfeasor.

This means when both parties are 50% negligent, both parties can recover 50% of their damages from the other party.

If one party is 49% and the other party is 51% negligent, the 49% negligent party can recover 51% of their damages from the other party.  The 51% negligent party cannot recover damages from the other party.

---

**OR**

---

"**Less than**"
The injured person is allowed a recovery only if his negligence is **less than** that of the tortfeasor.

This means when both parties are 50% negligent in the accident, neither party can recover from the other party.

If one party is 49% negligent and the other party is 51% negligent, the 49% negligent party can recover damages from the other party.  The 51% negligent party cannot recover damages from the other party.

---

The "Not greater than" form of comparative negligence would allow recovery of damages to an insured if the insured's negligence was 50% or less.

**Example:** In a situation where there was a lane change into the middle lane by the claimant and the insured at the same time, each party would be able to collect 50% of his damages from the other party. In the "Less than" form of comparative negligence the above situation would bar each party from recovery of his damages from the other party because the negligence was not less than the other party's.

In each case, the injured person's percentage of recovery is inversely related to his own negligence.  For instance, a driver who is 40% negligent may seek an award of 60% of his damages.

**In all forms of comparative negligence, the plaintiff's recovery is diminished by his percentage of negligence.**

Confidential Information of GEICO Companies
© Government Employees Insurance Company

### What percentage of negligence can you attribute to the insured and claimant?

1. The insured was stopped at a red light and was rear ended by the claimant.

2. The insured was stopped at a red light at 1:30am with no headlights on but the street was well lit with streetlights.  The claimant rear ended the insured.

3. The insured was stopped at a traffic light at 10pm on a Saturday night after coming from a bar.  The insured had 2-3 beers in a 2 hour period prior to the accident.  The claimant rear ended him stating the insured stopped short on a yellow light.

4. The insured stopped at a stop sign and proceeded after looking both ways.  The claimant came from the insured's left and struck the left passenger door with his full front.  Speed limit is 25 mph and there was $3000 damage to both vehicles.  The insured states the claimant was speeding.

5. The insured was driving 45 mph in a 40 mph zone on a hilly road when he popped up over a hill and found the claimant stopped with his left turn blinker on waiting for traffic to clear to make a left turn.  The insured rear ended the claimant.

6. The insured is merging onto a highway with the claimant in front of him in the merge lane.  The insured looks to the left to make sure traffic is clear but the claimant slows down in the merge lane.  The insured rear ends the claimant.

7. The insured and claimant are both backing out of parking spaces directly across from one another when they collide.  Both vehicles are damaged on the rear bumper.

8. The insured has backed out of a parking space and is stopped putting the car into drive.  The claimant who was on the opposite side of the parking aisle starts backing out of his space.  POI for insured is right rear ¼ panel and the damage to claimant vehicle is rear bumper.

9. The insured is driving through a parking lot not paying attention to the painted lines.  He is looking ahead of him to find a parking space close to the store.  The claimant pulls out of an aisle and collides with the insured.  Neither driver is very descriptive in their accident description and cannot say where the other driver came from.

10. The insured turns left on a solid green light because the car in the left lane, opposite direction, waved him through. The claimant is driving in the right lane of three (opposite direction) and collides with the insured as he is clearing the intersection.  The damage to the insured vehicle is to the right rear ¼ panel and the damage to the claimant's vehicle is the front.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

12

## Assumption of Risk

In some states, assumption of risk may be used as a defense.  The underlying theory is that the injured person consented (either expressly or implicitly by his conduct) to relieve the defendant from liability for the defendant's negligence.

**Example:**  If the injured person consents to ride in an automobile driven by someone he knows to be intoxicated, he or she assumes the risk of the consequences, i.e., that the driver may have an accident. The following usually makes the defense of assumption of risk applicable.

1. The injured party must have knowledge of and appreciate the risk involved.
2. The injured party must make a voluntary choice to encounter the risk.

## <u>Duress</u>

Duress, in law, actual or threatened violence or imprisonment, by reason of which a person is forced to enter into an agreement or to perform some other act against his will. The constraint or threat of constraint must have been directed toward the person thus compelled or toward the wife, husband, parent, child, or other near relative of the person compelled. Anyone who makes a contract under duress is entitled to void it and be free of its obligations, but in order to release him from the contract duress must be shown to have overcome his mind and will. However, annoyance and persuasion do not constitute duress

**Example:**  An insured is involved in a car jacking where the driver is forced to operate the vehicle in a manner that causes damage or injury while under fear for his or her own life.

## Statute Of Frauds

Statute of frauds, basis of most modern laws requiring that certain promises must be in writing in order to be enforceable; it was passed by the English Parliament in 1677. In the United States, although state laws vary, most require written agreements in four types of contracts: contracts to assume the obligation of another; contracts that cannot be performed within one year; contracts for the sale of land; and contracts for the sale of goods. (The Columbia Encyclopedia, Sixth Edition. Copyright 2006 Columbia University Press)

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

Application of this defense in automobile insurance claims is most often applied when there has been an alleged sale of a vehicle which may or may not obligate the owner, depending upon the status of that sale. The Statute of Frauds would operate to mandate that the person promoting the argument of a sale must produce a signed writing which evidences the agreement. In other words a person cannot escape liability simply by saying "I sold that car to the driver before the accident" without also producing a sales contract. The contract itself between purchaser and seller is not void without the contract, but proving it to others may be problematic without the writing.

## Statutes of Limitations

Each state has its own statutes of limitations specifically setting out the period of time within which a claim for property damage or bodily injury must be settled or suit instituted.  In most states the statutory period for property damage claims is different than that for bodily injury actions.  Time usually begins to run when the tort is committed and ceases when suit is filed.  (See the Claims Manual, Legal Liability chapter)

**Example**:  If the statute of limitations is 2 years to make a property damage claim, the claimant cannot file suit against the insured more than 2 years from the date of the accident.

## Contract Specific Defenses

A contract specific defense as it related to automobile insurance claims may occur in one of several forms.  For an insurance contract to effectively provide coverage for a loss, conditions precedent to coverage must be met.  These include the insured's obligation to pay his or her premium, to provide notice to the company when a loss occurs, to provide assistance in and cooperate in the investigation and or defense of a claim and to provide timely notice of any legal proceedings.  A failure to meet any of these conditions provide a potential defense to paying or handling a claim.

Insurance contracts are also written with exceptions or an insured may choose to give up or add elements of coverage.  Examples of this would be endorsements that effect coverage such as excluding coverage to certain drivers or adding coverage for items like collision, other than collision or rental reimbursement coverage.  The specifics of these endorsements determine if coverage applies to a loss and if not covered act as a defense.

Insurance contracts define under what circumstances coverage applies.  Exclusions are written into insurance contracts to limit certain kinds of exposure.  An example would be the exclusion of coverage where a driver who does not have permission takes a vehicle, operating it with out the specific or implied permission of the owner. In this case the exclusion provides a defense for the insurer, so that payments are not made for an occurrence the insurer did not intend to cover.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**14**

### Guest Statute

A guest is a gratuitous passenger; (one who has not paid for the ride) and from whose presence the driver does not derive any financial advantage.  In some states, if injured, the guest passenger must prove gross negligence to establish liability.  In the absence of gross negligence, the Guest Statute provides an avenue of defense.

# Other Theories of Defense

### Act of God

An act of God has been defined as any accident, misadventure, or casualty when it happens by the direct, immediate and exclusive operation of the forces of nature, uncontrolled or uninfluenced by the power of man.

**Example**: Consider an individual claiming to have been injured due to a tree falling on the car in which he was riding.  If the sole cause of the tree falling was the high winds of a tornado, the Act of God defense applies.  However, if winds and improper maintenance of the tree by the owner combined to cause the collapse, the act of God defense will not apply.

### Unavoidable Accident

This defense may be briefly summarized as follows: If a motorist has exercised the highest degree of care the circumstances require, and has nevertheless injured another, the accident is said to be unavoidable, i.e., one for which no liability will attach.  An unavoidable accident is an inevitable occurrence that is not to be foreseen and prevented by vigilance or care.
To successfully use the defense, the defendant must show that the accident happened from an unforeseen cause, or in an unexplainable manner.  These are questions of fact and often left to the decisions of juries.

**Example**:  Situations where the defense might be used include mechanical failure despite proper maintenance or a child "dart-out".  If the insured struck a child in an area where the presence of children in the area was unknown and was proceeding at a lawful and reasonable rate of speed, maintaining a proper lookout, and otherwise obeying the rules of the road when the child suddenly ran out from between two parked cars into the driver's path, the insured may not be held liable for the child's injury.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM00777

## Sudden Emergency Doctrine

Under this rule, an insured (defendant) who acts negligently may not be liable for that negligence when he acts as a result of a sudden peril created by someone or something other than himself (and, in rare cases, by his own sudden illness). The doctrine has three important qualifications: (1) the defense cannot be invoked by one creating the emergency except possibly an insured (defendant's) sudden illness; (2) the emergency must not have been avoidable through due care; and (3) the emergency must be so sudden as to leave no room for deliberation or intelligent action.

**Examples**: A motorist takes evasive (but negligent) action following the sudden crossing over a double yellow line by an oncoming vehicle. A sudden unanticipated medical emergency leads to loss of control of a motor vehicle. (also see Act of God) A sudden, unanticipated failure of steering, brakes or other car component resulting in loss of control. (also see Latent Defect)

## Latent Defect

A latent defect is a defect that is hidden. This defense is most frequently used when the accident is caused by a sudden unanticipated failure of the car to operate properly. The defect must be one that would not be discovered through routine maintenance

**Example**: The brakes or steering mechanism suddenly, without prior notice, fail to operate. If the insured had or should have had actual or constructive notice of the defect, there is no latent defect and the case simply involves negligence. However, if he did not have notice, if it cannot be established that he was negligent in the maintenance of his car, and if he acted as a reasonable and prudent man when confronted with the emergency situation, the insured may not be legally liable.

As a rule, it is extremely difficult to successfully defend a case based on a latent defect alone. Nevertheless, this defense can be used very effectively in reducing settlement demands. To properly establish the defense of latent defect, investigation must be conducted immediately. The defective part should be preserved and statements taken from experts and others who tested the operation of the car.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

16

### Inherent Defect

If the insured owns an automobile which is in some way defective, he may be liable for property damage or injuries resulting from the use of the car by another driver if the driver does not have actual or constructive notice of the defect.  Generally automobiles are not considered inherently dangerous unless they are defective in some manner.

**Example:**  if the insured knows his brakes do not work and he lends his car to a friend without warning him about the defective brakes, the insured may be held liable for the resulting damage, both to the driver of his car and to third parties.

## Vicarious Liability

Vicarious liability may be briefly defined as placing responsibility for one person's conduct on another whose actions may in no way, be wrongful.  Some examples of the application of vicarious liability are:

### Imputed Negligence

Situations involving imputed negligence are generally decided on the basis of the agency relationship existing between the master and servant, principal and agent, owner and driver, or parent and child.  For an agency relationship to exist one person must be under the authorization, instruction or command of another.  The agent (or driver) must be performing some act for the principal (or owner).

If it can be established that an agency relationship exists, then the negligent actions of the agent (driver) may be imputed to the principal (owner).  The agent does not have to be under the immediate control of the principal, i.e., the owner in the car when the loss occurs.  If the owner was in the car, there usually is a presumption of agency, since under ordinary circumstances the owner controls how and where the vehicle is driven.

In some states the negligence of the driver is imputed to the owner by statute if the vehicle is being driven with the permission of the owner.  In other states the owner is liable for the negligent operation of a motor vehicle by a member of his family. (Family Purpose Doctrine).  A few states make the owner liable only if the driver is a minor.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## Agency

While a legal distinction is made between agent-principal and master-servant, both will be referred to as employer-employee.  Master-servant usually describes a relationship of employment for wages, whereas a "principal-agent" need not be for wages.

Under the doctrine of Respondeat Superior (Latin for "let the master answer"), the employer is responsible for torts of employees committed in the scope of their employment.  If an employee is involved in an accident while performing some act in connection to his employment, the employer may be held liable.   The employee is also liable for his own negligence, but frequently the prospects are better of recovering a larger verdict from the employer who may also have additional liability insurance available.  If an employer is required to make some payment because of a negligent act of an employee, he is entitled to reimbursement from the employee and usually has a right of action to enforce such a claim.  It is usually held that intentional tortuous conduct by servants (employees) is not within the scope of employment.

**Example**:  The boss sent his employee out to an office services store to make copies for an upcoming meeting and the employee was involved in an accident.  Liability may be attributed to the employer because the employee was on an errand for the employer.  For an agency relationship to exist it is unnecessary that there be a formal employment arrangement.  It is sometimes sufficient if one person merely performs some act for another.

## Negligent Entrustment

The principle of negligent entrustment is applied when a vehicle owner negligently entrusts his vehicle to another with the knowledge that the person is incompetent or unfit to drive.  The owner may be held liable for an injury inflicted by the use of the vehicle by the driver, provided that the claimant (plaintiff) can establish that the injury was proximately caused by the driver's disqualification, incompetence, inexperience or recklessness.  Liability arises out of the act of entrustment of the vehicle from the owner with permission to the incompetent driver.

**Example:** The parent of a minor child who has had several accidents and speeding tickets may be held responsible for an accident that the minor child caused.

**Another example would be**:  Your friend's license was revoked for multiple DWI violations.  After consuming several beers at your backyard barbecue, he asks to borrow your car to go pick up another friend.  You toss him the keys, knowing he has no license and has been drinking all afternoon.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

18

## Social Hosts

Some states have now found social hosts liable for serving alcohol to guests who later cause injury to themselves or others.  When a social host supplies alcoholic beverages to a guest who becomes intoxicated thereby, the question arises whether the social host is liable to the intoxicated person or to third persons who may be injured as a result of the drinker's condition.  The general rule is that a person who supplies alcoholic beverages at a party or other gathering owes no duty to either the guest/drinker or the public at large and is not liable for the consequences of an accident occurring as a result of such intoxication.

This general rule has been modified in some states by statute and imposes liability on social hosts.  Usually, these cases involve intoxicated minors, on the theory that the social host has violated a state statute:  i.e., prohibiting the furnishing of alcoholic beverages to minors.

Some courts have even imposed liability on social hosts for providing alcoholic beverages to an adult guest.  Some recent cases have involved the liability of an employer who hosts a party where alcohol is served.  In an attempt to find liability, the plaintiff may argue that even though there is no direct liability for providing alcohol, there may be vicarious liability for the negligence of an intoxicated employee.

## Liquor Control Laws/Dram Shop Laws

All states require retail vendors of alcoholic beverages (i.e., bars, taverns, restaurants, liquor stores) to be licensed as a liquor vendor and require them to follow state regulations.  The sale of alcoholic beverages to minors or to obviously intoxicated persons is prohibited by law or regulation.  A violation may subject the vendor to a fine or other penalty.  Upon violation, the question arises what liability, if any, the vendor may have to a third person who is injured in an automobile accident caused by an impaired driver.

In some jurisdictions, the vendor who sells liquor to an already intoxicated or minor driver is liable for damage caused by the driver.  In other states the liquor vendor who sells liquor which causes the purchaser to become intoxicated is responsible for damage which results.  Many states have enacted Dram Shop laws (also called Civil Damage acts) which specifically permit an injured person to bring an action against a supplier of intoxicants (usually, but not always limited to commercial vendors) to another person (often limited to a minor or someone obviously intoxicated) causing or contributing to that person's intoxication.  It is important to explore thoroughly the possibilities of obtaining contribution from liquor vendors in those cases in which the insured is alleged to have been intoxicated.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

## JOINT ENDEAVOR

A joint endeavor forms a legal relationship that takes the form of a short term partnership in which the persons jointly undertake a transaction for mutual benefit. Generally each person contributes assets and share risks. Like a partnership, joint enterprises can involve any type of activity or transaction and the "persons" involved can be individuals, groups of individuals, companies, or corporations.

Using the concept of Joint Endeavor as a means of transferring some portion of liability in automobile claims may have its best application in claims involving alcohol or group trips.

**Example:** Two individuals meet at a bar to socialize.  During the course of the evening they share in buying drinks for one another, pooling their resources.  Deciding that the social environment is somewhat slow the leave.  They get into the vehicle owned by one of the friends and driving down the street; the driver runs off the roadway and causes injury to the passenger.  Establishing evidence of the joint endeavor provides a defense against claims brought by the passenger.

Suppose the scenario went like this.  In addition to the time spent at the bar, the two friends upon leaving the bar stop at a local convenience store and again pool their resources and buy a six pack of beer.  Because the driver is being cautious the passenger opens the drivers can and passes the beer to him.  They stop by another friend's house and the third friend decides to join them for the remainder of the evening.  The two friends that began the evening together give no outward signs of being intoxicated and the third friend gets into the vehicle in the back seat.  He notices the six-pack but sees that only two cans are missing and thinks nothing more of it.

While traveling down the street the driver crosses the center line and strikes another vehicle causing injury to both of his passengers and injury and damage to the other vehicle and its passengers.

 The driver has a minimum limits policy and the damages clearly exceed them.  In this situation the initial friend that has been participating in the joint venture, including assisting the driver to continue to consume alcohol in the vehicle will likely be bared from recovering for his injuries based on the Joint Endeavor.

What about the other passenger or the injured people from the other vehicle?  Since the third friend did not participate in the joint endeavor established earlier this would not be a viable defense to his claim.  Assumption of Risk may likely not apply to him either since he saw no outward signs of impairment and the two consumed beers would not be significant to cause him concern.  And what of the injuries in the other vehicle; as we mentioned there is not sufficient limits to pay the claims of all the parties based on the drivers policy.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

20

In this situation the friend that is engaged in the Joint Endeavor with the driver may have an exposure that would allow any policies that cover him as an insured to contribute because he is using the vehicle of the driver with consent.  The accident occurred out of his "Ownership, maintenance or use of a non-owned vehicle".  As a result, a claim may be presented to him seeking additional coverage for this accident. If available, his insurance policy may apply and provide an additional source to pay damages from this accident.

A joint endeavor forms a legal relationship that takes the form of a short term partnership in which the persons jointly undertake a transaction for mutual benefit. Generally each person contributes assets and share risks. Like a partnership, joint ventures can involve any type of activity or transaction and the "persons" involved can be individuals, groups of individuals, companies, or corporations.

## Bailment

What is bailment?, It is the delivery or entrustment of personal property by one person to another, and held by that person for a specific purpose or objective, with the understanding that the property will be returned when the purpose or objective is accomplished in the same condition in which it was delivered or entrusted.

The most typical example of this that we see is the lending of a vehicle to another. The owner of the vehicle (The Bailor) lends his vehicle to another person (the Bailee) for a particular purpose.  It is said that the vehicle was bailed, or loaned.

It is important to remember that in a bailment situation the Bailor (Lender) retains ownership and/or title to the property and only parts with possession for a specific purpose or objective, and usually for a specific period of time.

Now we can look at some situations where a claim could lie against the borrower or bailee of the property because of his/her own negligence.  Suppose the neighbor that borrowed the insured's vehicle to pick-up his/her own prescription entered an intersection on a stale yellow light. There was a dispute as to what color the light was when the intersection was entered.  The insured was deriving no benefit from the neighbor's use of his vehicle and clearly holds no fault.  The neighbor owed a duty of the highest care for the insured's property.

Who owes the insured for his damages in this scenario?  In this bailment situation, the insured is entitled to make his/her claim against the neighbor who borrowed the vehicle.  It may be that both the neighbor and the third party bear responsibility, but under this bailment situation, the borrower is responsible for the property.  Since he/she was negligent and violated the highest standard of care, he/she can be held responsible for the damage.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

Bailment is also an affirmative defense GEICO can use in arbitration to reduce damages that might be owed to another carrier.

**Example:** Bill is the owner of a vehicle insured by another carrier. Lana Asks Bill to use his vehicle to run to the store and get her lunch. Bill agrees and provides Lana with the keys. Lana is traveling 50 mph in a 35 mph zone through an intersection. A GEICO insured driver, traveling on the cross street, fails to stop at the red light and the vehicles collide. Both parties bear some degree of negligence in the loss.

GEICO receives a demand from Bill's insurance company for damages to Bill's vehicle. In response GEICO argues the affirmative defense of bailment to reduce damages because:
- Lana is not the owner of the vehicle
- Lana had Bill's permission to drive the vehicle and was within the scope of that permission
- Bill was not in the vehicle with Lana
- Lana was using the vehicle for her own use and there was no benefit to Bill
- The loss state recognizes bailment

We would argue that Lana is responsible for her proportionate share of the damages, and we would look to pay only that amount of the damages directly related to our insured's negligence.

In this example had our insured loaned their vehicle to Lana and she ran a red light being solely negligent for damage to our insured's vehicle, we could pursue her insurance carrier for the damages to our insured's vehicle.

**Even simple losses can involve bailment:** John is a GEICO insured when he loans his vehicle to his friend Sandy. Sandy was using the vehicle for her own use and John was not in the vehicle. Sandy and the adverse driver collide in a parking lot when both drivers back out of a parking spot at the same time. List the reasons GEICO could recover in arbitration from Sandy's carrier. If the following questions can be answered affirmatively, bailment would apply.

## Bailment Checklist
1. The driver obtained permission from the owner of the vehicle
2. The vehicle was being used within the scope of this permission
3. The driver of the vehicle contributed to the negligence of the accident
4. The owner of the vehicle did not benefit from its use

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

22

# Federal and State Government

From a contribution or payment recovery standpoint, it should be realized that generally the United State Government and state governments may not be sued without consent.  The United States Government has set out specifically by statute, the Federal Tort Claims Act, those conditions under which it has consented to be sued. Therefore, when handling claims against the Federal Government, it is necessary to refer to the FTCA.

## Federal Tort Claims Act

The Federal Tort Claims Act provides the only mechanism for instituting a claim against the United States Government regarding property damage or personal injury resulting from the acts of persons acting within the course and scope of employment or duty as an employee or agent of the federal government.  The FTCA creates immunity from personal liability for federal employees who cause damage or injury while driving a vehicle within the scope of employment.

If a claim is made against an insured for damages caused while operating a vehicle in the course of employment with the federal government, the claim or suit papers should be tendered to the individual's supervisor for processing under regulations implementing the FTCA.

The first step is for the government agency to determine whether the accident occurred within the scope of employment.  If the agency certifies that the accident was within scope, the appropriate US Attorney's office will have the Government substituted for the individual.  If in suit, the U.S. Attorney's office will have the case removed from state court into federal court.  Once this is done, the insured is out of the action.  In cases where it appears that the FTCA should protect our insured, care must be taken to monitor the situation until the governmental agency has certified scope of employment.

If the agency determines that the insured was not acting within the scope of employment at the time of the accident, we must be ready to step in to take over defense of the insured.  While it is possible to litigate the issue of scope of employment, our obligation to defend our insured continues until that issue is decided against the Government.

The FTCA applies only to employees (including military service members) of the **federal** government.  Many states have similar statutes which apply to state government employees.  Care should be taken to research local law when confronted with a claim based upon conduct of a state government employee in the scope of that employment.  Some states require insurers to provide minimal liability coverage for federal or state employees.  Coordinate these issues with your RLA and Claims Home Office Legal.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

GTM00785

## The Feres Doctrine

While the FTCA allows an individual to **make** a claim against the Federal Government due to the negligent act(s) of an employee (agent) of the government, the Feres doctrine (also referred to as the Feres rule) **bars recovery** of damages from the government under the Federal Tort Claims Act for injuries and property damage sustained in the course of activity incident to military service. The Feres Doctrine also prevents the parties from suing each other in a civil action.

**Example:** Two uniformed active duty service members are on a military installation operating their privately owned vehicles and are under orders to report to their duty stations following required annual physical fitness testing. They collide at an intersection controlled by stop signs. Since they are under orders and acting within the scope of their duties or engaged in activities incident to service they are barred from making a claim against each other. GEICO would deny the claimants damages, regardless of liability, under the principle of the Feres Doctrine. Each service member will file for any applicable first party coverage.
Questions need to be asked when an active duty service member is involved in an accident on government property.

Theses include:

1) What was the defendant's service status at the time of the accident?
2) What were the defendant's specific activities at the time of the accident and was he/she acting within the scope of his/her military duties?
3) Was the plaintiff an active duty serviceperson?
4) Was his/her activity incident to service?
5) Where did the accident occur?

Your decision making process should include an analysis of all of these issues.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

# Non-Negligence Related Defenses

## Charitable Immunity

There is no uniform rule as to whether charitable organizations are liable for injuries caused by their members while performing the organization's work.  In some states, the organizations are immune, and in some, they are not.   The tide of the law is away from immunity, however, and the law in each jurisdiction must be checked.  Please note, that while an organization may be immune, the member performing the negligent act is, <u>in all likelihood, not immune</u>.

**Example**:  The negligent driver of a church van may not be immune from liability, though the church may have immunity.

## Intrafamily Immunity

### 1.     Husband and Wife

The original common-law concept of the unity of marriage merged the legal existence of the wife into that of her husband.  The wife could sue or be sued only in the name of her husband, with the husband acting as her guardian.  The Married Women's Acts emancipated married women from this common-law disability.  This allowed them to sue or be sued in their own names, without the involvement or concurrence of the husband.

The courts reexamined the question of whether or not a married woman could sue her husband in tort, and what effect, if any, the statute had with relation to intra-family immunity.  The majority of the courts held that the Married Women's Acts did not affect the family immunity doctrine.  The doctrine constituted a bar to the maintenance of any action against the husband based on tort liability.  The family immunity doctrine prevents a husband from maintaining an action against his wife based on tort liability and vice versa.

Inter-spousal immunity is no longer applied for torts arising out of automobile accidents in the District of Columbia and all states except Arkansas, Georgia, Louisiana, Utah and other jurisdictions have partially abrogated the immunity to the extent liability insurance exists.  Questions in this area should be directed to your RLA.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**2. Parent and Child**

The family immunity doctrine applies to actions in tort between a parent and an un-emancipated child (a minor still living at home) on the theory that barring of suits is necessary for the preservation of family harmony and parental authority.  The rule has been applied to various family configurations: natural father and mother, stepfather or stepmother, or any other person standing in place of a parent to the child.  In short, the suit between these two parties is barred, whether brought by the child against the parent or by the parent against the child.

There has been a recent trend in the law to narrow or abolish parent-child immunity.  The latest decisional law or statutes should be checked for the particular jurisdiction.

Where the child has attained the age of majority or has been emancipated (released from parental authority) prior to the occurrence of the accident, the reason for the rule no longer exists.  Suits by such a child or suits by a parent against such a child are permitted.

Where the child has not attained his or her majority or has not been emancipated at the time of the accident and suit is begun by either party against the other after the child has been emancipated or has attained his or her majority, the general rule is that such suits are not maintainable.  This is because the rights of the parties are determined as of the date of the accident, not the date suit is brought.  If the plaintiff—whether the child or the parent—could not maintain the action as of the date of the accident, the subsequent change in the child's legal status does not create a cause of action where none was permitted before.


# Last Clear Chance

The doctrine of last clear chance applies when the claimant's (plaintiff) actions contributed to the cause of loss, but the wrongdoer (defendant) has the "last clear chance" to avoid the loss.  That **failure to avoid the loss** would be considered the proximate cause of the loss.  The theory is based upon the fact that the wrongdoer (defendant) had sufficient opportunity and time to avoid the accident once the claimant's position of peril was, or should have been, observed.  If there wasn't enough time to react, then the theory does not apply.

Recovery may be had under the last clear chance doctrine even though the injured party was contributorily negligent.  It is most frequently applicable in those situations in which the injured party is inattentive and oblivious to dangers; for example, an elderly man walking into the path of a car while reading a newspaper.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

26

The last Clear Chance Doctrine usually requires the following elements:

- The injured person must have been in a perilous position from which he could not extricate himself.
- The wrongdoer (defendant) could have discovered the injured person's predicament exercising reasonable vigilance.
- There must have been a sufficient period of time to avoid the accident.
- There must have been a failure on the part of the wrongdoer (defendant) to act with reasonable care.

In some jurisdictions the last clear chance doctrine has been modified.  It may even have been given a different name, such as the "discovered peril" doctrine.  This doctrine has effectively been abolished in comparative negligence jurisdictions because last clear chance is by definition included within the comparative fault calculation.  Last clear chance is usually used in contributory negligence jurisdictions.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## Fundamentals of every Investigation

The three elements of every claim are **coverage, liability, and damages.** Each element must be investigated, evaluated, and negotiated based upon its own separate and unique criteria and circumstances.

The first task in every investigation is to verify proper coverage. The question that must be addressed before any claim is handled should be "Is there coverage for this loss?" The TCR2 must determine if there is a valid contract in effect at the time of the loss and if so, whether or not the loss is a covered loss under the terms, conditions, or exclusions of the policy. This is considered part of the coverage investigation and it is covered in the coverage investigation lesson.

Investigation is the process of gathering facts and information surrounding the accident circumstances. Evaluation is the process of determining the credibility of the facts and information surrounding the loss. Investigation and evaluation will be treated as an integrated process because every time a new piece of information is gathered, it needs to be evaluated and compared to all the other information collected on the claim.

Negotiation will be covered in a future lesson. TCR2s will be negotiating some BI claims where the insured is partially or wholly negligent (depending on your region) and also property damage claims.

The TCR2 is encouraged to make frequent evaluations as the investigation progresses. Evaluating data as soon as it is received allows you greater control over the direction of the claim. Frequent and open-minded evaluations allow you to change directions and maintain a focus on the important issues as the claim evolves.

The purpose of the investigation is to secure necessary facts. Once obtained, the claim can be evaluated for settlement or possible denial or disclaimer.

Keep in mind, the primary objective is the early resolution and disposition of each claim. The claim should only be investigated to the extent that the TCR2 can justify and rationalize an equitable decision. The degree and extent of the investigation is largely subjective from one person to the next. The TCR2 will want to avoid the habit of over-investigating or "beating a dead horse." Also, avoid investigating issues not in dispute. The key is to acquire an adequate amount of credible information in order to make a rational and justifiable decision. The policy contract clearly gives us the right to investigate and the insured is under a contractual obligation to cooperate with GEICO as we conduct our investigation.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

28

## Investigation involves:

- **Inquiry is the process of obtaining necessary but unknown facts.**
- **Verification is an assessment of the accuracy of those facts.**
- **Comparison is the weighing of the evidence as it relates to all other evidence.**

As investigative techniques are learned, quality liability and coverage decisions increase proportionately with the amount of real information you have acquired. Continually compare new information with that already obtained so that any conflicts can be immediately recognized.  When newly acquired information contradicts previously gathered information, both must be examined.  Further investigation is needed to eliminate the conflict or determine which version of the facts is more credible.

The extent of investigation will depend on the nature and complexity of the accident and the issues at hand.  For example:  the TCR2 will expect to investigate an intersection collision involving serious injuries and extensive damages more thoroughly than an accident involving two cars with 1 car hitting a parked and unoccupied car on the side of the road.  A case of clear liability involving physical damage only or minor injuries may require a minimal amount of investigative effort.

> **The objective of every investigation is**
>
> **A fair settlement/resolution at the earliest possible time**.

Some sort investigation of every claim is necessary.  The first step is to ask yourself:

- Was the policy in effect at the time of the loss?
- Is coverage in order?  If so, are the circumstances covered under the policy contract?
- If it is a liability claim, is the insured legally liable?
- How much will it cost to settle the claim?

In other words, investigation includes reviewing coverage, liability, and damages on every file.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**Investigation is not an end in itself.** It is merely the basis for the settlement, denial, or compromise of a claim and is of real value only when it is commensurate with the size or the nature of the claim. Once a claim is settled, there is no longer a need for investigation on that case.

GEICO spends large sums of money for investigation of claims and the defense of lawsuits. Telephone adjusters and claims examiners are responsible for making sound claim settlements and at the same time controlling expenses of the investigation and defense. Ask yourself this question in every claim you handle (every time a file is reviewed), "Now that I've got the facts, can this claim be settled?"

While it is costly to over-investigate claims, it is even more costly to under-investigate. Judgment cultivated through experience enables a competent telephone adjuster to determine the proper level of investigation.

## What is a Thorough Investigation?

A thorough investigation is needed on files involving coverage issues, complicated factual situations, suspicious circumstances, questionable liability, or questionable injuries. Proper verification of coverage, coverage codes and GPUP is paramount. In addition, the examiner must investigate the following;

1. **The essential items** include contact with the insured, claimant(s), passengers, potential witnesses and the investigating police officer. (TIP)
2. **Recorded interviews or signed statements** should be obtained to determine the various versions of the loss, the number of people involved and the injuries sustained.
3. **Inspection of the vehicle** is important to not only measure the dollar amount of damage owed, but also the point of impact. Photos are also taken at the time of inspection and verification of proper pay codes.
4. **Photos of the accident scene** from the direction of travel can assist in reconstructing the accident or accident scene. While photographing the scene, the investigator should be sketching or noting the number of traffic lanes and any landmarks that may have obstructed vision or could be used in distance measurement.
5. **Other sources of investigation** may include DMV driving record through a driver's license check. ISO ClaimSearch is the only comprehensive all-claims database and system for claims processing and fraud detection
6. **Information from past accidents in the Claims History Index (CLINQ)**
7. **Police reports,** weather reports, city engineering records on malfunctioning traffic lights or road maintenance; SIU services to conduct activities checks, financial status, work habits, etc. It is important that the examiner fit the investigation need to the circumstances.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

**30**

When investigating an injury claim, we should have the injured person sign a medical authorization form initially. This form enables the investigator to secure the injured person's medical history from doctors and hospitals without lengthy "red tape" procedures and at a minimal cost. If this form cannot be secured, the TCR2 should request the bills and reports from the Insured or his/her representative directly. Send the medical authorization to the Insured or if represented by counsel, the Insured's attorneys immediately or as soon as you get a letter of representation.

## Pay Codes/Alpha Codes

|  | Good (ok to pay) | Bad (do not pay) |
|---|---|---|
| *First Party/Insured* | | |
| Collision | 2 | 1 |
| Comprehensive | 8 | 7 |
| UMPD | 10 | 9 |
| Inspection Only | | 13 |
| | | |
| *Third Party/Claimant* | | |
| Property Damage | 5 | 4 |

**Alpha codes** are placed behind the numerical pay code to provide additional information to the AD adjuster or to indicate special circumstances exist.

| | |
|---|---|
| A | Arms Rental Reservation |
| B | Bodily Injury To Insured Or Claimant |
| C | Rental CASHOUT Requested |
| D | Double Insured |
| G | Glass already handled |
| I | Child Passenger Restraint in Use |
| L | Claimant Direct Bill Other Than Enterprise |
| M | Mechanical Breakdown |
| N | New Policyholder Less Than 90 Days |
| P | Property Other Than Auto |
| R | Policyholder Direct Bill Other Than Enterprise |
| S | Attempt To Settle Bodily Injury Claim Of Claimant |
| U | Uninsured Motorist Claim Paid Under Collision |
| V | Diminution of Value |
| W | Waive Deductible |

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## Investigation of Auto Insurance Fraud

What is Auto Insurance Fraud?  In a broad strokes definition, fraud is a deliberate misrepresentation which causes another person to suffer damages when believing these misrepresentations to be true, usually monetary losses. Most people consider the act of lying to be fraudulent, but in a legal sense lying is only one small element of actual fraud. A salesman may lie about his name, eye color, place of birth and family, but as long as he remains truthful about the product he sells, he will not be found guilty of fraud. There must be a deliberate misrepresentation of the product's condition and actual monetary damages must occur.

Auto insurance fraud is a method by which an individual or insurance company claims more money than they are entitled to. Automobile insurance fraud can involve a staged car accident or a real accident with bills that hide the false claims or state that the costs are higher than they actually are. When a car accident is staged as a way to commit auto insurance fraud, the driver will usually take out an insurance policy that will cover the damage from the accident. The driver then stages an accident to collect more money than he or she deserves.

## Terminology

**"Cappers/Runners"** - Individuals typically involved in recruiting "stuffed passengers" who will be used to submit fraudulent claims to the insurance companies. "Cappers" are typically paid a percentage of the total receipts from the false claims. They supply cooperating passengers for the participating attorneys and medical providers.

**"Stuffed passengers"** - Individuals recruited to make false claims regarding their involvement in automobile accidents. They are typically coached as to the details of the fictitious collisions and resulting fictitious injuries.  In some instances these individuals are not aware of their involvement in fraudulent activity.

**"Nail car"** - The "victim" vehicle involved in the staged accident that is hit by the "hammer car." The vehicle is often "stuffed" with passengers, who then file the fraudulent claims with the assistance of legal professionals.  In some cases these vehicle are empty, but staged to appear as if an accident has occurred and passengers are then added by the time police arrive.

**"Hammer car"** - The "at fault" vehicle in a staged accident that hits the "nail car." This car is typically insured, and the insurer is often defrauded of an average of $6,000 per claimant per accident.

**"Kickbacks"** - Fees paid to "cappers" by unethical attorneys and medical providers for the referral of accidents and their patients. These payments are often made in cash to conceal them from investigators.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

32

## Staged Auto Accident Fraud

**Swoop and squat:** This scheme involves three vehicles, two driven by criminals and the third by the victim. The "swoop" car pulls ahead of the "squat" vehicle, intentionally cutting if off. The squat vehicle brakes suddenly. The victim can't react in time, rear ending the squat vehicle. The swoop vehicle keeps driving, even though they caused the accident. Because this driver can't be located, the victim has to pay the vehicle damage and personal injury claims of passengers in the squat vehicle.

**Side swipe:** This often occurs at busy intersections with multiple left turn lanes. As soon as the victim's vehicle drifts into the outer turn lane, the criminal side swipes it.

**Panic stop:** Criminals drive an older vehicle filled with passengers in front of the victim. A passenger watches and waits for the victim to be distracted, then tells the driver to brake suddenly, causing the victim to rear-end the criminal's vehicle.

**Drive down:** The victim merges his vehicle into traffic after being motioned in by the criminal. As the victim begins to merge, the criminal speeds up and causes a collision, later denying that he or she indicated the victim to merge

**The T-Bone:** this includes a driver and several onlookers who are part of the scam. The driver waits for a lone car to be passing through an intersection, and then pulls in front of that car and forces an accident. The onlookers will claim that the driver ran a red light, so that the blame is put on the innocent victim, and the scammers will receive money from the insurance company

**The Merge:** This fraud involves a driver in heavy traffic motioning to another driver that they may merge in front of them. As the victim attempts to pull into the lane, the scammer does not slow down and allows the cars to collide. When the police report is filed, the person who was trying to merge will appear to be at fault.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

## Practice Scenario

As you read this account of the loss, see how many "red flags" you can spot. Some tell-tale signs of fraud are listed at the end of this article, so you can check to see how well you did.

An insured was allegedly involved in a "chain reaction" accident in which she was rear-ended and forced into the car in front of her. In spite of the insured's claim of extensive damage to her car as well as severe bodily injury, the police report made no mention of either. There also was no mention of the third vehicle that allegedly rear-ended the claimant.

The loss, which was reported two weeks after the incident, was brought to the attention of a claims specialist by the medical facility that treated all three parties in the insured's car. The reports, which were filed by the same medical provider, indicated that all three had received treatment (in the form of MRIs, acupuncture, and psychiatric care) for identical injuries. None, however, had made claims for lost wages.

With suspicions aroused, the claims examiner and claims supervisor enlisted the support of a SIU investigator, who immediately reported their fraudulent findings to the State Fraud Bureau. In addition, the City Police Department's Accident Investigation Squad began an investigation of their own.

These investigations led to the arrest of the claimant, as well as her co-conspirators, for insurance fraud. Two of the passengers have since confessed to this fraud attempt as well as a number of previously staged accidents. The police hope to arrest everyone involved in the scheme, from the parties who set up the accident to the people who organized the entire scheme.

This incident might have cost the insurance carrier over $75,000 if not for the vigilance of the claims and SIU employees, and the City Police. It also provides an ideal opportunity to share some prevalent "red flags" to look for when reviewing a claim:

- Loss reported late and by a medical facility rather than by the insured or his/her agent
- Police report/vehicle damage that does not commensurate with injuries
- Similar medical treatment for all parties involved, regardless of their overall condition prior to the accident, their location in the car, and whether or not they were wearing seat belts
- All parties treating at the same clinic
- Medical provider making the first notice of loss to the carrier
- Severe injuries and extensive medical treatment with no claim for lost wages

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**34**

## Multiple GEICO Losses

Where more than one policyholder is involved in an accident, separate claim files will be established and separate examiners must handle each claim on its merits. (This means a separate investigation on each file.)

The GEICO Claims Code of Conduct Examiner Pledge on page 15 states:

> "I will not knowingly seek out or access information that relates to exposures on the claim that are assigned to another GEICO claims examiner."

> "I will not access, without supervisory authorization, information in any file other than my assigned file."

> "I will not knowingly use any information that does not specifically relate to the aspect of the claim that I am handling, unless sufficient permission has been granted to me by the injured party, his/her representative, or through subpoena."

> "If I inadvertently come into possession of material or information, without proper authorization, I will not use it and will forward/return it to its rightful destination."

File contents should **not** be intermingled nor should file information be shared without <u>written</u> authorization from the appropriate insured or representative. The written authorization must be obtained in advance of any review of a cross referenced file and should be retained in the file to be reviewed. However, a police report can be shared with the other file because it is public information.

Written authorization is <u>not</u> always needed when:

- Handling non-conflict of interest claims at the CSR level. See TCM 100169 dated February 4, 2008 titled "Adjuster agent or Independent contractor – Multiple GEICO Insureds'- Claims Handling- All"

- Sharing recorded interviews if verbal authorization is secured on the recording. The adjuster should request authorization to share the interview by asking the following question:  **"There may be other examiners who will handle other aspects of this accident.  Do I have your permission to share this recorded interview with the other examiners on this and/or the other file?"**.

Cases in which authorization is needed would include permission to review PIP or Med Pay records in BI claims as well as reviewing BI files in UIM claims.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

An authorization form has been developed for use in this type of case.  It is called the "Information Authorization Form" (C-240).  Questions should be discussed with your Regional Liability Administrators or Home Office Claims Legal.

## Guidelines for multiple insured claim files

- Each adjuster must complete an independent investigation of the loss.

- Each adjuster must make their own contacts and secure their own recorded interviews from Insured's, Claimants, and Witnesses. Recorded interviews will only be shared if the customer refuses to give a second interview and permission to share the statement must be obtained and documented in ALOG/ACTIVITY LOG.  Follow up with a confirmation letter to the insured that states:

---

This is to confirm our telephone conversation of _____, 20__ (date) in which

you gave permission for the adjuster handling _____(claimant's name)

case to listen to your recorded interview for the purpose of investigating the facts of

the accident that occurred on _____, 20__.

---

Another option available for getting permission from the insured to share the original recorded interview is to take a short supplemental recorded interview confirming permission to share the interview with the other adjuster.

1. When contacting customers, the adjuster must clearly identify themselves and whom they are representing.  This should be done at the first call and every subsequent call and make sure the customer understands who they are talking to.

2. Once a double GEICO file is identified, the x-file should be established and the adjuster assigned immediately through Mainframe.  See the DH manual for instructions on setting up a Double GEICO claim file.

3. The same section cannot handle both double GEICO files.  If they are assigned to the same section, your supervisor will reassign one of the files.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**36**

4. The double GEICO letter should be sent out notifying your Insured of their adjuster and the x-file adjuster information.  See the File Handling lesson for the list of letters available.

5. When making a DI appt or AD assignment, notify Auto Damage of the double GEICO file by placing a "D" after the paycode.

6. When making an outside adjuster assignment, note the instructions that it is a double GEICO case so that the case will be expedited.

7. Never ALOG in the x-file or email the x-file from ALOG/ACTIVITY LOG.

8. If a police report or an outside adjuster is needed, coordinate with the x-file so that only one is ordered.

9. Before making a liability decision, the adjuster must consult his/her supervisor and the x-file adjuster.

10. If the adjusters cannot agree on liability, the supervisors should meet to discuss the case.  If there is still no decision, the case should be referred to the TCR2 Claims Manager or RLA.

11. No liability decision should be communicated to an insured until both adjusters complete their investigation and agree on liability.

12. If a denial letter is to be issued, the double GEICO denial letter should be used.

**Notes:**

_____

_____

_____

_____

_____

Confidential Information of GEICO Companies
© Government Employees Insurance Company

## Associate Claim Files

Because many associates have GEICO as their insurance carrier, they deserve the same amount of privacy that our insured's get.  The GEICO Claims Code of Conduct explains that an examiner will "never handle any claim or business matter relating to himself/herself, a relative or close friend.  Associates must refer such claims to the supervisor or manager."

If the insured or a claimant happens to be an associate, the amount of investigation and service does not change in light of that fact.  They are treated with the same respect and fairness as any other insured and claimant.  **The GEICO Claims Code of Conduct states in Section V:**

> *"Anyone who has, or thinks he or she has, a claim against the Company is entitled at all times to courteous, fair and just treatment from the representative of the Company.  A claimant is entitled to an investigation of his or her claim and a reasonably prompt statement of the Company's position with reference to it".*

There are certain aspects of the claims that are different.  In order to provide the privacy every associate deserves, the claim file must be secured in a safe location.  If it is a paper file, the file will be locked up at night, most likely in the supervisor's cubicle locked in a desk cabinet.  If it is an ECF file, the system administrator must add security to the file so that only the adjuster handling the file and their supervisor has access to the file.

The TCR2 that is handling the associate's claim file must not speak with anyone regarding the claim file whatsoever except to their supervisor.  **The GEICO Claims Code of Conduct Examiner Pledge states:**

> *"I will not knowing use any information that does not specifically relate to the aspect of the claim that I am handling, unless sufficient permission has been granted to me by the injured party, his/her representative, or through subpoena".*

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

# Lesson Six - Part A
# Medical Review for TCR2
## Student Manual
## Centralized Liability School

## Objectives:

**At the completion of this phase of training, the student will be able to do the following:**

1.  Understand the benefits of medical knowledge.
2.  Recognize prefixes, suffixes, root words and common abbreviations that assist in the comprehension of medical terminology.
3.  Identify customary medical documentation (SOAP) entries and discuss the meaning behind the acronym.  This includes interpreting ER and EMS notes.
4.  Identify the most common medical signs and tests performed on injured party(s) in an auto accident.
5.  Identify the anatomy and physiology of the spinal column.
6.  Describe and classify soft tissue injuries and understand the dynamics of handling these injuries while reviewing medical documentation.
7.  Recognize the primary treatment modalities, treatment paths and medications used when treating soft tissue injuries and other disorders of the spinal column.
8.  Compare and contrast different types of fractures and understand the various treatment options available to the injured party(s) who sustains a fracture.
9.  Understand the symptoms and treatment for closed head injuries.
10. Identify other injuries of the musculoskeletal system and describe the treatment options available to the injured party(s) affected by these conditions.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

# The Benefits of Understanding Medicals

In this lesson we will explore common medical problems that can arise from auto accidents.  Proper understanding of these injuries will have several benefits:

- Superior customer service through increased empathy.
- Improved consistency in medical investigations.
- Greater details when securing recorded interviews.
- Accuracy in recommending case reserves.
- Empowerment of the adjuster to use effective negotiation skills.
- Equitable disposition of BI/UM features.

Let's take a closer look at each of these benefits.

## Superior Customer Service through Increased Empathy

Simply stated, having "empathy" is having the ability to put yourself in someone's shoes.  Since the beginning of your claims career, you have been providing empathetic statements to our Insured/claimants when taking and receiving any new loss.  This is the hallmark of the "Comfort and Rapport" section of the A – Call monitoring sheet.  As a TCR2 adjuster, having a detailed knowledge of the medical condition plaguing the injured party will allow you to gain a different perspective on the empathy you can provide him/her.

## Improved Consistency in Medical Investigations

Your responsibility as a TCR2 is performing the proper medical investigation for injuries claimed by our Insured/claimant.  Understanding the physiological component of an injury will guide you in your investigation and, ultimately, will assist you in placing a consistent value on similar losses.

## Greater Details when Securing Recorded Interviews

Recorded interviews at this level of claims handling will be very similar to the recorded interviews you conducted at previous levels of claims handling.  However, the recorded interview at TCR2 requires us to ask the right "medical" questions, which ensures we have a complete understanding of the nature of the injury in order to properly evaluate the injury claim.  Detailed knowledge of a condition will allow you to ask more precise questions.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

### Accuracy in Recommending Case Reserves

When analyzing our reserves, being aware of the treatment processes and protocols are beneficial in completing your review and recommending case reserves.  Based on your knowledge of the Claims Manual, you know how important it is to give a clear and concise summary of the claim when recommending or changing the case reserve. The knowledge you have about the injury itself will allow you to accomplish this task more accurately.

### Empowerment of the adjuster to use effective negotiation skills

The more knowledge you have of the medical review, the greater your ability to convey your thoughts when negotiating a proper settlement.  This can be applicable to any injury.

### More equitable disposition of BI/UM features

Increased productivity is a positive result of gaining advanced knowledge of medical review.  Extending your awareness of a subject allows you to recall that information at a faster pace when needed.  The quicker you recall the information, the faster you can make critical decisions.  More importantly, it supports our claims mission:

> **"Effect a prompt, courteous, and equitable disposition of claims through direct Insured/claimant contact."**

Having the proper knowledge of any specific injury will have exponential effects on how fast we work and the Customer service we provide.  In turn, this will have an impact on our average loss expenses.

---

**Remember**
**You can never make recommendations on medical treatment for the injured party(s).  They seek the treatment that is right for them and we evaluate that treatment.**

---

Confidential Information of GEICO Companies
© Government Employees Insurance Company

## Medical Terminology 101

Before we begin to examine specific injuries, we will take a look at the basic rules of medical terminology and its application.

Approximately 75% of medical terms are based on either Greek or Latin.  Since the majority of us are not experts in either of these languages, it can be challenging to understand the pronunciation and terminology when reviewing medical notes.

So how do we overcome these obstacles?  The first step is realizing the following:

- It doesn't take an expert to decipher and understand any medical term.
- Recognizing key parts of the word is half the battle.
- Typical medical terms will usually be associated with a particular condition. Understanding the diagnosis will give you a clue about the definition of a term.

When reviewing medical notes it is necessary to ask yourself, "What is the medical specialty of the person writing the notes"?  Knowing this information will allow you to have a general idea of the kind of medical terms that you will probably see in the notes.  Let's take a closer look at the common specialties you will see when reviewing medical documentation:

| | |
|---|---|
| Cardiologist | Heart specialist (MD) |
| Chiropractor | Treats by manipulating and adjusting the body (DC) |
| Dermatologist | Skin specialist  (MD) |
| General Practitioner | Also known as "The Family Doctor" (MD) |
| Internist | Treats diseases of the internal organs through non-surgical means (MD) |
| Neurologist | Specialist in the diseases of the nervous system (MD) |
| Occupational Therapist | Assist the injured party(s) with therapy that teaches/strengthens their ability to perform activities of daily living (ROT) |
| Ophthalmologist | Eye specialist (MD) |
| Orthopedist | Specialist in bones and joints (MD) |
| Osteopath | Treats diseases by manipulating the body as well as using ordinary medicine (DO) |
| Otolaryngologist | Ear, nose and throat specialist (MD) |
| Pathologist | Specialist in nature and cause of disease (MD) |
| Radiologist | Interprets x-rays, MRI, CT, etc. (MD) |
| Physical Therapist | Uses passive and active exercise prescribed by a Physician to treat injury and disease (RPT) |
| Physiatrist | Rehabilitation physicians that are nerve, muscle, and bone experts who treat injuries or illnesses that affect how you move (MD) |

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

Most of the notes you review will be written or dictated by one of these types of providers.  Not mentioned on this list are two other medical disciplines that work directly with the providers:

- Nurses (LPN or RN)
- Medical Technicians
- EMS Workers(First Responder, EMT-Basic, EMT-Intermediate or Paramedic)

These individuals will also make notations in the patient's records that can be beneficial when assessing an injury.  We'll look at examples of all medical notes later in the lesson.

For now, let's look at 4 different aspects of medical terms:

#### #1 - Root Words

Word roots are usually derived from Latin or Greek and are used frequently to identify a body part.  Most medical terms have one or more word roots for you to identify when deciding on whether any injury or treatment is accident related:

| Root Word | Meaning |
|---|---|
| Aden | Gland |
| Algesia | Sensitivity to pain |
| Asthenia | Weakness |
| Cardi/Cardio | Heart |
| Cephal | Head |
| Chondri/Chondro | Cartilage |
| Cost | Rib |
| Crani | skull |
| Derma/Dermis | Skin |
| Encephal | Brain |
| Esthesia | Sensation, feeling |
| Gaster/Gastr | Stomach |
| Hepat/Hepato | Liver |
| Hidrosis | Sweating |
| Myel/Myelo | Bone Marrow |
| Myo | Muscle |
| Neur/Neuro | Nerve |
| Oste/Osteo | Bone |
| Ot/Oto | Ear |
| Sclerosis | Hardening of body part |
| Spondyl | Vertebra |
| Tension | Pressure |

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

## #2 – Combining Forms (CF)

Combining form (CF) is a word root plus a vowel, usually "O". Here are a few examples:

- Cardi + O = Cardio (heart)
- Gastr + O = Gastro (stomach)
- Nephr + O = Nephro (Kidney)

## #3 - Suffixes

Suffixes are the word endings attached to medical terms. These word endings usually indicate a <u>procedure, condition, disease or part of speech</u>. Let's look at some examples:

| Term | Meaning |
|---|---|
| Algia | Pain |
| Dynia | Pain |
| Ectomy | Surgical removal |
| Emia | Presence of blood |
| Itis | Inflammation |
| Megaly | Enlargement |
| Oma | Tumor |
| Otomy | Surgical Incision |
| Plasty | Form or reform |
| Thermia | Heat or fever |
| Trophy | Nourishment, growth |
| Uria | Urine |

Confidential Information of GEICO Companies
© Government Employees Insurance Company

### #4 – Prefixes

This is the element located at the beginning of the word.  The prefix changes the meaning of the word and it usually indicates a number, time, position, direction, color, or sense of negation.  Here are some examples:

| Term | Meaning |
|------|---------|
| A/An | Negative condition |
| Anterior | Before or in front of |
| Arth/Arthr | Joint |
| Distal | Farthest from the center |
| En | In |
| Epi | On or upon |
| Hyper | Above normal, excessive, high |
| Inferior | Beneath, lower |
| Inter | Between |
| Intra | Within |
| Lateral | Pertaining to the side |
| Medial | Pertaining to the middle |
| Para | Alongside, near |
| Peri | Around |
| Posterior | Towards the back |
| Proximal | Nearest to the center |
| Sub | Under |
| Superior | Higher than, above |
| Supra | Over, above |

Now that we have defined the four aspects of a medical term, let's look at the three rules that will help you successfully identify any term:

> ## Rules for Identifying a Medical Term
> ## Rule #1 - Define the suffix or ending
> ## Rule #2 - Define the prefix, or beginning
> ## Rule #3 - Define the middle

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**



## Exercise – Define the Word

**Dermatitis -** _____

**Cephalgia -** _____

**Hyperthermia -** _____

**Intramuscular -** _____

As you gain experience, your skills of understanding specific medical terms will improve. If you are unable to identify the keys parts of a word, feel free to consult a medical dictionary. But be aware that the quicker you recognize and understand a term, the more productive you will be when attempting to substantiate the injury(s) claimed.

## Common Medical Abbreviations

Although a good bit of the notes you review will be transcribed, the majority will be hand written. Medical providers have a legal and moral obligation to thoroughly document all diagnosis and treatments performed on all patients. Due to the amount of patients and the need for more and more documentation, providers lean hard on abbreviations to expedite this task.

On the following page, you will find a comprehensive list of the most common abbreviations. Many providers have taken upon themselves to create new abbreviations that pertain only to there documentation. Being knowledgeable in your reviews will aid in your attempts to "decode" their particular medical notes.



Confidential Information of GEICO Companies
© Government Employees Insurance Company

| Usage | Meaning |
|---|---|
| > | Causes |
| < | Caused by |
| AT/NC | Atraumatic normocephalic |
| AP | Anterior/Posterior |
| Alert X 3 | Aware of person, place & time |
| b.i.d | Twice a Day |
| BP | Blood Pressure |
| CC | Chief Complaint |
| CHI | Closed Head Injury |
| CXR | Chest X-ray |
| c/o | Complains of |
| dos | Dosage |
| DTR | Deep Tendon Reflexes |
| Dx | Diagnosis |
| e.m.p. | As directed |
| Fx | Fracture |
| gtt. | Drops |
| HEENT | Head, ears, eyes, nose and throat |
| H&P | History and Physical |
| h.s. | At bedtime |
| HA | Headache |
| IM | Intramuscular |
| IV | Intravenous |
| LOC | Level of Consciousness |
| MVA | Motor Vehicle Accident |
| NIDDM | Non-Insulin Dependent Diabetes Mellitus |
| n.p.o. | Nothing by mouth |
| P.E.A.R.L | Pupils Equal and Reactive to Light |
| p.o. | By Mouth |
| PRN | As needed |
| q.d. | Every day |
| q.h. | Every hour |
| q.i.d. | Four times a day |
| q.o.d. | Every other day |
| ROM | Range of motion |
| ss | Half |
| Sx | Signs/Symptoms |
| t.i.d. | Three times a day |
| URI | Upper Respiratory Infection |
| UTI | Urinary Tract Infection |
| v.s. | Vital Signs |
| ⬇ | Decrease or below |
| ⬆ | Increase or above |

Confidential Information of GEICO Companies
© Government Employees Insurance Company

CONFIDENTIAL!

# Exercise – Explain the Following Medical Documentation

**Patient presents to ER with ⬇ LOC and HA. Involved in MVA x 6 hours ago.  Husband states wife struck head on steering wheel.  Alert x 3. PEARL.  Will evaluate for CHI.**

_____

_____

_____

_____

_____

## Medical Documentation Technique

When documenting medical findings, many providers use different styles based on their personal preference or by the standards set forth by their employer.  Some physical therapists and chiropractors will use a chronological record of their daily activities with patients.  Regardless, the most common style used by physicians to document medical findings is by the SOAP entry method.  SOAP is an acronym that means the following:

> **S – Subjective Symptoms**
> **O – Objective Data**
> **A – Assessment**
> **P – Plan**

It is paramount that the physician documents the patient's record in a clear and concise manner.  It also benefits individuals like you who must review and analyze the information with that record.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

Let's take a look at the type of information located under each of the four categories:

**S: (Subjective)**

This section describes the <u>patient's complaint,</u> or the reason for the visit. This information will be documented based on the patient's own words. Any pertinent past medical history, medication use, etc. will be included here.

**O: (Objective)**

This section describes <u>physical examination findings.</u> Documentation will include positive or negative findings. The patient's vital signs (temperature, blood pressure, etc.) can be included at the beginning of this section if relevant.  If any testing has been done during the examination (orthopedic testing, lab testing, etc.), the results will be recorded under this heading.

**A: (Assessment)**

The <u>patient's diagnosis</u> (obtained from the visit) will be documented in this section. If a patient has multiple diagnoses that were addressed at the visit, they should all be included in the assessment.  Also called "Diagnosis".

**P: (Plan)**

Under this heading, the provider should outline the <u>treatment plan</u> for the patient. This will include medications prescribed, tests ordered, and plans for future visits. Also called "recommendations".

When receiving medical notes and bills, it is wise to compare the two to verify that all items billed for procedures and testing have accompanying documentation.  Knowing where to locate these items in the medical notes will expedite your handling of that document.  We will discuss this in greater detail later in this lesson.



Take time to look at the example of the documentation format on the following page.

Confidential Information of GEICO Companies
© Government Employees Insurance Company



**CURRENT SUBJECTIVE FINDINGS:**

> **This section describes the patient's complaint.**

On the date of his most recent examination, 11/18/2002, M
states that he still suffers from the following:

a. Residual neck pain.
b. Residual pain and weakness in his lower back.
c. Difficulty lifting heavy objects.

**CURRENT OBJECTIVE FINDINGS:**

> **These are the doctor's findings.**

Significant degree of tenderness noted upon palpation over the
cervical and lumbosacral areas. Range of motion is decreased and there is
pain upon the extremes of motion. Patient was given a home physical
therapy program to practice for continuity of care.

**FINAL DIAGNOSIS:**

> **Diagnosis with ICD-9 codes.**

Sprain in cervical paraspinal muscles and ligaments (847.0)
Sprain in lumbosacral paraspinal muscles and ligaments (846.0)
Fibromyalgia (729.1)
Myositis (729.7)
R/O Cervical radiculopathy (723.4)
R/O Lumbosacral radiculopathy (724.4)
Posttraumatic stress syndrome (308.9)
Anxiety (300.00)

**CURRENT RECOMMENDATIONS:**

> **The provider's plan to promote healing and to relieve pain.**

a. Avoid heavy lifting.
b. Use orthopedic pillow for sleeping.
c. Continue daily home physical therapy (program given).

**On the following page, we will now take a look at a handwritten SOAP note.**

Confidential Information of GEICO Companies
© Government Employees Insurance Company

GTM01100

FIRST | LAST | ☐ F ☐ M | DATE OF BIRTH | PAGE

| DATE | PROGRESS NOTES |
| --- | --- |
| APR 2 7 | |
| | S: Pt. reports neck, mid, + LBP. |
| | O: HMP / TENS on C/s T/s L/s, Ther. Ex. |
| | A: Pt. tol. tx well. |
| | P: Cont. PT tx. |
| APR 2 9 | |
| | S: Pt [illegible] pain in the [illegible] LS - neck |
| | O: tx given: HP/EMS to [illegible] |
| | A: Pt tol tx well |
| | P: pt Cont tx S/PT. |
| MAY 0 3 | |
| | S: pt presents today [illegible] |
| | [illegible] |
| | [illegible] |
| | O: tx given: HP/EMS [illegible] |
| | [illegible] |
| | A: pt [illegible] uncomfortable during tx [illegible] constant |
| | LBP |
| | P: pt will cont [illegible] S/PT. |
| MAY 0 4 | |
| | S: Pt c/o [illegible] |
| | O: tx given: [illegible] |
| | A: Pt tol tx [illegible] |
| | P: pt Cont tx S/PT. |

DY-004-DHP

## Exercise – Match the documentation with the Proper SOAP Category

1. Subjective _______
2. Objective _______
3. Assessment _______
4. Plan _______

a. Sprain/strain
b. Patient c/o HA x 2 days
c. BP 120/70, P: 68, R: 16
d. PT – 2 x weeks for 3 weeks then re-evaluation.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

CONFIDENTIAL!

## How do we get the Reports?

A daunting task you carry as a TCR2 is gathering the medical documentation you will need to properly evaluate an injury.   You will also be responsible for gathering medical notes for the unrepresented injured party(s) and attempting to recover medical documentation on the represented injured party.

So how do we do this?  Once the exposure has been recognized and liability has been determined, you will be responsible for sending either a CL200 (BI with no representation), a CL42 (BI or UM with attorney representation) or a CL204 (UM without representation) to gain the injured party(s) authorization to obtain bills and records.  A form is also provided with these authorizations which allow the injured party(s) or attorney to list their providers and document any lost wages.  There is a cover letter that accompanies both these forms explaining the need for their completion.

---

**Note**
**Some regions will use different forms to obtain medical authorization.  Please see your post-school trainer or supervisor to verify the form used by your region.**

---

Sending the medical authorization out promptly is important for <u>six</u> reasons:

- It proves to the injured party(s) that we are making active efforts to obtain the necessary documentation to handle their claim.
- It places the injured party(s) on notice early in the process that the form will need to be completed and returned in the self-addressed envelope. This ensures an expeditious handling of the claim.
- Once we receive confirmation that treatment has ended, having the completed form in the file will allow you to work faster to obtain the records.
- It is necessary when complying with the Health Insurance Portability and Accountability Act (HIPAA).  <u>We must faithfully support medical confidentiality.</u>
- It can have an impact on setting accurate reserves.
- It complies with the SPR guidelines established by the Claims Home Office Performance Review Team under Section I. Investigation – Medical.

---

The CL200 will be automated to send to an injured party when the Loss State is MI, AL, MS, AR, LA, MS, TX, NM, OK, CO, KS, NE, WY, SD, IA, ND, FL, NJ, CT, RI, MA, VT, NH, ME and a BI feature is open on the claim.

---

Confidential Information of GEICO Companies
© Government Employees Insurance Company

Claim No.: .......................................
*(PATIENT: FILL IN YOUR CLAIM NUMBER)*

## HIPPA COMPLIANT AUTHORIZATION TO OBTAIN MEDICAL RECORDS

To: ................................................................................ (Provider Name)

................................................................................ (Provider Address)

For purposes of evaluating a claim made by me and/or preparing and conducting a trial on the issues concerning a claim, you are hereby authorized to furnish to Government employees Insurance Company, GEICO General Insurance Company, GEICO Indemnity Company, or GEICO Casualty Company (individually and collectively referred to as "GEICO") any and all medical information which may be requested concerning my physical condition and treatment therefore, diagnosis, prognosis, and any and all records, files, or other documentation concerning the treatment, prescription, consultation or other advisory visits or events (collectively referred to as the "Records") that pertain to:

- ................................................................................

   *[PATIENT: PRINT YOUR NAME ABOVE]*

   **DOB**
- ................................................................................

   *[PATIENT: WRITE YOUR BIRTH DATE ABOVE]*

- SSN:................................................................................

   *[PATIENT:  WRITE YOUR SOCIAL SECURITY NUMBER ABOVE]*

- The Records covered by this HIPAA Compliant Authorization cover the time period beginning five (years) prior to the date of last treatment through *[PATIENT: INDICATE YOUR LAST DATE OF TREATMENT IN THE FOLLOWING SPACE]* ........................., 20......., the date of last treatment, and up to and including the date of Provider's compliance with this HIPAA compliant Authorization.

- The Records shall specifically include, but shall not be limited to, such condition and treatment as may pertain to the automobile accident/loss/claim of *[PATIENT: INDICATE THE DATE OF THE AUTOMOBILE ACCIDENT/LOSS/CLAIM IN THE FOLLOWING SPACE]* ........................., 20.......

This HIPAA Compliant Authorization shall also allow GEICO'S representatives, or any physicians appointed by it, to examine your records concerning said condition or treatment.  The information covered by this Authorization includes, but is not limited to, reports, records, test results, X-rays, and any other diagnostic testing, whether in your possession or available to you.  I understand that the information in the Records may include information relating to sexually transmitted disease, Acquired Immunodeficiency Syndrome (AIDS), Human Immunodeficiency Virus (HIV) and other communicable diseases, behavioral health care/psychiatric care, and treatment for alcohol and/or drug abuse.  Copies of this Authorization shall be considered as valid as the original.  This information is being requested for the purpose of evaluation a claim made by me and/or preparing and conducting a trial on the issues concerning this claim.  This Authorization shall be valid for the duration of the claim.  This is not a release of claims for

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM01103

Claim No.: ....................................................
*(PATIENT: FILL IN YOUR CLAIM NUMBER)*

damages. I further understand that I am entitled to a copy of this Authorization and acknowledge receipt by signing below. I acknowledge that the information disclosed pursuant to this Authorization may be re-disclosed by GEICO pursuant to applicable law and may no longer be protected by the Health Insurance Portability and Accessibility Act (HIPAA).

**Revocation Section:** I acknowledge that I have the right to revoke this Authorization at any time. A revocation of this Authorization must be in writing and sent to the medical provider. The revocation of this Authorization will be effective upon receipt and will be prospective only.

I acknowledge that I am aware that the consequences of my not signed this Authorization can include a delay in the processing/resolution of the claim, a potential denial of the claim, or other consequences recognized by applicable state law and/or the insurance policy at issue.

..........................................................
[SIGNATURE OF PATIENT]

..........................................................
[PRINTED NAME OF PATIENT]

..........................................................
[DATE]

*Personal Representatives Section: If a personal representative executes this form on behalf of the patient, that representative warrants that he or she has authority to sign this form on the basis of:*

..........................................................................................

**MEMBER NATIONAL INSURANCE CRIME BUREAU**

CONFIDENTIAL!

## WAGE AND SALARY VERIFICATION
### GOVERNMENT EMPLOYEES INSURANCE COMPANIES

| DATE | OUR POLICYHOLDER | | DATE OF ACCIDENT | CLAIM NUMBER |
|------|------------------|--|------------------|--------------|
| | | | | |

Employee's Name

Employee's Address

Gentlemen:

The above named person has applied for Benefits under the terms of our Personal Injury Protection Coverage as a result of injuries in an automobile accident on the date indicated. We understand this person is your employee. To determine benefits that may be due the applicant, please provide us with the answers to the following eight questions, and return this form promptly. An authorization form is attached. Thank you for your cooperation.

Firm Dept.

Address

1. Occupation:
2. Dates of Employment:  From: ......................... Through: .........................
3. Dates absent following accident:  From: ......................... Through: .........................
4. Was employee paid during this absence?  Yes ......... No ......... If "Yes", Amount Paid $ .........
5. Is employee entitled to benefits under a wage or salary continuation plan? Yes ......... No.........
6. Name of your Workmen's Compensation Insurer: ..........................................
7. Has or will a claim be filed under any Workmen's Compensation Law for this accident? Yes ......... No.........

### 8. SCHEDULE OF WEEKLY EARNINGS         FOR 13 WEEKS PRIOR TO DATE OF ACCIDENT

| WEEK NO. | WEEK FROM DATE | WEEK TO DATE | NO. OF DAYS WORKED | AMOUNT EARNED INCLUDING OVERTIME OR EXTRA WORK | GRATUITIES MEALS | BOARD | TIPS | ALL OTHER | GROSS EARNINGS |
|------|------|------|------|------|------|------|------|------|------|
| 1. | | | | | | | | | |
| 2. | | | | | | | | | |
| 3. | | | | | | | | | |
| 4. | | | | | | | | | |
| 5. | | | | | | | | | |
| 6. | | | | | | | | | |
| 7. | | | | | | | | | |
| 8. | | | | | | | | | |
| 9. | | | | | | | | | |
| 10. | | | | | | | | | |
| 11. | | | | | | | | | |
| 12. | | | | | | | | | |
| 13. | | | | | | | | | |
| TOTAL | | | | | | | | | |

EMPLOYER........................ DATE........................
SIGNED:........................ PHONE #........................ TITLE........................

MEMBER INSURANCE CRIME PREVENTION INSTITUTE

C-255-A (4-91) NS

CONFIDENTIAL!

Confidential Information of GEICO Companies
© Government Employees Insurance Company

GTM01105

Once you receive the properly completed documents from the injured party(s) and you are notified that the injured party(s) has completed treatment, you are now ready to order your records.  See your post-school trainer or supervisor to determine which cover letter is used when requesting the medical records.  The wage record should be properly completed by the human resources department or supervisor of the injured party.  Reviewing the disability notes will help in determining how much income was lost due to the injury.

## Emergency Medical Services (EMS) Reports

Now that we have looked at some basic rules of medical terminology and documentation, we will now start applying that knowledge.  If you have ever witnessed or been involved in an auto accident, you probably know that an ambulance is often called to the scene to check and/or treat the parties involved in the accident.  Although the majority of injuries sustained in an auto accident are not life threatening, many of the participants will opt to take the ambulance to the local emergency room for evaluation.

By the time you receive the EMS notations, you will probably be aware of the primary injury claimed by the injured party(s) either through an RI or conversations with the injured party(s) representative.  However, the EMS report does provide you with a wealth of knowledge, which includes the following:

- Was the injured party(s) alert and oriented at the scene?
- Were they walking and talking at the scene?
- Were they extricated from their vehicle and placed on the backboard?
- Did they ambulate to the emergency vehicle?
- What was the overall general condition of the injured party(s) directly after the accident?
- What was the injured party(s) position in the vehicle?
- Were they thrown from the vehicle?
- What was the mechanism of injury?

Remember that all medical information obtained allows us to form an overall value of the loss.  Based on what is reviewed on the EMS report, we can form a fairly accurate opinion on the type of treatment that would normally be rendered once the injured party(s) arrives at the emergency room.  For example, if the claimant driver was extricated from the vehicle by EMS and secured firmly onto a backboard with spinal precautions in place, we can make an accurate assumption that a neurological exam as well as a cervical x-ray will be done by the ER staff.   EMS reports are almost always handwritten so your skills in recognizing the medical terms will be challenged.



**Let's look at an example of a typical EMS report.  These can also be called "Run Sheets".**

Confidential Information of GEICO Companies
© Government Employees Insurance Company



Glasgow Coma Scale results.

## So What Does This Tell Us?

EMS arrived to the scene and noted that the injured party was holding her child outside accident scene. Patient was able to hold child and walk around steadily. Patient stated that she felt mild pain and discomfort to sternal area (Center of the chest), possibly from seatbelt harness. The patient did not hit her head and denies loss of consciousness. Positive breath sounds bilaterally. Skin is warm and dry. No labored respirations. Patient wanted to just get checked out at ER. Transported without treatment and monitored enroute – No known drug allergies. No other history.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

Based on the example above, this individual was walking and talking at the scene and was holding a small child when EMS arrived. We know she was feeling some discomfort in the center of her chest due to an apparent seatbelt injury. In this case the seatbelt would be considered the mechanism of injury. We now have a pretty good idea of what we will see when looking at the Emergency Room record for this injured person.

In the example above, we also saw another area that you want to pay particular attention to when reviewing the EMS reports – <u>The Glasgow Coma Scale</u>. When reading the narrative, you can gather that this person was alert and had not sustained any type of neurological injury. Not all accidents will be this way. Many of your injured party(s) will claim that they lost consciousness as a result of the loss and are still having neurological problems related to a traumatic brain injury months later. Having a working knowledge of the score formulated at the scene of the accident will assist you in gathering a response to this type of injury.

So what is the Glasgow Coma Scale? The Glasgow Coma Scale is the most widely used scoring system used in quantifying level of consciousness following traumatic brain injury. It is used primarily because it is simple, has a relatively high degree of reliability and because it correlates well with outcome following severe brain injury. Let's take a look at the scoring system:

| Glasgow Coma Score | | |
|---|---|---|
| Eye Opening (E) | Verbal Response (V) | Motor Response (M) |
| 4=Spontaneous | 5=Normal conversation | 6=Normal |
| 3=To voice | 4=Disoriented conversation | 5=Localizes to pain |
| 2=To pain | 3=Words, but not coherent | 4=Withdraws to pain |
| 1=None | 2=No words......only sounds | 3=Decorticate posture |
| | 1=None | 2=Decerebrate |
| | | 1=None |
| | | Total = E+V+M |

In the example provided in the EMS report, this person's Glasgow Coma Scale Score was 15, which is the highest. This means she was perfectly alert and showed no neurological problems at the scene. Unlike soft tissue injuries (which we will analyze soon), most neurological problems related to a traumatic brain injury will manifest themselves immediately after an accident. So if this injured party(s) claimed to have cognitive problems (related to a traumatic brain injury) later without supporting documentation from a medical provider, referring back to this sheet could help you in addressing this issue.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

 ## Exercise - What does this EMS Report tell us?

FDNY EMS — PARTICIPATING MEMBER 911 AMBULANCE

**NYC 911 SYSTEM PROVIDER AMBULANCE CALL REPORT**

NO.: VOL-

Date MMDDYYYY: [illegible] | Unit: [illegible] | Unit Type-Check: ALS / BLS | Shield / Driver: 4419 | Shield / Tech: 2411 | CAD No.: [illegible] | Responded From: [illegible]

Call Location: [illegible] | Boro: Q | Apt. | PD Badge Number | Precinct | Call Type: [illegible]

Patient's Last Name | First Name | Sex: ☐M ☒F | Age: 23 | DOB MMDDYYYY: [illegible]

Home Address: [illegible] St | Apt | Social Security Number: [illegible]

City | State: NY | Zip Code | Next of Kin: [illegible] | Telephone

REC'D: [illegible] | 10-63: [illegible] | 10-84: [illegible] | 10-82: [illegible] | 10-81: [illegible] | AVAIL

Prior Treatment at Scene | By Whom | Prior: ☐Defibrillation(s). No ____ ☐CPR. Mins. ____ By: ☐PD ☐FD ☐Other

CHIEF COMPLAINT: [illegible] | MILEAGE: [illegible]

**PRESENTING PROBLEM**

MEDICAL: If more than one is checked, circle the primary problem

☐Airway Obstruction ☐Abdominal Pain ☐Allergic Reaction ☐Altered Mental Status ☐Behavioral ☐Cardiac Arrest ☐Chest Pain ☐CVA / TIA ☐Dehydration ☐Dizziness ☐Environmental: ☐Haz-Mat ☐Cold ☐Heat ☐General Malaise ☐G.I. Distress / Bleed ☐Hemorrhage ☐Nausea / Vomiting ☐Newborn ☐Obvious Death ☐Ob / Gyn: ☐Labor ☐Delivery ☐Psychotic / Suicidal ☐Respiratory Distress ☐Respiratory Failure ☐Respiratory Arrest ☐Seizure ☐Shock ☐Syncope ☐Unconscious ☐Other ☐Overdose: Substance ☐Poison: Substance [illegible]

INDICATE ALL THAT APPLY FOR MEDICAL or TRAUMA: Onset: [illegible] | Pain: [illegible] | Quality: 5 | Radiation: [illegible] | Severity: ☐Mild ☐Mod ☐Severe | Duration: [illegible]

TRAUMA Location: [illegible] ☐Anterior ☐Posterior Type: [illegible]

☐Amputation ☐Burn: ☐Thermal ☐Chemical ☐Electrical ☐Cardiac Arrest ☐C.N.S. ☐Crush ☐FX/Dislocation ☐Head Trauma ☐Hemorrhage ☐Impaled Object ☐Paralysis ☐Shock ☒Soft Tissue ☐Other

MECHANISM OF INJURY

☐Assault ☐Cold ☐Domestic Violence ☐Fall ☐G.S.W. ☐Hazardous Materials ☐Suspected Child Abuse ☐Heat ☐Machinery ☒MVA. Seatbelts ☒Yes ☐No ☐Pedestrian Struck ☐Stab ☐Other ☐Suspected Elder Abuse

**ASSESSMENT**

HISTORY ☒Denies ☐Amputee ☐Frail/Debilitated ☐Asthma ☐HIV/AIDS ☐Bed Confined ☐Hypertension ☐Cancer ☐Incontinent ☐Cardiac ☐IVDA ☐CHF ☐Seizures ☐COPD ☐TB ☐CVA / TIA ☐Wheelchair Confined ☐Diabetes ☐Other ☐Dialysis

MEDICATIONS ☒Denies ☐Unknown ☐Not Continued | ALLERGIES ☒Denies ☐Unknown

| TIME | B.P. | PULSE | RESP | GCS | TRAUMA # |
|---|---|---|---|---|---|
| [illegible] | [illegible] | 76 | 18 | 15 | [illegible] |
| 13:45 | 130/[illegible] | 74 | 18 | 15 | [illegible] |
| : | / | | | | |

SKIN: Normal ☒☒ Moist ☐☐ Dry ☐☐ | SKIN TEMP: Normal ☒☒ Warm ☐☐ Cool ☐☐ | SKIN COLOR: Normal ☒☒ Pale ☐☐ Cyanotic ☐☐ Flushed ☐☐ Jaundice ☐☐ | PUPILS: Normal ☒☒ Dilated ☐☐ R Larger ☐☐ L Larger ☐☐ Constricted ☐☐ Unreactive ☐☐ | MENTAL STATUS: Alert ☒☒ Verbal ☐☐ Painful Stimuli ☐☐ Unresponsive ☐☐

**TREATMENT**

AIRWAY: ☐Abdominal/Chest Thrust ☐Modified Jaw Thrust ☐Hyperextension ☐Oral / Nasal ☐Suction ☐DeLee

OXYGEN THERAPY: ☐Bag Valve Mask w/ O2 ☐Mouth to Mask ☐Cannula ☐Non-Rebreather ☐Nebulizer L.P.M. ____

IMMOBILIZATION: ☐Backboard: ☐Long ☐Short ☐KED ☐Cervical Collar ☐Splint: ☐Fixation ☐Traction ☐Head Immobilizer ☐Other

BLS and ALS INTERVENTIONS: ☐Aid/Bandage ☐Control Bleeding ☐Aspirin ☐CPR ☐SAED ☐Epi-Pen ☐Heat/Cold Application ☐Special ____ to PD ☐Insta-Glucose ☐Irrigation ☐Other ☐I.V. ☐Monitor ☐Cardiovert ☐ET Tube ☐Chest Decompression ☐I.O. ☐Defibrillate ☐Pacing ☐NG Tube ☐Needle Cricothyroidotomy ☐Saline Lock ☐12 Lead ☐Draw Blood ☐Drug Therapy ☐ET Confirm ☐ALS ASSESSMENT PERFORMED ALS Provided By ☐FD ☐Vol ☐Other

Presumptive Diagnosis: [illegible]

Patient Condition: ☐Critical ☐Unstable ☐Potentially Unstable ☒Stable ☐DOA ☐Rigor mortis ☐Extreme Dependent Lividity ☐Obvious Death ☐Decomposition ☐DNR

**COMMENTS**

TIME | EKG RHYTHM / MEDICATION(S) | TREATMENT / RESPONSE

[illegible] female [illegible] in a very minor accident [illegible] damage to passenger [illegible] light only [illegible] c/o lower back [illegible] [illegible] prior to our arrival [illegible] NO obvious trauma NO apparent distress [illegible] bilat V/S stable transported to Hosp 34

Confidential Information of GEICO Companies

© Government Employees Insurance Company

CONFIDENTIAL

## Emergency Room (ER) Reports

Similar to EMS reports, the Emergency Room Record also provides you a great deal of knowledge about the injured party(s).  The injured party(s) will report to their local ER for treatment after an accident either via EMS or by a privately owned vehicle (POV).

In most cases, the injured party(s) will present to the Emergency Room prior to seeking any other treatment.  This can be directly after the accident (as seen in the example above) or it can be days post accident.  Many emergency rooms have specific reports done for patients involved in auto accidents.  Some areas of the form assist the provider in understanding the mechanism of injury and other areas aid the provider in completing the physical exam.  In combination with the EMS record, it can sometimes give you information on what occurred in the accident.  We will see an example of this soon.

Emergency Room records are extremely important for two reasons:

- It provides a wealth of knowledge on the medical history of the injured party(s).
- It gives you a strong reference point to track and understand future treatment for the injured party.

### Understanding the Medical History

When an injured party(s) arrives at the emergency room, they are immediately triaged.  What does triage mean?  This means that they are categorized with respect to the other patients based on the severity of their injuries.  The less severe the injury, the longer they usually have to wait to be seen by a provider.  For example, the young lady seen in the EMS notes probably had to wait at the ER for 2-3 hours or longer prior to being seen.  Just because they presented via EMS does not always mean they will take priority over other patients.

During the triage process, a thorough medical history is obtained when the patient is interviewed.  The medical history obtained in this interview can be vital for many reasons:

- It can let you know if the injured party(s) has a prior history of problems similar to the injury being claimed during that visit.
- Certain conditions can cause delays in the healing process.  These conditions are also listed on the medical history portion of the ER record.  Examples of these conditions include Diabetes (insulin dependent as well as non-insulin dependent), malnutrition, chronic renal failure and emotional stress.
- Certain lifestyle choices can also affect healing.  Examples include cigarette smoking and obesity.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

- The medical history can list the current medications being taken by the injured party(s).  Identifying these medications can also give you clues on current problems that can affect the handling of the claim.  For example, someone with a history of taking Percodan PRN usually has a history of chronic pain.  You would then ask yourself the question - Why do they have chronic pain?

Here is an example of the triage form completed by the nurse upon arrival:

> Not currently on meds and denies significant past medical history



Being aware of the medical history of the injured party(s) is advantageous to your investigation of the injury and can play a major role in your negotiations to settle the claim.   Since treatment duration strongly depends on healing time, being aware of all factors that affect healing will benefit your file handling.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**Exercise – What Does this Triage form tell us?**



Confidential Information of GEICO Companies
© Government Employees Insurance Company

### Providing a Strong Reference Point

By the time you review the ER report for the first time, you have usually accomplished an RI with the injured party or you have discussed the particulars of the injury with his/her attorney.  The diagnosis given at the ER should not be a mystery to you.

Inversely, the treatment plans established on the ER reports can sometimes define the course of treatment for the duration of the healing time.  When starting your review of all medical records, having a clear and concise idea about the injury and treatment plan will help you develop an overall picture of the person's injury.

Another item sometimes attached to ER records will be a diagnostic impression after a radiological examination.  These reports can also be a strong reference point when reviewing additional medical records after the injured party leaves the ER.  Many emergency rooms have standard protocols used when someone reports to the ER after an auto accident.  Although this is true with any type of musculoskeletal injury, this is seen most often with individuals reporting with neck pain.  These individuals will receive a cervical x-ray 99% of the time, regardless of how they were transported to the ER.

If the person is not seriously injured but subsequent treatment is sought after being released by the ER, this report will give you baseline information if future x-rays are accomplished by other treatment facilities.  This holds especially true if additional x-rays are performed and interpreted by providers that are not radiologist and changes were noted in the impression.  Keep in mind that changes can occur, but it is something you still want to keep in the back of your mind when evaluating the medical notes and bills for the injured party(s).  The complexities of diagnostic testing will be discussed in depth later in your training.

Prior to fully evaluating the medical bills and medical paperwork established at the ER, you need to anticipate several bills and other pieces of documentation.  This includes the emergency room record created by the nurses and doctors.  Unless the doctors are actually on staff in the ER (and many are not), you will receive a separate bill for the doctor's services.  There will be a second itemized bill from the hospital for a facilities fee.  Any fee for the x-rays will be included in this itemized facility bill.  There will usually be a third bill from the radiologist who read the diagnostic films at the ER. If EMS was used, it is likely you will receive a 4th bill from the EMS service from your county or parish.  If the ambulance company is privatized, the 4th bill will come from them.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

 The good news is that usually all of this paperwork can be obtained simply by providing a copy of a signed medical authorization obtained from the injured party(s) via the Cl200/Cl204 to the hospital.  See your post-school trainer for the cover letter used when sending out this signed authorization to any medical provider.

We will now take a look at a sample ER record.  This will follow up on the same female involved in the accident where EMS was called to the scene:





**CXR** was accomplished due to the sternal pain. No Acute Deformities noted.

Patient was counseled on the CXR results, the diagnosis of a bruise on the chest secondary to blunt chest trauma and the need for follow-up.

Confidential Information of GEICO Companies
© Government Employees Insurance Company



# Exercise – What Does this ER report Tell us?

DATE 4/9/0_ HISTORY & PHYSICAL 23 Y ♀ who presents to ER BIBA c/o "I was in an accident my back is hurting, I have a headache"

ACTION IF NOT CURRENT
CURRENT ☐YES ☐NO
OPT CURRENT ☐YES ☐NO
MMR CURRENT ☐YES ☐NO

PMHx: ∅
PSHx: ∅
Meds: ∅
Allergies: NKDA

23 Y.O. ♀ AOx3 NAD Amb. well
VS: BP 110/ P 80 RR 18 temp 98
EYES: PERRLA, EOMI
EARS/NOSE/THROAT: Neg.
OROPHARYNX: pink
NECK: supple, NT
CHEST: CTA B/L w/ RLC CVS: S1 S2 ∅ murmur
ABD: Soft, NT ⊕ BS BACK: ⊕ LS tenderness

IMPRESSIONS Lower back pain S/P MVA

PHYSICIAN NAME (PRINT) ID #
PHYSICIAN NAME (SIGN)

LAB TESTS RESULTS TIME
☐ HGB
☐ HCT
☐ WBC
☐ NA
☐ K
☐ CL
☐ CO₂
☐ BUN/CR
☐ GLUC.
☐ AMYLASE
☐ PT/PTT
☐ UCG
☐ CPK

U/A
RBC WBC Prot
BLD KET GLU
BLOOD GASES TIME
PH
PO₂
PCO₂
HCO₃
HBO₂
HGB
HCO3
EKG RESULTS

RADIOLOGY
X-RAY # LS Spine Neg READING
☐ CHEST
☐ ABDOMEN
☐ C-SPINE
☐ L-SPINE
☐ PELVIS
☐ TIB/FIBULA L R
☐ FEMUR L R
☐ WRIST L R
☐ ANKLE L R
☐ HIP L R
☐ CT SCAN

ADDITIONAL MD NOTES

FINAL DIAGNOSIS Lower back pain S/P MVA CODE

CONSULTANT NAME SERVICE TIME CALLED
1.
2.
3.

DISPOSITION
☐ ADMITTED, TIME ROOM # SERVICE ☐ FAMILY MEMBER NOTIFIED
☐ EXPIRED, TIME ☐ M.E. CALLED, TIME ACCEPTED ☐ YES ☐ NO CASE #
☐ DISCHARGED, TIME ☐ INSTRUCTIONS GIVEN (TYPE) ☐ PVT MD NOTIFIED OF DISPOSITION
☐ OTHER TIME
CONDITION ON DISCHARGE
DISCHARGING PHYSICIAN NAME (PRINT) SIGNATURE ID # DATE 4/9/0_

CONFIDENTIAL

Confidential Information of GEICO Companies
© Government Employees Insurance Company



## Exercise – EMS and ER Reports (True or False)

1. EMS and ER reports can give you additional accident facts when negotiating liability.  <u>True</u> or <u>False</u>
2. The Glasgow Coma Scale is rarely used because of the length of time it takes to complete the test.  <u>True</u> or <u>False</u>
3. Triage is used by Emergency Rooms to categorize patients based on the severity of illness or injury.  <u>True</u> or <u>False</u>
4. Recognizing certain medications, medical history and social history assists you in measuring healing time.  <u>True</u> or <u>False</u>
5. Standard protocols are not used by Emergency Rooms.  <u>True</u> or <u>False</u>

## Diagnostic Imaging & Testing

In an earlier example, we saw where the patient received a chest x-ray (CXR) due to her complaints of mid-sternal pain.  This pain was secondary to the seat belt "catching" her upon impact.  This is an example of how diagnostic testing is used to investigate the severity of the injury.

Diagnostic testing is an invaluable tool used by the medical community to take pictures of the inside of the body to check for the existence of injury.  There are several different benefits with using diagnostic testing:

- It checks the existence of injury related to subjective complaints.
- Once treatment has begun, it can show the doctor that the patient is healing properly.  This is commonly seen with bone fractures.  Treatment regimes can be amended if the diagnostic testing indicates otherwise.
- If symptoms persist at certain intervals in treatment, additional diagnostic testing is sometimes indicated to check for further damage.  This is common when nerve damage is suspected.

The results of diagnostic testing are usually reviewed by a radiologist.  Providers within a particular specialty will also make treatment determination based on what they see in an x-ray.

There are a wide variety of medical tests used in different capacities.  Let's take a look at these tests:

Confidential Information of GEICO Companies
© Government Employees Insurance Company

### X-ray Imaging (See Example #1)

X-ray imaging is the oldest and perhaps also the most common medical imaging method.  Discovered more than a century ago, x-rays can produce diagnostic images of the human body on film or digitally on a computer screen.

X-ray imaging is the fastest and easiest way for a physician to view and assess broken bones, such as skull fractures and spine injuries. At least two images (from different angles) are taken and often three images are needed if the problem is around a joint (knee, elbow or wrist). X-rays also play a key role in guiding orthopedic surgery and in the treatment of sports-related and accident related injuries.  Anteroposterior and lateral views are the most commonly used standard x-ray perspectives.  This will be abbreviated as "AP/Lateral" on the injured party(s) medical documentation.

As we stated earlier, x-rays are usually taken of an injured party based on the patient's subjective complaints as standard protocol when presenting to the emergency room.  If the injured party reports to their own personal doctor or to another type of medical provider instead of an ER, they will usually perform x-rays of the effected area first before proceeding with any prescribed treatment or therapy.  This is done to investigate for fracture and to solidify a diagnosis of a soft tissue injury.  If treatment is prescribed based on an assumption that there is no fracture, the patient could be adversely affected by certain types of therapy if a fracture was indeed present.  This is especially true when the patient complains of neck pain.  This is why an x-ray is almost always completed first.

Let's take a look at an x-ray impression taken on an injured party who reported to the ER with subjective complaints of finger pain:



31

 **Exercise – A normal lumbar X-ray**

HOSPITAL MEDICAL CTR.
EXPRESSWAY
NY

DEPARTMENT OF RADIOLOGY

Patient Name: **XXXXX**                                           DOB: 09/15/**2XXX**
       MRN #: **XXXXXXXXX**              Billing/Visit Number:.
   Patient Loc:                    Clinic
Attending MD:  Staff, Physician
Requested by:  STAFF, PHYSICIAN                        Completed on: 04/09/2**XXX**

        Exam:  DX lumbosacral spine
                                                        ACC #: **XXXXXXX**
   History:

    lumbar spine

    Examination of the lumbar spine demonstrates the vertebral bodies to
    be intact.  The intervertebral disc spaces are well-maintained.  There
    is no significant degenerative disc disease.  There is a normal
    lumbar lordosis and no significant scoliosis.  No evidence of lytic
    or blastic metastatic lesions are appreciated.

    Impression: Normal lumbar spine.

CONFIDENTIAL!

**Confidential Information of GEICO Companies**
© **Government Employees Insurance Company**

**GTM01119**

### Magnetic Resonance Imaging (MRI) (See example #2)

Magnetic resonance imaging (MRI) is a diagnostic study that is useful in diagnosing numerous musculoskeletal disorders.  Radiowaves and magnetic fields are used to construct soft tissue and bone images.  It is advantageous in determining soft tissue disorders, including cartilage and ligament tears and herniated discs, but is also helpful in diagnosing bone disorders such as avascular necrosis, tumors, and multiple myeloma.  The MRI can detect if there is pressure from a disc herniation on one of the spinal nerves.

MRIs are rarely done in an emergency setting and are usually accomplished several weeks or months post accident.  The need for an MRI usually arises when typical therapy has occurred for 6-9 weeks and symptoms still persist.  Furthermore, the need for an MRI is also usually indicated by the results of neurological and physical examination tests.  The original diagnosis is typically a soft tissue injury.  In many cases, an MRI is indicated when the patient begins complaining of radiculopathy.

Here is an example of an MRI result:



**Doctor Doctor** , DC
xxx  East Main Street
Springville ,USA  XXXX

*High-Field & Open MRI • Multi-Slice Spiral CT*

Patient: Dan
Date of Birth:
ID:
Date:  09/12/

#### MAGNETIC RESONANCE IMAGING OF THE CERVICAL SPINE

**FINDINGS:**  At C2-3 and C3-4 there is no central stenosis, foraminal stenosis, or dis

At C4-5 there is spondylosis with ventral and dorsal osteophytic ridges.  There posterior disc bulge.  The combination of osteophyte and disc bulge results in ce stenosis with impingement of the ventral aspect of the cervical spinal cord at this leve

At C5-6 there is spondylosis with ventral and dorsal osteophytes.  There is a more fo central disc herniation compressing the cervical spinal cord in the midline.

At C6-7 there is a mild disc bulge.  There is no cord impingement or foramin

At C7-T1 there is a moderate central disc herniation indenting the effacing the ventral subarachnoid space.

**IMPRESSION:**

1.   C4-5 SPONDYLOSIS AND DISC BULGE RESULTING IN CENTRAL SPINAL STENOSIS WITH IMPINGEMENT OF THE SPINAL CORD.
2.   C5-6  SPONDYLOSIS  AND  CENTRAL  DISC  HERNIATION  WITH INDENTATION OF THE CERVICAL SPINAL CORD.
3.   C6-7 MILD SPONDYLOSIS AND DISC BULGE.
4.   C7-T1 MODERATE CENTRAL DISC HERNIATION PARTIALLY EFFACING THE VENTRAL SUBARACHNOID SPACE.

> A typical MRI report will contain many words and connotations that will need to be researched. The terms seen in this report will be explained in depth soon via the Medical Claims Trainer CD-ROM.

**Confidential Information of GEICO Companies**
© Government Employees Insurance Company

### Computed Tomography (CT) (See example #3)

CT scans are similar to an MRI because they are also used to identify soft-tissue abnormalities, bony abnormalities, and various musculoskeletal traumas.  Unlike MRIs, CT scans are done frequently in an emergency setting when subjective and objective findings indicate underlying injury.  With auto accidents, CT scans in the emergency setting are frequently on the head when a traumatic brain injury is suspected.

CT scans provide the provider with three-dimensional pictures of the effected area by using an x-ray beam with a computer.   They can be accomplished with or without contrast (IV infusion of dye).  Although the MRI is usually the choice in tests when the injured party(s) complains of continued pain or symptomology after prescribed treatment, the CT is still widely used in the clinical setting.



**CT of the head done in the ER setting on child with suspected traumatic brain injury.**

**CT indicated a possible small subdural hematoma in the left brain.**

© Government Employees Insurance Company

**Blood and other Laboratory Testing**

There are many blood tests done on injured parties immediately after an accident and throughout the treatment process.  As we saw earlier with x-ray imaging, many emergency rooms have established protocol in which an injured person will have a Complete Blood Count (CBC) done to check for severe hemorrhage and/or injury to a variety of organ systems.  It will also allow the provider to check for other conditions that might have been present prior to the accident (anemia, nutritional deficiencies, etc.).

For female injured party(s) within child bearing years, a urinalysis (UA) is commonly done to check for pregnancy prior to any x-ray or CT Imaging.  The female patient will sometimes be asked whether they could be pregnant before x-rays are accomplished.   If the injured party(s) is not sure, the UA will commonly be done prior to the x-ray study.

Another common blood test done in the ER setting is for individuals suspected by the police of being under the influence of alcohol or other drugs.  The local police will sometimes request a test if their on-scene investigation showed evidence that the individual was under the influence or if the behavior of the patient indicated the need for further serological studies.  When reviewing the alcohol (ETOH) blood tests it will sometimes be called BAC (Blood Alcohol Content) or BAT (Blood Alcohol Test).  Normal lab values for alcohol levels differ depending on the facility or jurisdiction, but values between 50-100 ml/dl are considered legal intoxication.  If the injured party(s) is accused of being under the influence of another substance, other blood tests will be seen in the medical documentation.  Regardless, it is important to remain aware of any potential lab study that could possibly be seen if your liability investigation concludes that the injured party(s) could have been under the influence of a substance that might have impaired their judgment when operating or riding in a vehicle.

Depending on the injury and the previous health status of the patient, there are a wide variety of blood tests accomplished for reasons too numerous to count.  Just remember that any test accomplished on the injured party(s) must be substantiated in the medical records and a causal relationship must be investigated.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

## Arthroscopic Examination

This type of study involves the insertion of an arthroscope into a joint (usually the knee) for visualization of structures and contents.  It can be used for exploratory surgery (removal of loose bodies and biopsy) and for diagnosis and/or repair of abnormalities of the meniscus, cartilage, or joint capsule.

Other structures that can be visualized through the arthroscope include the shoulder, elbow and ankle.



When reviewing medical documentation in which a patient went through arthroscopic examination due to an injury allegedly caused by an auto accident, it is of high importance to note any documentation that might indicate that the injured party(s) had any degenerative problems with the effected joint.  This will easily be seen in the history and physical (H&P) performed by the examining orthopedic surgeon.  If prior injury is noted in the documentation or in your investigation, we should question this and request additional documentation if warranted.

## Needle Electromyography (NEMG) (See example #4)

A needle EMG is an invasive procedure used by a neurologist, physical therapist or physiatrist in the diagnosis of <u>motor</u> nerve trauma of the neck and lower back.  It is commonly see in conjunction with nerve conduction studies.  A needle EMG is indicated when Nerve Compression (impingement) Syndrome is suspected, which includes ongoing subjective complaints of radiculopathy not relieved by medication or therapy.   EMG results reflect not only the integrity of the functioning connection between a nerve and its innervated muscle but also the integrity of a muscle itself.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

Needle Electromyography (EMG) is carried out by the insertion of a twin core needle electrode into the muscle and the electrical potentials are observed on an oscilloscope. The readings are taken at three different times.

1. During needle insertion
2. With the muscle at rest
3. During full contraction

The electrical waves produced are examined for their number, form and amplitude. When analyzing the results, a decrease in the number of muscle fibers able to contract is seen with peripheral nerve damage.  When these studies arrive within the packet of medical "specials", you will see a large amount of graphical data attached to the medical report.

Medical Doctors, Physiatrists, Doctors of Osteopathic medicine can perform a Needle EMG.  Most Physical Therapists can also perform a Needle EMG, due to their extensive training and being under the observation of a Medical Doctor.

EMG/nerve conduction studies may:

- corroborate a diagnosis or refute additional possibilities within a differential diagnosis
- provide a guide to the severity of an acute disorder of a peripheral or cranial nerve
- indicate that a pathologic process is active or progressive in chronic or degenerative disorders.

The key to properly evaluating the test will basically hinge on the analysis of the results, which should be clearly documented by the provider.

On the following pages, we will take a look at a typical Needle EMG report.  In the example, the insured had a variety of issues, which includes numbness in the right upper extremity (RUE).  Let's take a look at this report:

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

Sex: Female
Age: 43
Height: inches
Weight: lbs
I.D.#:
Ref. M.D.:

Address:
City:
State:
ZIP:
Phone:
Physician:
Test Date: 05/20/ 2XXX

## History/Comments:

43 y/o WF with h/o decreased sensation in the RUE.

## Motor Nerve Study

**Right Median Nerve**
Rec Site: APB
Stim Site

| | Lat (ms) | Norm Lat | Amp (mV) | Norm Amp | Dist (mm) | C.V. (m/s) |
|---|---|---|---|---|---|---|
| Med Wrist | 4.0 | < 3.9 | 13.3 | > 6.0 | | |
| Med Elbow | 8.8 | | 13.3 | | 276 | 58.1 |

**Right Ulnar Nerve**
Stim Site: ADM
Rec Site

| | Lat (ms) | Norm Lat | Amp (mV) | Norm Amp | Dist (mm) | C.V. (m/s) |
|---|---|---|---|---|---|---|
| Med Wrist | 3.6 | < 3.1 | 13.8 | > 7.0 | 80 | |
| B.Elbow | 7.0 | | 12.0 | | 220 | 64.3 |
| Spiral Grv | 9.9 | | 11.9 | | 155 | 53.1 |

## Sensory Nerve Study

**Right Median Nerve**
Stim Site: Med Wrist
Rec Site

| | Lat (ms) | Norm Lat | Amp (uV) | Norm Amp | Dist (mm) |
|---|---|---|---|---|---|
| Index | 3.5 | < 3.4 | 92.0 | > 20 | 140 |

**Right Ulnar Nerve**
Rec Site: 5th dig
Stim Site

| | Lat (ms) | Norm Lat | Amp (uV) | Norm Amp | Dist (mm) |
|---|---|---|---|---|---|
| Ulnar Wrist | 2.9 | < 3.1 | 42.3 | > 12 | 140 |

**Right Radial Nerve**
Rec Site: 5th dig
Stim Site

| | Lat (ms) | Norm Lat | Amp (uV) | Norm Amp | Dist (mm) |
|---|---|---|---|---|---|
| Radial Wrist | 2.7 | < 2.7 | 22.7 | > 18 | 140 |

CONFIDENTIAL!

Confidential Information of GEICO Companies
© Government Employees Insurance Company

I.D. #: _____

## F-Wave Study

| Right Ulnar Nerve Rec Site: ADM Stim Site: Med Wrist | Latency ms | Normal Latency |
|---|---|---|
| F wave | 29.25 | 28-32 |

## EMG Study

| Name | | Ins Act | Fibs | PSW | Fascics | Polyph | MU Amp | MU Dur | Config | Pattern | Recruit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| R. Abd.Pol.Br. | Normal | | | | | | | | | | |
| R. Abd.Dig.Min. | Normal | | | | | | | | | | |
| R. Pronator Ter. | Normal | | | | | | | | | | |
| R. Flx.Car.Uln. | Normal | | | | | | | | | | |
| R. Para R C6 | Normal | | | | | | | | | | |
| R. Para R C7 | Normal | | | | | | | | | | |
| R. Para R C8 | Normal | | | | | | | | | | |

### Summary/Interpretation:

Right Median Sensory Nerve revealed a very mild delay in peak latency; indicating slowing through the Carpal Tunnel.

Right Median Motor Nerve revealed a mild delay in onset latency; indicating demyelination and/or slowing through the Carpal Tunnel.

Right Ulnar Motor Nerve revealed a drop in amplitude and NCV around the elbow; indicating probable entrapment through the Cubital Tunnel.

Ulnar F-wave was found to be normal.

EMG needle evaluations were normal.

Impression -- Abnormal Study:

> We will look at this condition later in this lesson.

1. Median Nerve Neuropathy at the wrist most c/w Carpal Tunnel Syndrome. This appears to involve the Motor and Sensory portion of the nerve. The severity is mild.

2. Ulnar Motor Nerve Neuropathy at the elbow most c/w Cubital Tunnel Sydrome.

3. A radiculopathy is not demonstrated on this evaluation.

4. No denervation was noted.

**Confidential Information of GEICO Companies**
© Government Employees Insurance Company



**Surface Electromyography (See example #5)**

A common test seen, especially in the chiropractic arena, is the Surface EMG.   A "Surface" EMG is not the same as a conventional needle EMG but involves the use of a probe that is passed over the surface of the skin in order to measure electrical muscle activity. This method of EMG testing is considered investigational and is not a covered service with many health insurance carriers.

If a Surface EMG is submitted in an injured party(s) medical packet, we need to give it its due attention.  Just be aware that many entities do not recognize this as a beneficial tool in the diagnosis of Nerve Impingement Syndrome or other peripheral nerve conditions.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

## Myelogram (See Example #6)

A myelogram is a procedure in which a small amount of radiographic contrast is injected into the sack which contains the nerve roots in the spinal canal. This allows the radiologist to take a series of x-ray pictures on which the nerve roots are outlined. In this way, any abnormalities within the spinal canal can potentially be visualized to aid in diagnosis of certain spinal problems. A CT scan will probably be performed at the same time as the myelogram to further assist in visualizing the spinal canal. The myelogram dye is injected by the radiologist using a small needle inserted into the spine. Other tests, including CT scan and MRI of the spine, may be done as well and may be useful pieces of information. However, there is certain information that only a myelogram can provide and so it is still considered a useful test.

## Discogram (See example #7)

A Discogram is a special X-ray examination of the intervertebral discs of the spine. Doctors use it to determine if a damaged disc is the source of ongoing pain. Intervertebral discs are soft, cushion-like pads between the bones of your spine (vertebrae). A damaged disc may cause pain in the neck, arms, back, abdomen or legs.

During this procedure, the radiologist injects a dye into the suspected disc using X-ray guidance. The dye, which appears white on X-ray, makes the disc visible.

A discogram works in two ways:

- It allows the doctor to check the disc for damage.

- It helps identify the source of pain. If during the injection you feel pain that's similar to your ongoing pain, the disc is likely the source of this pain.

## Bone Scan (See example #8)

A bone scan is a nuclear scanning test that identifies new areas of bone growth or breakdown. It can be done to evaluate damage to the bones, to detect cancer that has spread (metastasized) to the bones, and to monitor conditions that can affect the bones (including infection and trauma). A bone scan can often detect a problem days to months earlier than a regular X-ray test.

---

**It is important to monitor the use of MRI, CT scan or EMGs without documented signs of radiating symptoms and question necessity.**

---

Confidential Information of GEICO Companies
© Government Employees Insurance Company

## Introduction to Strains/Sprains

A soft tissue injury is defined as <u>an injury to ligaments, muscle and/or tendons</u>.  As you might know, the function of a ligament is to limit movement of a joint in one direction and to provide support to that joint.  Muscles are attached to bone via tendons and are integral in our ability to move.   When these support structures are damaged, the injury is classified as a sprain or strain.  Let's take a look how these conditions differ:

- A <u>sprain</u> is an injury involving the <u>stretching</u> or <u>tearing</u> of a ligament (tissue that connects bone to bone) or a joint capsule, which help provide joint stability. A severely damaged ligament or joint capsule can cause instability in a joint. Symptoms may include pain, inflammation, and in some cases, the inability to move a limb (arm, leg, foot). Sprains occur when a joint is forced beyond its normal range of motion, such as turning or rolling your ankle.

- <u>Strains</u> are injuries that involve the stretching or tearing of a musculo-tendinous (muscle and tendon) structure. An acute (instant or recent) strain of the musculo-tendinous structure occurs at the junction where the muscle is becoming a tendon. These strains take place when a muscle is stretched and suddenly contracts, as with running or jumping. This type of injury is frequently seen in runners who strain their hamstrings. Many times the injury will occur suddenly while the runner is in full stride. Symptoms for an acute muscle strain may include pain, muscle spasm, loss of strength, and limited range of motion.

A physician categorizes sprains and strains according to severity.

- A Grade I (mild) sprain or strain involves some stretching or minor tearing of a ligament or muscle.

- A Grade II (moderate) sprain or strain is a ligament or muscle that is partially torn but still intact.

- A Grade III (severe) sprain or strain means that the ligament or muscle is completely torn, resulting in joint instability

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**Here is an illustration on the different grades of strains and sprains**



**Symptoms of soft tissue sprain/strain commonly increase over the following 4-5 days after the accident and may require additional medical attention.**

**How are people injured in accidents?**

People are commonly injured on different parts of their body depending on where the impact of the accident is.  The following types of accidents frequently have the same kind of injury:

- Front impact (head-on) impact
  - Hyperextension or hyperflexion (excessive bending or straightening) of the cervical or thoracic spine

- Side (T-bone) impact
  - Shoulder sprain/strains
  - Injuries from the neck to the hip

- Rear Impact
  - Whiplash
  - Neck/back sprain/strain
  - Cervical injuries

- Rotational (around a pivot point)
  - Shoulder
  - Knee
  - Neck
  - Hip injuries

Confidential Information of GEICO Companies
© Government Employees Insurance Company

GTM01130

- Rollover impact
  - o Compression injuries to the spine
  - o Sprain/strain injury
  - o Spinal fracture

### How is a strain/sprain injury diagnosed?

The main 3 mechanisms used to diagnose a soft tissue injury are X-rays, CT scans and MRIs combined with the provider observing objective and subjective signs of injury. X-rays cannot directly diagnose a soft tissue injury and are used to rule out a fracture. Diagnostic testing will be covered in depth as you continue your training.

### Expected Course of Treatment for Strain/Sprain Injuries

Like we observed earlier when describing ER records, the injured party who sustained a soft tissue injury may go to the hospital from the scene of the accident complaining of pain to numerous areas of his/her body. What happens in the emergency room for these types of injuries?

- The emergency room doctor will do a physical exam and take x-rays to rule out any fractures in the painful area. The x-rays may be interpreted by a radiologist. The emergency room doctor will give an initial diagnosis based on the results of the testing and recommend follow-up treatment.

- The injured patient may receive medication in the form of a muscle relaxant or they'll be told to take an over the counter medication such as ibuprofen or aspirin for pain relief.

- Depending on the severity of the sprain/strain, the doctor may immobilize the injured area for a short period of time.

- The injured person will be given discharge instructions. The discharge instructions will usually include the diagnosis, any medications that are recommended and usually some safety instructions. Remember our young friend who was diagnosed with a chest wall contusion (another type of soft tissue injury? When she was released from the ER, she was given discharge instructions based on her diagnosis – Contusion secondary to blunt force trauma.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

Let's take a look at her discharge instructions:



Strain/Sprain injuries are self-limiting which means that the injury usually resolves with or without treatment by a doctor or chiropractor.  These types of injuries usually respond well to active treatment and often resolve without residuals and/or permanent impairment.

The natural healing time for this type of injury is usually 6 to 9 weeks for a mild to moderate injury (Grades and I & II) and 9 to 12 weeks for a more severe injury.  Treatment after that time would not normally be supported as accident related (Grade 3).  We will continue our discussion on treatment for specific soft tissue injuries later in this lesson.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**