**Recorded Statements**

When taking a recorded statement of an injured party our word track includes the following questions, which if answered, should provide the query requirements:

1. Name
2. Date of birth
3. Social Security Number

The injury section of the word track now includes the following questions:

1. Are you currently retired?
2. Are you currently disabled from work?
3. Are you receiving or have you applied for Social Security Disability or other Social Security benefits?
4. Are you now or have you ever received Medicare benefits?
5. Do you have a valid HICN (Medicare Health Insurance Claim Number)?
6. If yes, what is the HICN number?
7. Have any of medical bills incurred in this loss been paid (in whole or in part) by Medicare?

**Discovery Techniques**

Most jurisdiction provide for some type of written discovery requests, usually referred to as Interrogatories. To obtain the necessary Medicare query information during the discovery process, we have suggested additions to typical Interrogatory requests as noted in bold below. Typical Interrogatories ask,

1. Identify yourself and state all names by which you have been known, your date of birth and Social Security Number, your marital status, the identity of your spouse, your employer and your occupation. **Also, please state if you receive Medicare benefits and if so please identify your HICN Number.**

2. Itemize all expenses and other economic damages, past and future, that you claim are a result of the occurrence and as to each item claimed identify the item, the amount claimed for the item, the method, if any, by which you computed that amount, the figures used in that computation, and the facts and assumptions upon which your claim is based. **If the expenses include medical bills, please indicate if Medicare paid all or part of any medical expense that you claim resulted from this occurrence.**

Confidential Information of GEICO Companies
© Government Employees Insurance Company

Many providers, including numerous law firms are disseminating incorrect or outdated information regarding Section 111 requirements.  As indicated above, we are now simply required to identify Medicare beneficiaries through the query process and once identified, report payments.  There are no new requirements or rules regarding the actual settlement of claims involving Medicare.  There is NO requirement to include in a settlement a certain amount allocated for future medical bills, sometimes referred to as a "set-aside."

Claims involving Medicare will still take time to resolve since we still must protect the lien if Medicare has made conditional payments.  In July of 2007, this Department published a Medicare Pilot Procedure that included suggestions on how to obtain the lien information and provided sample releases and a hold harmless agreement.  The information contained within that document is still applicable and accurate.

## In Summary

As you can see, the injury evaluation is the process in which we determine the claim's settlement Value or Price depending upon the overall facts concerning coverage, liability and damage.  Once you have determined these factors you must then consider the following:

1. The percentage of shared liability – as it relates to the injury portion of the claim.

2. The amount of medical bills and lost wages (special damages)

3. The nature of medical expense (treatment vs. diagnostic)

4. The nature of treatment (passive vs. active)

5. The length of treatment from the first date of service to last date of service as well as the intensity and frequency of treatment (e.g. visit patterns, how many times per week for how many weeks?)

6. The physician's credentials and reputation (MD, DO, DC, etc)

7. The claimant's pain and suffering (this is established by contacts with the claimant or their representative on discomfort, inconvenience, or physical and mental distress/anguish is based on the intensity established by the testimony of the injured party and the expert medical witnesses regarding intensity)

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

28

8.   Pre-existing condition

9.   Mitigation of damages (was the treatment plan followed?  Did the injured party seek treatment timely? Did they continue to aggravate the injury by aggressive activity?)

10. Jurisdictional variable or venue

11. Will a jury be compassionate to the injured party regardless of circumstances around the alleged injury?  Or will the jury alienate the claimant or insured by attitude their display of appearance/impression. Lastly, we must consider the ability and reputation of Plaintiff and Defense trial counsel.

12. Will there be a contribution to the settlement/policy limits by the insured or adverse carrier?

13. Was the No-fault Threshold(s) properly pierced?

14. Collateral Source

Confidential Information of GEICO Companies
© Government Employees Insurance Company



**Lesson Eight**
**ClaimIQ**
**Student Manual**
**TCR2 Module**

CONFIDENTIAL!

# ClaimIQ – Investigation and Liability

ClaimIQ is a place to gather information obtained during the liability and damages investigation so that claims personnel can then independently evaluate the claim and determine the fair and reasonable settlement range.

ClaimIQ is designed to **assist** liability adjusters in efficiently organizing and documenting the investigation and liability assessment of a claim. ClaimIQ assists with the development, organization and documentation of the investigation by providing questions for the most frequent loss scenarios, duties owed for those scenarios and access to reference tools regarding those duties owed in various states.

After the proper investigation has been completed and documented in ClaimIQ, the adjuster makes an independent assessment of the duties owed and breached on a particular claim and documents that independent assessment. Based on the duty breaches identified and documented by the adjuster, he or she uses his or her best judgment to make a final liability determination. Since the assessment and duty breaches are documented in ClaimIQ by the adjuster, ClaimIQ also provides a recommendation on liability.

The ClaimIQ **knowledge base** which is used to generate the recommended range is comprised of the combined knowledge of a team of experts who have many years of experience in investigating liability claims at GEICO. They have identified questions and factors that should be considered in the investigation and liability determination of various loss scenarios. Ultimately it is the adjuster's job to make the final liability assessment based on the facts developed during the investigation.

## Accessing ClaimIQ

There are two ways to access the ClaimIQ tab for your own pending:
.

1.  Clicking on the CIQ tab of the claim file will navigate you to that file's Feature Summary Page in CIQ

2.  Clicking on the CIQ icon on the ECF Icon bar will navigate you to the CIQ pending by adjuster

**This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company**

**General**

The ClaimIQ tab in ECF is used to access the CIQ home page for the claim. There are several sub-tabs inside the ClaimIQ tab. Those are as follows:

- Summary
- Investigation—Header, Interviews, Official Records, Analysis and References
- Liability—Assessment and Decision
- Injury –Diagnosis, Evaluation, Specials, Generals, Venue and Decision
- Negotiation Conduct—Conduct and ADR
- Litigation Tab—Suit handling and Trial Calendar
- Documents—CIQ documents and Activity Log
- References
- Notes

Several of the sub-tabs require access permissions, thus may not be visible to all users. ClaimIQ is currently used by CSR2, TCR1, TCR2 and CU adjusters. This section will focus primarily on liability investigation and assessment. ClaimIQ is designed to assist with organization and documentation of the liability investigation and will provide a liability recommendation based on that investigation and the adjuster's documented analysis of the duties owed and breached. Ultimately, the adjuster uses his or her judgment based on the facts developed during the investigation to assess the duty breaches and make a final liability determination.

The file must have a PD, BI or UM/UIM feature in order for the claim to be accessible in ClaimIQ. The primary method of accessing ClaimIQ is through the "CIQ" tab located on the far right hand side of ECF.



This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

4

A second and less frequently used method is via the "ClaimIQ Pending" tab which is located in the column of tabs on the far left hand side of ECF. Selecting this tab will bring up an examiner's entire pending.

Either method will navigate the user to a Feature Header View on the ClaimIQ Home Page. Selecting the CIQ tab in ECF will display all features associated with the specific claim being accessed in ECF. Selecting the ClaimIQ Pending tab located on far left hand column of ECF will display all features on all claims assigned to an examiner code. The Feature Header View's default view lists the claim number/IP #/feature, feature status (open, closed or re-opened), date of loss, coverage, insured and claimant names.



Clicking on the **Consultation Status View** field will change the default view to display the various modules of ClaimIQ. The four modules which are displayed on this view are Investigation, Liability, Injury and Negotiation. The status view allows the user in a quick glance to determine the status of each of the modules.

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

The screen below displays the view after selecting "Consultation Status View:"



The grid below displays the possible status views from the Home Page:

| Module name | Status: Module has not been started | Status: Module in process | Status: Module complete |
|---|---|---|---|
| Investigation | Not Started | In Process | Complete |
| Liability | Not Started | In Process | Full Liability, Shared Liability, No Liability |
| Injury | Not Started | In Process | Valued |
| Negotiation | Not Started | Demand Pending, Offer Pending | Demand Accepted, Offer Accepted, Settled |

Accessing this view allows you to quickly determine if there are any claims on which investigation and/or liability determination is pending.

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

6

**Search and Sort Functions**



The default view will display all features assigned to an examiner.  By setting parameters, the examiner can search for all features within a range of loss dates, a specific coverage type and/or an insured or claimant name.

Each column can be sorted by clicking on the column header.  For example: clicking on the "Date of Loss" column header will cause the claims to be displayed by date of loss with the oldest claim at the top of the column.  Clicking the link a second time will reverse the order, displaying the most recent dates of loss first.  Clicking on "Insured" will sort the claims in alphabetical order by an insured's last name.

The consultation status view/Feature header view can be toggled back and forth by clicking and the next view below will appear.  Clicking in the Feature Header View field will return you to that view.



This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

<u>**Feature Summary**</u>

To access the Feature Summary page, single-click on the claim number and feature displayed on the ClaimIQ home page.



There are 3 navigation bars which have different functions.  The tool bars are available on every page in the system and permit easy navigation to various other pages in the application.

**Global Tool Bar**



The Global Tool Bar on the top of the screen has several links.  The tabs which can be accessed are:

- Home: this will return you to the Home page
- SIU: this function is no longer used
- Reports: this function is no longer used
- Administration: this function is available to supervisors only

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

8

- Help: this button causes a new window to be displayed containing help screens
- Logout: function is disabled when accessing ClaimIQ via ECF

**Feature Tool Bar**



The Feature Tool Bar displays the claim number and a drop down with the IP #, feature, and IP's name. The drop down allows the user to navigate between different features on the same claim. This drop down is also located at the bottom of each page. The Feature Tool bar consists of the following links:

- Summary:  Permits navigation to the Feature Summary page.
- Parties: This function provides contact information for parties on the claim.
- Notes:  This link provides access directly to all notes entered into ClaimIQ. The notes page is similar to ALOG.
- Add Notes:  This link will generate a "Create Note" pop-up window.  This window will allow the user to create a permanent note which will save in ClaimIQ notes and in turn feed to ALOG. Please see the Adding Activity Notes on page 9.
- Documents: Accessing this link provides access to printable summaries of the various elements of the claim.  The most comprehensive of these documents is the Claim Evaluation Summary.  This document is primarily used for injury clams and is an excellent tool for supervisors to review along with any file conference as it gives a current summary of liability and injuries.
- Save: ClaimIQ automatically saves all entries when moving from page to page within ClaimIQ.  As with any computer application, it is prudent to save lengthy updates frequently.  Be sure to select "Save" before leaving ClaimIQ to go back to ECF.

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

GTM01280

**Navigation Bar**



The Navigation Bar is the main method for navigating through ClaimIQ.  It is located on the left side of the screen.  The user can select any ClaimIQ page he or she wishes to access.  A Claim Detail Information box and Feature Detail Information box are located above the Navigation Bar.  The Claim Detail Information box contains the date of loss, loss state, and policy number.  The Feature Detail Information box includes coverage, reserve and payment information.

At the top and bottom of each page within a module (Investigation, Liability, Injury, Negotiation or Litigation) are links which allow for navigation within the module.  The buttons are located immediately below the feature tool bar.  For example, if a user is on the Official Records page and needs to go to the Header Page, the user would scroll to the top or bottom of the Official Records page and select Header.  The user could also select Header on the left hand Navigation Bar.



**Float**

When working in ClaimIQ, selecting another tab in ECF will bring up the selected tab and will cause ClaimIQ to move to the background.  If the user wishes to have ClaimIQ visible when viewing information in another ECF tab, the user should check the "Float" checkbox located in the upper left hand corner of the ClaimIQ screen before selecting the ECF tab.  This will cause the ClaimIQ screen to remain in view and allow the user to move it (click the blue bar and drag) permitting the ECF tab selected to be visible.  Clicking on the < > or ^ will return the user to the Feature Header View.  Regardless if float is selected, it is a good work pattern to "Save" work done in ClaimIQ prior to navigating to another ECF tab.



This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

10

### Bypass Consultations

ClaimIQ is to be utilized by CSR2, TCR1, TCR2 and CU examiners on all claims with a liability or UM/UIM feature.  There will be rare occasions to bypass the liability consultation.  Guidance states "In ClaimIQ the term bypass has a specific meaning. The term means that none of the consultations will be performed on a specific feature."  Bypass consultations is only to be used in specific situations approved by Claims Home Office. Please review guidance or speak with your supervisor to become familiar with appropriate circumstances to bypass consultations.

To bypass consultations, click on the orange "Bypass Consultations" link located in the approximate center of the Summary page:



A drop down menu will display with Claims Home Office approved reasons to bypass consultations, an "Other" selection and a "Un-bypass" selection.



This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

To bypass consultations on multiple features, the user will need to select the reason separately in the drop down box associated with each feature.  If the reason for bypassing the file is not listed in the drop down, the user will select "Other" and document the reason in the text box which is generated by the choice of "Other."



When bypass consultations is selected, a note is saved in Notes documenting the transaction:



## Guidance

Guidance links have been provided throughout ClaimIQ to give additional information and context to the various fields.  The guidance links are located on the right side of the title bars for the section or sections for which they offer further information.



This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

12

The guidance for bypass reads as follows:



Bypass File -- In ClaimIQ the term bypass has a specific meaning. The term means that none of the consultations will be performed on a specific feature. In order to ensure that we are using the term consistently, the term "bypass" should only be used in those situations where the intention is not to perform any of the consultations contained within ClaimIQ. If an injury consultation is not required, document the reason under the Investigation Header. The amount of documentation required on bypassed features depends on the amount of investigation necessary prior to the bypass selection.

The following are the only approved bypass reasons:

- No coverage---
  - No coverage features do not migrate to ClaimIQ; so if no coverage features are the only features open, the ClaimIQ consultation will not be available
  - Standard documentation rules apply to any features where coverage investigation is pending. If the feature is open in ClaimIQ, you must document any investigation, liability decision and/or injury information as it develops.
- Opened in error---
  - If investigation, liability decision and/or injury evaluation is needed and/or made prior to determining feature was opened in error, that information must be documented before bypass is selected.
- Monitor BI excess/UM only---
  - Only Virginia, North Carolina, Montana, Tennessee, Georgia and Mississippi have been approved for the UM bypass reason. Even in those states, if any investigation, liability and/or injury assessment is needed, the bypass is not proper and standard documentation procedures should be followed. In the state of GA, add-on UM is not approved for bypass.
  - For BI Excess monitoring; if any investigation, liability and/or injury assessment is needed, this bypass is not proper and standard documentation procedures should be followed. Standard documentation is required until the file is closed. If the file is reopened due to suit or to pursue a compromise settlement, standard documentation rules apply.
- First party APD---
  - This applies for states that handle collision on rental vehicles and/or other non owned vehicles as property damage and no other ClaimIQ feature is opened.
  - Any other feature on the file must be handled according to standard documentation rules.
- Other----As of January 1, 2007, the only approved "Other" bypass reason is for Prop 51 in California
  - The Investigation, Liability and Injury Documentation must all be completed prior to the bypass. Offers/demands must also be documented. This allows bypass only for purposes of the Negotiation Conduct range since different % liability cannot be assigned to Specials and Generals
- Un-bypass is used for reopening after a consultation has been bypassed.

Please speak with your supervisor if you have any questions about this procedure.

**This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company**

13

### Adding Activity Notes



ClaimIQ allows the user to "Add Note" in the notes section. Notes entered into ClaimIQ are stored in ClaimIQ as a permanent record. Manually entered ClaimIQ notes are also saved in ALOG. The "Add Note" function includes the ability to bold, italicize and underline text, character formatting similar to Microsoft Word, spell check, a character counter and the ability to categorize the note by feature, module type and subject. The author of a note also has the ability to forward a copy of the note via email to other ClaimIQ users. Functionality exists to attach a document such as a .jpg file or word document to the note but this functionality is not presently used.



If the examiner wishes to view ClaimIQ Notes in ClaimIQ instead of ALOG, selecting "Notes" will display all notes saved on a claim. The Notes screen default view is to display all notes associated with the feature being viewed at the time you navigate to Notes. The search criteria will need to be defined by the user: range of dates, feature, ClaimIQ module (investigation, liability, injury, negotiation, other or litigation) and UserID (adjuster code, name or "System"). The typical practice is to leave the date range blank, change feature to "All," change ClaimIQ module to "All" and change UserID to "All." After setting the search parameters, selecting "Search" will bring up the requested notes.

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

14

Documents

Next on the Feature Tool Bar is a link to access documents.  The Documents page displays a
list of documents which summarize the applicable tabs in ClaimIQ.  The most commonly
used documents are the Claim Evaluation Summary and various litigation related documents.



However, documents for any tab can be viewed for a quick summary of that module. The
documents give a very thorough outline of the activity and/or decisions that have been
completed to date. They automatically update based on information input by the adjuster in
the various fields in ClaimIQ. Documents assist in reviewing files by allowing the selection
of a document for review of any module in the ClaimIQ application in a very organized and
efficient manner.

For example, selecting the "Liability" document will take you to the Liability Consultation
Summary which outlines the adjuster's decision and input on duties owed. It also tells you
whether or not any of the parties breached one or more duties as well as the adjuster's
determination on % negligence and all notes related to the Liability Assessment.

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company



Print the consultation

...ged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

16

The activity log is a record of various work preformed in ClaimIQ and is primarily for management use.

**Guidance:**

Guidance is located throughout the application and is accessed through a link on the horizontal green bar above each section of a page. Guidance gives assistance in using each section and should be reviewed if there are any questions on the protocol for completing a field.



## Investigation Module



The Investigation module is used to document the evidence gathered in the liability investigation and a summary of the facts of the accident. The evidence may include summaries of recorded interviews and summaries of official records such as police reports, DMV records, police accident reconstructions, scene photos etc.

The module consists of 5 sub-tabs. In brief:

- Header: Contains a summary of the loss facts and coverage
- Interviews: Location for documenting recorded interviews
- Official Records: Location for summarizing official documentation (i.e. police reports, DMV records, police accident reconstructions)
- Analysis: An optional location for documenting the reasoning behind a liability decision
- Reference: A listing of internet and intranet resources

## Investigation Header

The Header Page serves as the primary location for the examiner to document a detailed loss description. This page also contains a synopsis of policy limit and vehicle information which migrates from ECF. The page is divided into two sections: "Claim Information" and

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

"Feature Information." The "Claim Information" fields apply to the policy, the insured and a summary of how the accident occurred. The "Feature Information" fields apply specifically to the claimant associated with the feature being viewed.

The "Claim Information" and "Feature Information" bars are static. Beneath both of these bars are bars which can be expanded or collapsed. Bars with expand/collapse functionality are designated with a ⊞ symbol located on the far left hand side of the bar. The subsections for Claim Information are "Policy limits facts," "Vehicle facts" and "Required for biomechanical analysis." The subsections for Feature Information are "Vehicle facts" and "Required for biomechanical analysis." Please note "Required for biomechanical analysis" is used only in selected offices.

The first item which needs to be completed on the Header page is selection of a Question Guide. As this will populate the Header, Interview and Analysis pages, this should be the first step when accessing ClaimIQ. Please review guidance to become familiar with the meaning of each scenario and how a selection is made.

Below is a view of the Header Page before a Question guide is selected:



This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

18

Question Guide drop down:



View after a Question Guide is selected:



This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

GTM01290

The Loss description text box is used to document a summary of how the accident occurred. To assist in proper file documentation and to eliminate duplicate documentation, this text feeds to multiple other documents including Timed Reserve Review, Claim Evaluation Summary document (primarily used in relation to injury claims) and litigation documents. The Loss Description field should be updated after investigation is complete to reflect the description upon which liability was determined. If you update this description on receipt or as the investigation progresses, it is imperative that you remember to update with the final determination.

In addition to the Question Guide and Loss Description text box, there are 3 additional fields which allow documentation of useful information.  There is a text box for "Coverage Facts" which is ideal for noting excess coverage or coverage due to vehicle stacking.  There are Point of Impact drop downs associated with the insured's vehicle and the claimant's vehicle.  All of these fields feed to various documents and should be completed in accordance with regional procedures



⊟ Policy limit facts

| | Order by Party ☐ |
|---|---|
| Policy Limits (PD) | 5 |
| Policy Limits (BI) | 20/40 |
| Policy Limit (UMPD) | |
| Policy Limits (UMBI) | N300/N300 |
| Policy Limits (UM) | N300/N300 |
| GEICO Personal Umbrella Policy (GPUP) in effect? | |

Coverage Facts:

Our policy is primary and includes a GPUP for one million. There are 4 other vehicles involved in this loss and we will be looking for contribution from adverse driver John Jackson and adverse driver Lou Smith.  We have not been able to confirm their coverage at this time

The maximum number of characters is 1000 and any additional characters will be truncated.

⊟ Vehicle facts

| | Order by Party ☐ |
|---|---|
| INSURED's placeholder | |
| INSURED Vehicle Make: | L ROVER |
| INSURED Vehicle Model: | RANGEROVER |
| INSURED Vehicle Year: | 2006 |
| PD to INSURED Vehicle: | 0.00 |
| Point of impact on INSURED vehicle? | Center front ▾ |

⊟ Required for biomechanical analysis

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

20

**Investigation Interview Page**

The Interview Page is a dynamic question guide which is intended to assist the examiner in efficiently documenting a summary of a recorded interview. The audio recording of the interview is conducted through the use of the ECF recorder. The question guides have been designed to follow closely the flow of a typical recorded interview. The guides are designed to display questions which would be commonly asked on a majority of claims. Not all of the questions need to be asked on every interview nor are the questions all encompassing. Good claims judgment should be used in asking relevant questions which are needed to resolve the investigation.

The guides are set up as a combination of drop down questions and text boxes. When documenting a response to a question, be sure the documentation accurately reflects the answer given. If the drop down response does not capture the answer, a text box should be used. For example, there is a drop down asking for the number of lanes. If the interviewee answers "three," then the drop down "3" should be selected. If the interviewee states "three but the left lane was closed due to construction," then a text box should be used to document the response since the drop down does not accurately document the answer.



This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

The following steps must be completed prior to beginning to document a recorded interview:

1.  The top feature of the list should be selected.  For example, the screen shot shown below has two features, 03-APD and 04-ABI.  All statements should be documented on the 03-APD feature.  This includes the insured, claimant, passengers and witnesses.  This is due to the fact that statements can only be viewed on the feature on which they were documented.



2.  If a question guide was not selected on the Header page, select a question guide on the Interview page.  Regardless if the question guide is selected on the Header page, Interview page or Analysis page, an update on any one page will update the other pages.  Be careful not to change the question guide in the middle of documenting an interview if a snapshot has not been created as this will result in data loss.

3.  Select Interviewee.  All interested parties listed in ECF will feed to this drop down.  If the person you are interviewing is not listed on the drop down, update ECF with the interviewee's information so the name will feed to the drop down.

The interview guides contain 5 subcategories:
- Verification
- Scene and Conditions
- Events
- Evidence
- Injury

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company



Verification is designed to be used in conjunction with a separate list of 18 questions found in guidance. This expanded view of the Verification section should be completed after the recorded interview and serve to confirm that the questions were asked during the interview. The questions shown below are in order for a claimant's interview. Once these questions are answered, you may collapse the section by clicking on the – to the left of verification or you may leave it expanded.



Selecting Guidance on the Claim Information bar defaults to an overview of the Investigation/Interviews page and provides a reminder script for the Recorded Interview Introduction.

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company



Selecting the Verification Guidance displays the 18 items which are required to be verified in your pre-interview conversation before you proceed with the interview and address the Verification questions to be asked in the interview.



This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

24

You can "Float" the Guidance box and vector to the Parties tab to verify or change information.

You can re-size the box or click and drag it to relocate it on your screen. Uncheck the float box and select the < arrow on the Guidance panel to return to the Interview page. Selecting the > arrow will take you to CIQ Home.



Selection of the Injury option displays 40 potential injury questions which can be useful as a guide for the types of questions needed during an injury interview.

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company



Scene and Conditions contains a list of drop down questions and a large text box.  This series of questions is intended to describe the environmental and traffic conditions, the layout of the roadway and relative locations of the vehicles.

Expanding the Scene & Conditions guide for an R/I displays questions in the order you would ordinarily ask them. Using the Order by Party function will modify the order of questions based on the role of your IP.  If the interviewee answers a question "out of order" or provides information not addressed, you may add notes in the "Additional condition facts" text box.  This is also a very good place to ask for a brief description of the accident

**This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company**

from your interviewee.    You can enter up to 1000 characters in the Additional facts boxes, and the information will migrate to the Auto Generated text box.



Your selection of a particular menu choice such as "Lighting Conditions" may generate sub-questions.  This provides more flexibility than a standardized word track.  We do suggest that if all IPs are, for example, using windshield wipers or snow tires, you summarize the collective answer in the Notes text box instead of clicking on all of the radio buttons.  This will reduce the volume of your summary.  If the interviewee responds to a question with "I don't know", I'm not sure", "I don't remember", do not check a Yes/No answer.  Select "Unknown" if offered.  If not, document the response in the text box for that R/I segment.



This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

Events contain a series of drop down questions and a large text box intended to document how the accident occurred.



The Events guide is extensive. Keep in mind it is only a guide and not every question must be answered. It provides a list of questions that are most likely relevant to the question guide you chose.  Listen carefully to responses and be sure to ask appropriate follow up questions.  For example, after finding out what the point of impact was, you might ask "Where was the damage?", "Was there any subsequent movement after initial impact?", "Was there any other vehicle or property damage?" or "Where did the vehicle(s) come to rest?" Document answers in the Additional facts text box. Once again, the Order by Parties option is available and a text box for "Additional events facts" which can accept up to 1000 characters is provided.

Evidence contains a list of drop down questions and a large text box and is a location to document what occurred after the accident.

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company



If you select "Yes" for witnesses, an expanded view of the witnesses section will appear with text boxes to capture witness name(s), whether a witness supports one side or the other or what the interviewee tells you the witness(es) had to say. This textbox has a 130 character capacity, so use the Additional evidence facts box for extended comments and be as specific as possible as to who said what.



This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

**Injuries**

Injury consists of a large text box to document injury information.  Forty questions are found in guidance to assist the examiner in conducting the interview.  The text in the injury text box will feed to the Injury-Diagnosis page.  If the interviewee says someone else was injured, be specific, for instance, "Jones c/o neck pain", "Smith c/o headache", "I heard Smith tell the police officer his neck hurt".  Any notes you add in the "Document Injuries" text box will feed to the Injury Diagnosis page.



The Summarize Claim text box displayed on the Interviews page should be used to document a summary of the interview as well as any information from the interview which was not documented elsewhere in the guide.  The text box can accept up to 2000 characters.  The text from this box will migrate to ALOG serving as the Recorded Interview summary.  The Summarize Claim text box is specific to the interviewee's version, not the liability decision.

The Auto-Generated Text box will contain some information from the Header page and will display a summary of all recorded interview answers in narrative form.  As with any computer application, it is a good habit to "save" periodically while documenting an interview.



This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

30

When an interview is complete and the information saved, the Interviewee's responses from the drop downs and text boxes will be displayed in the Auto Generated Text.

To create a permanent record of the interview, please remember the three "S's":

> **S**UMMARIZE in the Summarize Claim textbox
> **S**AVE
> Create **S**NAPSHOT.

Creating a snapshot has 2 effects:
1. Feeds the text from the Summarize Claim box to ALOG
2. Creates a permanent and comprehensive summary of the interview.

The 3 S's are VERY important and must be done in that order at the completion of every recorded interview summary.



To view an Interview Snapshot, select an Interviewee and the date from the View Snapshots menu.

On the Investigation Snapshot, the subject of the interview is listed at the top. Any information entered in the Summary Text box is shown next, followed by each question category in the same order as the guide. This provides a comprehensive recorded interview summary. The snapshot does not feed to ALOG in its entirety. Only the text entered in the Summarize Claim text box migrates to ALOG.

**This document and its contents are privileged confidential information of the GEICO Insurance Companies © Government Employees Insurance Company**



Compare Interviews

"Compare Interviews" is a useful tool which allows viewing interviews side by side.  A snapshot must have been created to permit an interview to be viewed in this manner.  To compare interviews, select "Compare Interviews."



When "Compare Interviews" is selected, a new popup window will appear prompting the user to select which interviews are to be compared.

**This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company**

32



The gray text boxes located at the top of the document display text from the summarize claim text boxes on each of the interviews.  Under the "Question" column, black text indicates the responses given in each interview are identical.  Red text indicates the responses are different, the responses were documented in text boxes or an answer was documented for one interviewee but not the other.



This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

## Official Records

"Official Records" is a page which consists of a large text box where official documentation is summarized.  Official documentation should include but is not limited to police reports, DMV records, police scene investigations, police accident reconstructions, etc.  The text does not feed to ALOGI.



## Analysis

The analysis page looks similar to the Interview page but has a different purpose.  Use of this page is optional and there are regional variations.  Please check with your supervisor to determine if its use is required in your office.

The purpose of the Analysis page is to serve as a location to document the reasoning behind a final liability determination.  If used, the final decision and the reasoning behind the decision should be documented in the summarize claim text box located at the top of the page.  The 3 S's should be followed just as on the interview page: Summarize, Save and Create Snapshot.  Creating a snapshot will cause the text entered to feed to ALOGI.  The dropdown responses and associated text boxes <u>never</u> need to be completed.  If this page is not used, the reasoning behind a liability decision should be documented elsewhere in accordance with your region's procedures.

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

34

On claims which existed in ClaimIQ prior to June 2006, this page displays a series of drop down questions but no subcategories or large text boxes.



This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

### References

The investigation reference page displays links to internet and intranet web sites. You can use these references to research legal, medical and other information that may assist you in determining the facts of the claim. References include some of the following:

- Rules of the road to refer to driving regulations for the incident state
- Legal code for the claim's state of loss
- Weather conditions on the date of loss
- Google Maps
- Medical dictionaries and/or medical research.



This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

36

**Liability Assessment**

Once the investigation is completed, ClaimIQ assists liability examiners in organizing and documenting evidence gathered during the liability investigation. It also assists in analyzing the facts surrounding the loss to reach a fair and equitable liability determination.

The Liability Assessment page is used to assist with the analysis of duties owed and document the adjuster's assessment of duties breached.





The first step of the Liability Assessment involves selecting an accident scenario. For definitions of the scenarios, please refer to Guidance. In general, the loss scenario is selected once the examiner has an impression on how the loss occurred and should be updated as new information is obtained.

Next, the examiner will review parties for their negligence evaluation. The NFP column stands for **N**egligence-**F**ree **P**arty.

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

When the NFP column is checked, the party's name is removed from the duty breach section and you cannot evaluate liability breaches for this party. NFP will be selected for any person who could not be negligent in the loss.  We would not generally assess liability for passengers, a named insured not involved in the accident, or the claimant owner not driving the vehicle.  Guidance states:

> "Except in some cases of a single car loss, there should always be a minimum of two parties for comparison of negligence.
>
> Negligence Free Parties (NFP) are parties to a feature who cannot be considered negligent in their actions, for example, passengers, minors and legally incompetent persons."

The CBP column stands for **C**overed **B**y **P**olicy.  Check this column for the party for whom negligence under the insured's policy is being evaluated.  Generally on a liability claim, it will be the insured driver.  When dealing with uninsured or underinsured motorist PD and/or BI claims, remember that we "stand in the shoes" of the uninsured/underinsured person, so the uninsured/underinsured person would be **C**overed **B**y **P**olicy. If a loss involves evaluating liability on a non-driving vehicle owner (example: negligent entrustment) or a passenger (passenger somehow contributed to the loss) CBP would be selected for that party.  This will allow negligence to be assigned if necessary.  Be sure to select at least one person under CBP.  More than one person can be selected as CBP.



| NFP | Party | Role | CBP | Entity Description |
|---|---|---|---|---|
| ☐ | SMITH, DOTTIE M | Insured | ☑ | O |
| ☐ | FINN, HUCK | Claimant (03-APD) | ☐ | O |
| ☐ | SAWYER, TOM | Claimant (04-ABI) | ☐ | D,DRIVER OF 03 |
| ☐ | SMITH, ROY D | Other | ☐ | D,DRIVER OF 04 |

<u>Multiple Consultations</u>

In most cases, liability is determined for all features in a claim together. However, in certain circumstances of claims with multiple features, the liability assessment may differ for one or more features. A good example is automobile accidents involving multiple vehicles, with multiple impacts. These features may be grouped so that a separate liability assessment can be performed for each group.

Changes to the liability assessment for one feature apply to all features in a group.

**This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company**

To separately assess liability for features within a claim:

1. Click the Setup Claims in Multiple Consultations link.
2. Place features in groups by choosing letters from the drop-down menu.



Selecting the Setup Features in Multiple Consultations text will navigate you to the "Manage Consultations" pane where you may select the consultation to attribute to your parties.



**This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company**

Determine Duty Breaches and Proximate Cause

The application displays a list of duties for each potentially negligent party and utilizes the logic of legal liability. Legal liability involves 4 elements: (1) Duty Owed, (2) Duty Breached, (3) Proximate Cause and (4) Damages. Use Guidance to help review these duties if needed.

Duties are associated with each accident scenario. The assumption is most drivers involved in a particular accident scenario owe most if not all of the duties listed for that scenario. The examiner is asked to review the evidence gathered during the liability investigation and to determine if a duty was breached and if so, what affect or connection (proximate cause) the breach had on the resulting damages.

- If a duty was not breached, the examiner selects "no breach."
- If a duty was breached but had no effect on the resulting accident, the examiner selects "Y-None"
- If a duty was breached and contributed to causing the accident, the examiner selects Y-Low, Y-Medium or Y-High to indicate how strong the connection is between the breach and the resulting damages.

The examiner should use his or her best judgment based on the facts developed during the investigation to assess the duty breaches. Although these breaches apply on a majority of claims in a particular accident scenario, if the duty does not apply or is not relevant to a particular fact pattern, it should be left blank. Selecting the ▒ icon to the right of a breach will clear the selection.



This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

GTM01311

40

Ask yourself, based on your investigation:  Was a duty owed? If so, did the party breach that duty?  If yes, determine whether the breach of duty had no impact, low, medium or high impact on the issue of negligence. For example:  The insured had a broken headlight so he/she breached a duty to maintain the vehicle, but the claimant struck the insured in the rear so the insured breached a duty that has no proximate cause to the loss.  These choices drive the recommended liability value on the next screen.  Click on the orange "C" to clear a choice.



To further assist the adjuster in assessing breaches and negligence, the Liability Assessment Page consolidates and displays investigation information from the interview pages so that pertinent information is readily available.   When you select **Show** (this will display the information one breach at a time) or **Show All** (this will display the information for all of the breaches) the drop down questions and radio buttons related to the Duty will display if answered on the Interviews Page.



This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

41

Selecting the **Guidance** hyperlink to the right of **Investigation** will cause the guidance associated with the duty to display:



The system will also display links for **Legal Code** and **Rules of Road**.  **Legal Code** will direct you to the statutes for the loss state and **Rules of Road** will direct you to the state agency which governs vehicles in the applicable loss state.  Selecting the **Investigation** hyperlink will return to the default view and display the Interviews page answers.


**Liability Decision**
The next page on the Navigation Bar is the Liability Decision page.  Based on the duty breaches selected and the examiner's weighting for each breach, a recommended liability range is generated. .

At this point, the examiner enters his or her evaluated liability assessment.  This is the low fair evaluation. The full range of the evaluation is documented later on the Negotiation Conduct Page. The ClaimIQ recommendation is simply that, a recommendation.  The final liability decision is made by the examiner and regional management based on the evidence gathered during the liability investigation and their good claims judgment.  In fact, the examiner and/or supervisor's evaluated range is required for the completion of the Liability

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

42

Consultation. ClaimIQ Notes or ALOG should explain how the liability decision was reached.



Any field marked with an asterisk is required and must have a value (in this case a liability percentage). Any party for whom "CBP" was selected on the Assessment Page will have an asterisk next to their name on the Decision Page. In most cases, every field on the Decision Page should have a corresponding liability percentage.

Below the "Evaluate Liability" section is a listing of useful information on what impacted the liability recommendation and applicable statutory information.



This document and its contents are privileged confidential information of the GEICO Insurance Companies
© Government Employees Insurance Company

43

**Investigation Header Update**

Remember to go back to the Investigation Header, now that your investigation is complete, and enter the final accident description and point of impact on the insured car.  This information will feed to your Claim Evaluation Summary (customized documents).  It also feeds to your Timed Reserve Review worksheet.



This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

44

## Negotiation Conduct-Property Damage

The last item on the Navigation Bar is the Negotiation Conduct page.  This is the location where negotiation ranges and discussions are documented.



If a claimant is represented by an attorney, the attorney's information can be entered using the "Add Attorney" function.  Attorney information does not feed from ECF to ClaimIQ.  Instead, a database containing attorney information has been created over time in ClaimIQ.

When adding an attorney, the first step will be to determine if an attorney is already in the database.  Selecting "Add Attorney" will bring up a second window to search the database.

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company



You can search by:

1. Attorney name with city and state
2. Firm name with city and state
3. Tax Identification Number
4. Phone Number

If no results are found, "Search did not return any results" is displayed in red.



Please note the functionality to search by TIN and Telephone number was implemented August 2008 and many of the entries in the system will likely not have a TIN and may not have a telephone number.  A search by TIN or telephone number should also include the firm's name.

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

If the search finds the attorney you are looking for, select the ⊕ icon to save the attorney into the system.  If the attorney is not found, select the "New Attorney" and enter the firm and attorney's information.  After saving the new information, you will be brought back to the "Search for Attorneys" window and will need to select the ⊕ icon to save the newly entered attorney into the system.

Documentation of settlement ranges is an essential portion of the Negotiation conduct page.  Remember the Negotiation Range (settlement range) is determined by the adjuster based on the liability investigation, duties owed and/or breached and the laws of a particular state.  Three fields are present and are to be completed if the information is known.  The damages field will be infrequently used on property damage claims as the extent of the damage is frequently not known when liability is being negotiated.  Total liability should be determined on all claims and is to be completed when the liability investigation is completed.  If a full denial or full acceptance of liability occurs, the range would be 0%-0% or 100%-100%.  If liability is shared, the left hand column is the lowest fair evaluation of liability and should match the number entered on the decision page.  The right hand column is the highest % of liability we believe the insured (CPB) may owe.

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

**Record Exchange and Negotiation Strategy**

As soon as negotiations begin, the exchanges should be documented in ClaimIQ.

- Enter demands and offers using the drop down menu under "Exchange".  If multiple offers and demands are exchanged in a single day, the only requirement is to document where the conversation began (first offer or first demand) and where each party ended (last offer and last demand).  All offers and demands along with complete documentation of the discussion should be entered in ClaimIQ Notes or ALOG.
- The minimum information to create an exchange is:
  - The date
  - Type of exchange (offer/demand/denial)
  - A liability percentage **and/or** a dollar amount
- ▓ saves information entered in boxes
- ▓ deletes an exchange
- Click "Accepted" when claim agreement is reached (this is required in order to complete the negotiation consultation)
- If "Denial" is chosen, enter the insured's evaluated liability percentage and select accepted



This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

48

The purpose of the text box is to organize and document evidence and information which will be needed when negotiating a claim.  An examiner may note statutory information, specific statements from a recorded interview, police report information or any other information which would be useful when conducting settlement discussions.

The most direct method to populate the Negotiation Strategy text box is to enter text directly into the text box.  The box is equipped with a character counter, spell check and various formatting functions (bold, italics, underline, bullets).

The "Organize T-Chart" is a second method of utilizing the negotiation strategy text box. The T-Chart allows the examiner to clarify facts as positive (liability facts favorable to our insured) or negative (liability facts unfavorable to our insured).



To add facts to the T-chart, select a Module (Investigation, Liability, Injury, Litigation) and enter the fact.   After selecting the ⊚ sign, the text will be entered as a Neutral Factor.  You would need to move it to either the negative factor column or the positive factor column. Each fact would need to be separately entered and separately classified as positive or negative.  Click "Add to Strategy" and positive and negative factors appear as a Negotiation Strategy Box.

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

# **ClaimIQ Injury**

ClaimIQ is used to assist adjusters in efficiently organizing and documenting the investigation and evaluation of injury claims. When all the investigative material has been collected, using the ClaimIQ application will help to organize the medical bills and injury factors so that the claims personnel can independently evaluate the claim and determine the fair and reasonable settlement range.



The ClaimIQ knowledge base is comprised of the combined knowledge of a team of experts who have many years of experience in investigating and evaluating injury claim files with GEICO. They have identified questions, factors and indicators that will help you properly investigate, document and adjust the claim.

Based on the adjuster's documentation and assessment of the claimant's allegations of injuries and the factors associated with those injuries, ClaimIQ will provide a recommendation on the general damages for pain and suffering on many of the most common injuries. The recommended range is based on the adjuster's determination and documentation.

The ClaimIQ recommendation is only a recommendation.  The examiner and claims managers independently evaluate the claimant's injuries and ultimately determine general damages for pain and suffering.  To do so, the examiner notes each medical condition, the affected body part and whether supporting medical records of the alleged injury have been provided.  The examiner compares the claimant's allegations of injury made in the Recorded Interview to later injury allegations.  The examiner determines the general factors about the accident and whether the accident was a low/minimal impact.  The examiner determines the injury factor levels for each within scope injury and notes factors such as whether there is a past medical history, treatment for the injury, delay or lapse in treatment, onset of symptoms, treatment intensity and the impact on the claimant's lifestyle.

**This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company**

**GTM01321**

50

The ClaimIQ recommended range is based on the adjuster's determination and documentation of the following four factors which will be discussed in detail:

1. **The injury or injuries**
2. **The evaluation causation and severity questions**
3. **Impact on lifestyle**
4. **Venue**

You should consider these factors along with any other investigative material you have to make your injury evaluation and assessment. Keep in mind, the ClaimIQ recommended range is a "recommendation only" and the ultimate responsibility for properly and fairly evaluating and negotiating the claim lies with the examiner and/or supervisor.

**Injury Tab** --The injury tab in ClaimIQ contains 6 sub-tabs:
- Diagnosis—Injuries and Claimant Data
- Evaluation—Injury Treatment Information, General and Injury Factor Levels and Impact on Lifestyle
- Specials—Submitted Medical Damages, Submitted Lost Income, Other Submitted Specials and Treatment Calendar
- Generals—Permanency, Other General Damages and Impression Factors
- Venue—Venue and Threshold Factors
- Decision—Adjuster's Threshold Decision, Adjuster's Evaluated Specials, Adjuster's General Damage Evaluation, ClaimIQ Threshold recommendation and ClaimIQ General Damage Evaluation

**This document and its contents are privileged confidential information of the GEICO Insurance Companies © Government Employees Insurance Company**

# Injury - Diagnosis

The first step in documenting the injury evaluation is for the adjuster to determine and document the diagnosed and/or alleged injuries. The examiner documents the diagnosed and/or the alleged injuries sustained in the loss on the Injury Diagnosis screen.  To navigate to this page, you can (1) Click on the Injury Diagnosis sub-tab on the left side Navigation Bar or (2) Select the Diagnosis link on the feature tool bar.



After navigating to the Diagnosis page, the adjuster should document all injuries by choosing from the list of medical conditions, the affected body part and sub-type if applicable. As part of this injury documentation, the examiner must compare the claimant's allegations of injury made in the recorded interview (if obtained) to later injury allegations. The examiner must review the records thoroughly and document the injury allegations along with support (or lack of) for those allegations.

For example, to add a sprain/strain injury, you would go to the diagnosis page and do the following:
.
- Select sprain/strain from Medical Condition drop down.
- Select neck/back from body part drop down
-

**This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company**

- Sub-type is not applicable for this injury
- Click on the "**+**" sign to the right to add the injury.

Check the No Medical Records box when injuries are entered based upon the "allegation" of an injury.  Uncheck the box when you receive medical documentation to support the injuries.



If the injury is not listed in the drop down list, select "Other" and enter the information about the injury in the Description text box.  For instance, the claimant has knee pain but unknown if sprain/strain or contusion—just some pain.



Other injuries are referred to as "out of scope" which will be explained later in more detail. As with all consultation screens in ClaimIQ, if there is any other information that is pertinent to the claim or you want to add information that is not addressed via dropdowns or text areas, you click on the **"Add Note"** button on the Feature tool bar.  Any entry made on ClaimIQ Notes will automatically carry over to ALOG/activity log. This information should be considered in your evaluation of the claim.

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

# Injury Diagnosis selection

The Diagnosis page in ClaimIQ (CIQ) is used to properly record all of the claimant's injuries; both documented in medical reports and those merely alleged by the injured party or their representative.  You must document the source of any injury information to be sure that you have accurately documented your claim file.  In claims where you have no medical information, other than that a claimant is injured; the best way to document this would be to use the "other" selection from the injury drop-down list and in the free form field indicate that the claim has an unspecified injury.  Doing so accurately documents the source of the injury.  You must then select the "No Medical Records box" to indicate that this was an alleged injury and not noted in a medical report.

 An example might be:  "Per claimant attorney, claimant sustained an unspecified injury."

You should make every effort to determine more specifics from the attorney's office, or the claimant directly where unrepresented.  If you have information such as complaints of sore neck or hurts all over, again this can be documented as "other" with the No Medical Records box selected.

Once you have documentation from the medical provider, this information can be updated.  For example; the claimant reports a sore neck. You should document this as "other – sore neck" in the injury diagnosis in CIQ.  Later if you receive medical documentation that the claimant suffered a cervical strain/sprain, you would update the diagnosis page by removing the "other" entry and entering a neck/back strain sprain.

If the injured party in this situation also had complained of back pain, but that was not documented in the medical records, we would leave the complaint of back pain listed as "other" in the injury section noting no medical records to support the allegation of back pain.

When an injury is alleged but not documented within the medical notes, it should not be left in CIQ as an in scope injury.  The alleged injury should be taken out, and entered as an out of scope ("other").

This information feeds from the "Enter Injuries" section of ClaimIQ to all customized documents and the Timed Reserve Review.  So besides serving as a beginning for the evaluation process, proper documentation is necessary to assist with proper reserving and proper file documentation. Therefore, it should be updated timely and accurately upon receipt of new injury information.

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

54

# Injury Diagnosis - Claimant Data

The Diagnosis page is also used to document the appropriate gender of the injured party, as well as their height and weight if known and any known pre-existing conditions. The date of birth carries over from ECF.



Claimant Information

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

# Injury - Evaluation

The injury evaluation page can be accessed via the Navigation Bar on the left side or the Feature Tool Bar at the top or bottom of the page

### Injury/Treatment Information

**Medical Records Free Form Text Box**: This is a free form text box that allows for documentation of the injury and factors associated with that injury. It should be used during records review to note information contained in medical records.  To assist with workflow and easy access, the information entered can be migrated to negotiation strategy and/or ALOG notes.  By selecting Add to Strategy, a copy of the information is also included on the Negotiation Conduct page.  "Save as Note" feeds the information to ECF ALOG. This field also feeds to the customized documents in CIQ for suit and control files.



This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

56

**Injury Factor Levels**

Causation and severity factor questions are used in ClaimIQ to assist with:
  (1)  Providing a checklist of factors that should be considered when evaluating a specific injury.
  (2)  Providing a pain and suffering damages recommendation for in-scope injuries.

The causation factor questions indicate the items of medical information that need to be considered when determining the likelihood that an injury resulted from the accident. Severity factor questions are used to determine the degree of discomfort or distress that an injured party may be suffering as a result of his or her injury. **You must review the medical records and select the factor level that applies to a specific injury.** Guidance is available to assist in interpreting the factor levels.

In ClaimIQ factor levels have been established for the most common injury types (in scope injuries). **These questions should be answered as accurately as possible based on the adjuster's review of the medical documentation and other injury investigation included in the file. There may be other information that is pertinent to a particular claim evaluation that is not asked in the provided factor levels. This pertinent information should be documented in the Evaluation text area and considered in the adjuster's evaluation/negotiation range.** The factor levels vary across injuries—

Let's look at the factor levels associated with sprain/strain of the neck and back these include past medical history, treatment for the injury, delay or lapse in treatment, onset of symptoms.



This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

**Injury Factor Level Guidance**

1. Clicking on guidance will bring up the internal help guide for factor level questions. Towards the bottom of this guidance page are hyperlinks; you can select the specific injury that you are entering and it will give you specific guidance for that injury.



**This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company**

## ClaimIQ Guidance

Let's take a look at the evaluation "guidance" portion of ClaimIQ.

### Sprain/Strain to Neck/Back

Injuries include Sprains or Strains to the neck or back. **Causation** and **Severity** factors used to evaluate these injuries are:

### Low/Minimal Impact (Causation)

- No: For cases involving collisions between the following types of vehicles: cars/trucks/SUVs/buses- there is moderate to significant physical damage to the vehicles involved. Or the accident in question does not involve a car/truck/SUV/Bus. Or Low/Minimal Impact criteria do not apply.
- Yes: For cases involving collisions between the following types of vehicles: cars/trucks/SUVs and buses- there is no visible physical damage or there is minimal damage to the vehicles involved.

> **The selection of "Yes" for Low/Minimal Impact must be approved by your Claims Supervisor, and is usually conditioned upon the proper MIP investigation being completed and valid evidence secured.**

### Delay in Treatment (Causation)

- No: Treatment for injuries started immediately after the accident.
- Yes: The first treatment for the injury was delayed, and the delay in seeking treatment was not reasonable.

### Lapse in Treatment (Causation)

- No: After treatment for the injury commenced, there was no break in the treatment or there was a reasonable explanation for a break in treatment.
- Yes-Single: After treatment for the injury commenced, there was a questionable break in treatment and the treatment then resumed.
- Yes-Multiple/Prolonged: After treatment for the injury commenced, there were multiple gaps or prolonged breaks in treatment and the treatment then resumed.

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

**Medical History - Previous Treatment (Causation)**

Document the source of the information being used in this factor such as medical records, recorded interview or ISO (BI index) in notes.

- None: There is no evidence after diagnosis of treatment for the same or a similar injury or medical condition.
- Yes-Actively treating: There is evidence of active treatment for the same or a similar injury or medical condition.
- Yes-Recent w/in 1 year: There is evidence of treatment for the same or a similar injury or medical condition within the last year.
- Yes-More than 1 year: There is evidence of treatment for the same or a similar injury or medical condition more than one year prior to the accident.

**Compliant with Treatment Plan (Causation)**

- NA- does not apply or reasonable to have treatment based on circumstances – (Example: could not afford diagnostic tests or surgery)
- No-Did not follow recommended course of treatment and non-compliance may hinder ability to recover
- Yes-complied with treatment plan

**Treatment for Injury (Causation)**

- No: There is no evidence of treatment actually being given for injuries being claimed.
- Yes: There is evidence of treatment actually being given for injuries being claimed.

**Course of Treatment (Severity)**

- Ice and Rest: Injured Party requires ice and rest only to heal the injury
- Passive Treatment: Injured Party receives passive treatment and no exertion by the patient.
- Active PT: Injured Party requires active physical therapy (e.g., weights, other participatory exercises) to heal the injury. Treatment may also include ice and rest.

**ER (Severity)**

- No
- Yes—immediately or slightly thereafter
- Yes--delayed

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

60

**Injections (Severity)**

- None: No injections were given to treat the injury
- Single Trigger Point: A single trigger point injection was given to treat the injury
- Multiple Trigger Point: Multiple trigger point injections were given to treat the injury. These can be multiple injections to the same location over a period of time or injections to more than one location.
- Single Epidural: A single epidural injection was given to treat the injury
- Multiple Epidural: Multiple epidural injections were given to treat the injury. These are multiple injections over a period of time.

**Injury Site (Severity)**

- Cervical: Sprain/strain - injury is only to the cervical region.
- Thoracic: Sprain/strain - injury is only to the thoracic region.
- Lumbar: Sprain/strain - injury is only to the lumbar region.
- Cervical/Thoracic: Sprain/strain - injury is to the cervical and thoracic regions.
- Cervical/Lumbar: Sprain/strain - injury is to the cervical and lumbar regions.
- Thoracic/Lumbar: Sprain/strain - injury is to the thoracic and lumbar regions.
- Cervical/Thoracic/Lumbar: Sprain/strain - injury is to the cervical, thoracic and lumbar regions.

**MD (Medical Doctor) Involvement (Severity)**

- None: No MD was involved within treatment of injury.
- ER Only: MD treatment was received in ER only.
- Consult: MD was consulted on treatment of injury.
- Direct Tx: MD directed treatment of injury.

**Objective Findings (Severity)**

- None indicated
- Swelling
- Spasms
- Swelling w/spasms

**Onset of Symptoms (Severity)**

Timing of the beginning of symptoms experienced by the claimant as a result of the injury. Levels include:

- Immediate: Injured Party first experienced injury symptoms at scene of accident or slightly later

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

- First 24 hours: Injured Party first experienced injury symptoms within 24 hours of accident
- First 7 days: Injured Party first experienced injury symptoms between 24 hours and 7 days of accident
- More than 7 days: Injured Party did not experience injury symptoms until 7 or more days after accident

**Range of Motion Restriction (Severity)**

- None Indicated: Injured Party experienced no range of motion restrictions
- Limited: Injured Party experienced limited range of motion restrictions
- Severe: Injured Party experienced severe range of motion restrictions

If you do not answer all of the questions on this page, including Impact on Lifestyle, ClaimIQ will be unable to provide you with a recommendation. General and Injury Level Factor questions that are not answered will be noted by a different color in the answer field so that it is easy to determine which fields are pending responses.

**Out of Scope Injuries**

Since out of scope injuries (Other injuries) do not have factor level questions associated with them, it is imperative that you outline those injuries in detail here and consider them in your final evaluation. ClaimIQ will denote "Out of scope."



This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

62

## Determine Impact on Lifestyle

Impact on lifestyle is accessed at the bottom of the Evaluation page. The adjuster assesses impact on lifestyle after reviewing medical records and other injury investigative material in the file to determine if the claimant's lifestyle was impacted by the injury



The type of information that determines impact on lifestyle can be found in medical records. The physician/s should document this type of loss. Lost wages are included in Special Damages and not as part of Impact on Lifestyle.  For further information --See Guidance.

Impact on lifestyle is intended to account for the **non-medical effects** of a claimant's injury. Important aspects of impact on lifestyle include:

1.  A claimant's ability to care for him or herself (bathing, eating, etc.),
2.  A claimant's abilities to participate in his or her hobbies (sports, music, volunteer work, gardening, crafts, etc.),
3.  A claimant's abilities to participate in social or family events (vacations, reunions, etc.).

Levels include:

**No impact:** Claimant can perform all pre-injury activities without significant pain throughout the majority of the injury recovery period.
**Low impact:** Claimant can perform all pre-injury activities throughout the majority of the injury recovery period, but experiences pain due to injury.
**Medium impact:** Injury limits claimant's ability to perform personal care tasks, participate in hobbies, and/or participate in social or family events throughout the majority of the injury recovery period.
**High impact:** Injury prevents claimant from performing typical personal care tasks, participating in hobbies, and/or taking part in social or family events throughout the majority of the injury recovery period.

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

63

## Medical Reference Sites

The guidance in ClaimIQ is designed to give you information regarding use of the various text areas in ClaimIQ.  As part of your independent claim evaluation, you must review the medical documentation and understand the injury/s alleged. This may require some research on the part of the adjuster to assist with understanding the diagnosis and various other medical terminology, procedures and/or prognosis. Again, ClaimIQ provides links to many pertinent medical sites which can be used to further understand and evaluate the medical records.

**Select Reference**

| Reference | Description |
| --- | --- |
| **Legal** | |
| FindLaw | Find State Law |
| Legal Code | Transportation code |
| Rules of Road | Drivers handbook. |
| **Medical** | |
| ICD9 Coding | Converts ICD9 codes |
| Merck Manual | Descriptions of medical conditions. |
| Spine Health | Support for back and neck injuries. |
| Stedman's Medical Dictionary | Definitions of medical terms. |
| WebMD | General health and treatment resource. |



**This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company**

64

# Injury - Specials

The Specials page can be accessed via the Specials sub-tab on the Navigation Bar on the left or by clicking on the Specials link on the Feature tool bar at the top or bottom of the screens.



The examiner must enter **all** the submitted special damage information on this page! This includes loss of income and future treatment as "Other" specials. This page must contain an accurate description of what was originally submitted for our evaluation.  We will be showing you later where to evaluate the specials. (The evaluated specials will reflect any specials that were either reduced on merits or were not accident related or not included.) Again, **all <u>submitted</u> special damage information should be included on this Specials page.**

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

GTM01336

The providers will carry over from ECF so if they are not displaying you need to add them into the IP's party screen in ECF. All medical bills alleged to be incurred as a result of the loss are entered on this page with the appropriate provider. First and Last Dates of Service for each provider should be entered along with the number of visits to that provider. You can either enter the dates or click on the calendar to the right of the Service Date text box and select dates from the pop up calendar.



Medical costs can be classified as therapeutic or non-therapeutic:

**Therapeutic** includes costs for all medical procedures that are related to healing the claimant's injuries and/or providing palliative care. These include healing procedures provided by a doctor, physical therapist, chiropractor, dentist or other medical professional (including surgery) and pharmaceuticals.

**Non-therapeutic** includes all medical costs for items not directly related to healing the claimant's injuries. These include diagnostic services (including diagnostic exams, durable medical equipment, ambulatory devices, ambulance devices, ambulance charges, hospital room and board, etc.).

<u>Lost Wages</u>
If the employer has been documented in ECF, it will feed over to claimant's occupation on the Specials page in ClaimIQ. To add an employer, just select Add as Source + and this will update the Employer/Source.  You can add more than one Employer/Source of income. After the Employer is added, fields will be available for Days Out and Lost Income.

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

66

## Enter Other Submitted Specials

Under the "Enter Other Submitted Specials" section you enter any other alleged out-of –
pocket expenses incurred by the claimant. If there are no other submitted specials, the fields
can be left blank as there are no asterisks denoting required fields for this area.



The examiner enters the submitted medical damages and lost income claim. Other special
damages like child care, housekeeping, lawn care and transportation costs can also be noted.

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

## Treatment Calendar

A treatment calendar is available by accessing the Calendar link on the Specials page.



Providers are pre-filled from ECF. By selecting the appropriate provider, you can then drop the provider name into any treatment dates.  By selecting Submit, you will save the input. The year is selected from a drop down box on the calendar. There is print functionality for one month, six months and twelve months.



This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

68

# Injury - Generals

The Injury Generals page can be accessed via the Navigation Sidebar or Feature Tool Bar. The selection "Generals" can be found at the top or bottom of all Injury sub-tabs.



This page can be used to document additional information that is being considered in the evaluation of the claim. If not documented here, these evaluation factors should be included in Notes or Negotiation Strategy and certainly should be considered (if applicable) during the evaluation process. The examiner notes specific permanency for each claimed injury including scarring. The examiner also determines Impression factors including the insured's impression, claimant's impression, prior health condition, expert witnesses, trial factors, aggravated liability and whether each factor adds or reduces the value of the claim.

1. Permanency—disability or scarring
2. Other General Damages—may include loss of consortium.
3. Impression Factors—Insured impression, claimant impression, prior health condition, Experts and Witnesses, Trial Factors and Aggravated Liability

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

GTM01340

You must select the appropriate option by clicking on the drop down arrow in the permanency box. After the fields are filled in, you must hit the "+" sign to save this data. You may click on Guidance for an explanation of each field.

## <u>Injury - Venue</u>

To navigate to this page, you can click on the Venue sub-tab on the Navigation Bar on the left side or select Venue from the Feature tool bar. The venue state will automatically default to the Loss State but can be changed if suit is filed or the claim is proper in the Risk State venue.



If you know the county where the loss occurred, select it from the drop down box. If you don't know the county, click on the magnifying glass and you can look up the county by the Search function for the city.

This document and its contents are privileged confidential information of the GEICO Insurance Companies
© Government Employees Insurance Company

70

Other state specific information is noted under "Review Venue Details."

## Tort Threshold

For threshold states there are statutory factors that should be considered in order to determine whether or not the injury actually breaches the threshold for a valid compensatory claim. ClaimIQ assists with tort threshold determination by outlining for each of the Tort Threshold states the factors that should be considered. It is ultimately up to the adjuster and supervisor to determine if the threshold is pierced. However, ClaimIQ provides a recommendation based on the adjuster's responses to the applicable tort threshold factors for any threshold state. These factors outline the criteria set by the states' laws to sue for damages incurred as the result of an automobile accident.  Based on the venue chosen, the threshold factors appear for that specific state. Let's look at those factors for one state:



This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

# Injury - Decision

The Injury Decision page can be accessed via the left side Navigation Bar or the Feature Tool Bar selection Decision.



1. If the loss state has a threshold requirement, the CIQ recommendation on a threshold breach along with a textbox for the adjuster's decision on threshold breach will display here. The recommendation is based on the answers to the questions on the threshold factors page. The examiner should make a determination based on the state factors and the investigation in the medical records and file.

2. The specials for each of the categories on the Specials page will carry over.

3. Your **lowest FAIR evaluation** of the medical specials and general damages should be entered in the evaluated boxes on the right side. This will be reflective of any specials that were either reduced on merits or were not accident related or not included. Note this is likely the starting range of your Negotiations. On the Negotiation Conduct page (which we will discuss later) you will enter the full range of your evaluation—Low to High.

ClaimIQ does consider "out of scope injuries" in the recommendation. Therefore you will note the following message when viewing the recommendation: "Plus Out of Scope injuries." Here is an example: "$5000-$6700 Plus Out of Scope injuries". You, of course, must consider all related injuries (to include out-of-scope) in the Adjusters Evaluation/Negotiation Range.

> Remember, boxes noted with an "∗" require an entry.

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

## Negotiation Conduct – Injury

The Negotiation Conduct page should be used during the evaluation and negotiation process to document the final negotiation range as well as all negotiations. The Negotiation Conduct page is discussed in detail in the Liability portion of ClaimIQ; however, let's recap some of the highlights from that section of the manual as well as discuss the specifics of documenting bodily injury Negotiation Conduct.



1. **Plaintiff attorney** name should be added on receipt of file and will display at the top of the Negotiation Conduct page.  This attorney name also feeds to the Litigation documents.

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

2. **Submitted Damages**-The medical bills and lost wages that were entered by the adjuster on the Specials page will automatically pre-fill to this area. Remember—this should accurately reflect those specials originally "submitted" by the plaintiff and/or attorney.

3. **Evaluated Damages**-The medical bills and lost wages that were entered by the adjuster on the Decision page will automatically pre-fill to this area. The Pain and suffering as well as permanency and other Generals entered by the adjuster on the Decision page will also pre-fill to this area. Remember—this should be reflective of your evaluated specials and generals. Specials submitted may be reduced on merits or because they were not accident related or supporting documentation was not included with the "submitted" damages. Note this is likely the starting range of your Negotiations.

4. **Negotiation Range**-You should enter your negotiation ranges for each category after you have made a thorough review of all investigation and medical documentation and researched any items as needed. The totals will automatically calculate based on the following entries:
    a. Specials—this is the range that you have evaluated as being fair and reasonable for the specials submitted.
    b. Generals—this is the range that you have evaluated as being fair and reasonable for the generals submitted
    c. Liability—this is the range that you have evaluated as being fair and reasonable for the liability
    d. Offsets—if there are offsets they should be entered here
    e. Final Negotiation Range—will display based on these factors

**Negotiation Strategy and Record Exchange**

- As soon as negotiations begin, the exchanges should be documented in ClaimIQ. The demand amount from the demand letter should be entered upon receipt. Enter demands and offers using the drop down menu under "Exchange". If multiple offers and demands are exchanged in a single day, the only requirement is to document where the conversation began (first offer or first demand) and where each party ended (last offer and last demand). All offers and demands along with complete documentation of the discussion should be entered in ClaimIQ Notes or ALOG.
- The minimum information to create an exchange is:
    - The date
    - Type of exchange (offer/demand/denial)
    - A liability percentage **and/or** a dollar amount
-  ⬦  saves information entered in boxes
-  ▦  deletes an exchange

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

- Click "Accepted" when claim agreement is reached (this is required in order to complete the negotiation consultation)
- If "Denial" is chosen, enter the insured's evaluated liability percentage and select accepted



The authority dropdown and textbox is to be used by the supervisor or manager to denote the approved authority on the file.

Information from the Evaluation—Injury Treatment Information textbox will display in this Negotiation Strategy textbox as well if "Add to Strategy" was selected from that area. This area also feeds to Notes in both CIQ and ECF if "Save as Note" is selected.  Notes can be deleted from the text box or added as needed.

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

# Injury Documents

As stated previously, the most commonly used documents are the Claim Evaluation Summary and various litigation related documents.



By selecting the Claim Evaluation Summary you have quick and easy access to a complete synopsis of Coverage, Liability, Damages and Negotiations. (This is assuming that you have accurately updated the ClaimIQ fields throughout the handling of the file). This document can be viewed by your supervisor/manager in providing settlement authority and by you and your management team at any time throughout the handling of the file.

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

76

Let's take a look at a portion of the completed Injury –Claim Evaluation Summary. You will notice it outlines Providers along with both submitted and Evaluated Special and General Damages. The negotiation range, negotiation strategy and all negotiation exchanges are also included on this document.



**This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company**

## Proper file handling and documentation of ClaimIQ

When a settlement ends up being more than the file handler's documented "Negotiation Range" because additional information was presented to the handling adjuster during a settlement conference, this "Negotiation Range" is what the file handler enters on the Negotiation Conduct page in CIQ. The concern is that there will be a settlement on a file that is outside the file handler's documented negotiation range in CIQ.

It is important that the file be properly documented in this situation. In CIQ under Negotiation Conduct "Record Exchange", the handling adjuster will select the "Settled in Field" from the drop down box and enter the date and amount of the settlement. The negotiation range on the Negotiation Conduct page does not have to be adjusted in CIQ and the feature should not be bypassed in CIQ.

The handling adjuster will then document in either ALOG or CIQ Notes a summary of the settlement conference activity. It is required that the documentation properly reflect that the CIQ negotiation range referenced is the handling adjuster's negotiation range.

The following are examples of appropriate documentation:

In the case where the adjuster documents his/her own file regarding the settlement reached at the settlement conference ----

"Attended settlement conference, claimant attorney presented additional medicals, I re-evaluated the case and settled at $xxxx.xx, which is above my initial settlement range documented in CIQ."

**OR**

"My file was taken to settlement conference, claimant attorney presented additional medicals, the case was re-evaluated and settled at $xxxx.xx, which is above my initial settlement range documented in CIQ."

In the case where someone besides the adjuster of the file is documenting the settlement reached at the settlement conference -----

"Attended settlement conference, claimant attorney presented additional medicals, I re-evaluated the case and settled at $xxxx.xx, which is above the file handler's initial settlement range documented in CIQ.**"**

**OR**

"File was taken to settlement conference, claimant attorney presented additional medicals, the case was re-evaluated and settled at $xxxx.xx, which is above the file handler's initial settlement range documented in CIQ."

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

# First Call Settlements

A **First Call Settlement** is defined as a settlement in which the bodily injury claim is negotiated and settled with the injured party upon initial contact after a proper investigation has been completed and liability has been determined.



For proper file documentation, the injury diagnosis page should be updated, the "no medical records" box checked, and the FCS bypass selected.

If medical bills/records are received with the executed release, these are not required to be entered into CIQ, however ALOG should be documented that medical bills/records were received with the release.

If the claimant rejects the FCS, and medical bills/records are received, then the FCS bypass should be reversed, and the medical bills/records entered into CIQ.  Normal CIQ file handling procedures would apply going forward.

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

Your ClaimIQ Guidance states that the basis of a First Call Settlement should be documented; any known or alleged injury and providers should be entered. You must also document your offers and demands in the record exchange located on the "Conduct" page



It is imperative to select the **"Accepted"** box when your offer is accepted or we accept their demand.

Guidance on the Header Page related to documenting a first call settlement in ClaimIQ reads as follows:
- *First Call -*
  - *For proper file documentation of a First Call Settlement:*
    - *The ClaimIQ Injury Diagnosis page should be updated*
    - *The "No Medical Records" box should be checked*
    - *The First Call Settlement bypass should be selected*
    - *The Offer and Acceptance should be documented*
  - *If medical bills and/or records are received with the executed release, these are not required to be entered into ClaimIQ. ALOG or ClaimIQ notes should be documented that the medical bills and/or records were received with the release.*
  - *If the claimant rejects the First Call Settlement and medical bills and/or records are received:*
    - *The First Call Settlement bypass should be reversed*
    - *Medical bills and/or records should be entered into ClaimIQ*
    - *Normal ClaimIQ file handling procedures apply going forward*

Please speak with your supervisor if you have any questions about this procedure.

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

80

# How to Bypass ClaimIQ Injury Consultation



1

On the "Header" page you will note the following statement "If an injury consultation is not required, please document the reason" followed by a drop down menu.  You must select one of the following options:

**Obvious Policy Limits**- standard injury documentation is required until information demonstrates that the value clearly exceeds the "per person" limit of the BI or UM coverage. (This includes entering injury and specials presented).

**Global Policy Limits**— standard injury documentation is required until information demonstrates that the value clearly exceeds the "per occurrence" limit of the BI or UM coverage. (This includes entering injury and specials presented).

**Did Not Pursue**- Standard documentation is required; all information received must be input.

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

**First Call**—the basis of FCS should be documented, any known or alleged injury and providers should be entered. You must also document your offers and demands in the record exchange on the "Conduct" page of ClaimIQ.

**Withdrawn**-Standard documentation is required up until sufficient information is gathered to indicate claimant is withdrawing.

**Other**—there may be approved "Other" reasons for not completing the injury consultation. Please check with your Post School Trainer to see if any do apply in your venues.

*For all instances where Injury Consultation Not Required has been selected, if suit is filed and/or the evaluation is later needed (after documenting that the Injury consultation is not needed) for reserving and/or authority purposes, the consultation must be completed. Select "Choose One" to change status and complete according to standard procedures.

**Denied liability** - Standard documentation is required until the file is closed. If the file is reopened due to suit or to pursue a compromise settlement, standard documentation rules apply.  As shown in the screen shot below, the Record Exchange under the Negotiation Conduct tab of ClaimIQ must be updated to reflect the date the liability denial letter has been issued, in addition to the ClaimIQ bypass.



This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

82

# How to add a Lien Holder in ClaimIQ

Adding a lien holder is extremely important.  To add a lien holder you must first select the "parties" tab. The second step is to select "Add Lien Holder".



This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

Step three is simply completing the information in the appropriate fields. At a minimum you must complete the mandatory fields noted with an asterisk "*". As you can see below we have added "Medicare" as a lien holder.  You must then select "Save" to save and close this data box.



This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

Once you have successfully saved and exited the lien holder data box, you will now see an orange color highlight in the feature detail panel noted on the left sidebar of ClaimIQ.



This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

The second location to add a lien holder is on the bottom of the "Negotiation Conduct" Page. In the screen shot below, Medicare is showing as an existing Lien Holder.



You must follow your state specific guidelines on all claims that have a lien.

This document and its contents are privileged confidential information
of the GEICO Insurance Companies
© Government Employees Insurance Company

**Lesson Nine**
**<u>Negotiation and Settlement Techniques</u>**
**TCR2 Module**

**Objectives:**

1. Define negotiation.
2. Understand and apply the four phases of every negotiation.
3. Negotiate practice claims in role play situations.
4. Identify and understand common negotiation strategies
5. Understand and apply early settlement techniques.

GTM01358

2

# What is negotiation?



The definition of negotiation is:

- To confer with another so as to arrive at the settlement of some matter

- To arrange for or bring about through conference, discussion and compromise.

**In other words:**
**Negotiation is a means by which parties seek a**
**settlement that is agreeable to each.**

Negotiation is an activity in which parties are trying to satisfy their needs, either with attorney-represented or unrepresented injured party/claimant.  A successful negotiator knows the needs of the other party through their eyes. To reach an agreement or a settlement, dignity and self-respect of the parties must be considered and maintained. A settlement is a result of two ideas. Effective negotiators have the ability to influence others towards his or her desired end.

- ❖ **Whenever possible we prefer to negotiate claim settlements rather than litigate them to a conclusion.**

- ❖ **Negotiation provides a means for prompt and cost effective settlement of claims.**

- ❖ **Remember we negotiate all claims in Good Faith**

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**3**

 **Phases of Negotiation**

Every negotiation goes through the following phases:

1. **Preparation**

   - Gather information

Negotiation begins at the evaluation phase of your claim. Before you even begin to negotiate you must have a value on the claim you are trying to negotiate.  Remember we use the Judgment/Experience method of evaluation, in doing so you should have mitigators prepared in advance and rehearse what you are going to say.

The preparation phase of negotiation begins with reviewing the following areas;

- Who is legally liable for the injuries?
- What are the injuries and where are they located?
- What is the treatment intensity and cost of this treatment?
- Is all the treatment related to this loss?
- Was there a loss of income, and was this loss verified?
- What are the general damages suffered?
- Know what you want to say, know your subject and know your counterpart.

Most unrepresented injured party(s) will not prepare an official demand letter, so it's up to you as the TCR2 to coach your customer in negotiations. Generally, negotiations on this type of claim will consist of only a few phone calls to the injured party(s).

**4**

2. <u>Opening</u>

- Both sides present their starting position to one another

- It is the best opportunity to influence the other side

You have completed your preparation and are now ready to open your negotiations. As mentioned above, negotiation usually means just a few phone calls to the injured party(s), so it is imperative you build rapport with them before making your initial offer that opens the negotiation.  Deliver the normal "A" Experience and focus a bit more on the rapport.

At this point, it is extremely advantageous to establish a <u>pattern of agreement</u>. The objective of the pattern of agreement is to discuss the itemization of specials submitted to confirm that you are both looking at the same thing; an "apples to apples" comparison in other words.

Once you both have confirmed that you have all the needed documentation to support the injured parties claim, you need to verify the amount of their demand or if none was presented, ask how much the injured party is looking for in settlement of their claim.

Now that you have the demand, make your initial offer!  Remember, our initial offer is a fair offer for a fair settlement.  Therefore, you should open the negotiation with the intent on settling on the first contact.

3. <u>Bargaining</u>

- Your aim is to lower the gap between the two initial positions.

- To persuade the other side that your case is so strong that they are willing to accept less than they had planned.

- In order to do this, you must have a clearly thought-out plan.

Now that you have opened negotiations; it is time to begin bargaining for settlement. Generally this will occur in two ways, either the injured party(s) will give you the value he/she feels the claim is worth or *you* will give this to the injured party(s).

In either case, your intent is to close the gap between these values by discussing the things you identified as "mitigators" in the preparation phase.  You want to discuss both the things you think the injured party(s) will agree with and those things the

Confidential Information of GEICO Companies
© Government Employees Insurance Company

injured party(s) may not agree with, beginning with the agreed items, as set forth in the <u>pattern of agreement</u>.   If you were to start out with the items of disagreement first, this could lead to the injured party(s) feeling as if you are entering into negotiations as an adversary versus an advocate.  This will make the injured party(s) feel he/she was cheated on some items and they may not concede to further concessions. Remember, the injured party(s) will typically counter with a figure much higher than your own, so it is especially important to be fully prepared ahead of time.

Once an offer is made, it is up to the injured party(s) to accept, reject, or counter-offer.  The following will list the best ways to approach rejections and counter-offers.

### Rejection of offer

- o  Ask the injured party(s) for a dollar figure that they feel the claim is worth to them. How much more do they feel they need?
- o  Ask them why they feel they should receive more? Respond positively and remember the *Feel, Felt, Found* method of objection handling.
- o  Support your offer by again going through the strengths and weakness of the claim and discuss why/how you came up with the offer
- o  Explain to the injured party(s) why their dollar figure is different or unrealistic and why it is or is not warranted
- o  Do not jump automatically or increase your offer without justification
- o  Many injured parties hesitate  – We have the obligation to settle the claim in a fair and timely manner  with the injured party(s)

### Counter-offers

- o  If we increase our offer, we should give a specific reason for the additional amount. You do not want to give the impression you are purposely under evaluating the claim and arbitrarily increasing your offers without justification. Our initial offer is a fair offer for a fair settlement
- o  Explain the positive and negative factors of the claim that are the basis for your offer
- o  <u>Avoid</u> increasing your offer in response to silence, remember silence is a technique often used in a negotiation.  Also <u>avoid</u> making offers against yourself unless it is justified

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**6**

### 4.  Closing

This is the opportunity to capitalize on all the work done in the earlier phases.  For instance, you may be able to transfer the injured party(s), adverse adjuster or attorney to the sales department for a quote on auto insurance

Now that you have successfully bargained for an acceptable value it is time to close the negotiation.  During this process your intent is to summarize the agreed amount or reiterate your last demand and last offer to have the "meeting of the minds" that will verify that you both understand precisely where you left off with the negotiation and then explain the next step.  This typically is sending a release for signatures if the claim has settled and then issuing of the settlement check, and handling of any liens.

If the claim does not settle, you are setting up an approximate date and time for your continued negotiation, and always confirm your last offer and their last demand.

**We should always strive in our negotiations for mutual satisfaction of needs (ours, the injured party(s) and the injured party(s) attorneys).**

In a collaborative win/win negotiation we are trying to produce an outcome that provides acceptable gain to all parties. Not all human beings are alike. Therefore, needs are not identical. It is possible for both sides to emerge victorious.

## Notes:

_____

_____

_____

_____

_____

_____

_____

_____

_____

Confidential Information of GEICO Companies
© Government Employees Insurance Company

## The Needs Theory of Negotiation

We must recognize human behavior and needs so we can apply them to the negotiation process. The recognition of these needs will help you in the negotiation process. When you recognize the needs of the other party you will be able to negotiate towards the satisfaction of that/those needs. We must also recognize GEICO's needs.  As we stated earlier, we should strive in our negotiations for mutual satisfaction of needs:  GEICO's and the injured party(s)'s.  In a collaborative WIN/WIN negotiation we are trying to produce an outcome that provides acceptable gain to all parties.  The following are examples of needs:

### GEICO's Needs

- To effect a prompt, courteous & equitable disposition of claims through direct customer contact.
- Negotiations help us to meet our need to:
    - Comply with our contract.
    - Control both loss and expense costs.
    - Build good customer relations.

### Injured Party(s) or IP's Representatives Needs

- Negotiate a fair settlement to make the injured party "whole again" at the earliest time possible
- Keep their costs/expenses down

## Notes:

_____

_____

_____

_____

_____

_____

_____

_____

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

8

# Common Negotiation Strategies

### 1.  Wince
This is an overreaction to whatever your opponent says.  It lets the other person know you have a limit.

### Response:  Silence

Never jump at the first offer because you cheat the person on the other side.  When the claimant feels that our initial offer is too low or feels that one should never jump at the first offer they may counter this offer with a demand that is only slightly lower than their original demand.

This can show you that the claimant is being reasonable and is willing to compromise a settlement. Again, in this type of objection, don't bother to go over all the facts again. Just emphasize the strongest points in your favor.


### 2.  Silence
Learn to use silence to your advantage during negotiations.  This is one of the most powerful tools and dead air usually gets filled with concessions by the other person.

### Response:  More Silence


### 3.  Good Guy/Bad Guy
This is used as a team tactic with at least two people on your side.  The good guy is trying to make the other person feel as if he is on their side.  The good guy will try to get concessions without giving anything in return.

### Response:  Ask the team which person has the authority to settle.  Indicate that it is difficult to negotiate with three people on the phone at the same time.  Try to get the team to concede to one person for the negotiations.


### 4. Red Herring
The red herring tactic leads the other person down a false trail away from the real issue at hand.  It will get other person concerned about the side issues and is meant to eventually exhaust them so that they cannot make a good deal on the main issue.

### Response:  Set aside the side issue at hand and come back to it later once the main issue is resolved.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

GTM01365

### 5.  Outrageous Behavior

This is inappropriate behavior used to distract or intimidate you from negotiating the deal you want.  The intention is to get you to give up something by acting crazy.

**Response:  Do not acknowledge the behavior.**



Use, "We understand how you feel, others have felt the same way. Through our experiences, we have found….."  This technique is called the "Feel, Felt, Found way of handling objections.

During negotiations, the clamant may mention emotional points supporting their claim. They will for example, send a particularly strong photo of a smashed car or a severe-looking injury, and constantly refer to it.

Since there is no way to put a dollar value on emotional factors, this could be one of the most difficult objections to overcome.  Again, we must use the **feel, felt, found** method to support our position and secure a reasonable offer.

### 6.  Limited Authority

You have made an agreement with the adverse party but all of a sudden a third party must validate the negotiations.  This is a variation of the good guy/bad guy tactic meant to get concessions from you.

**Response:  Ask this question of the other party, "You will recommend this, won't you?"  This will increase the probability of success.**

Ask two closed-ended questions, and then follow with an open-ended question.  If the other party says yes, then things should be okay.  If the other party's answer is no, then you will have to attempt to recover from the objection.  Ask yourself, "Who can make a decision about this today?"

### 7.  Funny Money

The other party may use small increments of money or time to make the settlement seem more agreeable.

**Response:  Calculate the aggregate cost and decide if that is what you want to pay over time.**

Confidential Information of GEICO Companies
© Government Employees Insurance Company

**10**

**8. Trial Balloon**
You may be presented with a hypothetical solution to the problem.  The other party is hoping you get committed to it and open an avenue to a solution.  They may suggest an idea that they want you to put ownership on.  It helps to open communication lines and open up thinking.

> **Response:  You will know it has worked when the other side adopts the plan as if it were their idea.**

If the injured party(s) was not pleased with our initial offer or feels that the offer is just a negotiating tactic, they generally will not lower their initial demand but, ask that you give specific reasons why the offer seems low.  So again be prepared to state not only the amount but the reason for such an offer.  Remember it is not our intent to have a low settlement.  We want a fair settlement for a fair price.

Depending on the strength of your reasons, you may choose to increase your demand, but before doing so, wait to see if the injured party(s) will budge after hearing your response.

**9.  Nibbling**
This may be a tactic used to get concessions a little at a time.  These are used to add little additions to the basic agreement.  After the initial agreement, they ask for something else by stating, "oh by the way…"

> **Response:  We have already negotiated a fair settlement on this claim. Why was our offer accepted prior to this issue being brought up?  You may attempt to trade off something that is not important to you.**

**10.  Trade off**
Compromise may be used against you.  "If I do that for you, what will you do for me?"  This makes the opponent think before asking because they know they have to give something up in return.

**11.  The Vise**
This tactic makes you feel like you have undercut the offer.  The other party may say, "you have to do better than that!"

> **Response:  Ask the other party, "Exactly how much better?" Another tactic similar to the Vise that may be used is splitting the difference - as soon as a counter offer is on the table, you are asked to "split the difference."**

Confidential Information of GEICO Companies
© Government Employees Insurance Company

GTM01367

**12.  Put it in writing/Power of the printed word**
Many people believe that if it is in writing, it must be true

> **Response:**  **When a fair offer to settle a claim is made and the injured party(s) requests time to consider it, explain to the injured party(s)that you will be sending a release (if applicable) with a cover letter explaining our offer.**

**13.  False Deadline**
The other party gives you a deadline that is false.  There are no firm deadlines in negotiating a solution.

> **Response:  "If I have to answer today, the answer is no.  However, if I have some time to think about the offer, I might change my mind and the answer may be yes."**

## Notes:

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Confidential Information of GEICO Companies
© Government Employees Insurance Company

12

## How to break an impasse

Unfortunately, not all claims will settle as quickly as both parties would like, and you will be presented with an impasse in your negotiation.  An impasse is a point during the negotiation which both sides feel they cannot concede any more, and further discussions do not appear fruitful.  Here are a couple of ways to try and break the impasse.

**1. Change the players**.
This may sound extreme but it may be simply a matter of personality. Have a co-worker look at the file or better yet, ask your Supervisor to assign a co-worker to attempt to settle with the injured party(s). The impasse may have been because of who is doing the negotiation as opposed to the subject matter.

**2. Bring in a mediator.**
There is such a thing as pre-suit mediation. There are no rules that say you cannot have a neutral third-party  to help facilitate a settlement.  Discuss the case with your supervisor to determine if it may be worth it to sit down and mediate the case before a lawsuit is filed. If the injured party(s) has an attorney, suggest that both sides share the cost of the mediation. Maybe it should simply be a half-day mediation. Again, this is when you have reached an impasse and there is no further movement. Not only is it a change of personalities, but you also have the objective mediator to bring his or her talent to the table to break the impasse.

**3. Turning concessions into settlements**
At some point you will be expected to make a concession. There is nothing wrong with that but keep in mind negotiation is after all, give and take. Giving in is simply part of the drill to get what you want. The trick is to concede the negotiating point and recognize it as a golden opportunity to get something greater in return. There are basically three approaches to concede a point in a negotiation.

- **Concede but get nothing in return.**
  If a contractor is renovating your house and asks for a thirty day extension, you would not simply grant it without getting something in return. If you do grant it without something in return that is what I am talking about. It is the path of least resistance. You have made the other side happy. Other than gaining good will what do you have to so for it?

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

- **Concede but only for something of equal value.**

    In a business transaction, the buyer may want better payment terms and in return the seller says he will agree to such if the buyer will place a bigger order. The buyer wants a reduced price, the seller wants a commitment today. The examples could go on and on. The point is that if you make a concession and give up a certain number of dollars think of something of equal value to get in return.

- **Concede but get more in return.**

    This is the perfect negotiation from your point of view. Sometimes people equate the value of a concession with how hard they had to work for it. In truth, the cost is the same no matter how long it took to get there. Always *think* of what you can get in return by making your concession. Your concession will be to go up on your offer.

**4. The right to say "Yes" is very valuable.**

Once again with the buyer/seller analogy the seller is saying, "You can have this product for x dollars." That is a stronger position than the seller saying, "What will you give me for this?" By doing that the seller gave up the right to say yes.

In your situation, you must always say I am willing to pay "x" to get this claim settled, instead of asking "What do you want for your claim?". You set the parameters. You say what you are willing to pay. Do not turn it over to them to dictate your response.

**NOTES:**

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Confidential Information of GEICO Companies
© Government Employees Insurance Company

GTM01370

**14**

**<u>Other tips for negotiating</u>**:

1.  Never jump at the first offer/demand.  There will be occasion where the injured party(s) and or their attorney actually demands or offers to settle for an amount on the lower end of our evaluation.  If we accept and pay their initial demand they may think:
    *   I could have done better
    *   Something is wrong here

    People should feel they have won during the negotiations

2.  Do not argue.  Arguing will only make the other party defend their position.  Always maintain your professional control.  Try using the **Feel, Felt, Found formula**.

    "I understand how you *feel*.  Others have *felt* the same way.  However, we have *found* that in cases with similar injuries and medical treatment that the recovery period was just a few weeks.  Our offer is reasonable, and we can close your claim for $_____."

3.  Do not act too sophisticated when dealing with people.  Sophistication breeds competition. Tailor your speech to mirror that of your customer.

4.  Never/Ever Gloat.  How would you feel if the other party told you they would have accepted less of a settlement then the negotiated amount?

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**GTM01371**

## Early settlement techniques

Being in an accident can be a very emotional and stressful time for all parties directly involved. If you can reach an injured party early and make him/her feel confident that you will handle the claim fairly, you will ease much of the stress of the accident. The earlier you contact an injured party, the easier it will be to handle the claim. Most people generally move through a series of four stages after an accident: Gratitude, Critical, Negative and Hostile.

In the "Gratitude" stage, they're thankful just to be alive.  In the "Critical" stage, they have certain expectations about the kind of service they'll receive and are anxious about what will happen.

In the "Negative" stage, the injured party will let you know that the service does not meet his expectations.  The last stage is the "Hostile" stage, where the injured party feels extremely dissatisfied. At this point, he will likely hire an attorney in an attempt to get as much money as he can from the company.

By the time an injured party has reached level three or four, he is generally more difficult to deal with.

An injured party can move through the four stages in a minute or in a month. He or she may move back and forth from one stage to another.  The adjuster must deal with injured parties logically, preventing them from becoming negative or hostile. This is influenced by:

1)  The way the adjuster handles customer contact and

2)  The way the adjuster handles the file.

Our job is to provide a standard of service that prevents claimants from moving to the negative or hostile stage. This requires a complete understanding of our customer's expectations, early contact, a high degree of human relations skills and, if the customer becomes negative or hostile, an ability to resolve conflicts.

Communication is the key to making all types of customers feel that they are receiving good service.  Early and frequent contact assures the customer that he or she is important to you. You should contact an unrepresented injured party at least two times a month. When an injured party seeks representation by an attorney, you should contact the attorney at least once a month.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

16

Convince the injured party that we believe in "win/win" negotiations.  We strive to reach a settlement that meets the needs of both the injured party and the company.  Not only will the injured party be more satisfied, since he can put the whole event behind him/her, but you will also be able to keep your pending at a manageable level.  You should always keep a close eye on the files and settle them as soon as they are ready for settlement.

Be mindful that settlement values fluctuate; the actual value of a case since this will vary by jurisdiction and time.  The amount a case will settle for today will probably not be the amount it will settle for several years from now.  The important thing to pay attention to is the technique used in settling the case.

In any case, where you feel the insured is probably liable, it is very important to contact the policyholder to confirm the loss details and to explain that you will be settling the injured party's damages. This conversation may result in the policyholder providing additional facts which may cause you to re-think your decision and conduct further investigation. Or, you may still find this case to be a claim to settle.  In any event, the insured will appreciate the fact that you contacted him before making any payments.

The first contact the examiner has with the injured party and is able to reach an agreed-upon settlement figure, this is a "First-Call Settlement".   The proper way to document a "First-Call Settlement" is illustrated following this paragraph.  However, even if you are not able to reach a settlement on the first call, you should always attempt an early settlement, provided, of course, that it is a relatively minor claim and the injured party has told you that he feels his injuries are resolved.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

# First Call Settlements

A **First Call Settlement** is defined as a settlement in which the bodily injury claim is negotiated and settled with the injured party <u>upon initial contact</u> after a proper investigation has been completed and liability has been determined.



For proper file documentation, the injury diagnosis page should be updated, the "no medical records" box checked, and the FCS bypass selected.

If medical bills/records are received with the executed release, these are not required to be entered into CIQ, however ALOG should be documented that medical bills/records were received with the release.

If the claimant rejects the FCS, and medical bills/records are received, then the FCS bypass should be reversed, and the medical bills/records entered into CIQ.  Normal CIQ file handling procedures would apply going forward.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

18

Your ClaimIQ Guidance states that the basis of a First Call Settlement should be documented; any known or alleged injury and providers should be entered. You must also document your offers and demands in the record exchange located on the "Conduct" page of ClaimIQ (noted below).



It is imperative to select the **"Accepted"** box when your offer is accepted or we accept their demand.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

## Early settlement with verification of specials

It may take the examiner several weeks, or in some cases even months, to obtain the necessary medical reports and lost-wage information, but it is of utmost importance to keep in touch with the injured party during this time. Effective and frequent communication with the injured party is the key to maintaining good rapport. Most people want to handle their own business but if they feel as though they have become lost in the system, they start to feel neglected and distrustful and may believe that their claim may not be fairly settled. The importance of frequent, at least monthly, contact and clear explanations of the claim's status can't be over-emphasized.

When you are ready to contact the injured party regarding settlement, it's very important to make sure you are prepared to discuss the claim in a knowledgeable manner. If the injured party is represented by an attorney, you must contact the attorney directly for settlement.

 In either case, you must know:

1) Your file,
2) Medicals
3) Specials
4) The injured party
5) Attorney (if represented)
6) Jurisdiction
7) The goals and needs of the injured party,
8) His objections and counter agreements
9) Formulate your argument points, and
10) Finally, determine if there are any underlying motivational factors influencing the injured party's demand – a hidden agenda.

As you negotiate with an injured party they may not always accept your initial offer. You must then ask why they feel the claim was inadequate and what settlement figure did they have in mind. You must responded in a professional manner and discuss the objections and issues with the claim. You must then support your offer, discuss why the objections were not warranted and be very persuasive in the discussion. It is important to respond to any objection in a positive and convincing manner. You will find that this enables you to win the injured party's trust and will help you settle the claim much quicker. Also, just because someone says "No" to your offer doesn't necessarily mean a counter offer is in order. There must be valid reasons and issues for a counter offer and they must be explained to the injured party.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM01376

20

## Open-end releases

The open-end release is simply our standard general release with an added agreement in which we promise to pay any reasonable and necessary medical expense incurred by the injured party within one year from the date of the accident not to exceed a specified sum. It is designed to provide us with an additional tool and technique to use in accomplishing earlier and more reasonable liability settlements, particularly with those injured party's' who expect further treatment and expenses but who are reluctant to sign a general release of all claims, whether or not they are represented by an attorney.

In most cases, if the injured party went to the emergency room, he will not receive the bills until the next billing cycle, usually within 30 days. Also, the emergency room visit can generate a number of bills for different services.

Be sure to follow up with the injured party. If you say you'll call him back in an hour, and then call him back in an hour. If you say you'll put the check in the mail today, make sure that the check gets put in the mail that day. From the injured party's point of view, this accident has been very stressful and the way it's handled is one of the most important things to him right now.
He/she wants to feel that it is equally important to you. Following up as promised and courteous claimant contacts will only result in much better rapport with the injured party and assist in a mutual understanding at settlement time.

Two other effective settlement techniques are "Advance Payments" and "Walkaway" Settlements.

The "Advance Payment" technique means making payments to a liability injured party, or an uninsured motorist injured party, for which we do not secure any kind of release or receipt at the time payment is made; and the extent of injuries is such that an effort to obtain full release would be unwise at that time. Generally speaking, the following conditions should be present when using Advance Payments:

1. No questions of coverage and probably liability;

2. An injury resulting in economic hardship to the injured party: no collateral source for reimbursement of the expenses for which payments are being advanced; and the injured party in no way appears to be malingering and there is no indication that advancing payments will delay full recovery;

3. No apparent danger of excess exposure – _otherwise_, the insured must agree in writing to the use of Advance Payments; and

4. A written agreement with the injured party that the amounts advanced will be deducted from the final agreed-upon settlement value or judgment.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

> Advance Payments are rarely used in basic claim handling.  Check with your regional management regarding the need for management approval prior to extending advance payments.

## Walkaway settlements

The simplest definition of the Walkaway Settlement is: that when payment is made, no release is taken, and neither the company nor the injured party contemplates any additional payment. The technique permits a disposition of the claim while not cutting off the injured party's right to compensation if additional expenses are incurred.

Generally speaking, the Walkaway Settlement is most suitable to cases involving only very moderate injury where it is believed there will be no further out-of-pocket expense and the claimant does not want to sign a release.

It might also be well to distinguish the type of case in which we use the Advance Payment situation from the type of case in which we want to use the Walkaway Settlement.  In the advance payment situation, it is expected that there will be additional economic loss.  In the case of the Walkaway Settlement, a slight injury has been sustained and a present value can be agreed  upon with the injured party. Once an agreement on value has been established as fair and providing nothing else goes wrong, pay the agreed value and "Walkaway" from the case.  Like the Advance Payment, however, we want to guard against using the "Walkaway" technique in situations where there is reason to suspect that the injured party is inflating or will inflate his or her claim.

Now you have seen several effective settlement techniques:

1.      First-Call Settlements

2.      Early Settlement with Verification of Specials

3.      Open-End Releases

4.      Advance Payments

5.      Walkaway Settlements

Not all of these techniques fit every case. Different claimants have different needs. Remember, the earlier you contact the claimant, the easier it will be to handle the claim and reach a fair and equitable settlement.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

22

## Practice!

We will now break up into groups of two and practice First Call Settlements. One of you will be the claimant and one the TCR2 representative.  You may use any of the techniques discussed in the First Call Settlement JIT to include releases.  The student role-playing the TCR2 examiner should come up with a range they are willing to settle in, as will the associate role-playing the claimant.

**Coverage:**

Let's assume this is a no threshold state.  There are no coverage concerns with this claim file.

**Liability:**

The claimant was the driver of a car whom our insured collided with.  Our insured was ticketed for running a red light and plead guilty to the ticket.
We have settled the claimant's PD claim at 100%.

**Damages:**

Again, let's assume this is a no threshold state at 100% liability against our insured. The claimants' car sustained $3500 in damages as did your insured's.

**Injury:**

The claimant went to his/her family doctor one time and was written a prescription for pain medication.  He/she sustained a lower back sprain as a result of this loss. He/she has made a full recovery with no further treatment.

**Authority:**

You have $1000 first call settlement authority and amount not to exceed $300 for an Open Ended Release.

Your trainers will be walking around the room and observing and provide you with feedback as a group.  Good luck!

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM01379

## Negotiation-Conduct on ClaimIQ



1. Click here to add an attorney.
2. The values from the decision page will carry to here.
3. This is where we enter the negotiation range of the specials.
4. This is where we enter the negotiation range of pain and suffering.
5. This line will add the columns accordingly.
6. This is where we enter the negotiation range of liability.
7. If there are any offsets, this is where they are entered.
8. This line will take the range from 5, adjust the numbers based on 6, and subtract line 7 to develop your negotiation range.

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

24

## Negotiation Conduct

Your offer(s) can never be below low end of negotiation range.  You only need to change the evaluation or range if additional or different information changes your decision—or if after meeting with your supervisor or manager the two of you have agreed on a different amount--not if you simply add money to settle the claim (a note in "notes" and/or alogi should accompany any change or a settlement outside of the range).

## Record Exchange

Record Exchange must have start/end of each conversation and must check accepted to complete consultation (ALOG/Notes will reflect "blow-by-blow" of the negotiation). Use "T" Chart—it will only help.



1.  This is where we enter the starting and stopping number for each negotiation exchange.
2.  Click here to get a chart of all the previously answered questions from the
    a.  prior consultations to develop a negotiation strategy.
3.  If there are any lienholders, they can be added here or in "parties".

Confidential Information of GEICO Companies
© Government Employees Insurance Company

# Appendix
## Student Manual
## TCR2 Module

**Contents:**

- Effects of Blood Alcohol (page 2)
- How BAC is calculated (page 3)
- Glossary of Legal Terms (pages 4-6)
- Homework Reading Assignment #1 (pages 7-11)
- Homework Reading Assignment #2 (pages 12-25)
- How to evaluate a Bodily Injury Claim (pages 29-35)
- TCR2 Final Exam Study Guide (pages 36-44)
- Post School Curriculum and Checklist (pages 45-46)
- Regional Specific Question Form (page 47)

**Confidential Information of GEICO Companies**
© Government Employees Insurance Company

# THE EFFECTS OF A RISING BLOOD ALCOHOL LEVEL

| | |
|---|---|
| .02% - .04% | Mellow, relaxed, less inhibited |
| .05% | Level of alertness and coordination impaired |
| .06% | Judgment is somewhat impaired, less able to make rational decisions about one's capabilities (for example, driving) |
| **.08%** | Definite impairment of judgment, muscle coordination and driving skills, legal limit in most states (including VA & NC) |
| 0.10% | Legally drunk in all states, clear deterioration of reaction time and control, mood swings |
| 0.12% | Vomiting usually occurs, may have blurred vision, speech may be slurred |
| 0.15% | Clearly drunk, impaired balance and movement, the equivalent of ½ pint of whiskey is circulating in the bloodstream |
| 0.25% | In a stupor, all mental, physical and sensory functions are severely impaired, little comprehension of where you are, blackouts are common at this level, may pass out and have a hard time waking up |
| 0.35% | The level of surgical anesthesia, many lose consciousness, may stop breathing, a lethal dosage for a small percentage of people |
| 0.40% | Lethal dose for 50% of individuals |
| 0.45% - 0.50% | Breathing stops, fatal dose for most people |

2

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM01383

## HOW BLOOD ALCOHOL LEVELS ARE CALCULATED

Blood Alcohol Level (BAL) or Blood Alcohol Concentration (BAC) is the amount of alcohol in the bloodstream. It is calculated by determining how many milligrams of alcohol are present in 100 milliliters of blood. It is measured in percentages, so for instance having a BAC of 0.10 percent means that a person has 1 part alcohol per 1,000 parts blood in the body. Or, one thousandth of that person's blood is alcohol.

Hospital labs measure blood alcohol levels in milligrams (mg). Breathalyzer tests are administered by police officers measure alcohol levels in grams (gm). To convert mg to gm, move the decimal 3 points to the left. For example: a blood alcohol level of 53.01 converts to .05 Gms.

3

Confidential Information of GEICO Companies
© Government Employees Insurance Company

GTM01384



# Glossary of Legal Terms

**Subpoena Duces Tecum**-(suh-pea-nah dooh-chess-take-uhm or dooh-kess-take-uhm): a court order requiring a witness to bring documents in the possession or under the control of the witness to a certain place at a certain time. This subpoena must be served personally on the person subpoenaed. It is the common way to obtain potentially useful evidence, such as documents and business records, in the possession of a third party. A subpoena duces tecum must specify the documents or types of documents (e.g. "profit and loss statements of ABC Corporation for years 1987 through 1995, all correspondence in regard to the contract between ABC Corporation and Merritt") or it will be subject to an objection that the request is "too broad and burdensome." To obtain documents from the opposing party, a "Request for Production of Documents" is more commonly used. Failure to respond to a subpoena duces tecum may subject the party served with the subpoena to punishment for contempt of court for disobeying a court order.

**Example**-You may receive such a subpoena which will require you to send a complete **copy** of our claim file.  There is usually no need for a personal appearance.

**Summary Judgment**-court order ruling that no factual issues remain to be tried and therefore a cause of action or all causes of action in a complaint can be decided upon certain facts without trial. A summary judgment is based upon a motion by one of the parties that contends that all necessary factual issues are settled or so one-sided they need not be tried. The motion is supported by declarations under oath, excerpts from depositions which are under oath, admissions of fact and other discovery, as well as a legal argument (points and authorities), that argue that there are no triable issues of fact and that the settled facts require a summary judgment for the moving party. The opposing party will respond by counter-declarations and legal arguments attempting to show that there are "triable issues of fact." If it is unclear whether there is a triable issue of fact in any cause of action, then summary judgment must be denied as to that cause of action. The theory behind the summary judgment process is to eliminate the need to try settled factual issues and to decide without trial one or more causes of action in the complaint. The pleading procedures are extremely technical and complicated and are particularly dangerous to the party against whom the motion is made.

**Example**- If you are handling a BI claim in a state with a verbal threshold, and we feel that the plaintiff has not pierced the threshold requirements, we can motion for a summary judgment and if we win, the plaintiff's BI suit is dismissed.

4

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**Res Judicata**-Latin for "the thing has been judged," meaning the issue before the court has already been decided by another court, between the same parties. Therefore, the court will dismiss the case before it as being useless. Example: an Ohio court determines that John is the father of Betty's child. John cannot raise the issue again in another state. Sometimes called res adjudicata.

**Example-**If liability has already been determined in another BI suit, the decision would apply to the new BI suit which is likely for another interested party.  An example of Non Res Judicata would be in the case of PD arbitration.  Although liability has been decided in this forum, it **does not** apply to any law suit.  Liability would again be tried in a court of law and a decision reached.

**Prima Facie**-Latin for "at first look," or "on its face," referring to a lawsuit or criminal prosecution in which the evidence before trial is sufficient to prove the case unless there is substantial contradictory evidence presented at trial. A prima facie case presented to a Grand Jury by the prosecution will result in an indictment. Example: in a charge of bad check writing, evidence of a half dozen checks written on a non-existent bank account makes it a prima facie case. However, proof that the bank had misprinted the account number on the checks might disprove the prosecution's apparent "open and shut" case.

**Prima Facie Case**-a plaintiff's lawsuit or a criminal charge which appears at first blush to be "open and shut."

**Infant compromise order a/k/a ICO**-An order from a civil judge which approves the settlement of an injury claim to a person under the age of majority for his/her state.

**Friendly suit**-a lawsuit filed in order to obtain a court order when the parties to the suit agree on the expected outcome. Such a legal action will be dismissed if it is an attempt to get an advisory opinion, is collusive (deceitfully planned) to get a judgment to set a legal precedent or where there is no real controversy. However, such suits are allowed in situations in which the statutes require a court ruling to achieve a "reasonable result," such as reforming (correcting) a trust or agreement in which there was an error

**Collateral Source-** Is another source of recovery for medical bills.
**Example-**If a loss occurs in a no-fault state, the pip carrier is a collateral source.  If a loss occurs in a non no-fault state, the private health carrier or workers comp carrier may be a collateral source.

5

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**Declaratory Judgment a/k/a DJ action or Framed Issue Hearing-** a judgment of a court which determines the rights of parties without ordering anything be done or awarding damages. While this borders on the prohibited "advisory opinion," it is allowed to nip controversies in the bud. Examples: a party to a contract may seek the legal interpretation of a contract to determine the parties' rights, or a corporation may ask a court to decide whether a new tax is truly applicable to that business before it pays it.

**Example**- Often times we are faced with an Uninsured Motorist claim from our insured where we disagree with the other parties' insurance carrier that it is a valid UM claim.  The adverse has denied or disclaimed coverage for our insured's BI claim. A DJ action is commenced and a judge rules on whether our insured's injury claim is a valid BI or UM claims.

**Service of Process-** the delivery of copies of legal documents such as summons, complaint, subpoena, order to show cause (order to appear and argue against a proposed order), writs, notice to quit the premises and certain other documents, usually by personal delivery to the defendant or other person to whom the documents are directed. So-called "substituted service" can be accomplished by leaving the documents with an adult resident of a home, with an employee with management duties at a business office or with a designated "agent for acceptance of service" (often with name and address filed with the state's Secretary of State), or, in some cases, by posting in a prominent place followed by mailing copies by certified mail to the opposing party. In certain cases of absent or unknown defendants, the court will allow service by publication in a newspaper. Once all parties have filed a complaint, answer or any pleading in a lawsuit, further documents usually can be served by mail or even FAX.

6

Confidential Information of GEICO Companies
© Government Employees Insurance Company

# <u>Homework reading assignment #1 (pages 7-11)</u>

## Negotiation Tactics in the Insurance Claims Handling Profession

### By John W. Odam

Human beings are uniquely different from all other creatures great and small if in no other terms the way in which they settle their differences. It is highly unlikely that any other creature has the physical capabilities of communicating offers and counters offers, highballing and lowballing to reach an agreement. Only a human being has formalized the negotiation process to the tenth degree. Only a human being negotiates as an alternative to the use of brute force. Unfortunately, we sometimes feel like we must resort to that but very rarely do, only in war.

Those of us in the claims and litigation profession deal with negotiations each and every day, from the time we get to the office until the time we get home. In addition, we negotiate with our spouses, friends, co-employees and loved ones literally from the time we arise until the time we go to bed. Even after I go to bed, my wife and I negotiate as to whether I sleep on my back or left side to prevent my snoring.

Time does not permit me to cover today all the procedures on negotiating everything in life, from negotiating with your spouse about where you want to go out to eat, to negotiating with your teenage son about the use of the family automobile. Also, I will not include at this time, but would for a small fee later on, negotiate with your boss for a pay increase.

My point is, the negotiation process is with us all our waking hours. Man creates rules and procedures, either consciously or unconsciously, about how we should talk to each other when we want what someone else has. Negotiating in business and in the claims practice sometimes may appear more complicated than it has to be. In the end, every negotiation decision should be guided by the Golden Rule: Do unto others as you would have them to unto you. I would like today to identify some key elements in what keeps negotiating from becoming stale or predictable. To talk about some aspects of negotiation that perhaps will excite you and enthuse you to come to work every day and to negotiate with the claimant and/or with plaintiff counsel.

7

Confidential Information of GEICO Companies
© Government Employees Insurance Company

## TWO RECURRING THEMES

### A. Question everything

One theme throughout my talk today is to "question everything." Develop a healthy skepticism. Keep in mind no two negotiations are the same. What you did two weeks ago may not work today. How you handled yesterday's claimant may not necessarily apply to the one today.

### B. Think big

The second theme is to "think big." Now I do not mean to "think big" by giving away "big" money. What I do mean is that people should shoot for the moon on every deal to get the best situation from your side of the negotiation table. Strong positions, whether it means quoting an "outrageously" high price or making an "outrageously" low offer, in our situation that is the lower end of our authorized range. From our side of the table, I urge you to start negotiations with "insultingly" low offers.

Negotiating down the middle is splitting the difference. Any four years old can figure that out pretty quickly. Six Hershey bars on the counter and Tommy wants all six. Mother says he can have one so he says he will settle for three. The deal is done. This requires a very modest skill for a negotiator to simply split the difference. Thus, I say to you to "question everything" and "think big."

## THE PERFECT NEGOTIATOR

I say at the outset that many of the principles and concepts of this book I attribute to Mr. Mark McCormick from his book Mark H. McCormick On Negotiating. I recommend it to you without reservation. If you do not know him, let me tell you who he is. He runs a sports marketing company which he started 35 years ago with $500 in Cleveland, Ohio called International Management Group ("IMG"). His first client was some golfer by the name of Arnold Palmer.

He now represents hundreds of well known athletes such as Arnold Palmer, Jackie Stewart, Jean-Claude Killy, Bjorn Borg, Chris Everett, and Andre Agassi. His company also manages and creates events, everything from the Tokyo World Match Play at Wentworth, to a Jose Carreras concert in Singapore, to the Detroit Grand Prix Motor Race, to "Jesus Christ Super Star" in Sidney, Australia. They represent the Nobel Prize Foundation. They helped develop the commercial interest of Wimbleton and the Royal and Ancient Golf Club of St. Andrews. Most recently, he took on some freshman golfer by the name of Tiger Woods.

8

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

 If you do not happen to read the sports pages, which I doubt, read the business pages. I read the other day that Tiger Woods will make $60 million this year from endorsements. For example, recently he signed a lucrative contract with Rolex Watches, or should I say Mark McCormick did. No doubt, McCormick negotiated a good deal for him.

McCormick's television arm has represented the International Broadcasting rights of sports properties such as the Olympic Games, the World and European Figure Skating Championships, the National Football League, and all the major golf and tennis championships. IMG now has more than 2,000 employees in 69 offices and 28 countries around the world.

If you have not seen the movie, Jerry McGuire, I strongly suggest you do so. Not just for the acting of Tom Cruise and Cuba Gooding, Jr., although it was excellent, nor simply to hear the classic phrase, "Show me the money," but to see a great film on the art of negotiation in the sports arena.

Just think about it, each day you and I negotiate claims. While they are not, unfortunately or fortunately, in the realm of the Tiger Woods' fee arrangement with Nike, or what the fee might be for the next Garth Brooks concert, we do negotiate deals and try to reach agreements every day.

Why? Because that is our business and also because you know more about the particular claim than twelve people off the street collected as a jury might. I believe in the jury system with all my heart and soul and I am glad we have it. I believe we have the finest judicial system in the entire world. I negotiate, mediate and litigate cases every day and still believe that the parties who know most about the dispute are the ones best to reach a reasonable and fair solution for all concerned.

 When a case goes to a jury, it is simply because the parties or the counsel, including myself, are overlooking or misjudging some of the facts or the law or the risk and benefit in their analysis. Let me also say that I do not intend to get into detail "risk/benefit analysis" such as occurs in mediation. I understand you have had that speech and I will save that for another date. What I do intend to discuss are broad principles of negotiation that are applicable to not only claims handling mediation and lawsuits, but to selling your residence or your automobile, or negotiating for a pay raise.

9

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

I suggest to you that the perfect negotiator needs at least one or more of the following personal traits:

- A. A perfect people sense: Knowing what makes people tick and how far you can push your position before the other side resists or resents it.

- B. Strong competitive streak: Enjoying the hand-to-hand combat that is the essence of negotiating.

- C. A wide field of vision: Seeing the big picture, the long-term consequences as well as short-term gains.

- D. An eye for details: Being able to spot the thorny issues that everyone else overlooks.

- E. Unimpeachable integrity: Meaning what you say. You don't have to be hounded to keep your promise.

Of all of these, I believe unimpeachable integrity is at the top. Everyone respects honor and fair play.

- F. Examples of knowledge I would prefer the other side not to have:

    1 My client really wants to settle.
    2. I need to settle the case to keep some third party happy: Boss, peers, a quota, a goal, or some artificial deadline.

## NEGOTIATING TOOLS AT YOUR DISPOSAL

**A**. Do not need to be liked: Getting others to like you because of your brains, charm, honesty or sense of humor is a strength but needing to be liked is a weakness if it compels you to sacrifice negotiating points. Some negotiators are infinitely more pleasant than the other fellow. They will work with you to resolve an issue rather than work against you. Overriding strength as a deal-maker may be likeability. Have one talent or personality trait that can help you in negotiating. The key is to learn to recognize that quality in ourselves and let it prevail.

**B**. Tolerate ambiguity and conflict: Learn to deal with a discussion when it takes a 90 degree turn and circumstances change. You can deal with chaos and ambiguity. You can scramble.

10

Confidential Information of GEICO Companies
© Government Employees Insurance Company

GTM01391

**C**. Have a lot of integrity.

**D**. Negotiate anything: Negotiators love to negotiate. If they do not, they will always be outgunned by someone who does love it. The best negotiator regards everything as negotiable. Everything is on the table. He/she devotes the same enthusiasm and care in negotiating for a wristwatch as he/she does in negotiating $1 million lawsuits. It is talent of all successful negotiators that they consider negotiating a sport they love. Like athletes, they do it constantly so they are never out of shape. This is very important.

**E**. Do not need to be the smartest person in the room: When negotiating, always discuss each major point as if starting at ground zero. This may put the other side off balance. They don't know what you actually know, so they often attribute more street smarts to you than you actually possess.



11

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**GTM01392**

# Homework reading assignment #2 (pages 12-25)

## A GREAT NEGOTIATOR NEEDS TO BE GOOD AT ONLY ONE THING

**Four traits which can turn an average negotiator into a great one**

**1. Patience:**
Patience may be a virtue, but in negotiating it is a weapon of incalculable power. The patience to wait for a second, third or fourth discussions to have conditions improve.

**2. Clarity:**
Ability to express themselves clearly and succinctly. Simply build your case logically and quickly and make things easy to understand.

**3. Mastery of details:**
Quite often the one who has the greatest expertise and mastery of details has the upper hand.

**4. Administrative skill.**
Be a fanatic for correctness.

## WAYS TO NEGOTIATE WITHIN A HOSTILE, IMPERFECT WORLD

**A.** Stay in the match: Negotiating with an ornery claimant or attorney is a lot like playing tennis with a powerful opponent. The key is to stay in the match. There is no clock, no time limit, only the final judgment in the lawsuit. As long as you don't lose match point, you have a chance to win. Your opponent may lose his or her stroke or concentration or may tire while you gain a second wind. You should not self-destruct just because the other side takes a surprisingly aggressive attitude. Think of the Rockets and the Jazz in the playoffs. Do not let personalities scare you away.

**B.** Keep your walk away number to yourself: This is the absolute maximum you would be willing to pay to settle a case. Do not broadcast this number. In a hostile negotiation, if the other side knows the maximum you will pay, why should they accept any less? On the other hand, work to find out what their acceptable minimum is.

**C.** It is not always the price: Look for other aspects of the case such as timing on payment. Search and pry for what will help to get the claim settled.

**D.** Be hypothetical: If the opposition wants to get you to increase from $80,000 to $100,000, you might respond "What if we were to pay $80,000 but we were to throw in the following ingredients? For example; "quick payment, hand delivery, etc."

12

Confidential Information of GEICO Companies
© Government Employees Insurance Company

**E.** Look for deal makers, not deal breakers: Do not use the term "deal breaker." Use the term "deal maker." "I'll do that but that has to be the deal maker." "I might agree with those terms if you unequivocally tell me we have a deal."

## NEVER LET THE OTHER SIDE KNOW WHAT YOU WOULD NOT DO

I heard an associate attorney one time come back from a negotiation and tell the partner that the other side was making some tough demands, and then added, "Of course, I told them they were out of their minds. We would never even consider those terms." The partner cut him off and said, "Never tell them what you wouldn't do! The more options and the longer you can keep them, the stronger your position." This is a valid point. I am reminded of the moment in the movie The Godfather, when the Don tells his hothead son, Sonny, "Never tell anyone outside the family what you're thinking." This rule can apply in business and in our practice just as well. For example, the claims person may say, "I'd never pay more than X number of dollars to settle this claim." Conversely, the other side might say, "I won't take less than X number of dollars for this case." Ultimatums can backfire as often as they work. Ultimatums can stop discussion dead in its tracks. They are potential deal breakers, not deal makers. Most times, people abuse the "Never tell them what you wouldn't do" rule because of weakness or because of some misguided ego.

## A WORD TO INSURANCE CLAIMS MANAGERS: EVERYONE IS A NEGOTIATOR, EVERYTHING IS NEGOTIABLE

Let's think of it in business terms. Are we the buyer or the seller? We are the buyer. We have the money, and they want to sell us on what a great claim they have, how valuable it is. It is no different than us looking for a new home, come upon a "For Sale" sign and then talk with the owner to find out what a great house it is and why it is worth their asking price.

Buyers generally fall into two camps. One camp of people insists on negotiating everything. To them, the list price is nothing but a reference point, and absurd base price that, through shrewdness, persistence, and sheer nerve, they intend to lower. In our profession, that would apply to the initial demand made by the claimant or his/her attorney.

The second camp consists of people who never question "the rate card." They always pay the quoted price. They are constitutionally incapable of negotiating.

13

Confidential Information of GEICO Companies
© Government Employees Insurance Company

Needless to say, as a manager, you should prefer claims handlers who fall into the first group. It would be frightening to think that the claims handler comes anywhere close to paying the initial demand made by either the claimant or the plaintiff's attorney.

There are simple management principles I suggest you impart to emulate the fierce negotiators as opposed to being at the other end of the spectrum of those who pay the initial asking price.

**A. Make an attitude adjustment:**
Becoming a zealous negotiator first requires an attitude adjustment. You have to rethink your standards for what is and what is not negotiable. For example, it's ingrained in us to negotiate with certain people and not with others. You're supposed to negotiate with a used car dealer or a merchant at a flea market. Everyone knows that. On the other hand, you don't negotiate at a restaurant. If the menu says the steak cost $27.00, you don't tell the waiter, "I'll give you $24.00." Everyone knows that too. In our business it is in the company's best interest to always remind employees that bargaining chips should exist and should be aggressively used.

**B. Create policies that encourage negotiating:**
I will not expand upon this, but obviously it has to do with settling claims at the lowest possible "fair" price.

**C. Treat good claims handlers as corporate hero's:**
Think about it in the sales world. If a salesperson at a company closes a huge deal, word quickly spreads through the company. The salesperson is hailed as a hero and often rewarded with a bonus. The same hero treatment should be given to employees who make great buys. Sometimes stellar negotiating efforts go unnoticed and unheralded. Most companies don't send out memos hailing Jane Smith for the great lease she re-negotiated. Buying is not perceived as glamorous or heroic as selling. The honor of saving the company money rarely matches the glory of bringing it in. If you recognize and honor people for negotiating great buys, you're employees will not only learn from them, but will take pride in emulating them.

**D. Attack the little deals as well as the big ones:**
Not everyone is in a position to negotiate multi-million dollar lawsuits. Not everyone handles brain injuries and paraplegics. Sometimes it takes as much brains and initiative to negotiate the little deals where the dollars are closer. The point is, no deal point should be too small to question or fight for. Obviously, taken individually, no individual small claim settlement will make or break the company, but instill the attitude and multiply it by the dozens and dozens of claims one deals with in each of the offices of the company and the economic effect can be substantial.

14

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**GTM01395**

Most importantly, it does not cost the company anything to instill that attitude, even with respect to negotiating small claims. They add up. As an investment, it is all reward and no risk.

## WHAT YOU CAN LEARN FROM NEGOTIATING WITH YOUR SPOUSE

Considering all the mutual decisions married couples have to make each day as a result of negotiating with each other, the spousal relationship may be the most efficient negotiating situation in the world. A messy marriage on the brink of divorce is surely the least efficient negotiating situation. Whether they are negotiating little items such as who gets the shower first in the morning, or major items as where to go on vacation, couples maneuver, yield and assert themselves in fluid, effortless, and sometimes wordless ways. We can learn about negotiating simply from analyzing conditions that force us to behave that way. Can you create the same conditions when you get to work? It reminds me of the line in Mark Chestnut's song, "Divorce", "I got the Jeep and she got the palace!"

**A. Couples have to see each other again:**
No matter how heated the debate, a couple knows they will have to face each other again when they turn in at night -- unless they intend to divorce or separate. That fact alone tempers how extreme and firm their positions are. When people know they will have to "do business" with someone in the future, they tend to be more agreeable and less willing to pick a fight. It is quite likely you will be seeing the same plaintiff attorney, even if it is not the same claimant. In the workplace, knowing you will have to deal with the other side again on other matters not only makes people more agreeable, it makes them less desperate.

**B. Couples respect each other's turf**:
There are "no trespassing" zones in every marriage. It could be a touchy subject that automatically upsets the husband, an area of expertise particular to the wife, or an exclusive relationship that one partner has developed. It might be tough to emulate the same sensitivity in a business negotiation or claim settlement. After all, you probably do not know the other side one-tenth as well as you know your spouse. But a little homework should tell you what the other side regards as inviolate turf.

**C. Couples really need a mutual benefit:**
A lot of business people pay lip service to the "win-win" ideal in negotiating. The same applies to claims handling. Think about it. I do not know any skilled negotiator who isn't looking to win a little more than the other side. That should apply to the plaintiff attorney or to the claimant if they are awake and alert and worth their salt. It is nice when both sides walk away equally happy, but that is not absolutely necessary.

15

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

Pushing for that edge is what makes a talented negotiator. It is also what kills a lot of deals. Push the envelope but try not to tear it open. It is different negotiating with a spouse. If either the husband or wife gets the better end of a negotiation, both of them might lose.

## DO NOT FORGET TO LOOK AT YOUR HOLD CARDS, I.E., YOUR CLAIM FILE

What do I mean by this? In all areas of business negotiations and dealings sometimes people fail to do basic research. For example, some might make investments and plunge their money into a stock without researching a company, based upon a whim or the unsupported enthusiasm of a friend. Many people invest in a way similar to playing poker all night without ever looking at their cards. No doubt all lawyers and claims handlers are guilty of this to some extent. They do not know the full value of the hand they are holding because they forget to study their cards.

What are your cards? Your cards are your file. I guarantee you your file material is far more organized than that of the claimant and probably that of a plaintiff attorney. You have the luxury of having all of that file material in front of you and updated. If not in front of you, get them so you can comment and respond intelligently. Thus, base your decisions on facts and figures that you know. Again, think of an analogy of you being the buyer. The claimant or plaintiff attorney is trying to sell you on their case. If you are missing certain information or have certain questions ask that it be provided. If it is not provided then you have a basis for sticking to your opinion as to your evaluation of the claim. Again, think of buying a house. If the seller does not tell you the condition of the roof or the last time the house was inspected for termites or produce certain certificates, you certainly have basis to not pay their asking price. It is hard for the seller to quarrel with this rationale.

A. **Do not catch the virus of desperation**.

Sometimes there are external pressures; a supervisor pushing you to settle cases, a quota or deadline to be met, a rival in the office who is performing better than you on closings. Do not get desperate to get a deal done and make a bad deal. Such negotiating objective is no longer to get the best deal but rather to make sure any deal does not disappear. Again, if you were a manager, instill in your subordinates this philosophy. Do not pay more than a claim is worth just to close the file. A dollar here, $500 there, $1,000 here, $5,000 there adds up in the big picture of things. Inoculate your people against this philosophy.

16

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**GTM01397**

**B. Do not be distracted by a pot of gold.**

Once again, using the poker analogy, it is not unlike playing against someone who has a massive pile of chips. You are looking at the strengths of the other side rather than the strengths of your case. You focus on the strengths that the seller/plaintiff/claimant is telling you and not focusing on their strengths which are in your file. Do not be distracted by their sales pitch. Do keep it in mind but again, assess your hold card, assess your own file. Point out the weaknesses which you have documented in your file about their claim.

**C. Do not be dazzled by the fine china.**

I use this point for dealing with very successful plaintiff attorneys. Try to get out of your office and go to the office of the opposition but once there, do not be distracted by their physical signs of success; the brochures, newspaper articles framed on the walls, furnishings that would not even appear in the private offices of chief executive officers of the highest corporate officials in Houston. Again, focus on your hold card, focus on your case. All of those trappings of success have nothing to do with this particular case. Think of the Rockets vs. the Jazz. The fine china is the same as playing at home. Part of the purpose of the crowd is to distract the out of town players, get their mind off the game. Focus on your case. Think of the focus that Charles Barkley or John Stockton has. Think of the focus an out of town player has when lining up for a free throw and hundreds of people are waving balloons in his face behind the goal. All is a distraction from what one is about. Do not be distracted by the fine china, focus on your hold card.

THE TOOLS AT THE OTHER SIDE'S DISPOSAL:

**What pattern is the other side weaving?**

**1. The concession pattern.**

Everyone, consciously or unconsciously, has a pattern of conceding points in a negotiation. Some people stair-step their concessions. They give away points in increasingly larger increments, starting out small and holding back on the big concession they hope you never ask for. Other people reverse that pattern, shrinking their concessions as the process drags on. There is no single ideal concession pattern but it is a sin not to be aware of it -- in yourself, as well as others.

17

GTM01398

## 2. The accession pattern.

This is the flip-flop on the stair-step concession. On the stair-step for example, you are literally going up the steps, perhaps taking one step at a time or two steps at a time, increasing the amount of your offer in the same amounts or increasing amounts. Keep a record in your file so that you know what you are doing and it keeps a record of what the other side is doing as well.

What is the accession pattern? Take an obvious example, if you were to walk into an auto showroom and ask about a car listed at $20,000 and accepted the salespersons opening quote of the list price. After you and the salesperson shake hands you slightly add, "that includes leather seats, of course? and anti-lock brakes? and dual airbags? and an extended warranty doesn't it?" Perhaps it does not but perhaps the salesperson goes ahead and agrees to everything without adding the increased amount for those items if it did not include such. You might have grabbed on to $4,000 worth of free features.

What about the claim? What if you say you will settle a case for $10,000 and the claimant accepts and they then say that means I can have the check tomorrow doesn't it? How about next Monday? That does include payment of my medical expenses, does it? Perhaps there are certain points where you will obviously say no but there might be points that you had not intended to include but you accede to those because you know the deal is done. Perhaps you are not giving away anything of value but obviously if you did not intend to include it as a part of your original deal and you do now include it, you have added something of value.

### Tactics of negotiations

## 1. Splitting the difference.

One would think this would be the easiest pattern to spot. It is how most of the world "negotiates". You want $20,000, I offer $10,000 and we settle at $15,000. Perhaps both sides end up not entirely happy. Some people simply live to split the difference. Their first offers are intentionally so extreme, high if they are selling, low if they are buying, that splitting the difference is an excellent and desirable result for them.

Constantly check to see if this is the pattern. See if it is the dominant pattern of a negotiation and determine if that is one you want to adopt or not. If the claimant is strategically exaggerating their position, waiting for you to split the difference, they will whip you every time. We all know on personal injury claims that in addition to the hard specials, there are the general damages that either the attorney or the claimant decides on.

18

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

Do not let them quote $30,000 with the view to get to $15,000, unless you think the case is worth $15,000. Keep in mind also that as concessions are made on both sides there will probably be a point where one will want to split the remaining difference or that is suggested at least. Again, do not split that difference unless you think that is moving to the true value of the case and you are not being whipped.

## A.  Block that tactic:

As indicated above, the claimant may be using certain negotiation tactics. If you are well prepared and have a good idea of what the other side is doing, be ready for every question they throw at you. Try to transform the negotiation process into a pleasant dialogue rather than be confrontational. Negotiation tactics are like moves in a chess game. You do not over react or get angry when someone makes a daring move in chess so do not over react in negotiation either. You should be familiar with the move and know what your next move should be. The following are some examples of how to deal with tactics from the other side of the negotiation table.

## 2. <u>Do not accept the negative attack.</u>

This is the person that immediately comes in and starts making disparaging remarks about your insured and their conduct and is the crudest negotiation tactic at all. There might be various reasons for this. They may think you would be intimidated by the assault. They certainly might believe in the truthfulness of their statements. They may be wanting to make you feel guilty or responsible for what your insured did. The tactic is designed to break down your position. Listen to it but do not give in to it.

## 3. <u>Do not accept their ultimatum.</u>

How many times have we heard "take it or leave it" or "you have to do better than that"? Sometimes these phrases really work. Perhaps with a trained attorney in mediation that truly is their bottom line but do not necessarily believe that to be the case with the claimant; that their ultimatum is the end. Rarely are ultimatums the end, they are only the beginning.

## 4. <u>Do not fall for the good cop.</u>

The "good cop/bad cop" tactic is one of the most familiar routines in negotiation. We have all seen it. Two people show up at the negotiation table. One of them is the designated bad guy whose job is to chew you up, wear you down and make outrageous demands. The other person is the good guy, usually a senior person whose job it is to apologize for his colleagues bad manners.

Obviously this might be the tactic with plaintiff attorney who is playing the roll of the good cop and the bad cop is the client who simply will not take less than a certain amount of money. It may be the claimant who is the good cop but claims his wife, spouse or someone else he seeks advice from simply is telling them to stand fast.

19

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM01400

Focus all of your energy on turning the bad guy around to your point of view. If you cannot do that you not lost anything - because you will not do any better with his partner.

**5.  <u>Let the other side show you how it is done.</u>**
McCormick using the example of Bjorn Borg who hit the ball with such over powering topspin, his opponents had to enhance their repertoire, simply to stay on the court with him. The smart ones, however, were willing to adapt and play Bjorg and challenge him with a topspin of their own.


QUESTION EVERYTHING:


**A. <u>Learn to ask, "Says Who?"</u>**
This simply means applying skepticism to the other side. Treat each of their assumptions and statements with extreme skepticism. When the other side outlines a position always think to yourself, "Says Who?" If they say it cost x to repair the car, "Says Who?" Where is the report from the bodyshop saying that? If they give a negotiating deadline, ask why there is such a rush. If they make a suspiciously high demand ask for proof of why the case is worth that much.

These examples could go on and on but I hope you get the point. Whatever is said think to yourself "Says Who?" as to that value. Who is the doctor they went to see? Where is the doctor's report? Where are the medical bills? Where are the expenses? Where is the report from their employer?

**B.  <u>The myth of the negotiating table.</u>**
Let me first say that I recognize that all of you have many claims to handle and there are constant demands on your use of time. I would suggest however on the largest cases to block out some time and get out of the office and to get away from the telephone "negotiating table". Meet the claimant at a coffee shop and size him or her up. Why not meet the plaintiff attorney, claimant or both at a restaurant (each side pays their own) and talk in a casual setting. You eat lunch everyday anyway, why not make the suggestion to talk about a case over lunch? Even if they do not accept your offer, you have shown a willingness to negotiate and to be fair and if they are not willing to show their face then there might be something wrong.

Better yet, meet them for breakfast! More than likely they will not even be out of bed by that time. While a neutral place is probably the most desirable it may the plaintiff attorney office or the home of the claimant. Whatever works but get out from the negotiating table into an informal casual setting to obtain information and size up the other side and not around the negotiating table.

20

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**C. Go with your gut instincts, but go with care.**

**1. <u>Is it a gut decision or a gut reaction?</u>**
A gut decision is a choice you face after you have collected and digested all the facts. A gut reaction is the same choice after you have only heard one fact. Do not make gut reactions but rather do make gut decision. That is, if it feels right "in the gut" after your analysis of the information you have go with that gut reaction.

**2. <u>Do you have a private set of rules?</u>**
What I mean by this is to establish a private set of rules that make you feel comfortable and work more often than not. The tough part is sticking to your rules. If you have a rule about gut instincts you might apply a second rule one would call the "one missing piece" rule. That is look for one missing piece in the puzzle. If you have a big question mark about something have that question answered.

**3. <u>Are you being forced into a gut decision?</u>**
The best example of this is a rush by the other side to take action. It may be they intend to file a lawsuit or they will take their demand off the table. Do not be pressured into anything. Apply your own rule of "going slow".

**4. <u>Act confidently after you go with your gut.</u>**
Do not look back. If you go with your gut instincts then it is implicit that you must trust your gut instincts. Do not second guess the outcome. Move on to another file.

**5. <u>The reverse of "talent" should never touch the money</u>** -- claimants should see the money.
McCormick makes a big deal about keeping the "talent" out of the negotiating or seeing the money. He tells his superstar athletes that he does not tell them how to read a nickel defense or hit a topspin lob and he would appreciate it if they do not lecture him on how to structure a deal or sell their services. Just because Tiger Woods can hit a golf ball better than anyone around does not mean that he can negotiate and cut the best deal with Rolex, particularly when he is in his early 20's.

The reverse of this may be that you want to dangle the money or the check in front of the claimant to show him or her that you can pay the amount immediately or tomorrow or the next day or before that Christmas holiday. Negotiate with them with a checkbook in hand if possible. Again to paraphrase Tom Cruise, "Show them the money".

21

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

**6.  <u>Knowing your negotiating style</u>** - and the other side's, too.

What is your negotiating style? Do you have to have all of the eyes dotted and t's crossed before you have a deal or are you comfortable agreeing to broad outlines? There is nothing inherently right or wrong about either negotiating tactic so long as you recognize what you are doing.

**7.  <u>Is the other side guilty of "perfect math"?</u>**

McCormick uses an example of company personnel discussing cost cutting in the operation in one of their offices. They were discussing an apartment that was kept in time for visiting clients. One contended that they could make money on the apartment if, as she said, "they could put a client in the apartment everyday of the year and charge them $500 a week. Multiply that by 52 weeks and the $26,000 would cover the rent." His associate cut him off by saying, "that sounds good, but you are using perfect math. I seriously doubt it if the apartment will be full each week."

Thus, the phrase perfect math means that it is based on false or inflated assumptions that pollute our decision. The numbers look rosy but the assumptions are casual.

Perfect math might be the claimant saying they will have to see the doctor x more number of times for y number of dollars or they will be off work for the next x number of weeks at y number of dollars. This makes assumptions they will in fact be off work and what their pay will be. Be very careful about making assumptions in the future based upon past or current circumstances. Circumstances change for the worst sometimes as for the better.

**8.  <u>When there is nothing to do, do it brilliantly.</u>**

I have mentioned patience before and this is what I am talking about now. Patience may be the most vital negotiating skill, in its absence, the most deadly error. The best example is that you have made an offer and the claimant has not accepted it and you take that to mean it is rejected and for some unknown reason you rush in and increase your offer to see what they will take. Be patient. Wait for a response in terms of a counter. Be patient, the old phrase "don't bid against yourself".

22

Confidential Information of GEICO Companies
© Government Employees Insurance Company

GTM01403

THE THEORY AND PRACTICE OF THINKING BIG:

As I mentioned earlier on, the one overriding and overall principal should be to "think big". Again, by this I do not mean think big in terms of giving big money away. I mean to look at the big picture.

**A. Start high or start low, but do not start in between**.

Once again, if we view this as the seller/buyer transaction you are the buyer. Thus, always start low. I have touched on this before. Do not be afraid they will not like you when you make an outrageously or insultingly low offer, remember this is the low end of your authorization range. You can never go back down unless there is a drastic change of circumstances. You only go in one direction that is up. So start at the bargain basement.

**B. The "insulting offer" is not insulting.**

Remember this is the low end of your authorization range. You are in the business of handling claims. You probably have a much better idea than the claimant as to "what the case is worth". Thus, what you might consider to be "insultingly low" might be a lot of money to the other side. Keep in mind they can only say no. It is doubtful they will come out to your office and shoot you or set a car bomb. You do not know if it is insulting until you make the offer. If they act insulted do not say you are sorry but rather that was what the value was on the case. Urge them to come up with more information as to why you should make a higher offer.

**C. The first number is the most dangerous.**

I have touched on this before. The most dangerous number in any negotiation is the first dollar figure mentioned by either side. It is either the "dollar anchor" the high or low number that frames the entire discussion that follows. For example, if the claimant is asking $100 and you are truly prepared to pay $60 or for that matter $50. Start at $20 or $30. By increasing the distance between the other side and you, you have increased the amount of room you have to move on price. At the same time you have increased the room the other side has to move down.

23

Confidential Information of GEICO Companies
© Government Employees Insurance Company

GTM01404

ADVANCED TECHNIQUES TO ADVANCE YOUR SIDE OF THE
BARGAIN:

**How to break an impasse.**

We have all been there. There is simply no further movement. They are no coming down off their last demand. Here are a couple of ways to try and break the impasse.

**1. <u>Change the players</u>.**
This may sound extreme but it may be simply a matter of personality. Have a co-worker look at the file or better yet deal on the telephone with the claimant or if you have met already have someone else do it. The impasse may be because of who is doing the negotiation as opposed to the subject matter.

**2. <u>Bring in a mediator.</u>**
There is such a thing as pre-suit mediation. There are no rules that say you cannot have a third-party neutral to help implement a settlement. It may be worth it for the insurance to agree to give the claimant or opposing counsel a list of three names or so to sit down and mediate the suit before a lawsuit is filed. If the claimant has an attorney, suggest that both sides pay the mediation fee. Maybe it should simply be a half-day mediation. Again, this is when you have reached an impasse and there is no further movement. Not only is it a change of personalities but you have the neutral like mediator to bring his or her talent to the table to break the impasse.

**3. Turning concessions into victories.**

At some point you will be expected to make a concession. There is nothing wrong with that but keep in mind negotiation is after all, give and take. Giving in is simply part of the drill to get what you want. The trick is to concede the negotiating point and recognize it as a golden opportunity to get something greater in return. There are basically three approaches to concede a point in a negotiation.

**4. <u>Concede but get nothing in return.</u>**
If a contractor is renovating your house and asks for a thirty day extension, you would not simply grant it without getting something in return. If you do grant it without something in return that is what I am talking about. It is the path of least resistance. You have made the other side happy. Other than gaining good will what do you have to so for it?

**5<u>. Concede but only for something of equal value.</u>**
In a business transaction the buyer may want better payment terms and in return the seller says he will agree to such if the buyer will place a bigger order. The buyer wants a reduced price, the seller wants a commitment today.

24

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

The examples could go on and on. The point is that if you make a concession and give up a certain number of dollars think of something of equal value to get in return.

**6. <u>Concede but get more in return.</u>**

This is the perfect negotiation from your point of view. Sometimes people equate the value of a concession with how hard they had to work for it. In truth, the cost is the same no matter how long it took to get there. Always think of what you can get in return by making your concession. Your concession will have to be to go up on your offer. See if you can not always couch it in terms of I will go up to x if you will do y.

**7. <u>The right to say yes is very valuable.</u>**

Once again with the buyer/seller analogy the seller is saying, "You can have this product for x dollars." That is a stronger position than the seller saying, "What will you give me for this?" By doing that the seller gave up the right to say yes.

In your situation, you must always say I am willing to pay x to get this claim settled not asking "What do you want for your claim?" You set the parameters. You say what you are willing to pay. Do not turn it over to them for you to respond to.

CONCLUSION

Without doubt every one of you have heard or used these principals either consciously or unconsciously in your career. Hopefully, I have added to your arsenal of weapons to use in negotiation. If you do not remember anything else I say today, remember to have fun in the sport of negotiating. It is what you do for a living. The better your competition, the more exciting it is.

The idea is to be fair but that means fair to both sides. Who can argue with "playing on a level playing field". Who knows one of these days it might be you negotiating the next set of endorsement rights for Tiger Woods or that high school athlete you know who goes on to college, maybe even your son or daughter when they decide to turn pro. I promise before this day is over you will be negotiating with someone about something. I know I will. That's right. Negotiating with my wife as to whether I can sleep on my back or my left side. Thank you very much for your time and attention.

25

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

GTM01406

# <u>TCR2 Final Exam Study Guide</u>

1. What is GEICO's Claims Mission Statement?


2. Explain "contribution" as it relates to the Insured and to GEICO.

      a.  GEICO –


      b.  The Insured –


3. Excluding "other", list the two acceptable reasons for bypassing ClaimIQ?


4. Define/describe the following:

      a.  Latent Defect –


      b.  Inherent Defect –


      c.  Disclaimer of coverage –


      d.  Denial of coverage –

26

Confidential Information of GEICO Companies
& Government Employees Insurance Company

e.  Bailor/Bailee –

f.  General damages –

g.  Special damages –

h.  Negligent entrustment –

i.  Assumption of risk –

j.  Feres doctrine –

k.  Open end release –

l.  Release and Trust agreement –

m. Exacerbation of a pre-existing injury –

27

Confidential Information of GEICO Companies
© Government Employees Insurance Company

GTM01408

5. Describe how the below circumstances affect your evaluation of a BI claim.

    a.   Collateral Source –

    b.   Did the claimant mitigate their damages –

    c.   Limit of Liability – Coverage limits –

    d.   No-fault Threshold(s) properly pierced –

    e.   Ability of defense counsel –

    f.   Contribution from insured or adverse carrier –

    g.   Venue –

    h.   Plaintiff counsel reputation –

    i.   Aggravated negligence or circumstances –

    j.   Appearance/Impression of our insured and claimant-

28

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

6. When do you use the 'CBP' in ClaimIQ?

7.  True/False – Should/Can you make an offer below YOUR evaluation of the claimant's BI claim?

8.    What do the initials 'SPR' represents and what are the four categories that are reviewed?

      a.

      b.

      c.

      d.

9.  True or False?  You are required to begin your negotiations at the lowest amount of your evaluation.

      Why or Why not?

10.  List and describe the four factors that ClaimIQ uses to determine a recommended pain and suffering settlement range?

29

Confidential Information of GEICO Companies
© Government Employees Insurance Company

11. Describe the spinal disc components listed below

    a.  Annulus Fibrosis-

    b.  Nucleus Pulposus-

    c.  Thecal Sac-

    d.  Spinal Nerve Root –

12. List in order the five regions of the spinal column and the number of vertebrae in each region.

    a.

    b.

    c.

    d.

    e.

13. Describe the spinal disc maladies listed below;

    a.  Schmorls's Nodule

    b.  Spondylosis

Confidential Information of GEICO Companies
© Government Employees Insurance Company

    c.  Hyperlordosis

    d.  Spondylolisthesis

    e.  HNP

    f.  Disc Bulge with impingement

    g.  Anterior disc protrusion

14.  What are the three factors that every adjuster is required to review each time he/she is evaluating a claim?

15.  List and describe the four phases of negotiations?

    a.

    b.

    c.

    d.

31

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

16. What are adjusters required to document in ClaimIQ record exchange?

17. Define the following types of fractures:

    a. Compound-

    b. Open-

    c. Displaced-

    d. Non-displaced

    e. Transverse

    f. Green-stick-

    g. Compression-

    h. Avulsion-

32

Confidential Information of GEICO Companies
© Government Employees Insurance Company

GTM01413

18.  Making an offer to settle a claim for an amount well below what the claim is worth is an example of?

19.  List three items that put GEICO on "constructive notice" of a Medicare lien and what should we do?

       a.
       b.
       c.

20.  When would you enter an offset in ClaimIQ?

21.  Define Impact on Lifestyle?  How would you determine it?

22.  What does the BI excess letter do?  When should it be sent out?

23.  Explain the concept of Joint Endeavor:

33

GTM01414

24.  What are the four elements for the application of Bailment?

25.  What is the Waddell  Sign?



34

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

# Post School (Transition) Phase

## TCR2 Central School Curriculum

The Post School phase of your TCR2 training is transition and will be held in your profit center. This phase will last two weeks. The first day and a half will be classroom instruction, followed by "desk work" on the afternoon of the second day.

The cornerstone of the transition phase will be a limited pending, which you will work and be given new files. You will be given the files after your trainer has instructed you on regional and state specific laws along with handling procedures. You will be given your "new loss" at the end of the second day along with a new transfer file. For the next two weeks, you will work your pending and be given new files.

During this time your trainer will be there to coach and instruct on any additional topics and answer any questions. Your trainer will also be responsible for performing SPR audits and monitoring your calls. Feedback will be provided to you by your trainer. It is our expectation that by the tenth day of training you will have obtained **two** "A" calls and **two** "A" files on an SPR review.

Attached you will find an outline of the daily transition phase activities.

35

**Confidential Information of GEICO Companies**
**© Government Employees Insurance Company**

Trainer:

| | Trainer initials | Trainee initials | Notes |
|---|---|---|---|
| **Part A - Regional Specifics** | | | |
| Reviewed associate performance goals | | | |
|   Explained how goals are measured | | | |
|   Explained how to achieve the goals | | | |
| Reviewed cost containment procedures (SIU, minimal impact etc.) | | | |
| Reviewed system generated, dictated & form letters used | | | |
| Reviewed state specific laws, statutes, regulations, & procedures | | | |
|   Reviewed regional TIP goals | | | |
|   Reviewed BI features and procedures for opening | | | |
|   Reviewed recent Bad Faith claims | | | |
|   Reviewed regional infant settlement procedures | | | |
|   Reviewed liens and Assignment of Benefits | | | |
|   Reviewed regional threshold requirements | | | |
|   Reviewed Dram Shop laws and recent cases | | | |
|   Reviewed BI/UM offsets | | | |
|   Reviewed stacking options available in each state | | | |
|   Reviewed the "A" call CD Rom | | | |
|   Reviewed regional phone call guidelines | | | |
|   Reviewed regional walk away settlement procedures | | | |
|   Reviewed family exclusions/immunity defenses | | | |
|   Secured authority cards and explained limits | | | |
|   Obtained desk codes for the trainees | | | |
| Reviewed general operating procedures such as | | | |
|   Reviewed ADR | | | |
|   Reviewed Field Liability Representative assignments | | | |
|   Reviewed Releases/Release and Trust agreements | | | |
|   Reviewed procedures on obtaining medical records | | | |
|   Reviewed regional PIP payment recovery guidelines | | | |
|   Reviewed procedures for opening new & transfer files | | | |
|   Reviewed guidelines for transferring files to CU | | | |
| **Part B - Trainee has shown the ability to** | | | |
| Take recorded interviews (injury, liability, & coverage) | | | |
| Organize day and prioritize tasks | | | |
| Properly document activity log and ClaimIQ | | | |
| Properly refer a case to ADR (regional specific) | | | |
| Properly negotiate a BI settlement | | | |
| Has obtained two "A" calls | | | |
| Has obtained two "A" file SPR's | | | |

36

Confidential Information of GEICO Companies
© Government Employees Insurance Company

GTM01417

## TCR2 Region Specific/Post School Questions



Use this form to record Regional or State-Specific questions from your training to
address in Post-School with your Regional Claims Trainer.

Confidential Information of GEICO Companies
© Government Employees Insurance Company

GTM01418





# Student

GTM00644



GTM00645



GTM00646